**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, TELEPHONE AND DATA SYSTEMS, INC., LEROY T. CARLSON, JR., PETER L. SEREDA, and VICKI L. VILLACREZ, <br><br> Defendants. | JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

1.      Plaintiff Howard M. Rensin, Trustee of The Rensin Joint Trust ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by United States Cellular Corporation ("UScellular," or the "Company,") and Telephone and Data Systems, Inc. ("TDS, collectively with the Company, the "Companies"), as well as regulatory filings and reports, securities analyst reports and advisories by the Companies, press releases and other public statements issued by the Companies, and media reports about the Companies. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired TDS securities between May 6, 2022 and November 3, 2022, inclusive (the

1

"Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against the Companies and certain of their executive officers and directors.

3.      At all relevant times, UScellular operated as a majority-owned subsidiary of TDS. As of December 31, 2022, TDS owned 84% of UScellular's common shares, had the voting power to elect all of the directors of UScellular, and controlled 96% of the voting power in matters other than the election of directors of UScellular. In 2022, UScellular accounted for 77% of TDS' total operating revenues.

4.      Throughout fiscal 2021 and into fiscal 2022, UScellular was battling a systemic loss of "postpaid" customers. Postpaid customers are those who have a line of service with the Company that is billed in monthly installments, generally one month in advance of service. Throughout the Class Period, approximately 90% of the Company's individual lines of service associated with devices activated by UScellular customers were postpaid. UScellular's net postpaid customers declined every quarter throughout 2021, resulting in the loss of 26,000 customers over the year. Likewise, UScellular's churn rate of postpaid customers increased over the same period.

5.      At the outset of the Class Period on May 6, 2022, the Companies announced UScellular's financial and operating results for the first fiscal quarter of 2022, including that UScellular was losing more "postpaid" customers than it was able to add, resulting in a net loss of postpaid customers. Throughout the Class Period, the Companies would continue to see UScellular's postpaid customer business deteriorate.

6.      In response, Defendants routinely touted UScellular's purported ability to address postpaid customer "churn" and attrition via tailored promotions, including a "free upgrade"

promotion beginning in the second quarter of 2022. The "free upgrade" promotion applied to new and existing customers and was designed to encourage customers to upgrade their phones, keeping them "in contract" and reducing the postpaid customer churn. This promotion was reportedly based on the results of a series of regional tests and trials conducted during the second quarter of 2022. Defendants also touted their ability to balance UScellular's promotional activity with UScellular's profitability.

7.      For example, Defendants confirmed their continued "focus on churn with our customers" and the Company's then-present "*flexibility to raise prices, if we need to*" and "*flexibility to adjust, if we need to*." Defendants reported they have "*done a really good job of it, to strike a balance between subscriber results and financial results*."

8.      Defendants also touted the ability of UScellular's "*free upgrade*" promotion to "meaningfully address a number of the subscriber challenges that we identified earlier in the year," and reported that "so far, we're pleased with the results […] and we expect that upgrade activity to result in improved churn downstream." Defendants reiterated "*that offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions*."

9.      However, contrary to Defendants' statements assuring investors that tailored promotions and purported expense discipline would address UScellular's churn rate while balancing its profitability, UScellular's churn rate continued to worsen and the Company's promotional activity decimated its profitability.

10.      On November 4, 2022, Defendants finally disclosed the full truth when reporting operating results for the third fiscal quarter of 2022. Defendants' corrective disclosures revealed that, not only was UScellular's heavy promotional activity, including its "free upgrade" promotion,

still failing to correct postpaid churn rate, but that the "offer structure" and its lack of "expense discipline" had, in fact, substantially eroded the Company's profitability. On this news, the price of TDS securities plummeted as the artificial inflation caused or maintained by Defendants' misstatements was removed from the price of TDS' securities. TDS' common stock price declined $4.29 per share (more than 25%), from a closing price of $16.57 per share on November 3, 2022, to a close of $12.28 on November 4, 2022. TDS' preferred shares trading under the symbol TDSPrV declined $0.96 per preferred share (more than 5%), from a closing price of $17.20 per preferred share on November 3, 2022, to a close of $16.24 on November 4, 2022. TDS' preferred shares trading under the symbol TDSPrU also declined $1.01 per preferred share (more than 5%) over the same period.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

13.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. UScellular and TDS are both headquartered in this District, with UScellular's

4

principal place of business located at 8410 West Bryn Mawr, Chicago, Illinois 60631 and TDS' principal place of business located at 30 North LaSalle Street, Suite 4000, Chicago, Illinois 60602.

## PARTIES

15.     Plaintiff Howard M. Rensin, Trustee of The Rensin Joint Trust, purchased TDS securities during the Class Period and was damaged thereby as set forth herein, and as set forth in his certification filed herewith.

16.     UScellular is a corporation, organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. Its common stock trades on the New York Stock Exchange ("NYSE") and is traded under the symbol "USM."

17.     TDS is a corporation, organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. Its common stock trades on the NYSE and is traded under the symbol "TDS." TDS' preferred shares also trade on the NYSE under the symbols "TDSPrV" and "TDSPrU."

18.     At all relevant times, Defendant Laurent C. Therivel served as President, Chief Executive Officer ("CEO") & Director of UScellular. During the class period, Defendant Therivel also served as Director of TDS.

19.     At all relevant times, Defendant Douglas W. Chambers served as Executive Vice President ("Executive VP"), Chief Financial Officer ("CFO"), and Treasurer of UScellular.

20.     At all relevant times, Defendant LeRoy T. Carlson, Jr. served as the President and CEO of TDS. During the class period, Defendant Carlson also served as chairman of the board of UScellular.

21.     Defendant Peter L. Sereda served as the Executive VP and CFO of TDS during the class period until his termination on May 24, 2022.

22.     During the class period, Defendant Vicki L. Villacrez served as Executive VP and CFO from Defendant Sereda's termination on May 24, 2022 through present. During the class period, Defendant Villacrez also served as a director of UScellular.

23.     Defendant Therivel, Defendant Douglas, Defendant Carlson, Defendant Sereda, and Defendant Villacrez  are collectively referred to herein as "Individual Defendants."

24.     The Companies and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

25.     By reason of the Individual Defendants' positions with the Companies as executive officers, the Individual Defendants possessed the power and authority to control the contents of the Companies' annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Companies' reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Companies, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### I.     UScellular Background

26.     UScellular is a wireless telecommunications service provider that purportedly operates in 21 states that collectively represent a total population of 32 million. UScellular claims

to provide service to 4.7 million "retail connections" which it defines as individual lines of service associated with each device activated by a postpaid or prepaid customer. All of UScellular's wireless operating markets are in the United States.

27.     UScellular purportedly offers a variety of wireless services to consumer, business, and government customers. Customers can obtain wireless services on a postpaid or prepaid basis. UScellular reports that approximately 90% of retail connections were postpaid connections of as December 31, 2022. Whereas UScellular's prepaid service enables individuals to obtain services without credit verification by paying for all services in advance, a postpaid connection represents an individual line of service for a device for which a customer is generally billed one month in advance for a monthly access charge in return for access to UScellular's network services.

28.     UScellular tracks and monitors changes to its gross and net postpaid customers on at least a quarterly basis. Relatedly, UScellular uses a churn rate metric to track its loss of postpaid customers, which represents the percentage of its connections that disconnect service each month out of the Company's total connections in a given month. UScellular also separately tracks the postpaid churn rate of handsets (for example, cellular phones) and connected devices, which are non-handset devices that connect directly to the UScellular network, including tablets, wearables, modems, and hotspots. TDS tracks this same data relating to UScellular's postpaid customers and postpaid churn rate. Furthermore, Defendants admit that UScellular tracks other metrics "fairly closely[,]" such as the ratio of gross adds to voluntary defects.

## II.    TDS Background and Control Over UScellular

29.     TDS has two business segments: UScellular and TDS Telecommunications LLC ("TDS Telecom"), a provider of broadband, video, and voice services and a wholly-owned subsidiary of TDS. As of December 31, 2022, TDS purportedly provides communications services

through UScellular to customers with 4.7 million retail wireless connections and through TDS Telecom to customers with 1.2 million broadband, video, and voice connections.

30.     TDS conducts all of its wireless operations through its majority-owned subsidiary, UScellular. As of December 31, 2022, TDS reported that 77% of its operating revenues was from UScellular, versus only 19% from TDS Telecom and 4% from its other operations. As of December 31, 2022, TDS' reported 62% of its gross investment in property, plant, and equipment was at UScellular, totaling $9,334 million, versus only 36% at TDS Telecom and 2% elsewhere.

31.     As of December 31, 2022, TDS owned 84% of the combined total of the outstanding common shares and Series A common shares of US cellular and controlled 96% of the combined voting power of both classes of US cellular common stock. TDS has the voting power to elect all of the directors of UScellular and controls 96% of the voting power in matters other than the election of directors of UScellular. As of December 31, 2022, seven of the thirteen directors of UScellular were also directors of TDS and/or executive officers of TDS and/or UScellular.

32.     TDS operations also include the operations of its wholly-owned hosted and managed service subsidiary ("HMS"), which operates under the OneNeck IT Solutions brand, and its wholly-owned subsidiary Suttle-Straus, Inc. As reported in TDS' Annual Report for the fiscal year ended December 31, 2021, filed on Form 10-K with the SEC on February 17, 2022 ("TDS 2021 Form 10-K"), "HMS' and Shuttle-Straus' financial results were not significant to TDS' operations."

33.     As a result of TDS' ownership of UScellular's common shares, TDS is effectively able to elect all of UScellular's directors and otherwise control the management and operations of UScellular. During the class period, UScellular and TDS shared much of the same senior

leadership. For example, Defendant Therivel served as both CEO and director of UScellular and a director on TDS' board. Defendant Chambers served as both Executive VP, CFO, and treasurer of UScellular and previously served as Senior Vice President – Finance and Chief Accounting Officer of TDS, among other TDS roles. Defendant Villacrez served as both Executive VP and CFO of TDS and director of UScellular. Defendant Carlson served as both the Chair of UScellular and the president and CEO of TDS. Additionally, Anita J. Kroll served as the Chief Accounting Officer of both UScellular and TDS. Furthermore, throughout the Class Period, every quarterly earnings call presented by TDS and USM were joint calls, as the business operations of USM were also the business operations of TDS.

### III. Prior to the Class Period, UScellular Continually Lost Net Postpaid Customers Despite Running Promotions to Combat Customer Turnover

34.     Over the course of fiscal 2021, the Companies reported a net loss of UScellular's total prepaid customers every quarter. During this period, UScellular lost 26,000 postpaid customers, from 4,406,000 postpaid customers at the end of the first fiscal quarter of 2021 to 4,380,000 postpaid customers at the end of the fourth fiscal quarter of 2021.

35.     Despite adding new postpaid customers each quarter, UScellular's net postpaid customers continued to decline each quarter throughout 2021 because UScellular was losing more postpaid customers than it could add in any given quarter.

36.     Throughout fiscal 2021, the Companies reported an overall increase in UScellular's postpaid churn rate, as depicted in Figure 1, below. UScellular's postpaid churn rate also increased in the second, third, and fourth quarters of 2021 over the same periods of 2020.

**Figure 1**[12]



37.    During this same time period, the Companies also reported an overall increase in postpaid churn rate with respect to handsets, as depicted in Figure 2, below. UScellular's postpaid handset churn rate also increased in the second, third, and fourth quarters of 2021 over the same periods of 2020.

---

[1] Churn rate in Figures 1 and 3 represents the postpaid churn rate of both handsets and connected devices.
[2] Unless otherwise stated, all figures are compiled from data stated in the Companies' respective quarterly filings.

**Figure 2**



38.     On August 6, 2021, Defendants held an earnings call to discuss the Companies' financial and operatring results for the second quarter of 2021. During the August 6, 2021 earnings call, Defendant Chambers discussed UScellular's rising postpaid churn rate during that quarter, stating, in part:

> Postpaid handset churn, depicted by the blue bars, was 0.88%, up from 0.71% a year ago. **This was driven by voluntary churn, which continues to run at higher year-over-year as a result of increased switching activity and aggressive industry-wide competition.** Total postpaid churn, combining handsets and connected devices, was 1.11% for the second quarter of 2021, higher than a year ago as we have also seen churn increase on connected devices due to certain business and government customers disconnecting devices that were activated during the peak periods of the pandemic in 2020.

39.     During this earnings call, Defendant Therivel and Defendant Chambers also acknolwedged that the "competitive environment" and competitors' "aggressive promotions" impacted postpaid results for the quarter. In response, Defendant Therivel explained that the

Company was likewise making "some very aggressive offers" and assured investors that "we are maintaing our focus on profitable growth, and we're leveraging our regionally focused strategy to test different offers to help us hone in on the right balance between subscriber growth and profitability."

40. On November 4, 2021, Defendants held an earnings call to discuss the Companies' financial and operating results for the third quarter of 2021. Despite UScellular's prior promotional activity, during the November 4, 2021 call, Defendants again reported an increased churn rate due to aggressive industry-wide competition, stating:

> Postpaid handset churn, depicted by the blue bars, was 0.95%, up from 0.88% a year ago. **This was driven by voluntary churn, which continues to run higher year-over-year as a result of increased switching activity and aggressive industry-wide competition.** Involuntary churn also increased slightly in the quarter but is still below pre-pandemic levels. Total postpaid churn, combining handsets and connected devices, was 1.15% for the third quarter of 2021, higher than a year ago as we've also seen churn increase on connected devices due to certain business and government customers disconnecting devices that were activated during the peak periods of the pandemic in 2020.

41. During that same earnings call, Defendant Therivel again discussed "aggressive" promotions and assured investors that UScellular had "effectively leveraged that regional strategy to test a variety of different offers and to help us hone in on an approach **that properly balances subscriber growth with profitability**."

42. On February 18, 2022, Defendants held an earnings call to discuss the Companies' financial and operating results for the fourth quarter of 2021. Despite UScellular's prior promotional acitivty, during the February 18, 2022 earnings call, Defendant Chambers again noted the rising postpaid churn of handsets was due, in part, to widespread competition:

> Next, let's turn to the postpaid churn rate shown on Slide 12. Postpaid handset churn was 1.10%, up from 1.01% a year ago. **This was driven primarily by voluntary churn, which continues to run at higher year-over-year -- continues to run at higher year-over-year as a result of increased switching activity and aggressive**

**industry-wide competition.** Involuntary churn also increased slightly in the quarter.

Total postpaid churn, combining handsets and connected devices, was 1.35% for the fourth quarter of 2021, higher than a year ago due to the higher handset churn and certain business and government customers disconnecting connected devices that were activated during the peak periods of the pandemic in 2020.

43. Thus, leading up to the Class Period, UScellular experienced persisting and worsening customer churn, and suffered anemic postpaid subscriber growth.

## IV. During the Class Period, Defendants Execute UScellular's Most Aggressive Promotion Ever To Attempt Churn Improvement and Increase Postpaid Customer Connections

44. In response to analyst questioning concerning the churn rate during the Companies' February 18, 2022 earnings call, Defendant Therivel touted the ability of new promotions coming in the second quarter of 2022 to address UScellular's churn rate, stating, in part:

**Philip A. Cusick**
*JPMorgan Chase & Co, Research Division*

[…] And then for LT, clearly UScellular churn is being pressured by more competition. Do you assume that this continues and how do you hit your ROI estimates on this new spectrum and CapEx in this kind of environment?

**Laurent C. Therivel**
*President, CEO & Director*

So, Phil, when I think about how to hit those targets, I talked about, I'd point you to a couple of levers. I think the first when you look at our postpaid business -- postpaid consumer, we have to continue to do better. But our share of gross adds has actually been quite strong last year, and particularly in Q4. So it's really a churn story. **And the churn dynamic is going to be affected by the upgrade promotions. We're going to be launching a new approach to upgrades in the second quarter, just driven by personalization engine we've been investing in. And so soon, right, you'll see what I would call, mass upgrades. And so that has more to do with simply having more aggressive upgrade promotions for the entire market.**

45. In particular, UScellular launched a new promotion in June of 2022 that was "any phone free for anyone," which applied to new and existing customers and which was designed to

encourage customers to upgrade their phones, keeping them "in contract" and reducing the postpaid customer churn. This promotion was reportedly based on the results of a series of regional tests and trials conducted during the second quarter of 2022. As a result of such testing and trials, during and throughout the Class Period, Defendants understood the impact that the Company's "any phone free" plan would have on profitability.

46.     As set forth more fully *infra*, during the class period, the Companies made materially false and misleading statements to investors concerning UScellular's ability to reduce its churn rate while balancing profitability via its promotional activity, including its "free upgrade" promotion. Contrary to Defendants' representations, despite UScellular's heavy promotional activity, including its "free upgrade" promotion, UScellular's postpaid churn rate actually *increased* while the promotional costs decimated its profitability.

## V.     Defendants' Material Misrepresentations and Omissions

47.     On May 5, 2022, after market close, UScellular filed its quarterly report for the first quarter of 2022 on Form 10-Q Q1 ("UScellular Q1 2022 Form 10-Q"), signed by Defendants Therivel and Chambers, discussing risk factors that had already materialized and were ongoing:

> In recent periods, wireless service providers have increased promotional aggressiveness to attract new customers and retain existing customers. ***Operating revenues and Operating income may be negatively impacted in future periods by the competitive need to offer increased promotional discounts to new and existing customers.***

*UScellular Q1 2022 Form 10-Q*, at 7.

48.     The UScellular Q1 2022 Form 10-Q additionally contained operational risk factors that had already materialized and were ongoing:

> ▪ ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect UScellular's revenues or increase its costs to compete.***
>
> […]

14

▪ ***Changes in various business factors, including changes in demand, consumer preferences and perceptions, price competition, churn from customer switching activity and other factors, could have an adverse effect on UScellular's business, financial condition or results of operations.***

*UScellular Q1 2022 Form 10-Q*, at 17.

49.     The UScellular Q1 2022 Form 10-Q also incorporates risk factors contained in its Annual Report for the fiscal year ended December 31, 2021 filed on Form 10-K with the SEC on February 17, 2022 ("UScellular 2021 Form 10-K"), stating that it "has not identified for disclosure any material changes to the risk factors as previously disclosed in [the UScellular 2021 Form 10-K]." *UScellular Q1 2022 Form 10-Q*, at 19. The UScellular 2021 Form 10-K contains several materially false and misleading risk factors, including:

1) ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect UScellular's revenues or increase its costs to compete.***

Competition in the wireless industry is intense and is expected to intensify in the future due to multiple factors such as increasing market penetration, introduction of new products, new competitors, increasing promotional aggressiveness and changing prices. There is competition in service plan pricing; handsets and other devices; promotional discounts; network quality, coverage, speed and technologies, including 5G technology; distribution; new entrants; bundled services and products, such as content; and other categories. ***In particular, wireless competition includes aggressive service plan and device pricing, including pricing for unlimited plans, which could result in switching activity and churn and limit UScellular's ability to monetize future growth in data usage.*** In addition, competition based on network speed may increase as customer demand for higher speeds increases. ***UScellular anticipates that these competitive factors may cause the prices for services and products to decline and the costs to compete to increase.***

*UScellular 2021 Form 10-K*, at 5.

6) ***Changes in various business factors, including changes in*** **demand, consumer preferences and perceptions,** ***price competition, churn from customer switching activity and other factors, could have an adverse effect on UScellular's business, financial condition or results of operations.***

***Changes in any of several factors could have an adverse effect on UScellular's business, financial condition or results of operations. These factors include, but are not limited to:***

[…]

▪ *Competitive pressure from promotional activity;*
▪ *The pricing of services, including an increase in price-based competition;*

[…]

▪ *Churn rates;*

*UScellular 2021 Form 10-K*, at 7-8.

50.     On May 6, 2022, TDS also filed its quarterly report for the first quarter of 2022 on

Form 10-Q Q1 ("TDS Q1 2022 Form 10-Q"), signed by Defendants Carlson and Sereda. In that

filing, TDS made the same materially false and misleading statements made in the UScellular Q1

2022 Form 10-Q:

In recent periods, wireless service providers have increased promotional aggressiveness to attract new customers and retain existing customers. ***Operating revenues and Operating income may be negatively impacted in future periods by the competitive need to offer increased promotional discounts to new and existing customers.***

*TDS Q1 2022 Form 10-Q*, at 10.

▪ ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect TDS' revenues or increase its costs to compete.***

[…]

▪ ***Changes in various business factors, including changes in demand, consumer preferences and perceptions, price competition, churn from customer switching activity and other factors, could have an adverse effect on TDS' business, financial condition or results of operations.***

*TDS Q1 2022 Form 10-Q*, at 26.

51.     The TDS Q1 2022 Form 10-Q also incorporates risk factors contained in the TDS

2021 Form 10-K, stating that it "has not identified for disclosure any material changes to the risk

factors as previously disclosed in [the TDS 2021 Form 10-K]." *TDS Q1 2022 Form 10-Q*, at 28.

The TDS 2021 Form 10-K contains several materially false and misleading risk factors, including:

1) ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect TDS' revenues or increase its costs to compete.***

Competition in the wireless industry is intense and is expected to intensify in the future due to multiple factors such as increasing market penetration, introduction of new products, new competitors, increasing promotional aggressiveness and changing prices. There is competition in service plan pricing; handsets and other devices; promotional discounts; network quality, coverage, speed and technologies, including 5G technology; distribution; new entrants; bundled services and products, such as content; and other categories. ***In particular, wireless competition includes aggressive service plan and device pricing, including pricing for unlimited plans, which could result in switching activity and churn and limit TDS' ability to monetize future growth in data usage.*** In addition, competition based on network speed may increase as customer demand for higher speeds increases. ***TDS anticipates that these competitive factors may cause the prices for services and products to decline and the costs to compete to increase.***

*TDS 2021 Form 10-K*, at 11.

6) ***Changes in various business factors, including changes in*** **demand, consumer preferences and perceptions,** ***price competition, churn from customer switching activity and other factors, could have an adverse effect on TDS' business, financial condition or results of operations.***

***Changes in any of several factors could have an adverse effect on TDS' business, financial condition or results of operations. These factors include, but are not limited to:***

[…]

▪ ***Competitive pressure from promotional activity;***
▪ ***The pricing of services, including an increase in price-based competition;***

[…]

▪ ***Churn rates;***

*TDS 2021 Form 10-K*, at 13-14.

52.     On May 6, 2022, the Companies held an earnings call to discuss the Companies' financial and operating results of the first quarter of 2022. Defendants Therivel, Chambers, and Sereda participated in that call. During the call, Defendant Therivel touted UScellular's

"flexibility" to adjust pricing on its promotions to address profitability, and underscored the Company's "continue[d]" "focus on churn":

> So what else are we seeing? It's really been a very aggressive upgrade environment. Particularly from AT&T. Verizon has matched that. And so we really have to focus on 2 things. One is [ add lines ] and the other one is we've got to ***continue to focus on churn with our customers***.[3] And you'll notice I talked about the announcement we're going to be putting out there about not raising prices on any of our customers, postpaid or prepaid, until at least the end of 2023. And we think it's the right thing to do. I think customers are looking for certainty. And given the position of telecom and the overall in economic conditions, right, telecom. There is a recession, we enter it late and we exit early so I think we're relatively insulated.

> That being said, if we do see really high levels of inflation, ***we do have the flexibility to raise prices, if we need to, on new customers, or we can always require new rate plans, if you want to qualify for device promotions. So we still have flexibility to adjust, if we need to***, but we think it's the right thing for customers. ***And we think it will be very attractive for bringing down churn***. We also have a couple of other plans that we're going to be rolling out later in the quarter to address the churn problem. ***So I'm optimistic in our ability to address churn while we continue to improve gross adds***.

53.     In response to analyst questioning during that same earnings call, Defendant Chambers downplayed the risks promotions posed to margins and emphasized the Company's continued efforts to reduce costs:

> **Sergey Dluzhevskiy**
> *GAMCO Investors, Inc.*

> Great. And my last question is for Doug on the guidance and cost savings opportunities. So I think the midpoint of your EBITDA guidance implies about 200 basis points, a little less, of margin pressure compared to actual 2021 results.

> And I guess my question is, what are some of the things that you are doing to take costs out of the business right now to mitigate some of those pressures? And maybe over a longer -- maybe a 2- to 3-year horizon, what are some of the cost-cutting efficiency initiatives that you are pursuing and how meaningful they could be over time? What are some of the larger buckets of those cost-efficiency opportunities?

---

[3] Allegedly false and misleading statements are designated by bolded italics. Other statements are included for context.

**Douglas W. Chambers**
*Executive VP, CFO, Treasurer & Director*

[….]When you look at our margins in 2017 as a percentage of service revenues, they were in the 22s, they steadily increased to in excess of 28% in 2020. Now in 2021, a little step backward because of all the dollars we had to invest in promo, ***but we're still making progress on this cost.***

54.     Also in response to analyst questioning during that same earnings call, Defendant Therivel announced that the Company struck a balance between subscriber and financial results and was positioned to further address churn:

**Richard Hamilton Prentiss**
*Raymond James & Associates, Inc., Research Division*

Makes sense. And one more back to LT on the switcher pool but for postpaid. What are you seeing as far as the upgrade market out there? I don't know if you reported what's your percent was, but how does that look like? It's trending. It used to be iconic devices would spike it a little bit, but that's really kind of [indiscernible]. So what was your upgrade number and where do you see it heading?

**Laurent C. Therivel**
*President, CEO & Director*

[….] And so finally, we have -- we believe we have an opportunity to really dig in and invest now on the churn side. We tried over the last couple of quarters and ***we think we've done a really good job of it, to strike a balance between subscriber results and financial results.*** And when the industry has extremely aggressive upgrade offers out there, we've tried to make sure that we're driving positive ARPU and we're driving positive OCF, and we think we've done that.

We think we have an opportunity now to go invest substantively in churn and to bring churn down and ***to further improve that upgrade rate***. And that's what underpins the price protection guarantees that I talked about earlier on the call. And so we think there's an opportunity to really dig into that now and go on offense in that area. And so we're excited about that.

55.     On May 23, 2022, TDS presented at J.P. Morgan's 50th Annual Global Technology, Media and Communications Conference. In response to questions from analyst Philip A. Cusick with JPMorgan Chase & Co, Research Division, Defendant Carlson stated:

19

**Philip A. Cusick**
*JPMorgan Chase & Co, Research Division*

So despite that, and the industry is growing pretty substantially in the first quarter, **you lost postpaid phone subscribers.**

**LeRoy T. Carlson**
*President, CEO & Director*

Right.

**Philip A. Cusick**
*JPMorgan Chase & Co, Research Division*

And so the -- he's had a couple of years of changing things and addressing -- getting toward addressing some of these new markets, and yet **your churn is higher than it's been in quite a while, and relative to your peers, higher as well**.

**LeRoy T. Carlson**
*President, CEO & Director*

Yes. So let me speak to that. What the primary driver of that loss in postpaid customers in the first quarter was the increase in churn that you mentioned, Phil. And we believe the increase in churn is due to the fact that most companies have aggressive offers for new customers, okay? And U.S. Cellular is among them.

U.S. Cellular did not have as aggressive an offer for existing customers as the other companies in the industry had. So we believe that our customers left us because they were not having as nice an offer for upgrading their phones as our competitors had. ***And we're going to be investing in that upgrade rate, increasing our upgrade rate, investing in churn, as LT said recently that we want to reduce that churn, Phil, and get it back to where it was 6 months ago or so when it was meaningfully lower than what it is now.***

56.     On August 4, 2022, after market close, UScellular announced its financial and operating results for the second quarter of 2022. In that announcement, Defendant Therivel stated that "***we are seeing promising early results from our recent moves in the marketplace, including our rate plan guarantee and our existing-same-as-new offers***."

57.     On August 4, 2022, after market close, UScellular filed its quarterly report for the second quarter of 2022 on Form 10-Q Q2 ("UScellular Q2 2022 Form 10-Q"), signed by

Defendants Therivel and Chambers, discussing potential risks that had already materialized and were ongoing:

> In recent periods, wireless service providers have increased promotional aggressiveness to attract new customers and retain existing customers. ***Operating revenues and Operating income may be negatively impacted in future periods by the competitive response to offer increased promotional discounts to new and existing customers.***

*UScellular Q2 2022 Form 10-Q*, at 7.

58.     The Q2 2022 Form 10-Q additionally contained operational risk factors that had already materialized and were ingoing:

> ▪ ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect USCellular's revenues or increase its costs to compete.***
>
> […]
>
> ▪ ***Changes in various business factors, including changes in demand, consumer preferences and perceptions, price competition, churn from customer switching activity and other factors, could have an adverse effect on USCellular's business, financial condition or results of operations.***

*UScellular Q2 2022 Form 10-Q*, at 17.[4]

59.     On August 4, 2022, after market close, TDS also filed its quarterly report for the second quarter of 2022 on Form 10-Q Q2 ("TDS Q2 2022 Form 10-Q"), signed by Defendants Carlson and Villacrez. In that filing, TDS made the same materially false and misleading statements made in the UScellular Q2 2022 Form 10-Q:

> In recent periods, wireless service providers have increased promotional aggressiveness to attract new customers and retain existing customers. ***Operating revenues and Operating income may be negatively impacted in future periods by the competitive response to offer increased promotional discounts to new and existing customers.***

*TDS Q2 2022 Form 10-Q*, at 10.

---

[4] UScellular again incorporated its materially false and mislead risk factors contained in its UScellular 2021 Form 10-K at 5, 7-8. *UScellular Q2 2022 Form 10-Q*, at 21.

▪ ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect TDS' revenues or increase its costs to compete.***

[…]

▪ ***Changes in various business factors, including changes in demand, consumer preferences and perceptions, price competition, churn from customer switching activity and other factors, could have an adverse effect on TDS' business, financial condition or results of operations.***

*TDS Q2 2022 Form 10-Q*, at 28.[5]

60.    On August 5, 2022, the Companies held an earnings call to discuss their financial and operating results of the second quarter of 2022. Defendants Therivel, Chambers, and Villacrez participated in that call. During the call, Defendant Therivel reassured investors that, based on regional testing and trials done during the second quarter of 2022, the Company's "free upgrade" promotion, while having little impact over the second quarter, was meaningfully addressing UScellular's churn, and that the Company was able to maintain expense discipline, allowing it to maintain its guidance despite aggressive promotions:

> As I detailed during that first quarter earnings call, we identified some specific areas of subscriber pressure where we saw opportunities to improve. And that was noticeably churn and add-a-line. And this led to a series of regional tests and trials during the second quarter. And as a result of those trials, we launched our new promotion in late June, and that was any phone free for anyone and that's for new and existing customers. Now because of the timing of when we launched this promotion, it had little impact on second quarter subscriber results*. **But we believe this will meaningfully address a number of the subscriber challenges that we identified earlier in the year. And while it's early, so far, we're pleased with the results.*** We've seen significant increase in add-a-line and upgrade activity, and ***we expect that upgrade activity to result in improved churn downstream***.

> And thanks to the trials that we ran**, *we're able to structure this offer in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable. And that offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions.*** In fact,

---

[5] TDS again incorporated its materially false and mislead risk factors contained in its *TDS 2021 Form 10-K* at 11, 13-14. *TDS Q2 2022 Form 10-Q*, at 28-30.

we're going to be maintaining all of our guidance, which Doug will discuss further later in the presentation.

[….]And so overall, I'm quite encouraged with the financial results in the quarter. Postpaid ARPU grew 5% year-over-year, and that represents by far one of the highest increases in the industry this quarter, and that's despite the headwind of a highly promotional environment. ***We also continue to maintain expense discipline across the organization, which has allowed us to launch some aggressive promotions and make investments in key growth areas of the business while still maintaining our operating cash flow guidance.*** I mentioned investing in growth areas and halfway through the year, we're seeing positive momentum in a number of those areas.

61.     In response to analyst questioning during the same earnings call, Defendant Therivel misleadingly touted the positive impact of the Company's recent promotional activity and its role in reducing churn:

**Richard Hamilton Prentiss**
*Raymond James & Associates, Inc., Research Division*

[…] Help us understand, is there the ability to get back to positive postpaid phone adds? And what does that take? Does it take larger switcher pool? Does it take lowering churn? Does it take more aggressive local offers. Just help us understand the path back to positive postpaid phone adds? […]

**Laurent C.  Therivel**
*President, CEO & Director*

Rick. I guess it's cheating to just say yes, yes, yes and yes and move on to the next question. So I'll try and give you a bit more color. But in general, it's everything you list. Do I see a price to -- do I see a path to positive consumer postpaid net adds? Yes, I do. What is it going to take? I think the biggest step that's going to take in the near term is churn improvement. When I look at voluntary churn, that's where we saw the majority of our pressure in the first quarter. ***And we -- the offer that we've launched here is specifically designed to address that.*** One of the things we saw as we -- over the past couple of years is we've seen a larger and larger percentage of customers that are out of contract. And out-of-contract customers churn at a substantially higher rate than in-contract customers. And so the goal is how do we get customers back into contract. And that was one way is with the offer that we put forward. ***We think it specifically addressed that issue, and we're seeing really good results.*** So we're seeing upgrades up substantively. We're seeing the ratio of voluntary defections to gross adds improve substantively. The other way that you're going to get to positive net adds on the growth side of the equation, and we were light on add-a-line. And so this offer specifically addresses the add-a-line

opportunity, and we're seeing add-a-line performance increase substantively. And so I think execution on this offer, continuation of the momentum that we're seeing, and then it has to translate into churn reduction, and that takes some time. But you don't see churn immediately dive, right? ***What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter***, and we'll see more benefit, hopefully, in the fourth quarter. [...] Finally, as you know, I mean, we don't operate in a vacuum. It is an aggressive competitive environment out there. But I see some opportunity. AT&T and Verizon both raised prices in the second quarter. We committed to our customers, we would not, and that is meaningful to them. And so we're seeing a lot of customers come into the store and specifically referenced that price guarantee as a reason for coming in. And by the way, that's before we even put television advertising behind it, which we didn't -- really didn't launch until July. ***So a lot of the momentum is positive. I'm optimistic that we're heading in the right direction.*** But what will it take to get to positive consumer net adds for the business as a whole, it's going to take all of that executing on all cylinders.

62.    On August 9, 2022, TDS filed a registration statement on Form S-3D ("TDS Registration Statement"), signed by Defendants Carlson and Villacrez, among others. In that filing, TDS restated materially false and misleading risk factors:

▪ ***Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect TDS' revenues or increase its costs to compete.***

[...]

▪ ***Changes in various business factors, including changes in demand, consumer preferences and perceptions, price competition, churn from customer switching activity and other factors, could have an adverse effect on TDS' business, financial condition or results of operations.***

*TDS Registration Statement*, at 10.

63.    The statements in paragraphs ¶¶47-62 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had no reason to believe UScellular's "free upgrade" promotional activity, which was tested and trialed during the second quarter of 2022,

24

was effective at reducing the Company's postpaid churn rate as they represented to investors, as opposed to merely adding new postpaid subscribers, when its churn rate was actually *increasing* or remaining constant over most quarters in the class period; (ii) UScellular was not making progress with respect to its churn rate, as it represented to investors; (iii) UScellular was not in fact balancing its promotional activity and its profitability; (iv) due to extreme competition among postpaid carriers, UScellular did not have the flexibility to offset the costs from widespread, expensive promotions with price increases; and (v) as a result of the Companies' decision for UScellular to continue engaging in heavy promotions to address its postpaid subscriber churn rate despite any lack of positive impact on churn rate, UScellular's profitability substantially declined. As a result of the foregoing, the Companies' public statements were materially false and misleading at all relevant times.

## VI. The Truth Emerges

64.  On November 3, 2022, after the close of market, UScellular announced the Company's financial and operating results for the third quarter, including that service revenues totaled $781 million, versus $788 million for the same period in the previous year, and that net income (loss) attributable to UScellular shareholders and related diluted earnings (loss) per share were $(12) million and $(0.15), respectively, for the third quarter of 2022 compared to $34 million and $0.38, respectively, for the third quarter of 2021. The Companies also announced that UScellular was reducing the Company's fiscal year 2022 outlook, such that the upper bounds for the ranges of fiscal 2022 guidance concerning service revenues, adjusted OIBDA, and adjusted EBITDA were lowered by $50 million, $75 million, and $75 million, respectively.

65.  The Companies also disclosed that UScellular lost another 32,000 postpaid customers in the quarter, and that its overall postpaid churn rate had increased from 1.30% to

1.42% quarter over quarter and its postpaid handsets churn rate had increased from 1.10% to 1.15%

quarter over quarter.

66.    On November 4, 2022, during a conference call to discuss the Companies' financial

and operating results for the third quarter, Defendant Chambers revealed their failure to address

UScellular's churn rate and the negative impact of promotions on profitability, stating:

> Postpaid handset gross additions increased by 2,000, driven by increased add-a-line activity, as LT mentioned previously. **Postpaid handset net additions were down 17,000 driven by an increase in churn, which I will discuss in a moment.** However, compared to the first and second quarter our ongoing promotions drove improvements in both gross and net additions.
>
> Connected device gross additions increased by 4,000 driven by fixed wireless additions, while net additions decreased by 6,000, primarily due to higher defections, which I will discuss on the next slide.
>
> […]
>
> Postpaid handset churn increased from the prior year fairly evenly between voluntary and involuntary. **Voluntary churn increased as a result of increased switching activity and aggressive industry-wide competition. Involuntary churn also increased as the frequency of nonpay customers increased to prepandemic norms. Total postpaid churn, combining handsets and connected devices, increased due to higher handset churn and certain business and government customers disconnecting connected devices, many of which were originally activated during the pandemic in conjunction with government and agency funding that has subsequently ended.**
>
> […]
>
> Our overall financial results for the quarter are shown on Slide 14. For this discussion, I will refer to adjusted operating income before depreciation and amortization as adjusted operating income. **Adjusted operating income declined 23%, driven by increases in loss in equipment and bad debt expense.** As LT commented earlier, **we ran our new and existing promotion throughout the third quarter in a majority of our footprint. This promotion is designed to reward our existing customers, reduce churn and ultimately increase service revenue from increased customer volumes and ARPU over time.** As previously discussed, **in the near term, this promotion drove a high upgrade rate in the third quarter and was the primary driver of a $28 million increase in loss on equipment.**
>
> […]

26

We expect loss on equipment and bad debts expense to remain at higher levels than the prior year in the fourth quarter as we plan to continue our new and existing promotion, and we expect involuntary churn and bad debts expense to continue to follow prepandemic trends. LT mentioned our ongoing cost optimization program, and this continues to deliver results. Despite our current inflationary environment, excluding cost of equipment sold and bad debts expense, other cash expenses decreased $14 million year-over-year.

Turning to Slide 15. I will cover our guidance for the full year 2022. Our guidance remains within the original ranges that we have provided all year. **However, we are lowering the top end of the range for service revenues, adjusted operating income and adjusted EBITDA. All of these ranges are negatively impacted by our subscriber growth challenges in 2022. Further, the adjusted operating income and adjusted EBITDA ranges are also impacted by the promotional investment we are making in our new and existing promotion and relatively higher levels of bad debts expense.** We believe it will take time for our promotional offers to drive subscriber results, but we are encouraged with the positive trends we've discussed previously.

We are committed to staying the course, and we are planning to continue our aggressive promotional activity during the holiday season, which is reflected in these estimates. Further, we have been taking actions to mitigate bad debts and, as always, are balancing those measures with our subscriber growth objectives. **As a result, we have narrowed our guidance by decreasing the high end of the range of service revenues by $50 million and both adjusted operating income and adjusted EBITDA by $75 million.**

67.     During the earnings call, analysts were skeptical of the Company's further plans to find a balance between subscriber growth and profitability.  For example, Philip A. Cusick of JPMorgan Chase & Co, Research Division, pointedly stated to Defendant Therivel: "I see you fighting hard, and I see the creativity, **but this doesn't seem to be working out.** So without going back through your script, **help investors understand why they should have faith that you can turn the direction of subscriber growth without destroying profitability in the business?"**

68.     In response, Defendant Therivel acknowledged that UScellular has not seen improvement in voluntary churn despite heavy promotional activity:

The first, stabilizing postpaid. Last year, and up until the first 2 quarters of this year, we struck, I believe, a really good balance of profitability and subscriber growth. **The first 2 quarters of this year, coming out of the pandemic, we saw**

27

**substantive increase in voluntary churn. And so we felt that we needed to address that and address it aggressively. So what we've done in the past quarter is we've gotten much more aggressive on the upgrade side of the house.** The more you can get customers under contract at a really high level, you can think of in-contract customers churning at half the rate of out-of-contract customers.

[…] **I hoped to have seen better improvements in voluntary churn this quarter.** That being said, the leading indicators, I think, are strong for bringing customers in contract, and thus bringing churn down over time, couple that with some more aggressive gross add actions. Where we've run flat rate pricing, for example, in some of our lower share markets, we've seen very good progress. Add aligns up substantively. ARPU up substantively. **And so the one piece of the equation that I think is disappointing for this quarter, and you see it in our numbers, is our LOE is up because we've had to spend to get those upgrades, and we haven't yet seen the improvement in voluntary churn.**

69.     On this news, TDS' common stock price declined **25.89%**, declining from a close of $16.57 on November 3, 2022 to a close of $12.28 on November 4, 2022. TDS' preferred shares trading under the symbol TDSPrV also declined $0.96 per preferred share, or **5.61%**, from a closing price of $17.20 per share on November 3, 2022, to a close of $16.24 on November 4, 2022. TDS' preferred shares trading under the symbol TDSPrU also declined $1.01 per preferred share, or **5.21%,** over the same period.

70.     Analysts following the news echoed the same concerns as those who attended the call. For example, on November 4, 2022, Morningstar Equity Company issued a report stating, in pertinent part:

**Although U.S. Cellular's management highlighted some positive signs it believes show its strategy to improve performance with postpaid wireless customers is on the right track, the results don't yet show it**. **Worse, expenses associated with these customers skyrocketed.** Our view of U.S. Cellular has not changed—we expect a reduction in the level of customer losses rather than growth. However, we're revising our near- and long-term projections for profitability, resulting in our fair value estimate dropping to $28 from $32.

The firm lost 31,000 postpaid phone customers in the quarter, a slight improvement compared with each of the last two quarters. The number of postpaid gross additions—151,000—was excellent, which we attribute to promotions the firm has in place through 2022. **However, those promotions have hurt the current financial performance, and postpaid customer churn of 1.42% was the highest**

**level for any quarter in about six years. Some of the churn was involuntary, which showed up in much higher bad debt expense**.

**[….] The poor postpaid customer performance and elevated expenses rightfully drowned out the good news in the quarter.** However, the small parts of U.S. Cellular's business are performing well, and postpaid average revenue per user, or ARPU, remains high as customers are more often choosing higher rate plans. Postpaid ARPU grew more than 4% year over year to over $50 for the second straight quarter. As a result, postpaid revenue grew 1.6% year over year.

71.     On November 4, 2022, Citi Research issued a report noting UScellular's continued loss of postpaid customers and rising postpaid churn rate and promotional costs, stating, in pertinent part, "[w]e expect TDS and USM shares to trade lower on the weaker wireless outlook."

72.     On November 7, 2022, Raymond James & Associates, US Research issued a report, downgrading TDS from "Strong Buy" to "Market Perform," noting, in pertinent part:

We are downgrading TDS to Market Perform, from Strong Buy, as despite the significant value that remains underappreciated at USM (~80% owned by TDS, makes up ~80% of TDS revenues), most significantly the portfolio of 4.3K towers, we do not see a near-term path to unlocking that value. **Moreover, USM's 3Q22 postpaid net losses were worse than expected (-31K vs. RJE -20K, Street -18K) and adj. OIBDA also came in weak ($163M vs. RJE $199M, Street $201M), with full year adj. OIBDA guidance midpoint down ~5% (now $750-825M vs. $750-900M), driven primarily by bad debt expense and Loss On Equipment (LOE).** While management has been having recent success in driving upgrades to increase customers under contract and stabilize the postpaid base, with upgrade rate at 8.2% in the quarter vs. 5.25% a year ago, we think OIBDA will remain optically bad into 2023 as investment in equipment subsidies continue to drive LOE. […]

USM: What Do We Want To See? In terms of what would get us back to positive on the name, stabilizing the postpaid subscriber base is important, as USM has lost ~3% of postpaid subscribers in the LTM. […]

73.     On November 8, 2022, analyst Philip A. Cusick of JPMorgan Chase & Co, Research Division, issued his report on the Companies' third quarter 2022 results. The report stated that JPMorgan Chase was similarly lowering its TDS price target (from $21 to $14), and stated, in pertinent part:

USM reported mixed 3Q results with strong top line growth offset by elevated promotional spend and higher bad debt expense. USM reported revenue of $1.083b above JPMe at $1.031b and EBITDA of $205m below JPMe at $247m.…USM faces a competitive postpaid wireless environment reporting 3Q postpaid phone churn of 1.15% vs T, TMUS, and VZ at 0.84%, 0.88% and 0.92%, respectively. Management is implementing aggressive promotions as evidenced by all-time high upgrades of 8.2% in 3Q22, one of the highest we have ever seen from any carrier. USM trimmed the top of its prior guide for service revenue by $50m and both adj EBIT and adj EBITDA by $75m. At TDS, the fiber expansion continues with FTTH representing 36% of service addresses (vs. 34% in 2Q) vs~60% targeted by 2026. Management still expects 2022 revenue of ~$1.025b but now expects adj EBITDA of $270m-$290m vs prior guide of $260m-$290m. **We lower our USM price target to $24 from $32, reflecting (1) increasingly challenged subscriber trends, (2) significantly higher promotional spending, and (3) customer credit quality concerns. We lower our TDS price target to $14 from $21 to reflect ~83% ownership in USM** and pressured FCF with ongoing fiber capex cycle, but with shares now down at record lows we upgrade both companies to a Neutral rating.

[….] **USM's strategy isn't working out, but seems finally priced that way.** As much as we like the UScellular management team, their long-term strategy of differentiated, high quality local service is not working out in a market of increasingly aggressive national competitors. From an effective duopoly 10 years ago, USM cellular markets have become 2, 3, and increasingly four player markets, as AT&T and Verizon (in their non-cellular footprint), and increasingly T-Mobile have overbuild USM's cellular footprint. Cable, backed by Verizon, is making life harder. This will not stop, and we encourage the company to explore a sale. The ownership structure and a strong legacy balance sheet will allow UScellular to continue to invest in spectrum and 5G, in the hopes of one day making a return, **but we have heard this before and there is no indication that it will happen this time either.** History would tell us that ownership is unwilling to sell, which we believe limits upside potential. However, we see no solvency issues here because the balance sheet remains strong and assets like towers and the Verizon LA partnership could always be sold if necessary. With a market cap of only $2 billion (EV ~$5b) at USM, and solid trends at TDS, we upgrade both to Neutral.

## AGENCY AND *RESPONDEAT SUPERIOR* LIABILITY

74.     Throughout the class period, TDS confirmed when communicating to investors that

UScellular, Defendant Therivel, and Defendant Chambers (collectively "US Cellular Defendants")

were acting as agents of TDS with respect to UScellular operations and financial results. As set

forth above, ¶¶ 30-33, at all relevant times, TDS owned 84% of UScellular common shares, had

the power to elect its directors, controlled its operations, had common senior leadership with UScellular, and derived 77% of its operating revenue from its UScellular segment.

75.     At all relevant times while communicating with investors, the Companies' interests were aligned in positively portraying UScellular's operations and finances to investors and analysts.

76.     At all relevant times, UScellular Defendants represented UScellular's operations and finances to investors as agents of TDS, on behalf of TDS, at TDS' direction, and under TDS' supervision. Throughout the Class Period, the Companies communicated with investors and analysts via joint earnings calls attended by executive leadership of both Companies and via substantively identical earnings call presentations. During each such earning call, both UScellular and TDS leadership spoke to UScellular's operating and financial results and communicated jointly with analysts on these topics. TDS leadership was present for every such statement made by UScellular during these earnings calls but made no effort to correct the alleged false statements identified *supra*. Additionally, TDS made no effort to correct any of the alleged false statements contained in UScellular's filings with the SEC, identified *supra*, despite having knowledge of these misrepresentations and their falsity and incorporating substantively identical misstatements into TDS' own filings with the SEC.

## **ADDITIONAL SCIENTER ALLGATIONS**

77.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Companies were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Companies, their control over, and/or receipt and/or modification of the Companies' allegedly materially misleading statements and/or their associations with the Companies which made them privy to confidential proprietary information concerning the Companies, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

78.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of TDS' securities and operated as a fraud or deceit on Class Period purchasers of TDS securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of TDS' securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of TDS securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

79.     At all relevant times, the market for TDS' securities was an efficient market for the following reasons, among others:

a)  TDS' securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b)  the Companies filed periodic public reports with the SEC and the NYSE; and

c)  the Companies regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

80.     As a result of the foregoing, the market for TDS' securities promptly digested current information regarding TDS from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of TDS securities during the Class Period suffered similar injury through their purchase of TDS securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

81.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Companies who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TDS securities

during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Companies, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

83. The members of the Class are so numerous that joinder of all members is impracticable, in part, because TDS has 105,050,300 shares of common stock outstanding as of January 31, 2023 and because the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

84. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the prices of TDS securities were artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of TDS' securities when the truth was revealed, and if so, what is the appropriate measure of damages.

85.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

86.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

87.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF
## COUNT I

**Violation of Section 10(b) of
the Exchange Act and SEC Rule 10b-5
(Against All Defendants)**

88.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

89.     This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

90.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TDS' securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire TDS' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

91.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the TDS' securities in an effort to maintain artificially high market prices for TDS' securities in violation of Section 10(b) of the Exchange Act and Rule 10-5.

92.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the TDS' publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

93.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

94.     As a result of Defendants' fraudulent activity, the market price of TDS's securities was artificially inflated during the Class Period.

95.     In ignorance of the true financial condition of TDS, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of the Companies containing the misleading information, purchased or otherwise acquired TDS' securities at artificially inflated prices during the Class Period.

96.     Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in the Companies' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding TDS. Plaintiff and other members of the Class purchased TDS' securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of TDS' securities through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of TDS.

97.     Throughout the Class Period, Defendants were aware of material non-public information concerning the Companies' fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

98.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of TDS securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

99.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

100.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Companies and their business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

101.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Companies and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements

38

prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

102.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of the Companies' business, the information contained in their filings with the SEC, and their public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of TDS' corporate releases detailed herein and are therefore responsible and liable for the misrepresentations contained herein.

103.     The Individual Defendants acted as controlling persons of the Companies within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Companies, the Individual Defendants had the power and authority to cause the Companies to engage in the wrongful conduct complained of herein. The Individual Defendants controlled the Companies and all of their employees. As alleged above, the Companies are the primary violators of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

104.     As a direct and proximate result of the wrongful conduct of the Companies and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of TDS' securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Levi & Korsinsky, LLP as Class counsel;

(B)     Awarding Plaintiff and the members of the Class damages, including interest;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 2, 2023                              Respectfully submitted,

*/s/ Nicholas R. Lange*
**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Gregory M. Potrepka
Nicholas R. Lange
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
nlange@zlk.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 2, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.


/s/ *Nicholas R. Lange*
Nicholas R. Lange

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, ___Howard M. Rensin_____ , duly certify and say, as to the claims asserted under the federal
Name

securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Telephone and Data Systems, Inc. securities which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct. Executed this May 2, 2023.

Howard M. Rensin
_____
Name

_____
Signature

| Case Name | Telephone and Data Systems, Inc. |
| Ticker | TDSPrV |
| Class Period | 05-06-2022 to 11-03-2022 |

| Account 1 |
| --- |
| **Client Name** |
| Howard Rensin |

| Date of Transaction | Transaction Type | Quantity | Price per Preferred Share |
| --- | --- | --- | --- |
| 08-22-2022 | P | 0.64 | $ 20.4800 |
| 08-22-2022 | P | 45 | $ 20.4800 |
| 08-22-2022 | P | 212 | $ 20.4800 |
| 08-22-2022 | P | 1500 | $ 20.5000 |
| 08-22-2022 | P | 8243 | $ 20.5100 |