**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, and TELEPHONE AND DATA SYSTEMS, INC.,<br><br>Defendant. | No. 1:23-cv-02764<br><br>Honorable Mary M. Rowland |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ iii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND ............................................................................................................................. 3

    A.  The Parties ................................................................................................................... 3

    B.  Pre-Class Period: Intense Competition and Aggressive Promotional Environment in the Wireless Market and UScellular's Use of Regional Trials ........................... 4

    C.  Q1 2022: UScellular's Attempt to Strike a Balance Between Financial Outcomes and Subscriber Outcomes Using Regional Trials ................................................... 6

    D.  Q2 2022: UScellular's Nationwide Launch of the Promotion .................................. 7

    E.  Post-Class Period: UScellular Continues to See Early Positive Results of Its Promotion, but Churn Is Not Improving as Quickly as Expected .......................... 9

    F.  Early 2023: Promotion Results in Improved Subscriber Results and the Company Announces That Earnings Guidance for 2022 Was Met ...................................... 11

    G.  The Complaint ......................................................................................................... 11

ARGUMENT ................................................................................................................................ 12

I.     PLAINTIFF DOES NOT ADEQUATELY ALLEGE THAT ANY STATEMENTS WERE FALSE OR MISLEADING ....................................................................................... 12

    A.  Plaintiff Does Not Adequately Allege That Statements Made During UScellular's May 6, 2022 Earnings Call Were False or Misleading. ......................................... 13

        1.  Plaintiff Does Not Adequately Allege That Therivel's Statements Regarding His Opinion of UScellular's Balance Between Subscriber and Financial Results Were False or Misleading. ..................................................................... 13

        2.  Plaintiff Does Not Adequately Allege That Therivel's Statement Regarding His Opinion of UScellular's Regional Approach Was False or Misleading. ....................... 18

        3.  Plaintiff Does Not Adequately Allege That Chambers's Subjective Statement Regarding In-Store Traffic Patterns Was False or Misleading. .................................... 19

    B.  Plaintiff Does Not Adequately Allege That Therivel's Statements Made During the August 5, 2022 Earnings Call Were False or Misleading. ..................................... 21

        1.  Plaintiff Does Not Adequately Allege That Therivel's Statements Regarding the Promotion Were False or Misleading. ....................................................... 21

        2.  Plaintiff Does Not Adequately Allege That Therivel's Forward-Looking Statements Were False or Misleading. ......................................................... 25

            a.  Therivel's Forward-Looking Statements Were Identified as Such and Accompanied by Meaningful Cautionary Language. ................................................ 27

            b.  Plaintiff Has Not Adequately Alleged That Therivel's Forward-Looking Statements Were Made with "Actual Knowledge" of Their Falsity ................................ 29

II.    PLAINTIFF DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER AS TO ANY DEFENDANT..................................................................................................32

III.   PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a)..............................................................................................35

CONCLUSION.......................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                               **Page(s)**

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)........................................................................15

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021).................................................................34, 35

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)......................................................................16

*City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) .............................................................................29, 30, 31, 32

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ...............................................................................12, 32

*Davis v. SPSS, Inc.*,
431 F. Supp. 2d 823 (N.D. Ill. 2006) ..................................................................15, 23

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ................................................................26, 28

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) ......................................................... *passim*

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 753 (7th Cir. 2007) ........................................................................... 14-15

*Isquith by Isquith v. Caremark Int'l, Inc.*,
136 F.3d 531 (7th Cir. 1998) ..............................................................................25

*In re Midway Games, Inc. Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill 2004) .................................................................28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..........................................................................................13, 17

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) .........................................................................32, 34

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) .........................................................................17, 33

*Plumbers Pipefitters Loc.Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys
Healthcare Solutions, Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ...............................................................26, 28

*Pugh v. Trib. Co.*,
  521 F.3d 686 (7th Cir. 2008) ................................................................33, 34, 35

*Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ................................................................ *passim*

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)................................................................18

*Roth v. OfficeMax, Inc.*,
  527 F. Supp. 2d 791 (N.D. Ill. 2007) ................................................................32

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)................................................................18, 33

*In re Supreme Indus., Inc. Sec. Litig.*,
  2018 WL 2364931 (N.D. Ind. May 23, 2018) ................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................3, 12, 32, 33

*Utesch v. Lannett Co., Inc.*,
  316 F. Supp. 3d 895 (E.D. Pa. 2018) ................................................................21

*Water Island Event-Driven Fund, LLC v. Trib. Media Co.*,
  39 F.4th 402 (7th Cir. 2022) ................................................................3

**Statutes**

15 U.S.C. § 78u-4 ................................................................3, 12

15 U.S.C. § 78u-5 ................................................................13, 25, 26, 27, 29

**Other Authorities**

Fed. R. Civ. P. 9(b) ................................................................2, 12, 32

Defendants Laurent C. Therivel, Douglas W. Chambers (together, the "Individual Defendants"), Telephone and Data Systems, Inc. ("TDS"), and United States Cellular Corporation ("UScellular" or the "Company") (collectively, "Defendants") hereby move to dismiss the First Amended Complaint ("Amended Complaint" or "Complaint").

## **INTRODUCTION**

As it regularly discloses to investors, UScellular operates in a highly competitive market dominated by much larger competitors. *See* Ex. A, 2021 10-K at 5 ("UScellular's primary competitors . . . are larger than UScellular [and] possess greater financial and other resources."). Going into 2022, UScellular's CEO, Defendant Therivel, explained to investors that this aggressive industry-wide competition led to an increase in year-over-year "voluntary churn," i.e., the percentage of UScellular customers who disconnect each month on a voluntary basis. UScellular continued to struggle with subscriber results during the putative Class Period (May 6, 2022 through November 3, 2022). In particular, voluntary churn numbers, reported each quarter, worsened on a year-over-year basis. There were bright spots during the Class Period. For instance, the Company's average revenue per user ("ARPU") grew year-over-year. Additionally, beginning in June 2022, informed by regional trials, the Company launched an "Any Phone Free for Anyone" promotion (the "Promotion"), that it believed would improve results at a manageable cost. Still, in November 2022, at the end of the Class Period, the Company announced to the market it was lowering the top end of certain financial guidance. Ultimately, the Company met all of its projected financial metrics for the year. And by the fourth quarter of 2022, following the Class Period, the Company's churn results had begun to improve.

Nevertheless, narrowly focusing on disappointing results announced at the end of the Class Period, the Complaint challenges certain opinions and forward-looking predictions of Therivel, and one statement by UScellular's CFO, Douglas Chambers, and implausibly claims

1

they were an effort to defraud shareholders. With respect to the first quarter 2022 earnings call, Plaintiff challenges positive statements of belief regarding the delicate balance between financial results, like ARPU, and subscriber results. As discussed below, efforts to improve financial results in the near term might impact subscriber results in the long term, and *vice versa*; efforts to improve subscriber rates in the near term might impact financial results in the long term. Getting that balance right is difficult, and Defendant Therivel's statements on how to achieve it were sincerely-held statements of belief backed by ample disclosures regarding the underlying push and pull. As to the second quarter 2022 earnings call, Plaintiff challenges positive statements of belief regarding potential "leading indicators" of success for the Promotion, as well as forward-looking guidance regarding cash flow and profitability, and predictions about how long the Promotion might take to achieve results. But the Company provided investors with robust warnings about the risks that these predictions might not come to pass, and subscriber results were fully disclosed throughout the Class Period. Plaintiff's mere subjective disagreement with Defendants' opinions and predictions does not state a claim under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") for two separate and independent reasons.

*First*, the PSLRA imposes strict pleading requirements that a complaint identify "with particularity" the alleged false statements and precisely why those statements were purportedly false or misleading. This is an even higher standard than the rigorous burden imposed under Rule 9(b). Moreover, when it comes to statements of opinion and forward-looking statements, which are the vast majority of the statements at issue here, the standards are even higher. Plaintiff's challenges to assessments regarding matters such as the financial vs. subscriber balance and the

early results of the Promotion, which were accompanied by robust disclosure of underlying facts allowing investors to come to their own conclusions, do not meet these demanding requirements.

*Second*, the PSLRA requires that a complaint plead facts that give rise to a "strong inference" that each defendant acted with the requisite state of mind (i.e., scienter, or an intent to defraud). A strong inference of fraud must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs*"), 551 U.S. 308, 314 (2007). Plaintiff fails to meet this requirement, instead relying on generalized allegations from supposed Confidential Witnesses. Those allegations at most demonstrate that the Company was experiencing subscriber result challenges of the sort that were fully disclosed to investors. Plaintiff does not allege any motive for Defendants to mislead investors over roughly six months on matters that would inevitably be disclosed in due course: there are no allegations of suspiciously-timed stock sales, or any other possible motives to temporarily inflate the Company's stock price. To the contrary, the far more likely inference is that Defendants simply held different beliefs than those Plaintiff, with the luxury of hindsight, now espouses. But there is no "fraud by hindsight," *Water Island Event-Driven Fund, LLC v. Trib. Media Co.*, 39 F.4th 402, 408 (7th Cir. 2022), and because the Amended Complaint fails to satisfy the rigorous standards of the PSLRA, it must be dismissed. 15 U.S.C. § 78u-4(b)(3)(A) (court "shall" dismiss any complaint that fails to meet the PSLRA's heightened pleading requirements).

## **BACKGROUND**

### A.    **The Parties**

TDS is an approximately 83% owner of UScellular's common shares, and additionally operates other businesses providing a range of broadband, video, and voice communications

3

services to residential, commercial, and wholesale customers. *See* Ex. B,[1] 23Q2 10-Q TDS at 1, 12. Defendant UScellular owns, operates, and invests in wireless markets throughout the United States. *See* Ex. C, 23Q2 10-Q at 2. Both UScellular and TDS are publicly traded companies incorporated in Delaware, with headquarters in Chicago, Illinois. Am. Compl. ¶¶ 26-27. Defendant Therivel is president and CEO of UScellular and serves on its Board of Directors. *Id.* ¶ 28. During the Class Period, Therivel also served as a Director of TDS. *Id.* Defendant Chambers is executive vice president, chief financial officer, and treasurer of UScellular, *id.* ¶ 29, and currently serves on its Board of Directors. Plaintiff is alleged to be an owner of preferred stock in TDS. Dkt. 1 at 42-43.[2]

### B. Pre-Class Period: Intense Competition and Aggressive Promotional Environment in the Wireless Market and UScellular's Use of Regional Trials

Among other products and services, UScellular offers wireless service on a "postpaid" basis: a line of service for which a customer is billed in monthly installments, typically one month in advance. Am. Compl. ¶ 46. As the Amended Complaint acknowledges, the market in which UScellular operates for postpaid competitors is "viciously competitive." *Id.* ¶ 5.

On February 18, 2022, prior to the Class Period, Chambers explained in an earnings call that this aggressive industry-wide competition increased year-over-year "voluntary churn," i.e., the percentage of connections that disconnect each month on a voluntary basis. *See* Ex. D, 21Q4EC at 8. *See also* Ex. A, 2021 10-K at 37 (disclosing "churn from customer switching activity" as a risk factor); Ex. E, 2.17.22 8-K at 4 (disclosing gross post-paid additions of

---

[1] The Court may consider the SEC filings and conference call transcripts referenced in the Amended Complaint, along with 10-K, 10-Q, and 8-K forms filed with the SEC. *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894, 895 n.3 (N.D. Ill. 2020).

[2] Plaintiff apparently did not own common stock of either UScellular or TDS, but purports to represent a class made up of individuals who owned TDS "securities." Defendants reserve the right to address the implications of that at the class certification stage should it prove necessary.

165,000 and net losses of 12,000, and a churn rate of 1.35%). Chambers further explained that, as part of the intense competition, UScellular was experiencing an aggressive "promotional environment"—i.e., expensive promotions were heavily used in the industry to attract customers. This environment had led to "our costs running through promo [going] up substantially in 2021," which would likely continue to increase in 2022. Ex. D, 21Q4EC at 16.

The Company warned investors about the effect the intense competitive environment could have on its business going forward. For instance, in its 10-K filed on February 18, 2022, UScellular told investors, in its first operational risk factor, that:

> **Intense competition involving products, services, pricing, promotions and network speed and technologies could adversely affect UScellular's revenues or increase its costs to compete.**
>
> ***Competition in the wireless industry is intense and is expected to intensify*** in the future due to multiple factors such as increasing market penetration, introduction of new products, new competitors, increasing promotional aggressiveness and changing prices. … In particular, wireless ***competition includes aggressive service plan and device pricing*** … which could result in switching activity and churn. … UScellular anticipates that these competitive factors may cause the prices for services and products to decline ***and the costs to compete to increase***.
>
> UScellular's primary competitors are national or global telecommunications companies that are larger than UScellular, possess greater financial and other resources, possess more extensive coverage areas and more spectrum within their coverage areas, and market other services with their communications services that UScellular does not offer. … ***There can be no assurance that UScellular will be able to compete successfully in this environment***.

Ex. A, 2021 10-K at 5 (first emphasis in original, remaining emphases added). Moreover, UScellular accompanied each earnings call with a reminder of this "intense competition" risk factor, as well as risks related to "changes in … price competition, or churn rates" among other things. *See, e.g.*, Ex. F, 22Q2EC Pres. at 2 (emphasis added).

During the February 18, 2022 earnings call, Therivel further explained the Company's strategy moving forward in the competitive environment for postpaid customers. One of the

Company's "strategic priorities" was to continue to use its "regionalization strategy" launched in 2021 to "test and optimize a wide range of actions," including promotions. Ex. D, 21Q4EC at 5. The regional strategy leveraged the fact that, unlike its larger competitors, UScellular operates in a number of noncontiguous regions and can operate different tests in different regions. The Company used the regional approach to optimize its strategies.

### C.  Q1 2022: UScellular's Attempt to Strike a Balance Between Financial Outcomes and Subscriber Outcomes Using Regional Trials

For the first quarter of 2022, the Company reported worsening subscriber results. In its quarterly report, it reported 1.3% in total postpaid churn, compared to 1.12% the prior year, 126,000 in gross postpaid additions,[3] compared to 143,000 the previous year, and 44,000 in net postpaid losses,[4] compared to 6,000 the prior year. *See* Ex. G, 22Q1 10-Q at 5. *See also* Ex. H, 22Q1EC at 6-7. On May 6, 2022 (the beginning of the putative Class Period), Therivel expressly told investors he was "not satisfied with our subscriber results in the first quarter." Ex. H, 22Q1EC at 5. He reiterated that "the environment over the past 4 months—over the past 2 years, really, has been extremely competitive." *Id*.

Therivel further explained the Company's approach to operating in a highly competitive environment. While it had "regionally tested aggressive offers in the marketplace … we've also tried to be disciplined from a financial perspective, and you see that in our strong adjusted operating income performance for the quarter." *Id*. Later, in response to an analyst question, Therivel further explained that the Company was not exclusively taking a regional approach: he noted that "[a]t times, we will roll out national programs," but the regional trials conducted by

---

[3] "Gross additions" are "the total number of new connections added during the period, without regard to connections that were terminated during that period." *See* Ex. I, 2022 10-K at 23.
[4] "Net losses" represent the total number of "connections that were terminated" during the period net of new connections added. *Id*.

the Company had helped the Company to "test and learn" and had also helped the Company to "optimize and will continue to help [the Company] optimize." *Id.* at 11.

The Company's strategy during the quarter resulted in improving financial metrics. While the Company was "highly focused on improving churn" (i.e., a subscriber outcome), on the "theme of balance," Therivel told investors that the Company had experienced "challenging subscriber results to better drive ARPU," or average revenue per user. *Id.* at 5. This meant that "despite the headwind of a highly promotional environment," the Company's ARPU actually *grew* 4% year over year. *Id*. Accordingly, although he was not satisfied with the Company's *subscriber* results for the quarter, Therivel told investors he *was* "pleased with the [Company's] *financial* outcomes in the first quarter." *Id*. at 6 (emphasis added). Therivel repeatedly emphasized the push and pull between subscriber results and financial results and the Company's efforts to strike the right balance, explaining, for instance, that the Company "continually tr[ied] to optimize financial outcomes with subscriber outcomes," and that "[a]lthough subscriber results were challenged, particularly in postpaid, we continue to try to strike the right balance between financial outcomes and subscriber outcomes." *Id*. at 5-6.

### D.     Q2 2022: UScellular's Nationwide Launch of the Promotion

For the second quarter of 2022, the Company continued to report increases year-over-year in churn and net customer losses. In its quarterly report, it reported 1.3% in total postpaid churn, compared to 1.11% the prior year, 128,000 in gross postpaid additions compared to 141,000 the previous year, and 40,000 in net postpaid losses, compared to 6,000 the prior year. *See* Ex. J, 22Q2 10-Q at 5. *See also* Ex. K, 22Q2EC at 6.

On August 5, 2022, Therivel reminded investors that, on the prior earnings call, the Company had "identified some specific areas of subscriber pressure where we saw opportunities to improve." Ex. K, 22Q2EC at 5. Therivel told investors that "this led to a series of regional

tests and trials during the second quarter. And as a result of those trials, we launched our new promotion in late June, and that was any phone free for anyone" (i.e., the Promotion). *Id*. Therivel told investors that the Promotion "had little impact on the second quarter subscriber results" because of the "timing of when we launched [it]," but that "we believe this will meaningfully address a number of the subscriber challenges that we identified earlier in the year." *Id*.

In response to an analyst question, Therivel explained that the Promotion was "specifically designed to address" voluntary churn by getting customers to sign new contracts, since "over the past couple of years …we've seen a larger and larger percentage of customers that are out of contract." *Id.* at 10. The decline in customers in-contract was disappointing because "out-of-contract customers churn at a substantially higher rate than in-contract customers." *Id.* Therivel explained that when addressing the goal of increasing the number of in-contract customers, "[w]e think [the Promotion] specifically addressed that issue, and we're seeing really good results" because "we're seeing upgrades up substantively." *Id.*

As a result of these early signs, while cautioning again that it was "early," Therivel stated that "we are pleased with the results," and that "we believe this will meaningfully address a number of the subscriber challenges that we identified earlier in the year." *Id*. at 5. Nonetheless, the Company was clear that postpaid handset churn had continued to "increase[] from the prior year." *Id*. at 6. Therivel told investors: "I'm encouraged by the momentum in our growth areas, but we still need to improve postpaid subscriber results." *Id*. In response to an analyst question, Therivel explained, "[D]o I see a path to positive consumer postpaid net adds? Yes, I do. What is it going to take? I think the biggest step that's going to take in the near term is churn

8

improvement." *Id*. at 10. And after explaining, as noted above, the early encouraging subscriber results in the second quarter, Therivel stated:

> And so I think execution on [the Promotion], continuation of the momentum that we're seeing, and then it has to translate into churn reduction, and that takes some time. But you don't see churn immediately dive, right? What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter.

*Id*.

On the financial side of the equation, Therivel stated that he was "quite encouraged with the financial results in the quarter." *Id*. at 5. Postpaid ARPU grew again during the quarter, by "5% year-over-year … by far one of the highest increases in the industry." *Id*. The gain came "despite the headwind of a highly promotional environment." *Id*. Chambers further noted that increased "equipment sales revenues" for the quarter had been "partially offset by higher promotional activity," *id*. at 6, and further advised investors that the Company expected "a continued highly competitive and promotionally focused environment." *Id*. at 7. In response to an analyst question, Chambers advised that the full effect of the Promotion on the Company's revenue would not be realized immediately, and would be seen over time. *Id*. at 16-17. Despite its costs, Therivel, referencing the Company's regional trial experience, stated:

> And thanks to the trials that we ran, we're able to structure [the Promotion] in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable. And that offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions.

*Id*. at 5.

**E.** **Post-Class Period: UScellular Continues to See Early Positive Results of Its Promotion, but Churn Is Not Improving as Quickly as Expected**

For the third quarter of 2022, after the end of the Class Period, the Company reported 1.42% in total postpaid churn, compared to 1.15% the prior year, 151,000 in gross postpaid

additions, compared to 145,000 the previous year, and 31,000 in net postpaid losses, compared to 8,000 the prior year. *See* Ex. L, 11.3.22 8-K at 4; *see also* Ex. M, 22Q3EC at 6-7 (noting improvements in gross and net additions relative to the prior two quarters).

During the November 4, 2022 earnings call (after the Class Period), Therivel acknowledged that the timeline for improving churn was not moving as quickly as he had expected: "I hoped to have seen better improvements in voluntary churn this quarter." Ex. M, 22Q3EC at 13. In part because of the "subscriber growth challenges in 2022" and the impact of "promotional investment we are making," the Company lowered the top end of its guidance for 2022 for service revenues, adjusted operating income, and adjusted EBITDA, but otherwise kept its guidance ranges in place. *Id*. at 7. Therivel further explained that the Company had launched its Promotion because the first two quarters of the year "saw substantive increase in voluntary churn. And so we felt that we needed to address that and address it aggressively." *Id*. at 13. The Promotion is a "long-term strategy. It's something that we generally, as a company invested, in the long term." *Id*.

During the same call, an analyst asked Therivel to explain how the local trials similar to the Promotion had performed during the third quarter. *Id*. at 16. Therivel answered that in regional trials, "it took us 6 months or so, 6, 7 months to see the improvements in voluntary churn." *Id*. at 17. While, as noted earlier in the call, *id.* at 13, the Company had hoped the national trial would generate improvements in churn at a faster pace, Therivel noted that "if you forecast [the 6-7 month timeline] forward, that helps explain why we are cautiously optimistic that we're going to see that voluntary churn trend turn in the fourth quarter and into early next year. But you don't know." *Id*. at 17. In fact, Therivel explained during the call that "we are seeing a number of leading indicators moving in the right direction," including a 54% increase in

10

upgrades, a 6% increase in gross add-a-line as compared to the prior year, and an increase from 59% in the second quarter to 62% in the third quarter, of post-paid handsets that are in contract. *Id.* at 5. Moreover, "despite a highly promotional environment where those device discounts are actually a headwind to ARPU," the Company's ARPU continued to "grow[] nicely at 4% year-over-year." *Id*.

> **F.      Early 2023: Promotion Results in Improved Subscriber Results and the Company Announces That Earnings Guidance for 2022 Was Met**

On February 17, 2023, the Company announced that despite having brought down the upper end of its guidance range in several metrics after the third quarter of 2022, all of the Company's actual results for 2022 ended up within the range of its original guidance. *See* Ex. N, 2.16.23 8-K at 2; Ex. E, 2.17.22 8-K at 2. By the fourth quarter of 2022, the churn rate began to improve; by the end of Q1 2023, it had improved about 10% year-over-year, and as of the most recent quarter was still improving. *See* Ex. N, 2.16.23 8-K at 4; Ex. O, 23Q1EC at 5; Ex. P, 8.4.23 8-K at 1.

> **G.      The Complaint**

Plaintiff's original complaint was filed in May 2023, nearly seven months after the alleged "corrective disclosure." Dkt. 1. Plaintiff filed an Amended Complaint on September 1, 2023. Dkt. 32. The Amended Complaint relies heavily on two purported confidential witnesses ("CWs"), both allegedly former employees of the Company. CW1 purports to be a former Area Vice President, Southwest Region, from December 2020 through June 2023. CW2 purports to be a former member of the Growth Marketing Department. Notably, the Amended Complaint does not allege when CW2 was employed by the Company.

Plaintiff challenges statements made by Therivel, and one statement made by Chambers, during two earnings calls in 2022. With respect to the Q1 2022 earnings call, Plaintiff

11

challenges: (i) Therivel's opinion regarding the "balance" UScellular was striking between financial and subscriber results, (ii) Therivel's opinion regarding UScellular's "regional approach," and (iii) Chambers's opinion regarding whether in-store traffic trends were "concerning." As to the Q2 2022 earnings call, Plaintiff challenges Therivel's: (i) statements and opinions regarding the Promotion, and (ii) forward-looking statements regarding the Promotion.

## ARGUMENT

"Federal Rule of Civil Procedure 9(b) provides that a party alleging fraud or mistake 'must state with particularity the circumstances constituting fraud or mistake.'" *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (citation omitted). The PSLRA raises the pleading standard in securities cases even higher. "Under the PSLRA's heightened pleading instructions, any private securities complaint … must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Tellabs*, 551 U.S. at 321 (alteration in original). The Complaint does not satisfy these strict pleading requirements.

## I. PLAINTIFF DOES NOT ADEQUATELY ALLEGE THAT ANY STATEMENTS WERE FALSE OR MISLEADING.

The PSLRA requires that Plaintiffs "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(1)). Statements of opinion or belief and forward-looking statements—which make up the vast majority of the challenged statements in the Amended Complaint—are held to an even higher standard. Statements of opinion or belief are actionable only when a defendant (1) "d[oes] not hold the belief [it] professed" or (2) "omits material facts about [its] inquiry into or knowledge concerning a statement of opinion, and if those facts

12

conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 189 (2015); *see also Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 897 (N.D. Ill. 2020) (citing *Omnicare*, 575 U.S. at 186). Finally, a forward-looking statement is not actionable if either (i) it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (ii) plaintiff fails adequately to allege it was "made with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). The Complaint fails under each of these standards.

### A. Plaintiff Does Not Adequately Allege That Statements Made During UScellular's May 6, 2022 Earnings Call Were False or Misleading.

#### 1. Plaintiff Does Not Adequately Allege That Therivel's Statements Regarding His Opinion of UScellular's Balance Between Subscriber and Financial Results Were False or Misleading.

Plaintiff challenges several statements that Therivel made on May 6, 2022 regarding his opinion of UScellular's performance and operations in the first quarter of fiscal 2022, the second of which was made in response to an analyst question:

> **We've also tried to be disciplined from a financial perspective**, … Although subscriber results were challenged, particularly in postpaid, **we continue to try to strike the right balance between financial outcomes and subscriber outcomes**.
>
> **We think we've done a really good job of it, to strike a balance between subscriber results and financial results**.

Am. Compl. ¶¶ 105, 107 (all challenged statements in bold and underlined).

Plaintiff alleges these statements are false or misleading for a laundry list of reasons. Many appear to be selected at random, and relate, for instance, to the launch, costs, or benefits of the Promotion (which as of May 2022 had not yet been launched and was not the topic of the

13

challenged statements), or to other events post-dating the call. *See, e.g.*, ¶ 108(i)-(iv), (xii)-(xiii).[5]

Plaintiff additionally alleges that, according to the supposed CWs, these statements were false or

misleading because, for instance, at "quarterly Business Review meetings," and in reports

prepared for those meetings, employees in charge of each region explained that it was a

"'struggle' to meet KPI [key performance indicator] goals, including goals related to postpaid

churn, gross and net postpaid customer adds, in-store traffic and conversion rates," Am. Compl.

¶ 108(v)-(vi); *see also id.* ¶¶ 14, 63-65, 79, 150; that at such meetings, it was discussed that each

of the regions performed poorly relative to internal goals for quarterly post-paid churn and in-

store traffic, *id.* ¶ 108(vii)-(xi), *see also id.* ¶¶ 95, 149, 157-160; that "going into 2022," Therivel

told CW1 that 2022 would be "one of the company's 'toughest years,'" and that "churn will be a

problem for us," *id.* ¶¶ 96, 108(xii), 155-56; and that "poor instore traffic was a contributing

factor to increasing churn," *see, e.g.*, *id.* ¶¶ 95, 149; *see also id.* ¶¶ 75, 108(viii), 151. None of

these allegations is sufficient.

As an initial matter, Plaintiff significantly overstates the vague accounts provided by the

two anonymous former employees. The Seventh Circuit has warned that district courts should

treat anonymous accounts such as these with skepticism. "It is hard to see how information from

anonymous sources could be deemed 'compelling' or how we could take account of plausible

opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are

lying. Perhaps they don't even exist." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th

---

[5] Indeed, Plaintiff devotes numerous paragraphs to allegations that certain statements were false or misleading because of information that purportedly came to light *after* those statements were made. *See, e.g.*, Am. Compl. ¶¶ 15, 96, 108(xi),155 (discussing meeting in September or October 2022); *id.* ¶¶ 101, 108(xiii) (discussing a "Directors forum" in October or November 2022). These allegations are classic examples of alleged fraud-by-hindsight and do not set forth particularized allegations that any statement is false or misleading.

Cir. 2007); *see also City of Livonia Emp.s' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.* ("*Boeing*"), 711 F.3d 754, 759 (7th Cir. 2013) ("Allegations concerning … unnamed confidential sources of damaging information require a heavy discount.").

Moreover, the CW reports suffer from additional flaws. Certain CW allegations are simply non sequiturs to Plaintiff's allegations. For instance, Plaintiff alleges that the challenged statements were false or misleading because Therivel was informed in "quarterly Business Review Meetings" and through reports prepared for those meetings that it was a "struggle" to meet KPI goals—especially those for churn and in-store traffic, *see, e.g.*, Am. Compl. ¶¶ 63, 95, 149. Plaintiff also alleges that at such meetings Therivel "mentioned that in-store traffic and margins were below target and needed to improve." *Id.* ¶¶ 14-15, 95, 149. But the only such meeting that, by Plaintiff's own allegations, occurred during the Class Period was in June 2022, *after* the May 5 call at which Therivel made the challenged statements. *Id.* ¶ 63.

Other allegations are the kind of generalized information that courts have repeatedly found insufficient. *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill. 2006) (rejecting "vague assertions by one confidential witness corroborated by vague assertions by another"); *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020) (rejecting claims based upon CW allegations regarding meetings at which "serious operational and launch issues" were frequently discussed); *compare* Am. Compl. ¶ 155 (highlighting allegations of Therivel's generic internal discussion of churn, in-store traffic, and other general difficulties). Still others are vague "second, or even third hand" accounts, which fare no better. *Davis*, 431 F. Supp. at 828 (citation omitted); *id.* ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo.") (citation omitted). *See also Boeing*, 711 F.3d at 759 (confidential witnesses "may be ill-

15

informed, … [and] may be misrepresented" and so require a "heavy discount"); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474, at *6 (N.D. Ill. Mar. 27, 2012) (rejecting CW allegations based on "second-hand information"); *compare* Am. Compl. ¶¶ 62, 145-146 (according to CW1, "either Jagher or Crisostomo would use the [KPI] information presented in the monthly AVP meeting to prepare for a meeting with Defendant Therivel, amongst others"); Am. Compl. ¶¶ 78, 160 (unspecified "executives" received daily reports that included churn rates).

At most, these statements amount to an allegation that the Company struggled with results such as post-paid churn and in-store traffic during the first quarter of 2022, and that Therivel was aware of the struggles. *See also* Am. Compl. ¶¶ 176-180 (alleging Defendants closely monitored churn). But those facts were hardly "hidden" from investors. To the contrary, investors were provided detailed information regarding subscriber results, including the fact that the Company's handset churn rate had worsened year-over-year. *See supra* at 6-7; *see also* Am. Compl. ¶ 59; Ex. Q, at 1 (analyst report from February 2022 recognized UScellular's challenges with customer losses and the need to "build[] its postpaid smartphone customer base"). Therivel told investors that "subscriber results were challenged," and that he was "not satisfied with our subscriber results in the first quarter." Ex. H, 22Q1EC at 5-6; *see also supra* at 6-7. And with respect to in-store traffic, Chambers also told investors that, as of the first quarter of 2022, it was "down slightly year-over-year." Ex. H, 22Q1EC at 11; *see also supra* at 6-7.

Nor are the challenged statements in any way inconsistent with the Company's experiences with churn or subscriber results. To the contrary, as is evident when the statements are viewed in their full context, without Plaintiff's misleading truncation (*see* Ex. H, 22Q1EC at 5-6, 16; *see also supra* at 6-7), the statements were about the Company's attempt to be

16

disciplined *from a financial perspective* and its attempt to balance that financial discipline—including spending money to acquire new subscribers—with subscriber results—i.e., the sort of "push and pull" between the two metrics that the Company had long described to investors. In fact, the Company's financial results for the quarter were positive, including growth in year-over-year ARPU. *See supra* at 7.

Finally, Therivel's statement that the Company is "trying" to strike the right balance, and that "we think we've done a really good job" is a non-actionable statement of belief. *See Omnicare*, 575 U.S. at 183 ("[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."). That is, it is precisely the sort of "inherently subjective and uncertain assessment[]" that securities laws "do[] not allow investors to second-guess." *Id.* at 186. As noted, statements of opinion or belief are actionable only if a defendant (1) does not honestly hold the professed belief or (2) omits material facts regarding the basis of that belief. *See supra* at 12-13 (citing *Omnicare*, 575 U.S. at 186, 189). The Complaint alleges neither. In addition, the statement was made in response to an analyst question rather than in remarks prepared in advance and therefore challenges must meet a higher standard still. *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (dismissing claims based on statements made in response to analyst questions and noting that "[o]ral exchanges are less precise than written ones" because the speaker does "not know what question was coming, had to answer off the cuff, and did not have an opportunity to review the question and edit his answer before the next question was posed"); *cf. Omnicare*, 575 U.S. at 190 (noting the comparative "formal[ity]" of written SEC submissions such as registration statements and holding that "whether an omission makes an expression of opinion misleading always depends on context"). Plaintiff's apparent subjective

17

disagreement that the Company *had* struck the right balance (as borne out by positive financial results) does not state a claim for securities fraud. *Boeing*, 711 F.3d at 758 (dismissing claims where optimistic public statements were founded on a "realistic hope" that defects could be remedied); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future."); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (emphasizing that "companies must be permitted to operate with a hopeful outlook").

> **2. Plaintiff Does Not Adequately Allege That Therivel's Statement Regarding His Opinion of UScellular's Regional Approach Was False or Misleading.**

Plaintiff challenges Therivel's statement on the May 6, 2022 earnings call regarding UScellular's "regional approach," made in response to an analyst question:

> **The regional approach you've talked to, I'm very pleased with** … So we're really trying to test and learn, and it's helped us optimize and will continue to help us optimize. **So I'm very pleased with how it's proceeding**.

Am. Compl. ¶ 106. Plaintiff alleges that this statement was false or misleading because "Defendants were imminently abandoning their regionalization strategy in favor of the one-size-fits-all Any Phone Free Promotion." *Id*. ¶ 108(i). But Plaintiff's claim proceeds from a false premise that misrepresents UScellular's "regional approach." As is clear from the context, the regional approach Therivel was discussing was far broader than a decision regarding a single promotion: it was a comprehensive strategy that involved "creating regions and putting the processes and the structures in place to use those regions as test beds" for numerous "pricing and promotion and marketing mix trials." *Id.* ¶ 106. In fact, between the two specific statements that Plaintiff challenges, Therivel explained that after learning lessons "from individual or regional trials" UScellular will "[a]t times … roll out national programs." *Id.* Thus, far from "abandoning" their regionalization strategy by adopting a national promotion, the adoption of a

18

national promotion following a regional trial was an essential part of UScellular's "regional approach."

Moreover, being "pleased" with the regional strategy is an expression of belief, and this statement was made in response to an analyst's question. *See supra* at 17. Plaintiff has not alleged that Therivel subjectively was not actually pleased with the regional strategy, nor has Plaintiff pointed to any underlying material information regarding the regional strategy that Therivel failed to disclose. To the contrary, far from deceiving investors regarding the Company's intent to "abandon[]" regional trials in favor of a broader approach, during the same call, Therivel expressly *told* investors that the Company would shortly "be doing a relatively substantial move that was educated by the regional trial." Ex. H, 22Q1EC at 11; *Fryman*, 462 F. Supp. 3d at 902 (rejecting allegations where the plaintiff failed to allege "the existence of any internal information that contradicted" any of the defendants' statements).

> **3.      Plaintiff Does Not Adequately Allege That Chambers's Subjective Statement Regarding In-Store Traffic Patterns Was False or Misleading.**

Plaintiff alleges that a single statement from Chambers during the May 6, 2022 earnings call in response to an analyst question regarding in-store traffic was false or misleading: "**No. I mean, our store traffic is down slightly year-over-year but nothing concerning**." Am. Compl. ¶ 109. Plaintiff alleges, on the basis of information provided by CW1, that when this statement was made, in-store traffic was below UScellular's target levels and that Defendants were focused on improving in-store traffic numbers. *Id*. ¶ 110. As explained *supra* at 14-16, Plaintiff's vague confidential witness allegations fail, including because they are primarily based upon information allegedly shared at a Business Review meeting that occurred *after* the challenged statement. Moreover, none of CW1's allegations regarding in-store traffic patterns allege that *Chambers* received any of the allegedly contrary information. *See, e.g.*, *id*. ¶¶ 63-65

19

(discussing Business Review meetings Therivel allegedly attended); *see also supra* at 15-16. But more fundamentally, as with the other CW allegations, these allegations are not a revelation of hidden information: Chambers stated in the challenged statement itself that "store traffic is down slightly year-over-year," so investors were fully informed of how in-store traffic was performing.

Plaintiff also distorts Chambers's answer to the analyst's question: "And store traffic any sense of the consumer slowing down or the industry slowing down after a strong year?" Ex. H, 22Q1EC at 11. Specifically, Plaintiff claims that when asked "point blank — whether in-store traffic had diminished," Chambers "unequivocally stated '*No*[,]'' and that there was 'nothing concerning.'" Am. Compl. ¶ 7. Plaintiff's allegation is false.

The question to which Chambers responded "no" included a statement about store traffic, but went on to ask whether Chambers had a "sense of the consumer slowing down or the industry slowing down after a strong year."[6] That was what Chambers was responding to. In short, Plaintiff has not alleged a single fact, let alone any particularized ones, suggesting that Chambers believed that the industry or consumer appetite *overall* would be slowing down. Nor would it make any sense for Chambers to deceptively answer in a way intended to conceal the downtrend in in-store traffic, only to immediately thereafter state in the very same statement, that "store traffic is down."

All that is left is Chambers's subjective opinion with respect to the state of store traffic— i.e., whether or not he actually found it "concerning." Plaintiff alleges this statement is false or

---

[6] The full exchange was as follows:
> **Analyst:** Okay, great. And store traffic any sense of the consumer slowing down or the industry slowing down after a strong year?
> **Chambers:** No. I mean, our store traffic is down slightly year-over-year but nothing concerning.

Ex. H, 22Q1EC at 11.

misleading because CW1 met with Chambers every month "to discuss anything that might cost money." Am. Compl. ¶ 153. As an initial matter, this cannot literally be true; UScellular reported total operating expenses of over $4 billion in 2022. Ex. I, 2022 10-K at 25. Chambers cannot have consulted CW1 with respect to every single cost at a company of that scale. *See Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 904 (E.D. Pa. 2018) (rejecting CW allegation that CEO's "approval was required 'to do anything'" because it "sounds in exaggeration and stretches the bounds of credulity"); *cf. Boeing*, 711 F.3d at 759 (listing reasons confidential witness allegations lack credibility). Moreover, neither the allegations from CW1 or elsewhere support a claim that Chambers did not honestly hold the belief he expressed. Nor does the Complaint allege that any particular facts were necessary to provide context for or qualify Chambers's expressed belief.

> **B.** **Plaintiff Does Not Adequately Allege That Therivel's Statements Made During the August 5, 2022 Earnings Call Were False or Misleading.**
>
> **1.** **Plaintiff Does Not Adequately Allege That Therivel's Statements Regarding the Promotion Were False or Misleading.**

In the second quarter of fiscal 2022, UScellular launched the Promotion, see *supra* at 7-9. Plaintiff challenges statements that Therivel made on the August 5, 2022 TDS and UScellular earnings call regarding the initial effects of the Promotion, the majority of which were made in response to analyst questions. The challenged statements are as follows:

> **And while it's early, so far, we're pleased with the results.** We've seen significant increase in add-a-line and upgrade activity, and we expect that upgrade activity to result in improved churn downstream.

> And so the goal is how do we get customers back into contract. And that was one way is with the offer that we put forward. **We think it specifically addressed that issue, and we're seeing really good results. So we're seeing upgrades up substantively. We're seeing the ratio of voluntary defections to gross adds improve substantively.**

> **[T]he ratio of gross adds to voluntary defects. We're seeing improvement there.**
>
> AT&T and Verizon both raised prices in the second quarter. We committed to our customers, we would not, and that is meaningful to them. **And so we're seeing a lot of customers come into the store** and specifically referenced that price guarantee as a reason for coming in.

Am. Compl. ¶¶ 113-15, 119.

Plaintiff alleges, based on CW allegations, that Therivel's statements regarding the Promotion were false or misleading for a laundry list of reasons, such as because, at "quarterly Business Review meetings," employees in charge of each region explained that it was a "'struggle' to meet KPI [key performance indicator] goals," and it "would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn." *Id.* ¶ 116(v)-(vi), (viii), (ix)-(xi). Many of these supposed bases for falsity are taken verbatim from Plaintiff's allegations regarding statements made in the first quarter discussed above. They fare no better here, for the same reasons set out above. *See supra* at 13-17. For instance, setting aside the numerous other issues with the allegation regarding the Business Review Meeting, set forth above, allegations regarding what Therivel said during a single meeting in June, have no bearing on statements regarding the Promotion, which was not launched until later that same month. At that time, the Promotion was, at most, in its infancy.

Additionally, Plaintiff alleges the statement, "And so we're seeing a lot of customers come into the store," Am. Compl. ¶ 119, was false or misleading because of the Company's declining in-store traffic. *Id.* ¶ 120. But this allegation relies on Plaintiff's misleading omission of the remainder of Therivel's answer set out in the very same sentence. Viewed in its proper context, Therivel was not advising investors how many customers were coming into the store; he was simply saying that customers who were coming to the store were referencing the Company's commitment to not raising prices, a fact Plaintiff does not remotely dispute.

Plaintiff further alleges that, according to CW2, Therivel and Chambers received "what-if-scenarios" for promotions showing cost and anticipated benefits "[a]fter running experiments," and that "CW2 and the Growth Marketing department would report results of cost and benefit analysis to Defendants Therivel and Chambers." Am. Compl. ¶¶ 71-72; *id.* ¶ 116(i), (iii)-(iv). Plaintiff alleges on this basis that each challenged statement regarding the Promotion "materially overstated[] the impact that the [Promotion] would have on subscribership and churn outcomes" and "materially understated the financial impact of the [Promotion], including with respect to anticipated losses on equipment sales." *Id.* ¶ 116(i), (iii)-(iv).

As an initial matter, the Court need not credit the allegations from CW2: Plaintiff does not allege that CW2 was employed by the Company during the Class Period (and the absence of such allegations suggests that CW2 was not), so Plaintiff has not adequately plead that CW2 had any knowledge at all regarding the Promotion. *Davis*, 431 F. Supp. 2d at 828 ("Plaintiffs must plead 'with substantial specificity' how confidential witnesses 'came to learn of the information they provide in the complaint.'") (citation omitted). More fundamentally, Plaintiff does not explain what "cost and benefit analysis" contradicted Therivel's statements, or in what way the Promotion's benefits and financial impacts were overstated. Instead, Plaintiff generally takes issue with statements, e.g., regarding improvements in upgrades and the ratio of defections to adds, presumably because they were not uniformly negative.[7] But Plaintiff does not allege anywhere that these metrics did not actually improve after the Promotion was launched near the end of the second quarter. As such, he does not adequately allege that these statements were

---

[7] Plaintiff further alleges that all generally positive statements regarding the Promotion were false or misleading because the Promotion was "table stakes" to stay relevant in the market. Am. Compl. ¶¶ 108(ii), 116(ii), 118(i). But this allegation is entirely consistent with Defendants' statements that it had launched aggressive promotions *in response to the competitive environment*, *see supra* at 4-9, and so cannot adequately allege falsity.

false. The remainder of the challenged statements, e.g., "[w]e think [the Promotion] specifically addressed [getting customers back in contract], and we're seeing really good results" and "while it's early, so far, we're pleased with the results," are statements of opinion made in response to analyst questions, and thus subject to the standards set out above. *See supra* at 17. Plaintiff cannot meet those standards. To the contrary, when the statements are read in their full context without Plaintiff's improper truncations (*see* Ex. K, 22Q2EC at 5, 10-11, 16), it is clear that Therivel explained exactly what he meant by "good results" with regard to getting customers back in contract: the fact, as stated in the next sentence, that "upgrades," which under the Promotion required customers to sign a contract, were "up substantively." And Therivel also disclosed exactly what "results" he was "pleased with": the "significant increase in add-a-line and upgrade activity" and "the ratio of gross adds to voluntary defects," i.e., improvements in areas expressly targeted by the Promotion. *See supra* at 7-9. Plaintiff's challenge to these statements accordingly fails as well.

Nor does Plaintiff explain in any way why these statements of belief misstate the Promotion's benefits and costs. Far from misstating the benefits of the Promotion, on the very same call on which Therivel made the challenged statements, the Company specifically disclosed that postpaid churn had increased, and Therivel explicitly noted, "I'm encouraged by the momentum in our growth areas, ***but we still need to improve postpaid subscriber results***." Ex. K, 22Q2EC at 5-6 (emphasis added); *see also* Am. Compl. ¶ 121; Ex. R, at 1 (analyst report from August 10, 2022 noted disclosure of "more net postpay customer losses" and an "elevated level of churn" and indicated that "the competitive environment … will remain a headwind"). And Therivel explained how the churn rate could remain negative while other metrics improved—because churn was "downstream" of these other metrics, meaning that their

improvement signaled a *later* improvement in churn (Ex. K, 22Q2EC at 5), an improvement that ultimately did occur, *see supra* at 9-11. With respect to the costs of the Promotion, Chambers explained during the same call that increased "equipment sales revenues" had been "partially offset by higher promotional activity," and further advised investors that the Company expected "a continued highly competitive and promotionally focused environment." Ex. K, 22Q2EC at 6-7. Moreover, contrary to Plaintiff's allegations (Am. Compl. ¶¶ 130-31), during the call, Chambers *explained* that the impact of the Promotion on the Company's revenue would continue to be felt over time. Ex. K, 22Q2EC at 16-17 (noting promotion costs realized over 36 months). Fundamentally, Plaintiff's allegations amount to a disagreement with Therivel's statements of opinion regarding the Promotion's early results. But courts do "not intervene in a business … judgment simply because [others] reached different conclusions" from internal personnel. *Fryman*, 462 F. Supp. 3d at 903 (citing *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012)); *cf. Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998) (claims based simply on alleged mismanagement of a corporation "would carry the securities laws far outside their intended domain"). Plaintiff's challenges to these statements fail for this reason as well.

### 2. Plaintiff Does Not Adequately Allege That Therivel's Forward-Looking Statements Were False or Misleading.

The PSLRA establishes a "Safe Harbor" for forward-looking statements. The Safe Harbor contains two independent prongs. The first prong protects any forward-looking statement that is "identified as a forward-looking statement," and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(1)(A)(i). While cautionary language must be "substantive and tailored to the specific predictions made in the allegedly misleading statement," it "need not

25

expressly refer to the risk that ultimately caused the projection to differ from the results, for 'prevision' on the part of defendants is not required." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009) (citations omitted). Defendants' state of mind is irrelevant for this prong, and it, on its own, is a basis for dismissal. *Plumbers Pipefitters Loc.Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Solutions, Inc.* ("*Allscripts*"), 778 F. Supp. 2d 858, 877 (N.D. Ill. 2011).

The Safe Harbor's second independent prong requires the Plaintiff to plead facts establishing a strong inference "that the forward-looking statement … was made with *actual knowledge* by [the speaker] that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B) (emphasis added). That is, "a plaintiff who is complaining about 'forward-looking' statements—predictions or speculations about the future—[must] prove 'actual knowledge' of falsity on the part of defendants, not merely reckless indifference to the danger that a statement is false." *Boeing*, 711 F.3d at 756 (citing, *inter alia*, 15 U.S.C. § 78u-5(c)(1)(B)).

Here, Plaintiff challenges Therivel's statements regarding (i) the Company's ability to meet its projections (that the Company is "maintaining our operating cash flow guidance" and "maintain[ing] our profitability outlook for the year") and (ii) subscriber results and expense pressure Therivel believed the Company would experience "in the second half of the year." The challenged statements are as follows, some of which were made in response to analyst questions:

> **We also continue to maintain expense discipline across the organization, which has allowed us to launch some aggressive promotions and make investments in key growth areas of the business while still maintaining our operating cash flow guidance.**

> **And thanks to the trials that we ran, we're able to structure this offer in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable. And that offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions.**

26

**Do I see a price to -- do I see a path to positive consumer postpaid net adds? Yes, I do. … What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter.**

Am. Compl. ¶¶ 113-14, 117. These statements are each forward-looking and are protected under both prongs of the Safe Harbor. 15 U.S.C. § 78u-5(c)(1)(A)(i) (forward-looking statements include "*a projection of revenues, income, [or] earnings*," "plans and objectives of management for future operations," and "*a statement of future economic performance*") (emphasis added).[8]

### a. Therivel's Forward-Looking Statements Were Identified as Such and Accompanied by Meaningful Cautionary Language.

The forward-looking statements are not actionable because they were accompanied by meaningful cautionary language tailored to the predictions. Specifically, Plaintiff alleges that Therivel's statements regarding the Company's ability to meet its guidance and regarding the timeline for the Promotion were false or misleading because the Promotion did not deliver positive churn results within the "second half of the year," and because Plaintiff believed the Promotion to be too costly. *See infra* at 30-31. However, the Company expressly warned investors regarding these risks. The earnings call at which these statements were made included the following disclosure:

---

[8] To the extent that these statements contain non-forward-looking components, such as "[w]e also continue to maintain expense discipline across the organization, which has allowed us to launch some aggressive promotions and make investments in key growth areas of the business," Plaintiff does not allege that these components are false or misleading. For instance, statements about "expense discipline" are expressly not about the Promotion, but about the Company's ability to cut costs on an "ongoing" basis "across the organization." Ex. K, 22Q2EC at 5. Plaintiff does not say a single thing in the Complaint about general "expense discipline," much less allege that the Company's statements regarding it are false. Nor does Plaintiff challenge whether the Company has made "investments in key growth areas," or that it has "launch[ed] some aggressive promotions." Plaintiff instead challenges Therivel's statements that the Company could carry out these strategies *and maintain its cash flow and profitability outlook*—a black-letter example of a forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i).

These statements are based on current estimates, projections, and assumptions, which involve certain risks and uncertainties that could cause actual results to differ materially from those in the forward-looking statements. Important factors that may affect these forward-looking statements include, but are not limited to: ***intense competition***; … ***changes in … price competition, or churn rates*** …[.]

Ex. F, 22Q2EC Pres. at 2 (emphasis added). The call also incorporated by reference disclosures in UScellular's recent 10-K and 10-Q filings. *Id. See In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1167 (N.D. Ill 2004) ("Cautionary statements in SEC filings incorporated by reference are adequate to invoke the PSLRA's safe harbor."). These disclosures included:

- "***Intense competition involving*** products, services, pricing, ***promotions*** and network speed and technologies could adversely affect UScellular's revenues ***or increase its costs to compete***."

- "***In particular, wireless competition includes aggressive service plan and device pricing … which could result in switching activity and churn***[.]"

Ex. A, 2021 10-K at 5 (emphases added).[9] Where, as here, cautionary language "identif[ies] the principal contingencies that could have caused [the Company's] actual results to depart from its forward-looking statements and projections," such language is sufficiently cautionary. *Allscripts*, 778 F. Supp. 2d at 875; *see also Desai*, 654 F. Supp. 2d at 846 (To dismiss as "boilerplate" cautionary statements that are "anticipatory of Plaintiffs' claims … borders on the farcical."). The statements accordingly are not actionable under prong one of the Safe Harbor.

---

[9] Further relevant cautionary disclosures in the 10-K included:
- ***Changes in various business factors, including*** changes in demand, consumer preferences and perceptions, price competition, ***churn from customer switching activity*** and other factors, ***could have an adverse effect on UScellular's business, financial condition or results of operations***.
- Changes in any of several factors could have an adverse effect on UScellular's business, financial condition or results of operations. These factors include, but are not limited to: … ***Competitive pressure from promotional activity***; The pricing of services, including an increase in price-based competition; … ***Churn rates***; … ***Net customer acquisition and retention costs***.

Ex. A, 2021 10-K at 7-8 (emphases added).

28

**b.** **Plaintiff Has Not Adequately Alleged That Therivel's Forward-Looking Statements Were Made with "Actual Knowledge" of Their Falsity.**

Plaintiff's allegations regarding the challenged forward-looking statements also fail under prong two: Plaintiff has not pleaded that the statements were made with *actual knowledge* of their falsity. "[A] plaintiff who is complaining about 'forward-looking' statements … [must] prove 'actual knowledge' of falsity on the part of defendants, not merely reckless indifference to the danger that a statement is false." *Boeing*, 711 F.3d at 756 (citing 15 U.S.C. § 78u-5(c)(1)(B)).

*First,* Plaintiff alleges that the Company could not launch the Promotion and meet its cash flow guidance or profitability outlook. Am. Compl. ¶¶ 116(ii)-(iv), 118(i)-(iii). On that basis, Plaintiff challenges statements that the Company's expense discipline has "allowed [it] to launch aggressive promotions … while still maintaining our operating cash flow guidance," and that the "offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions." But Plaintiff does not allege anywhere why this is so—simply that *Plaintiff* viewed the Promotion to be overly expensive and was unhappy with the Company's subscriber results. Such assertions do not come close to a particularized allegation of *actual knowledge* on the part of Therivel that his statements were false. *See Boeing*, 711 F.3d at 758 (optimistic public statements founded on a "realistic hope" that defects could be remedied do not show actual knowledge of falsity); *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *9 (N.D. Ind. May 23, 2018) (knowledge of prior backlogs and "sales shortfalls" did not render optimistic forward-looking projection knowingly false). Indeed, while the Company lowered the upper end of certain of its guidance on November 4, 2022, by the end of the year, its results were within the originally projected range. *See supra* at 9-11. That undermines the claim that the Promotion was so costly that Therivel's statements regarding meeting the guidance must have been false or misleading. *See City of*

29

*Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (holding that even a "near miss" of a forecast by "just over one percentage point" is "a long way from fraud").

*Second,* Plaintiff challenges Therivel's statements of belief regarding the timeline on which the Promotion would deliver positive subscriber results. Plaintiff challenges the statement that "thanks to the trials that we ran, we're able to structure this offer in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable" and the statement, in response to an analyst question, that "[w]hat we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter." Am. Compl. ¶¶ 113-14. As an initial matter, the statement that "we believe" the Promotion will "drive positive subscriber results in the second half of the year" is fully consistent with, and supported by, the fact that Therivel reported "leading indicators" of improvements in churn, such as a "substantive[]" increase in upgrades that could drive subscribers under contract, beginning in the second quarter. As discussed above, *supra* at 24-25, Plaintiff does not adequately plead that those reports of improvements were false.

Additionally, Plaintiff takes issue with the expense of the Promotion, *see* Am. Compl. ¶¶ 97, 116(iii), but Plaintiff does not offer any allegation whatsoever that Therivel did not believe the prospective expense pressure was "manageable." Instead, Plaintiff apparently challenges Therivel's statements of belief or expectation regarding churn improvement. Specifically, Plaintiff's claim is that Therivel knew that the Promotion *would* improve subscriber results, but Plaintiff alleges, those results would improve over a longer timeline than Therivel told investors. *See, e.g., id.* ¶¶ 89-92 (alleging that Therivel knew it would take more than six

30

months to see consumer churn benefit from the Promotion). In this regard, Plaintiff cites statements such as Therivel's statement on the Q3 2022 earnings call, made after the Class Period, that in regional trials "it took us 6 months or so…to see the improvements in voluntary churn" from the regional version of the Promotion. *Id.* Based on Plaintiff's six-month timeline, counting out from the "late June" launch of the Promotion, Therivel supposedly knew that churn would begin to improve in December. By contrast, Plaintiff alleges that Therivel expressed a belief that churn would begin to improve at some point in the "third quarter," i.e., the second half of the year. Plaintiff's allegation of fraud, accordingly, comes down to a timing difference of, potentially, ***three months***. Plaintiff does not explain why Therivel would have any incentive to lie to investors about a matter of three months. Moreover, courts consistently have refused to find securities fraud in the kind of imprecision Plaintiff alleges. "The law tolerates greater imprecision from forecasts because predicting the future is an uncertain enterprise." *Zebra Techs. Corp.*, 8 F.4th at 596-97. This is particularly true when "speaking about a developing process," such as a newly launched promotion. *Id.* at 597. And it is all the more true with respect to statements of belief, including those made in response to analyst questions, like those here. *See supra* at 17.

Moreover, statements such as "[i]n the markets that we trialed [promotions] in previously, it took us 6 months or so, 6, 7 months to see the improvements in voluntary churn," Am. Compl. ¶ 90 (emphasis added); *see also id.* ¶¶ 91-92, 135-36, 163-64, are ***not inconsistent*** with Therivel's belief that he hoped to see improvement in 2022. All they convey is that six or seven months was the timeline for improvement in a *regional* trial. Plaintiff does not allege anywhere that Therivel believed the *national* Promotion would follow the exact timeline of the smaller regional trial. To the contrary, Therivel stated during the third quarter earnings call that

31

"I hoped to have seen better improvements in voluntary churn this quarter." Ex. M, 22Q3EC at 13. "[U]nexpected difficulties" in the course of a new promotion "are a business problem, not a securities problem." *Zebra Techs. Corp.*, 8 F.4th at 596-97. Plaintiff has failed to plead any allegations suggesting that Therivel's forward-looking statements were made with actual knowledge of falsity. Therefore, Plaintiff's allegations regarding these statements must be dismissed under the second prong of the Safe Harbor as well.

## II. PLAINTIFF DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER AS TO ANY DEFENDANT.

As a separate and independent basis for dismissal, Plaintiff does not come close to pleading scienter under the stringent standard required by the PSLRA. A plaintiff claiming fraud under Section 10(b) must allege scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). Scienter may be "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.* ("*Kohl's*"), 895 F.3d 933, 936 (7th Cir. 2018) (citation omitted).[10] Under the PSLRA, plaintiffs must "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* at 936 (quoting 15 U.S.C. § 78u-4(b)(2)(A)) (emphasis in original). This is a demanding standard, higher than the standard set out in Rule 9(b). *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 796 (N.D. Ill. 2007). Moreover, allegations establish the requisite strong inference "only if … the inference of scienter [is] cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. This showing must be made as to *each* defendant. *Cornielsen*, 916 F.3d at 601-02. In determining whether inferences can be reasonably drawn,

---

[10] Recklessness in this context has been defined as an "extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Boeing*, 711 F.3d at 756 (citation omitted).

32

courts "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 310.

Here, many of Plaintiff's alleged false statements are statements of opinion, and so they require an inquiry into Defendants' subjective knowledge of their falsity, or they are forward-looking statements, which require Plaintiff to show that they were made with "actual knowledge" that the statement was false or misleading. As such, many of the reasons why the statements are not false or misleading are equally reasons why Plaintiff has not adequately alleged a strong inference of knowledge or recklessness. *Cf. Fryman*, 462 F. Supp. 3d at 902 (N.D. Ill. 2020) ("These arguments fail to prove scienter for the same reason they fail to establish an actionable misstatement or omission[.]").

Plaintiff's scienter allegations fail for numerous other reasons as well. Plaintiff provides no explanation whatsoever for why Therivel and Chambers would commit fraud during two earnings calls, only to have to reveal the "truth" themselves a few months later. *Zimmer Holdings, Inc.*, 679 F.3d at 956 ("Managers usually do best when a firm has long-term success. Those who boost prices fraudulently for [a few] months … and then see market capitalization decline, may find themselves on the street[.]"); *Citytrust Bancorp, Inc.*, 25 F.3d at 1130 (purported fraud is implausible where alleged misstatements would achieve only "a short respite from an inevitable day of reckoning"). "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *Boeing*, 711 F.3d at 758. Here, there are no allegations that Therivel or Chambers sold shares at inflated prices or had any economic incentive to mislead shareholders because of compensation arrangements or any other reasons. This cuts against an inference of scienter. *Cf. Pugh v. Trib. Co.*, 521 F.3d 686 at 695 (7th Cir. 2008) ("[T]he fact that the defendants are not alleged to have sold the stock at the inflated prices meant

33

that they stood to lose a lot of money if the value of Tribune's stock fell."). At most, the Complaint relies on the unstated assumption that Therivel and Chambers wanted to paint a rosier picture for investors than was warranted during the months-long Class Period—a short-lived scheme that would quickly come to light as a result of statements made during 2022's third quarter earnings call by the Defendants themselves. *See supra* at 9-11. To be sure, the PSLRA does not require a specific allegation of motive. But in undertaking the necessary "holistic" assessment of whether a strong inference has been established, the lack of any logical reason to have engaged in fraud is relevant, because "otherwise, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kohl's*, 895 F.3d at 939-40 (a "motive to pretend nothing was amiss" cannot support a strong inference of scienter) (cleaned up).

None of the remaining "Additional Scienter Allegations" alleged in the Complaint provides further support to Plaintiff's allegations. Instead, the Complaint largely regurgitates prior allegations that fail for the reasons set out above. Am. Compl. ¶¶ 141-180. The few additional allegations it adds are of the same general tenor as the CW allegations, and accordingly fare no better, *see, e.g.*, Am. Compl. ¶ 141 (statements that Therivel made on a podcast, indicating that he held regular meetings with UScellular officers, some of which included a "deep, deep dive on what's going on in the business"), or are allegations that postpaid sales constituted "core operations" of UScellular and TDS and accordingly Defendants can be presumed to be aware of them, Am Compl. ¶¶ 166-172. But this argument misses a step: "Plaintiff[] [has] not adequately alleged the existence of any internal information that contradicted" any of the Individual Defendants' statements. *Fryman*, 462 F. Supp. 3d at 902 (dismissing claims on this basis). Moreover, "the 'core operations' inference generally will not

establish a strong inference of scienter by itself," and, as already explained, Plaintiff has failed to plead any other facts establishing scienter. *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021). Whether considered individually or holistically, the inference that Defendants supposedly engaged in a scheme to defraud investors for a matter of months, only immediately to "reveal" the "truth" themselves months later is far weaker than the competing and far stronger inference: that no such scheme existed. Plaintiff's scienter allegations accordingly fail.

## III.  PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a).

"[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh*, 521 F.3d at 693. Because the Amended Complaint fails to adequately allege any underlying violation, Plaintiff's Section 20(a) claim fails. *Id.* at 698.

## CONCLUSION

Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice.

Date: October 16, 2023

Respectfully submitted,

By: *James W. Ducayet*
James W. Ducayet (ARDC No. 6236997)
jducayet@sidley.com
Elizabeth Y. Austin (ARDC no. 6308514)
laustin@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

***Attorneys for Defendants***

35