**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, and TELEPHONE AND DATA SYSTEMS, INC., <br><br> Defendants. | No. 1:23-cv-02764 <br><br> Honorable Mary M. Rowland |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

STATEMENT OF FACTS .................................................................................................. 3

I.    UScellular is a U.S. Wireless Provider that Competes with Larger, Established Carriers Through Promotions that are Analyzed and Authorized by Defendants .................................... 3

II.   Defendants Implement a Regional Approach to Trialing and Testing Promotions Which Admittedly Lets Them Know the Scope of Any Promotion's Efficacy and Cost ...................... 4

III.  Defendants De-Emphasize USM's Regional Approach in Favor of a Company-Wide Any Phone Free Promotion Designed From April 2022 Trial Data ................................................... 5

IV.   Defendants Knew in Real Time that UScellular's Promotion Failed to Improve Subscriber Challenges and In-Store Traffic Rates ...................................................................................... 6

V.    After the Class Period, Defendants Reveal that the Promotion Failed to Improve Churn, Subscribership, and Service Revenues, And Devasted USM's Financials ................................. 7

ARGUMENT ........................................................................................................................ 8

I.    The FAC Adequately Alleges Material Misstatements and Omissions ............................ 8

    A.   Defendants' Timeline Statements Were Materially False and Misleading .................. 10

    B.   Defendants' In-Store Traffic Statements Were Materially False and      Misleading ... 13

    C.   Defendants' Statements Concerning the Promotion's Purported Financial "Discipline" and Results Were Materially False and Misleading ............................................................. 15

    D.   Purported Satisfaction With the Promotion Was Materially False and      Misleading .. 17

    E.   The Safe Harbor Does Not Immunize Defendants' Statements ................................. 19

II.   The FAC Adequately Alleges Scienter .......................................................................... 24

    A.   Defendants' Admissions Support a Strong Inference of Scienter .............................. 25

    B.   Defendants' Extensive Involvement in Implementing, Monitoring, and Publicly Discussing UScellular's Promotions Support a Strong Inference of Scienter ...................... 26

    C.   Postpaid Sales Are Defendants' Core Operation, Strongly Supporting      Scienter .. 30

    D.   The FAC's Allegations Holistically Support a Strong Inference of Scienter ............... 30

III.  The Court Should Credit the CWs' Convincingly Detailed Accounts ............................ 33

CONCLUSION ................................................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ........................................................ 10, 15, 17, 30

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) ................................................................................. 8, 15

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004), as amended (Sept. 3, 2004) .................................... 21, 23

*Axis Hospitality, Inc. v. Hanson*,
2010 WL 431662 (N.D. Ill. Feb. 1, 2010) .............................................................. 25

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ........................................................... 9, 30

*Boca Raton Firefighters' & Police Pension Fund v. DeVry, Inc.*,
2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) ......................................................... 35

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ......................................................... passim

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .......................................................... 25, 30

*City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ............................................................ 34

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) .................................................................................... 12, 13

*Davis v. SPSS, Inc.*,
431 F. Supp. 2d 823 (N.D. Ill. 2006) ..................................................................... 35

*Desai v. Gen. Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ..................................................................... 22

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .......................................................... 14, 15, 26

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. May 10, 2010) ...................................................... 13

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) .......................................................... 9, 16

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. May 26, 2020) ....................................................... 19

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) .................................................................... 27

*Gosselin v. First Tr. Advisors L.P.*,
  2009 WL 5064295 (N.D. Ill. Dec. 17, 2009)......................................................... 10

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ................................................... passim

*Higginbotham v. Baxter Int'l Inc.*,
  495 F.3d 753 (7th Cir. 2007) .......................................................................... 34

*Holwill v. AbbVie Inc.*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .................................................. 9, 29

*In re Adient PLC Secs. Litig.*,
  2020 WL 1644018 (S.D.N.Y. April 2, 2020) ....................................................... 28

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ................................................. 10, 28

*In re Baxter Int'l Inc. Sec. Litig.*,
  2021 WL 100457 (N.D. Ill. Jan. 12, 2021)......................................................... 30

*In re Boeing Co. Aircraft Sec. Litig.*,
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ............................................. 11, 23, 32

*In re First Merchants Acceptance Corp. Sec. Litig.*,
  1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ........................................................... 9

*In re Heckmann Corp. Sec. Litig.*,
  869 F. Supp. 2d 519 (D. Del. 2012)................................................................... 25

*In re MGM Mirage Sec. Litig.*,
  2013 WL 5435832 (D. Nev. Sept. 26, 2013)....................................................... 13

*In re NeoPharm, Inc.Sec. Litig.*,
  2003 WL 262369 (N.D. Ill. Feb. 7, 2003) .................................................... 14, 25

*In re Next Level Systems, Inc.*,
  1999 WL 387446 (N.D. Ill. Mar. 31, 1999)........................................................ 21

*In re SCANA Corp. Sec. Litig.*,
  2019 WL 1427443 (D.S.C. Mar. 29, 2019) ........................................................ 11

*In re Sears, Roebuck and Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003)................................................................. 30

*In re Supreme Industries, Inc. Sec. Litig.*,
  2018 WL 2364931 (N.D. Ill. May 23, 2018)....................................................... 23

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ............................................................................... 9

*In re Venator Materials PLC Sec. Litig.*,
  547 F.Supp.3d 624 (S.D. Tex. July 7, 2021) ...................................................... 13

*Inst. Inv. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3rd Cir. 2009) ........................................................................... 19

iii

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ........................................................................................... 13

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) ............................................................... 32

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................. 12

*Lewis v. Straka*,
535 F. Supp. 2d 926 (E.D. Wis. 2008) ................................................... 26, 27, 31

*Lowry v. RTI Surgical Holdings, Inc.*,
532 F. Supp. 3d 652 (N.D. Ill. April 1, 2021) .................................................. 25, 35

*Lowthorp v. Mesa Air Grp., Inc.*,
2021 WL 3089118 (D. Ariz. July 22, 2021) ...................................................... 10, 11

*Macovski v. Groupon, Inc.*,
553 F. Supp. 3d 460 (N.D. Ill. Aug. 11, 2021) ................................................... 10

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................................................................... passim

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ............................................................................ 12, 33

*Matrixx Initiatives, Inc. v. Siracusano*,
131 U.S. 1309 (2011) ......................................................................................... 17

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) .............................................................................. 34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................................... 11

*Ong v. Sears, Roebuck & Co.*,
388 F. Supp. 2d 871, 905 (N.D. Ill. 2004) ....................................................... 23

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) ............................................. 20, 27, 31

*Pierrelouis v. Gogo, Inc.*,
2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) .......................................... 22, 23, 24, 35

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) ............................................................................. 32

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ............................................................ passim

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*,
717 F. Supp. 2d 1170 (E.D. Wash. June 2, 2010) ............................................... 13

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ............................................................................. 33

iv

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ........................................................ passim

*S. Ferry LP #2 Killinger*,
687 F. Supp. 2d. 1248 (W.D. Wash. 2009)..................................................................... 29

*SEC v. Cook*,
2015 WL 5022152 (S.D. Ind. Aug. 24, 2015) ................................................................. 9

*SEC v. Kameli*,
2020 WL 2542154 (N.D. Ill. May 19, 2020)................................................................... 9

*Selbst v. McDonald's Corp.*,
2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ....................................................... 20, 21

*Smith v. Signature Sys.*,
2022 WL 595707 (N.D. Ill. Feb. 28, 2022) ................................................................... 24

*Sutton v. Bernard*,
2001 WL 897593 (N.D. Ill. Aug. 9, 2001) ................................................................... 28

*Takara Tr. v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. Apr. 28, 2006).............................................................. 21

*Tellabs, Inc. v. Makor Issue & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................. 24, 25

*Utesch v. Lannett Co.*,
316 F. Supp. 3d 895 (E.D. Pa. 2018) ............................................................................ 29

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ........................................................................... 34

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A).............................................................................................. 21

15 U.S.C. § 78u-5(c)(1)(B) ............................................................................................. 23

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................................... 8

Fed. R. Civ. P. 9(b) .......................................................................................................... 8

SEC Rule 10b-5 ................................................................................................................ 8

TDS' core business is the sale of "postpaid" wireless telecommunications services through its subsidiary UScellular (or "USM" and with TDS, the "Companies").[1] Before the Class Period, UScellular experienced intense competition from the Big 3 (AT&T, Verizon, and T-Mobile), who offered plush promotions designed to entice postpaid customers to switch wireless carriers. Thus, UScellular experienced alarming churn (i.e., switching) and massive postpaid customer losses. To combat these issues, USM hired Defendant Therivel to "driv[e] gross adds and keep[] churn down." Therivel initially implemented a regional approach to promotions—tailoring programs to one or more of USM's six Regions to evaluate the promotions' effectiveness and cost. However, the regional approach did not stem postpaid subscriber challenges or address dwindling in-store traffic, particularly as competition from the Big 3 persisted. In response, Defendants launched a Company-wide, exorbitantly expensive "Any Phone Free for Anyone, New and Existing Customers" promotion in June 2022 (the "Promotion")—the most aggressive in USM history.

As the Promotion rolled out, Defendants issued a false timeline to investors. Defendants misrepresented that based on the April 2022 trial results, the Companies would see "steady churn improvement" in the "third quarter" and "second half" of 2022. Defendants also falsely assuaged investors concerning UScellular's in-store traffic (one of the most significant drivers of churn). Indeed, in response to direct questions by securities analysts, Chambers flatly denied "concern[s]" about, and Therivel misleadingly touted, USM's in-store traffic. But none of this was true. Instead, as Therivel admitted in February and May 2023, Defendants "knew" before the Class Period began that data from April 2022 evidenced that it would take at least "6 to 9 months" for the Promotion

---

[1] "¶_" and "¶¶_" refer to paragraphs in Plaintiff's First Amended Class Action Complaint For Violations of the Federal Securities Laws ("FAC"). ECF No. 32. "Motion" refers to Defendants' motion to dismiss the FAC, "DB" refers to Defendants' brief supporting the Motion, and "Ex." refers to Defendants' Exhibits appended thereto. ECF Nos. 35-36. Unless otherwise noted, capitalized terms have the same meanings as in the FAC, all emphasis is added, and all internal quotations and citations are omitted.

to improve subscribership metrics. Moreover, unbeknownst to investors, churn and customer losses were growing exponentially throughout the Class Period, and the most significant driver of those failures, in-store traffic, was well below target. Defendants also knew from analysis of costs and benefits in 2021 that implementing a Company-wide promotion offering free phones to new and existing customers would require UScellular to more than double its promotion budget, which was hardly financially disciplined when combined with USM's costly 5G expenditures. Accordingly, Defendants also made false statements when touting their ability to "maintain expense discipline" in connection with the Promotion which purportedly enabled it to launch across USM's entire operating footprint while still "maintain[ing] [USM's] profitability outlook."

Defendants' statements were also false when made. For instance, Confidential Witness ("CW") 1, a former USM Area Vice President ("AVP"), explained that during every quarterly Business Review meeting (which Threivel attended) each of the six AVPs reported that it was a "struggle" to meet goals for critical metrics such as postpaid churn, gross and net postpaid customer adds, and in-store traffic rates. CW1 also confirmed that throughout 2Q22 and 3Q22, "according to the numbers" CW1 saw in the Business Review meetings that there had not been *a single one* of the six areas that had positive store traffic or met their postpaid churn quotas, which Defendants also knew from receiving daily ADS reports of churn and in-store traffic results. In response to these dim results, AVPs were asked, and meeting participants would discuss, why UScellular's promotions and other efforts were failing to improve in-store traffic and postpaid churn. Critically, Therivel raised USM's poor in-store traffic and margins during every Business Review throughout CW1's tenure, always asserting that those metrics needed to improve.

Defendants' Motion disingenuously ignores the "6 to 9-month" timeline that Therivel twice admitted to, and instead relies on mountains of extraneous exhibits to inappropriately create a

2

counternarrative contesting the FAC's well-pled allegations. In doing so, Defendants claim that churn improved by the end of 2022. In fact, churn in 4Q22 was *worse* than reported at the time of Defendants' false and misleading statements in May and August 2022, and no better than it was in 4Q21. Defendants also contest Plaintiff's robust scienter allegations in a perfunctory 3-page afterthought. However, the FAC's overwhelming factual support demonstrating that Defendants knew the challenged statements were false and misleading when made dooms their motion.

Ultimately, Defendants disclosed on November 3, 2022 and November 4, 2022 that, contrary to their Class Period misstatements, UScellular's aggressive Promotion was financially disastrous and incapable of delivering the subscribership and churn improvement that Defendants described (let alone on the timeline represented). Defendants lowered UScellular's financial guidance ranges for 2022 and disclosed that net income attributable to TDS' common shareholders and related diluted earnings had declined. UScellular's margins and losses on equipment sold, which were already negative, had also reached historic lows due to the Promotion while churn reached a six-year high of 1.42%. On this news, TDS' common stock price fell 25.89%, on unusually heavy trading volume. The price of TDS' preferred shares also declined over 5% each.

## STATEMENT OF FACTS

I. **UScellular is a U.S. Wireless Provider that Competes with Larger, Established Carriers Through Promotions that are Analyzed and Authorized by Defendants**

USM provides wireless services throughout its non-contiguous U.S. footprint. ¶¶44, 106. Approximately 90% of its "retail connections" (i.e., individual lines of service associated with activated devices) are postpaid. ¶¶45-46. UScellular sells services and devices through channels including, significantly, USM and franchisee-owned stores where customers shop in person. ¶¶39, 48. At all relevant times the market for postpaid subscribers was competitive and dominated by the Big 3, requiring USM to offer promotions to attract customers. ¶¶56-57, 80-82.

CWs explained how UScellular created and implemented promotions. According to CW2, promotional offers were ideated and executed by the Growth Marketing department, which CW2 formerly worked in. ¶41. CW2 confirmed that before a promotion was implemented, Growth Marketing conducted "experiments" to measure the cost and benefit through financial modeling. ¶70. While any given promotion's objectives varied, USM's key objective of this analysis was realizing a revenue benefit justifying the cost (i.e., ensuring the promotion was profitable and a net benefit to USM). *Id*. The Growth Marketing department then reported the results of the cost/benefit analysis, along with financial calculations prepared by the Finance department, to Defendants Therivel and Chambers, among others, as a part of the promotion approval process. ¶71.

For each promotion, Therivel and Chambers also received numerous "what-if-scenarios" to consider in determining whether to approve a promotion, including analyses of cost, forecasted expense, whether the promotional budget would be exceeded, and what anticipated benefit was necessary to believe the promotion made sense for UScellular's business. ¶¶70-72. Although Therivel and Chambers both participated in UScellular's promotion evaluation process, Therivel was the "ultimate determinator" for approving every proposed promotion. ¶73.

## II. Defendants Implement a Regional Approach to Trialing and Testing Promotions Which Admittedly Lets Them Know the Scope of Any Promotion's Efficacy and Cost

On August 7, 2020, in connection with his hire, Therivel established a twelve-to-eighteen month timeframe to accomplish key objectives, including "driving gross adds and keeping churn down." ¶¶50, 176. During 2020, USM temporarily benefitted from the pandemic because customers were quarantining and infrequently visiting stores to switch to another carrier. ¶¶52-55. However, in 2021, business normalized and competition intensified. ¶56. The Big 3 offered luxurious promotions, including free phones and steep discounts. *Id*. In response, USM increased promotional activity hoping to reduce postpaid customer attrition (i.e., "churn"). ¶66.

4

UScellular considered implementing promotions across its entire footprint like the Big 3. *See* ¶86. However, according to CW2, when USM examined implementing a nationwide upgrade promotion in 2021, the results revealed that UScellular would have to increase its promotion budget from $175 million to $400 million. ¶¶86-87. Instead, through its regionalization approach, UScellular offered different promotions to different geographic regions, which Defendants admit "educated" them with "lessons learned" regarding the promotions' effectiveness. ¶¶67, 69, 174.

**III.    Defendants De-Emphasize USM's Regional Approach in Favor of a Company-Wide Any Phone Free Promotion Designed From the April 2022 Trial Data**

Despite USM's increased regional promotion in 2021, it continued experiencing rises in churn and negative net postpaid additions. ¶¶57-58. In fact, by the end of 1Q22, UScellular's churn rate had increased from 1.12% to 1.30% when compared to 1Q21. ¶93. Similarly, net postpaid additions declined from negative 6,000 in 1Q21 to negative 44,000 in 1Q22. ¶94. Thus, by 1Q22, about two months past Therivel's stated eighteen-month maximum for improvement, the trajectory of USM's subscriber outcomes severely challenged the goals he set when hired. ¶¶49-50, 93-94.

Consequently, during "the second quarter" of 2022 Defendants trialed an expansive, Company-wide promotion wherein *any* customer could receive any phone free when signing a USM contract. ¶¶83, 87. CW1, one of only six USM AVPs, confirmed the Promotion's trials were conducted in April 2022. ¶87. Based on the April 2022 trial results, Defendants "knew" that it would take at least *six to nine* months for the Promotion to positively impact USM's churn and subscribership. ¶¶88-91, 164. Defendants launched the Promotion across UScellular's footprint in June 2022. ¶85. Defendants, therefore, "knew" the earliest investors could anticipate seeing subscriber improvements was 1Q23—not the third quarter or second half of 2022. ¶164. Defendants launched the Promotion because, internally, it was understood that a promotion of that scope and magnitude was necessary for USM to stay relevant against the Big 3. ¶¶83-84. In fact,

according to CW2, USM personnel (including Therivel and Chambers) colloquially used the term "table stakes"—referring to any promotion that was executed to remain competitive, even if it was not financially prudent and regardless of the impacts to profitability. ¶¶84, 84 n.8, 86, 88.

## IV. Defendants Knew in Real Time that UScellular's Promotion Failed to Improve Subscriber Challenges and In-Store Traffic Rates

The Promotion did not improve USM's subscriber challenges, which Defendants knew because they had real-time information and regularly received reports concerning, *inter alia*, churn rates and in-store traffic. *See e.g.*, ¶¶63-65, 75-76, 95. For instance, CW1 confirmed that each month AVPs aggregated KPI data for their respective areas, including, *inter alia*: revenue, postpaid churn, postpaid gross and net customer adds, number of customers who visited a store, and conversion rates. ¶¶61-62. All such KPIs were discussed at monthly AVP meetings and used by either the Chief Marketing Officer or VP of Retail Sales and Operations for a meeting with Therivel occurring the following day. ¶¶39, 61-62. AVPs also compiled KPI data into reports, broken out by month and quarter and color coded red, yellow, or green based on performance, which were circulated to all meeting participants, including Therivel, in advance of quarterly Business Review meetings. ¶¶63-64. Further, each AVP and USM executive received daily reports every morning at 7:00 a.m. that included churn rates measured month-to-date, year-to-date, and quarter-to-date, making it possible "to see in real time" the number of subscribers lost. ¶78.

CW1 confirmed that the Southwest Region's postpaid churn quotas were never met and were "always in the red" each quarter throughout CW1's employment. *Id*. Moreover, throughout CW1's entire tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPIs, including goals for postpaid churn, gross and net postpaid customer adds, in-store traffic rates, and conversion rates. ¶65. CW1 explained that, during CW1's tenure, the biggest challenges for all six AVPs were store traffic and maintaining existing

customers (i.e., preventing churn). *Id*. Indeed, according to CW1, there had not been a positive increase to in-store traffic *in any month in 2022* for stores that UScellular operated in 2021 (as opposed to newly opened stores). ¶75. UScellular's "ShopperTrak" software measured in-store traffic in real-time, and that data was reported to AVPs every morning for every store. ¶76.

CW1 added that, throughout 2Q22 and 3Q22, "according to the numbers" CW1 saw in the Business Review meetings, *there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas*. ¶95. These results, according to CW1, were discussed at the Business Review meetings and the reports accompanying those meetings identified poor instore traffic as a contributing factor to increasing churn. *Id*. In fact, at every Business Review meeting throughout CW1's tenure it was discussed that in-store traffic and postpaid churn were not improving and Therivel specifically asked at every such meeting what would be done to correct metrics such as in-store traffic and sales conversion. *Id.* Therivel also mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve. *Id.* Defendants also admit that they closely monitored churn metrics, including, but not limited to, customer switching activity, churn dynamics, and the ratio of gross adds to voluntary defects. ¶¶168, 177-79; *see also* §II.B, *infra*.

## V. After the Class Period, Defendants Reveal that the Promotion Failed to Improve Churn, Subscribership, and Service Revenues, And Devasted USM's Financials

On November 3, 2022, Defendants revealed that the Promotion had wreaked havoc on the Companies' financials without delivering positive subscriber results. *See* ¶¶93-94, 97-100, 123-24. Indeed, Defendants disclosed that net income attributable to TDS' common shareholders and related diluted earnings had declined to *negative* $25 million and *negative* $0.22, respectively, down from positive $28 million and positive $0.24 in the same period a year earlier. ¶123. Defendants also lowered the top ends of UScellular's fiscal 2022 guidance ranges for Adjusted

7

OIBDA and Adjusted EBITDA. ¶124. Defendants also explained the drivers of these results. For instance, far from seeing steady churn improvement in the "third quarter[,]" churn had increased from 1.30% in 2Q22 to 1.42% in 3Q22. ¶127. Despite its Promotion beginning in June 2022, UScellular also reported net postpaid additions of negative 31,000 for 3Q22 - a massive 287% decline from negative 8,000 subscribers that USM sustained in 3Q21. ¶94. UScellular also reported margins on equipment sold of negative 17.2% and losses on equipment sales of $52 million, both historic lows. ¶¶98-100. Thus, Defendants' corrective disclosures evidenced that the Promotion was not structured in a financially disciplined manner.

On this news, TDS' common stock price declined 25.89%, declining from $16.57 per share at close on November 3, 2022 to $12.28 per share on November 4, 2022, on unusually heavy trading volume. ¶138. TDSPrV preferred shares, which closed at $17.20 per preferred share on November 3, 2022, fell to $16.24 per preferred share on November 4, 2022, a decline of 5.6%. TDSPrU preferred shares, which closed at $19.30 per preferred share on November 3, 2022, fell to $18.29 per preferred share on November 4, 2022, a decline of 5.2%. ¶139.

**ARGUMENT**

On a Rule 12(b)(6) motion, courts must accept "factual allegations" as true and draw "all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the FAC must allege (1) a material misrepresentation or omission; (2) scienter; (3) a connection to the transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Id*. at 616-17. Defendants' Motion only challenges falsity (element 1) and scienter (element 2).

**I.      The FAC Adequately Alleges Material Misstatements and Omissions**

Under Rule 9(b) and the PSLRA, the FAC must identify "what" statements or omissions

8

are misleading, "who" made them, "when," "where," "and how" they were made, and explain "why the statement[] [was] misleading." *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *2 (N.D. Ill. Sept. 1, 2020). On a motion to dismiss, courts "need not determine whether [Defendants'] statements were in fact misleading[.]" *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *4 (N.D. Ill. Sept. 7, 2021). Instead, they must only determine whether sufficient facts are alleged "to support a reasonable belief as to the misleading nature of the statement or omission." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *3 (N.D. Ill. Oct. 30, 2012). Thus, Plaintiff need not plead "detailed evidentiary matter[.]" *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *9 (N.D. Ill. Nov. 4, 1998); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("even securities plaintiffs need not [plead] their entire case"). Falsity is met if Plaintiff alleges "any false or misleading statement by each defendant." *Azar*, 2021 WL 4077327, at *4. Once falsity has been pled, the Court "need not address" and rule on all statements. *Ross*, 2012 WL 5363431, at *8.

"The test for whether a statement is materially misleading" is "whether the defendants' representations, taken together and in context, would have mislead a reasonable investor." *SEC v. Kameli*, 2020 WL 2542154, at *25 (N.D. Ill. May 19, 2020); *SEC v. Cook*, 2015 WL 5022152, at *17 (S.D. Ind. Aug. 24, 2015) (statement misleading if "reasonable investor would have received a false impression"). For example, "statements, even if literally true, could still be misleading[.]" *Ross*, 2012 WL 5363431, at *6. Similarly, opinion statements are actionable where: (i) "the speaker did not hold the belief professed;" (ii) statements contain untrue embedded statements of fact; or (iii) statements "omit[] material facts about the issuer's inquiry into or knowledge concerning a statement[.]" *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *9 (N.D. Ill. Apr. 18, 2022). Further, once a defendant "speaks on an issue[,]" "there is a duty to tell the

9

whole truth." *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at \*5 (N.D. Ill. Feb. 10, 2023).[2]

### A.  Defendants' Timeline Statements Were Materially False and Misleading

Defendants materially misrepresented the results of the April 2022 trials that underpinned the Promotion. Specifically, Defendants understated the length of time they learned it would take, based on the trials, for the Promotion (which began in June 2022) to impact postpaid churn. For example, on August 5, 2022, during the 2Q22 Earnings Call, Therivel falsely stated (¶¶113-14):

- "*[T]hanks to the trials we ran*, we're able to structure this offer [the Promotion] in a way that we believe will drive positive subscriber results in the *second half of the year*[.]"

- In response to an analyst's question regarding postpaid subscribership, that he saw "a path to positive consumer postpaid net adds" referring to the Promotion, and that UScellular was *already* "seeing really good results[,]" "upgrades up substantively[,]" and "the ratio of voluntary defections to gross adds improve substantively[,]" such that "what [UScellular] expect[ed] to see is *steady* churn improvement *throughout the second half of the year*."

- "So we should start to see some benefit from this [i.e., the Promotion] *in the third quarter,* and we'll see more benefit, hopefully, *in the fourth quarter*."

As Therivel admitted in February and May of 2023, the above statements were false when made because Defendants "knew" *before the Class Period* that the April test results showed the Promotion "would take about 6 to 9 months to see the consumer churn benefit." ¶¶163-64; *see Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 475 (N.D. Ill. Aug. 11, 2021) (later admission rendered earlier statements false when made); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*6 (N.D. Cal. Nov. 4, 2020) ("*Apple*") (same). In other words, Defendants misrepresented the April 2022 trials' findings, which Defendants knew of and which demonstrated, contrary to their representations, the earliest USM expected benefits from the Promotion was 1Q23. *See Lowthorp v. Mesa Air Grp., Inc.*, 2021 WL 3089118, at \*11 (D. Ariz. July 22, 2021) (later statement that

---

[2] Contrary to Defendants' assertion, Plaintiff alleges more than mere mismanagement. *See* DB 25. Instead, as discussed throughout §§I.A-C, the FAC must be sustained as it alleges Defendants "engaged in deception through material misrepresentations and omissions" concerning the Promotion, the Promotion's results, and in-store traffic. *Gosselin v. First Tr. Advisors L.P.*, 2009 WL 5064295, at \*2 (N.D. Ill. Dec. 17, 2009).

defendant knew the company needed more resources rendered earlier statements false).

Defendants erroneously claim the statements above are inactionable opinions because they include "we believe" or "we think." *See* DB 30. But Defendants' statements were not opinions. Rather, they were descriptions of the April trials' findings (*i.e.*, what the "trials we ran" indicated with respect to a timeline for improvement) and representations regarding results USM was purportedly already experiencing in 3Q22 related to the Promotion. Throwaways like "we believe" do not transform statements into opinions because such words can "preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015).

Furthermore, even if Defendants' statements are opinions, they are actionable because they omitted material facts, included embedded untrue facts, and Defendants "did not hold the belief . . . professed[.]" *See id*. at 184-89. Indeed, Therivel did not believe the Promotion was structured to "drive positive subscriber results in the second half of" 2022, and he omitted material facts regarding the April 2022 trials, given that he later admitted Defendants "knew" the Promotion would not result in churn benefits for at least 6 to 9 months based on such trials. ¶¶91-92, 164; *see Lowthorp*, 2021 WL 3089118, at *11 (opinion statement actionable where defendant admitted knowing contradictory facts when statement was made); *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *25 (N.D. Ill. Aug. 23, 2022) ("*Boeing II*") (time estimate actionable where statement was "backed by some inquiry" but evidence from inquiry was "decidedly less optimistic" than defendant's representation); *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019) (timeline statements actionable where defendants "omitted material facts" and "could not have sincerely believed" the timeline given contradicting information).

Defendants also claim that Therivel's statement that USM "expected steady churn

11

improvement throughout the second half of" 2022 is "consistent with" "leading indicators" for churn improvement which purportedly were "moving in the right direction[.]" DB 10, 30. But "leading indicators" are not the same as "steady churn improvement[,]" particularly when the 3Q22 churn rates were "the highest level for any quarter in about six years." ¶189; *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) ("*Makor*") ("[I]t is misleading to describe a decline as equivalent to a continued growth rate."). Moreover, Defendants knew, based on data in daily ADS reports, that churn was ***worsening***. *See* ¶¶61-65, 78, 95 (reports showed that none of USM's six regions met their postpaid churn quotas in 2Q22 or 3Q22).

Defendants raise a similarly dubious (and inappropriate) argument that churn improved by the end of 2022. *See* DB 11, 25. But review of Defendants' extraneous exhibits shows that UScellular experienced churn rates of 1.35% for 4Q22 (*see* Ex. N at 4)—higher than the 1.30% churn rate that was knowable by investors at the time of Defendants' false statements (i.e., the figures reported on August 5, 2022) and the ***same exact rate*** that USM reported for 4Q21. Thus, churn had not improved ***at all*** by the end of 2022, whether in comparison to the time Defendants' misstatements were made, or on a year-over-year basis. ¶¶57, 93; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (allowing defendants "to present their own version of the facts at the pleading stage" would make it "near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently plausible claim for relief.").

Defendants' attempt to chalk USM's 3Q22 churn results to forecasting imprecision fares no better (*see* DB 31) because, unlike in *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596-97 (7th Cir. 2021), which concerned predictions about merger synergies involving "another corporation's assets[,]" Defendants' timeline statements omitted information learned during ***UScellular's*** April 2022 regional trials. *See id.* at 596 ("corporations generally

12

possess good information about completed operations"); *see also In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) (defendants' timeline statements misleading where they knew and omitted facts that the project would not be completed on-time).

**B. Defendants' In-Store Traffic Statements Were Materially False and Misleading**

Defendants materially misrepresented UScellular's in-store traffic. *See* ¶¶109, 119. For instance, on May 6, 2022 during the 1Q22 Earnings Call, Therivel and Chambers evasively dodged a question regarding whether there was "softening in store traffic." ¶109. The analyst repeated the question, asking: "[a]nd store traffic any sense of the consumer slowing down or the industry slowing down after a strong year?" Chambers responded with an unequivocal "*No*" and added that "our store traffic is down *slightly* year-over-year but *nothing concerning*." *Id*. Therivel did not correct Chambers. In fact, during UScellular's next earnings call on August 5, 2022, Therivel went even further, representing that "we're seeing a lot of customers come into the store." ¶119.

Defendants made false statements because,[3] unbeknownst to investors, USM experienced sustained rates of poor in-store traffic. *See* ¶95. Indeed, CW1 identified in-store traffic as one of the biggest challenges for all six AVPs during CW1's tenure. ¶¶65, 110. For example, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet in-store traffic rates, and Therivel mentioned at every such meeting that in-store traffic rates were below target and needed improvement. ¶¶65, 95, 110. CW1 similarly reported that, throughout 2Q22 and 3Q22, "according to the numbers" CW1 saw in the Business

---

[3] Therivel had "ultimate authority" over every statement made. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Moreover, where both Defendants were asked for comment, and where both jointly presented on USM's behalf, and where neither disagreed, each is charged with making the other's statements. *In re Venator Materials PLC Sec. Litig.*, 547 F.Supp.3d 624, 665 (S.D. Tex. July 7, 2021) (allowing joint presenter to speak falsely during earnings call actionable); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. May 10, 2010) (same); *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. June 2, 2010) (same).

13

Review meetings, ***not one*** of the six areas had positive store traffic. ¶¶95, 110. In-store traffic was also discussed as a driver of churn at every Business Review meeting, and Therivel asked questions about how it could be improved. ¶95. Moreover, Defendants received reports every morning concerning UScellular's in-store traffic for every USM store, and there was no positive increase to in-store traffic in any month in 2022 for stores operating in 2021. ¶¶75-76; *see* n.19, *infra*.

Defendants attempt to recast the analysts' questions fails. *See e.g.*, DB 20 (purporting that "Chambers was responding to" whether "industry or consumer appetite overall" was slowing, rather than in-store traffic at USM specifically). It is "inappropriate" to resolve competing interpretations of a transcript (a quintessential question of fact) at "the motion to dismiss stage[.]" *See Flynn v. Exelon Corp.*, 2021 WL 1561712, at *7 (N.D. Ill. Apr. 21, 2021). Even still, Defendants' spin is belied by Chambers' response, namely that "***our*** store traffic," i.e., USM's, "is down slightly year-over-year but nothing concerning." ¶109. Defeated by their own words, Defendants next argue that investors were fully informed of how in-store traffic performed. *See* DB 20. Not so. Chambers' qualified response gave investors the false impression that decreases in store traffic were minimal and not "concerning" when, in reality, there were no positive increases to store traffic in 2022, and it was an issue of Defendants' constant concern.[4] ¶¶75-76, 95, 161; *see In re NeoPharm, Inc.Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (trivializing issue actionable where defendants knew and did "not disclos[e] the serious extent and nature of the problems"); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 875, 879 (N.D. Ill. 2011) ("*Allscripts*") (statement actionable where it "mislead[s] a reasonable investor into developing an

---

[4] Defendants also contend that it would not "make any sense for Chambers to deceptively answer in a way intended to conceal the downtrend in in-store traffic[.]" DB 20. Defendants improperly conflate a falsity analysis with an assessment of motive which is not relevant to falsity. Moreover, Defendants ignore that downplaying the severity of the situation in hopes it would improve constitutes motive. *See* §II, *infra*.

14

overly rosy picture of the risks and . . . problems[.]"); *Allison*, 2023 WL 1928119, at *7.

Defendants similarly assert that Therivel was not commenting on in-store traffic at UScellular stores when responding to analysts' questions. DB 22 ("Therivel was not advising investors how many customers were coming into the store"). Defendants' self-serving characterization should be disregarded given that a reasonable investor would be misled to believe Therivel was referring to USM stores when he admitted "we're seeing a lot of customers come *into the store*." ¶119; *see Flynn*, 2021 WL 1561712, at *7; *AnchorBank, FSB*, 649 F.3d at 614.

### C. Defendants' Statements Concerning the Promotion's Purported Financial "Discipline" and Results Were Materially False and Misleading

Defendants repeatedly made false and misleading statements purporting that the Promotion balanced financial and subscriber outcomes. *See* ¶¶105, 107, 113, 117. For example, on May 6, 2022 during the 1Q22 Earnings Call, Therivel falsely represented that:

- UScellular "regionally tested aggressive offers [i.e., the Promotion] … we've also tried to be *disciplined from a financial perspective*[.]" ¶105.

- "[W]e continue to try to strike the right balance between financial outcomes and subscriber outcomes[,]" and "we think we've done *a really good job of it*[.]" ¶¶105, 107.

Similarly, on August 5, 2022 during 2Q22 Earnings Call, Therivel misleadingly tied the Promotion to UScellular's purported expense discipline stating:

- UScellular "continue[d] to *maintain expense discipline* across the organization, which has allowed us to launch some aggressive promotions [i.e., the Promotion] and make investments in key growth areas of the business while still maintaining our operating cash flow guidance." ¶117.

- [T]hanks to the trials that we ran, *we're able to structure this offer* [i.e., the Promotion] in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable. *And that offer structure, coupled with our ongoing expense discipline*, enables us to maintain our profitability outlook for the year even with those aggressive promotions [i.e., the Promotion]. ¶113.

  Therivel's statements were false because they materially understated the Promotion's

financial impact while overstating its benefit to subscribership and churn outcomes. CW2 confirmed that UScellular's testing of a nationwide upgrade promotion in 2021 revealed that USM would have to increase its promotion budget more than two-fold. ¶86. Therivel and Chambers also knew and omitted that offering a footprint-wide free phone promotion would devastate USM's financials without the commensurate benefit to its subscriber challenges because they received reports analyzing costs and benefits and numerous "what-if-scenarios[,]" including, *inter alia*, the 2021 analysis. *See* ¶¶70-72, 86. Thus, UScellular was not exhibiting "expense discipline" in connection with the Promotion. Further, Defendants' "ongoing" performance only compounded the misleading effect of these statements given that Therivel remarked at every Business Review meeting that margins were below target and needed to improve. ¶95. Accordingly, Defendants' statements were materially false and misleading. *Fryman*, 2022 WL 1136577, at *12 (opinion actionable where defendants knew their reserves were materially understated).

Moreover, since the Promotion was trialed in April 2022 and launched company-wide in late June 2022, Defendants also knew that the Promotion was not driving positive subscriber results based on the data available to them in the daily churn reports.[5] *See* ¶149 (none of UScellular's six regions met their postpaid churn quotas in 2Q22). Indeed, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting, one of which Defendants concede occurred in June 2022 before Therivel's 2Q22 statements (*see* DB 22), that it was a "struggle" to meet KPI goals, including, *inter alia*: postpaid churn, gross and net postpaid customer adds, and conversion rates. ¶65; *see Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *5

---

[5] Defendants claim that only one quarterly meeting occurred during the Class Period, and that it took place after the May 6, 2022 earnings call. *See* DB 15. This overstates CW1's allegations. *See* ¶63 ("at least one"). Moreover, Defendants' myopic view overlooks that CW1 stated these occurred throughout CW1's tenure (which predated the Class Period) and the myriad of other allegations demonstrating Defendants received data that contradicted their statements. *See* ¶¶65, 75-79, 95-96; *see also* §II, *infra*.

(N.D. Ill. Aug. 11, 2021) (financial performance statements actionable where defendants knew future benefits were not achievable and "would drag the company's performance down.").

Given these facts, Defendants cannot credibly have believed they had "done a really good job" striking a balance between subscriber and financial results.[6] *See Allison*, 2023 WL 1928119, at *7 (opinion actionable where defendants knew contradictory facts). In fact, when accounting for the effect of the Promotion, USM's "push and pull" (DB 16-17) between financial results ("ARPU") and subscriber results (reducing churn) was a devastating shock to investors. *See e.g.,* ¶187 (JPMorgan: "help investors understand why they should have faith that you can turn the direction of the subscriber growth without destroying the profitability in the business"). Moreover, while Defendants contend they are not required to take a "gloomy" outlook (*see* DB 18), they are nevertheless required to disclose contradictory information to make their rosy statements not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011). Additionally, Plaintiff does not dispute the postpaid subscriber results USM reported in 1Q22 as Defendants contend. *See* DB 16. Rather, Plaintiff alleges that statements concerning USM's purported ability to maintain financial discipline while implementing the aggressive, footprint-wide Promotion were false and misleading because UScellular had just completed regional tests for its most aggressive promotion ever and was imminently launching the Promotion company-wide despite knowing the overwhelming cost to do so (¶¶86-88), particularly given USM's other expenses. *See* ¶101 (USM "invested so much in its 5G buildout" without any realized gain); ¶95 (margins were below target).

### D. Purported Satisfaction With the Promotion Was Materially False and Misleading

Therivel repeatedly claimed, falsely, that Defendants were pleased with the results of the

---

[6] That Threivel made this statement in response to an analyst's questions does not somehow render it nonactionable as Defendants' claim. *Compare* DB 17 *with Allscripts,* 778 F. Supp. 2d at 879 (finding actionable defendant's "direct response to an analyst's question").

17

Promotion and its April 2022 trials. *See* ¶¶106, 113-15. For example, on May 6, 2022, Therivel misrepresented that he was "very pleased" with "the regional approach" and "how it's proceeding[,]" especially in light of the recently completed Promotion trials. ¶106. On August 5, 2022, Therivel gave an update on the Promotion, stating that, "so far, we're pleased with the results." ¶113. On that same call, in response to an analyst's question as to whether UScellular could get to positive postpaid phone adds, Therivel said "yes" and invoked the Promotion's effect on churn as his purported basis. ¶114. He went further, misrepresenting that the Promotion already yielded results such that investors could expect steady churn improvement in 2022, stating (*id.*):

- We think it specifically addressed that issue, and **we're seeing really good results**. So we're seeing upgrades up substantively. We're seeing the ratio of voluntary defections to gross adds improve substantively. […] What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter.

In response to a question regarding the Promotion's revenue impact, Therivel also commented on "the ratio of gross adds to voluntary defects[,]" stating, "***[w]e're seeing improvement there***." ¶115.

These statements were false and misleading when made. With respect to the May 2022 statements, Therivel deceived investors by representing he was pleased with the regionalization results (including the April 2022 trials for the Promotion) when USM was set to launch a Hail Mary national promotion regardless of cost impacts. Defendants recklessly gambled on the Promotion in hopes of addressing the systemic postpaid churn that the regionalization approach failed to remedy, and in doing so, Defendants deviated from the regional promotion structure USM previously claimed allowed it to effectively compete. *See* ¶¶67, 69, 83-85.[7] Defendants assert that Therivel's statements cannot be misleading because he disclosed USM was "doing a relatively substantial move." DB 19. Therivel, however, concealed that such move was being implemented

---

[7] Defendants' preferred interpretation of the statements (DB 18) cannot be credited on a motion to dismiss.

regardless of costs or learnings from "the regional trial." ¶106. Defendants' reliance on *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 902 (N.D. Ill. May 26, 2020) for the proposition that Plaintiff has not alleged the existence of any contradictory information, is thus misplaced.

Additionally, contrary to Therivel's August statements, Defendants were not pleased with the early results regarding "churn improvement" or "voluntary defects."[8] ¶114. For instance, during each Business Review throughout CW1's tenure (including the June 2022 meeting), Therivel complained that USM's in-store traffic was below target and needed to improve, and asked AVPs what strategies they intended to employ to improve postpaid churn. ¶95. Indeed, according to CW1, not a single one of USM's six operating regions met its postpaid churn quotas throughout 2Q22 or 3Q22. *Id.* Each of the six AVPs also reported, during the June 2022 quarterly Business Review, that it was a "struggle" to meet KPIs, including goals for postpaid churn, gross and net postpaid customer adds, and in-store traffic rates. ¶¶65, 148. Thus, for the same reasons discussed in §§I.B-C, *supra*, Defendants' statements were false and misleading.[9]

### E. The Safe Harbor Does Not Immunize Defendants' Statements

Defendants seek protection from the PSLRA's safe harbor provision. DB 25-27. However, the safe harbor does not shield backward or present-looking misstatements, or forward-looking

---

[8] Defendants attempt to sever Therivel's August statements by focusing on what (they say) he was pleased with – namely, the purportedly good results UScellular was seeing with add-a-line, upgrade activity, and the ratio of gross adds to voluntary defects (i.e., churn) – to distance themselves from worsening churn and ballooning costs. *See* DB 24. With context, however, Therivel was discussing voluntary churn and the Promotion's early results as a means for why investors could expect to see steady churn improvement and revenue opportunity in the second half of the year. *See* ¶¶87, 114-15; *Ross*, 2012 WL 5363431, at *6 ("statements, even if literally true, could still be misleading to investors depending on the context").

[9] Analysts' reactions undermine any claim (*see* DB 24) that investors understood either the benefits or the costs of the Promotion. *See e.g.,* ¶121 (Wells Fargo (Aug. 10, 2023): "USM sees some positive indicators in terms of store traffic and customer activity that suggest an improving subscriber outlook in 2H'22"); ¶187 (JPMorgan (3Q 2022 Earnings Call): "help investors understand why they should have faith that you can turn the direction of subscriber growth without destroying the profitability in the business"). Thus, analyst reactions during the 3Q 2022 Earnings Call (¶187) corroborated the falsity of Defendants' challenged statements. *See Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263-64 (3rd Cir. 2009).

statements unaccompanied by meaningful cautionary language and made with actual knowledge of falsity. *See Hedick*, 2021 WL 3566602, at *14. Further, the safe harbor does not protect the backward or present aspects of statements that are "mixed" with forward-looking aspects. *Id.* at 15; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs II*"). Defendants' false statements are not immunized by the safe harbor because they were either not forward-looking, not accompanied by meaningful cautionary language, and/or made by Therivel with actual knowledge of falsity or misleadingness.

### 1. Defendants' Statements Are Not Forward-Looking or Are "Mixed"

**First**, Therivel's timeline statements were mixed with backward-looking aspects because they misrepresented facts learned from the April 2022 trial. *See, e.g.*, ¶113 ("***thanks to the trials that we ran***"); ¶114; §I.A, *supra* (Defendants "knew" *before the Class Period* that the Promotion "would take about 6 to 9 months" for churn benefits (¶¶91-92, 164)); *Hedick*, 2021 WL 3566602, at *15; *Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 2023 WL 5748359, at *7 (N.D. Ill. Sept. 6, 2023) ("*ATI*"). Thus, these statements were not "forward-looking" because they were false when made. *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *8-10 (N.D. Ill. Sept. 21, 2005).

Likewise, Therivel's August 2022 statements misrepresenting existing expense discipline and cashflows are present or backward looking. ¶117 (claiming *continued* expense discipline *allowed* USM to launch aggressive promotions while *still maintaining* prior guidance);[10] ¶113 ("offer structure, coupled with our *ongoing* expense discipline*, enables us to maintain* our profitability outlook for year"); *Hedick*, 2021 WL 3566602, at *15; *ATI*, 2023 WL 5748359, at *7 ("*continues* to match…communicated then-existing, concrete facts"). Contrary to Defendants'

---

[10] Defendants admit these statements were "mixed." DB 27 n.8. Additionally, Therivel's statements prior to and after his statement at ¶117 confirm he was reporting on then-present facts. Ex. H at 5 (discussing "results in the quarter"; "halfway through the year, we're seeing positive momentum"); *Selbst*, 2005 WL 2319936 at *9 (forward-looking statements assessed "collectively in the context in which they were made").

20

contention (DB 27 n.8), Plaintiff *does* allege Therivel's statements of then-present facts were materially misleading.[11] *See* ¶118; §I.C (summarizing facts establishing that by August 2022 USM was *not* maintaining expense discipline, which was a present undisclosed obstacle to cash flow).

**Second**, every alleged misstatement was misleading by omission and "it is axiomatic that the failure to make a statement cannot be forward-looking." *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. Apr. 28, 2006); *Selbst*, 2005 WL 2319936, at *9 (No safe harbor when "facts which seriously undermined the accuracy of the [p]rojections" omitted); *In re Next Level Systems, Inc.*, 1999 WL 387446, at *7 (N.D. Ill. Mar. 31, 1999) (omissions "undermining the accuracy of [a] forecast" not protected). Here, when speaking about known purported benefits and costs (¶¶113-14, 117), Defendants were obligated to disclose the full truth, including that benefits were expected in 1Q23 and that USM was *not* managing costs or maintaining profitability/margins.

### 2. Defendants' Boilerplate "Cautionary Language" Is Not Meaningful

Defendants' misstatements were unaccompanied by "meaningful cautionary statements identifying important factors" that could influence results. 15 U.S.C. § 78u-5(c)(1)(A). Weighing "meaningful[ness]" is a fact-intensive issue and "difficult if not impossible" to adjudicate, particularly "at the pleading stage[.]" *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729, 734 (7th Cir. 2004), as amended (Sept. 3, 2004); *see also id.* at 732 ("[B]oilerplate warnings won't do"). Thus, Defendants' cautionary language affords no safe harbor.

**First**, Defendants' generic disclosures regarding "competition" (which pertain to any business) are not meaningful because they are irrelevant. The falsity of the misstatements alleged

---

[11]Contrary to Defendants' same contention (DB, 27, n.8), Therivel's statements concerning USM's expense discipline explicitly relate to the Promotion. ¶117 ("We also continue to maintain expense discipline … *which has allowed us to launch some aggressive promotions*"). Regardless, Therivel's present-tense statement regarding expense discipline in August 2022 necessarily includes the Promotion's impacts given the regional trials occurred in April 2022 and it was launched Company-wide in June 2022. ¶¶85, 87.

in the FAC does not turn on USM's ability to "compete successfully in this environment." DB 5, 28. Rather, the statements are false because Defendants represented, contrary to evidence including CW allegations and the April 2022 trial data, that: 1) UScellular saw subscribership impacts from the Promotion in the "third quarter" of 2022, which would "stead[ily]" continue "throughout the second half" of the year; and 2) that expense pressure was manageable when they knew that the cost to implement the Promotion was exorbitant. *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *11 (N.D. Ill. Apr. 26, 2021) (cautionary language simply "highlight[ing]" aspects of the business insufficient and not meaningful where it warns of general risks rather than known specific risks).[12]

**Second**, Defendants knew of the Promotion's exorbitant costs by August 2022. *See* §I.C; ¶¶70-73, 86 (promotional expense analysis reports, including that promotional budget would more than double); ¶95 (Therivel complained about margins). Thus, Defendants' purported warning that costs ***could*** increase does not ameliorate their statements' falsity. *Compare* DB 28 ("Intense competition involving . . . promotions . . . ***could*** adversely affect UScellular's revenues…") *with Hedick*, 2021 WL 3566602, at *16 ("risk warnings […not] meaningful, because they failed to disclose contrary present facts about the contemporaneous effects that Defendants' [promotional] measures were having on . . . revenue."). Defendants similarly represented that investors could expect to see steady churn improvement in the third quarter and second half of 2022 when they knew the timeline for improvement was materially understated and the data that they received each morning evidenced worsening churn. *See* ¶¶39, 61-65, 78, 91-92, 114. Defendants' failure to disclose that underlying data, and decision to instead represent that they were seeing improvements, renders their generic risk warning that "churn . . . could have an adverse effect on

---

[12] Defendants' distinguishable authority (DB 28) dealt with risk factors that were relevant to falsity. *See Allscripts*, 778 F. Supp. 2d at 864-65, 875 (warning of "products failing to perform properly due to […] errors" when plaintiff alleged software suffered errors); *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 846 (N.D. Ill. 2009) (warning of same inability to refinance maturing debt that was complained of).

UScellular's business" meaningless. *See* DB 28 n.9; *see Pierrelouis*, 2021 WL 1608342, at *11. At most, Defendants raise premature fact questions. *See Asher*, 377 F.3d at 734.

### 3. Defendants' Knowledge of Falsity Precludes Safe Harbor Protections

Plaintiff established that Defendants knew that the challenged statements were false and misleading. §§I.A, I.C, II. Thus, Defendants' statements also fail the safe harbor's second prong and should not be afforded protection. *See* 15 U.S.C. § 78u-5(c)(1)(B); §§I.A, I.C, II; *Pierrelouis*, 2021 WL 1608342, at *11 (when taking allegations as true, knowledge was plausible); *Boeing II*, 2022 WL 3595058, at *24 (timeline statements knowingly misleading when made).

Defendants assert conjecture that Therivel might have believed the Promotion would deviate from the timeline of the April 2022 trials. *See* DB 31-32. Defendants cannot request favorable inferences on a motion to dismiss. Moreover, Defendants wholly ignore Therivel's admission that "based on the testing we've done in our regional trials, we *knew* it would take about 6 to 9 months to see the consumer churn benefit." ¶164. Equally hollow, Defendants contend the FAC only establishes that "Plaintiff viewed the Promotion" as expensive and "was unhappy" with subscriber results. DB 29. Not so. *See* §I.C (Defendants knew, prior to August 2022, the Promotion would devastate USM's financials without commensurate subscriber benefits).[13] Also, they cannot dispute in a motion to dismiss whether churn improved and guidance was met *after* the Class Period. DB 29-30; *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 905 (N.D. Ill. 2004).

### 4. Defendants Concede That Not all Contested Statements Are Forward-Looking, Precluding Dismissal of Plaintiff's Claims On This Basis

Courts do not "permit piecemeal dismissals of *parts* of claims; the question at th[e motion

---

[13]In *In re Supreme Industries, Inc. Sec. Litig.*, 2018 WL 2364931, at *9 (N.D. Ill. May 23, 2018) (*see* DB 29), the court's decision turned on defendants' predictions that, contrary to their guidance, backlog would decline, evidenced by discussions of "slowing industry" and "demand moderation", whereas Defendants definitively assured investors that "[i]n fact, we're going to be maintaining all of our guidance[.]" ¶113.

to dismiss] stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *Pierrelouis*, 2021 WL 1608342, at *10. Because Defendants only claim that *three* of the statements Plaintiff challenges are forward looking (DB 26-27), and because Plaintiff adequately alleged the falsity of the remaining misstatements, Plaintiff's claims survive regardless of the safe harbor's application. *Id.* ("If [P]laintiff states a claim based on some statements, then he states a claim that survives defendants' motion to dismiss, and the Court need not determine whether the forward-looking statements could support a claim on their own."); *see Smith v. Signature Sys.*, 2022 WL 595707, at *5 (N.D. Ill. Feb. 28, 2022) (Rowland, J.) (citing *Hedick*, 2021 WL 3566602, at *3 (noting the Seventh Circuit cautions against "piecemeal dismissals")).

## II.    The FAC Adequately Alleges Scienter

A strong inference of scienter is well-pleaded "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Hedick*, 2021 WL 3566602, at *11. For the latter, the complaint must allege the defendant "either knew the statement was false [or misleading] or was reckless in disregarding a substantial risk that it was false [or misleading]." *Tellabs II*, 513 F.3d at 704. Recklessness is sufficiently pleaded when the substantial risk was "so obvious that the defendant must have been aware of it." *Id*. A strong scienter inference "need not be irrefutable…or even the most plausible of competing inferences[.]" *Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("*Tellabs I*"). Rather, it need only "be cogent and at least as compelling as any opposing inference[.]" *Id*. at 314; *Allscripts*, 778 F. Supp. 2d at 885 (whether scienter pled rests "on the practical judgment about whether, accepting the whole factual picture painted by the [complaint], it is at least as likely as not that defendants acted with scienter."). Because this inquiry examines whether all facts "alleged, taken collectively, give rise

24

to a strong inference of scienter," courts "consider the complaint in its entirety…not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs I*, 551 U.S. at 322-23.[14]

Here, Defendants' statements were knowingly false or made with reckless disregard for the truth given, *inter alia*, they received daily, real-time churn and in-store traffic data, received reports aggregating monthly and quarterly KPIs from all six regions, and met weekly, monthly, and quarterly to discuss USM's business, of which postpaid sales was its core function. ¶¶141-62, 166-72. Defendants also admittedly closely monitored churn and provided detailed responses to analysts. ¶¶173-80. As discussed more thoroughly below, the FAC's allegations considered individually or holistically overwhelmingly support scienter.

## A. Defendants' Admissions Support a Strong Inference of Scienter

Therivel admitted on February 17, 2023 and May 5, 2023 that, despite telling investors they could expect "steady" churn improvement in the second half of 2022, including "the third quarter" of 2022, Defendants "knew" based on the April 2022 trials, prior to launching the Promotion in June 2022, that it would take "6 to 9 months" to see postpaid subscriber improvement. ¶¶91-92, 164. These admissions are "classic evidence of scienter" and support a strong inference of scienter. *NeoPharm, Inc.*, 2003 WL 262369, at *14; *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *5-6 (N.D. Ill. Feb. 27, 2018) ("*Allstate*") (rejecting "fraud by hindsight", finding defendant's admission supports scienter); *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 661 (N.D. Ill. April 1, 2021) (later admission supports scienter); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 539 (D. Del. 2012)

---

[14] Defendants' scienter arguments primarily concern whether the FAC alleges: 1) that Defendants did not actually hold the beliefs articulated in their supposed "opinion" statements, and 2) that Defendants' purported forward-looking statements were made with actual knowledge that they were false and misleading (*see* DB 33), which fail for the same reasons discussed in §§ I.A-D, I.E.2-3, *supra*. Defendants' failure to meaningfully address Plaintiff's other individual or holistic scienter allegations waives any response. *See Axis Hospitality, Inc. v. Hanson*, 2010 WL 431662, at *4 n.7 (N.D. Ill. Feb. 1, 2010).

("admissions alone" created strong inference of scienter). Therivel's admissions strongly support that he knew his statements discussed in §§I.A, I.C-D, *supra* were false when made.

### B. Defendants' Extensive Involvement in Implementing, Monitoring, and Publicly Discussing UScellular's Promotions Support a Strong Inference of Scienter

#### 1. Defendants Evaluated and Determined Whether to Approve the Promotion

According to CW2, Defendants Therivel and Chambers led an executive group who reviewed, evaluated, and ultimately decided whether to approve each promotion—with Therivel acting as the "ultimate determinator." ¶¶70-73. During every promotion's approval process, Therivel and Chambers received cost/benefit reports and what-if scenarios that analyzed whether the cost of a given promotion was justified. ¶143. According to CW2, UScellular examined the cost and impacts of implementing a nationwide upgrade promotion, which revealed that such a promotion would require UScellular to more than double its promotion budget. ¶¶86, 142-44. Therivel and Chambers therefore knew, despite their statements to the contrary, that the cost to implement such a promotion would be overwhelming, particularly when evaluated in combination with UScellular's consistent decline in postpaid customers (¶¶57-58, 93-94), target misses for margins that Therivel complained of (¶95), and other expenses (i.e., UScellular's massive 5G investment for which the company did not realize any benefit during the Class Period). ¶101; *see Hedick*, 2021 WL 3566602, at *13 (strong inference of scienter supported by allegations that defendants led the initiative, made statements on the topic, and approved and reported the results).

#### 2. Defendants Regularly Received Reports and Participated in Meetings Discussing KPIs Including Postpaid Churn, Additions, and In-Store Traffic

A "classic fact pattern[] giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Flynn*, 2021 WL 1561712, at *10; *Lewis v. Straka*,

26

535 F. Supp. 2d 926, 930 (E.D. Wis. 2008) (same); *ATI*, 2023 WL 5748359, at \*18 (scienter supported where "executives . . . allegedly received materials explicitly documenting the problem and they—or their fellow high-level executives—talked about the problem to employees").

The FAC plausibly alleges myriad facts demonstrating Defendants' knowledge of the facts that they misrepresented to investors. For example, UScellular aggregated real-time data concerning churn and in-store traffic for each store, which was shared with AVPs and executives daily. ¶¶160-61. These morning reports showed that there had not been a positive increase to in-store traffic *in any month in 2022* for stores that UScellular operated in 2021. ¶¶75, 160-61. Such information flatly belies Defendants' misstatements concerning in-store traffic. ¶¶109, 119. Defendants also received reports for meetings they attended wherein UScellular's dismal churn, in-store traffic, and sales were discussed. For instance, each month, CW1 and the other AVPs compiled KPIs that were discussed in a monthly AVP meeting with the CMO or VP of Retail Sales to prepare them for a meeting with Therivel, amongst others, the following day. ¶146.

In addition to the AVP meetings, throughout CW1's tenure, CW1 and other AVPs aggregated and circulated KPI data in advance of quarterly Business Review Meetings, which would then be reviewed and discussed at the meeting. ¶¶61-65; *see Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300-01 (S.D.N.Y. 2018) (CW allegations that negative effects of defendants' actions were discussed at numerous meetings and in reports circulated to executives, throughout class period). Therivel, among other executives, attended the Business Review Meetings and received the aggregated data which was presented within color-coded reports. ¶148. The reports used red to signify results that were below budget, and red items received significant discussion during the quarterly Business Review Meetings. ¶64. According to CW1, quarterly postpaid churn quotas for the Southwest region were "always in the red" for each quarter

throughout CW1's employment. ¶78. CW1 also explained that, according to the numbers CW1 saw for 2Q22 and 3Q22 in the Business Review meetings, not one of the six regions had positive store traffic or met their postpaid churn quotas. ¶149; *see also Allscripts*, 778 F. Supp. 2d at 885 (defendants' participation in monthly conference calls wherein information contradicting the alleged false statement supports scienter). During the Business Review meetings, including the one during the Class Period, each AVP repeatedly raised that it was a struggle to meet KPI goals for postpaid churn, net postpaid additions, and in-store traffic. ¶150. Therivel also raised that in-store traffic and margins were below target and needed to improve, and expressly inquired what AVPs intended to do to improve those metrics during each Business Review meeting.[15] *Id*.; *Apple*, 2020 WL 6482014, at *9-10 (knowledge of declining traffic raised strong inference of scienter).

Further, Therivel and Chambers were hands-on executives who met weekly with USM's executive team to discuss its operations, the majority of which related to postpaid connections. ¶141; *see* §II.C, *infra*. Therivel and Chambers also participated in monthly "deep, deep dive[s]" with those executives regarding USM's operations. ¶141; *see Sutton v. Bernard*, 2001 WL 897593, at *6 (N.D. Ill. Aug. 9, 2001) (scienter strongly supported where defendants were "'hands-on'" managers with access to documents concerning the fraud who "closely monitored the company's business via reports generated … on a weekly and monthly basis."). According to CW1, Chambers also paid acute attention to USM's spending, held mandatory monthly meetings with AVPs to discuss costs, and approved "anything that might cost money" for those AVPs.[16] ¶¶153-54.

---

[15] Defendants argue the FAC's CW allegations are too "generalized." (DB 15 (citing *In re Adient PLC Secs. Litig.*, 2020 WL 1644018, at *27 (S.D.N.Y. April 2, 2020)). Unlike in *Adient* where the CW reported that the defendants discussed unspecified "operational and launch issues[,]" CW1 identified the specific metrics that consistently went unmet, were "always in the red[,]" and which Defendants regularly discussed, complained of, and admittedly monitored. 2020 WL 1644018, at *27; *see* ¶¶61-65, 75-79, 95-96.

[16] Eager to undercut CW1's credibility, Defendants conveniently overlook the examples of costs that CW1 personally discussed with Chambers. *Compare* DB 21 *with* ¶¶153-54. Nevertheless, CW1's additional

Therivel also met one-on-one with CW1 to discuss difficulties with postpaid churn, in-store traffic, and sales. ¶96. In doing so, Therivel admitted before the Class Period that "churn will be a problem for us[,]" that 2022 was going to be one of USM's toughest years, and that in-store traffic and margins were below target. ¶¶96, 156. In a later meeting with CW1, Therivel confirmed 2022 was "a tough year" for revenue, postpaid churn, and gross and net postpaid customer additions. ¶155.

Finally, consistent with CW1's recollection, Defendants admitted to monitoring items such as "switching[,]" "churn dynamics[,]" gross adds[,]" and "voluntary defects." ¶¶176-78. Thus, the detailed allegations concerning the information Defendants received, how they received it, when, and their reactions thereto, all support a strong inference of scienter.

### 3. Defendants' Detailed Responses to Analysts' Questions Support Scienter

Throughout the Class Period, Defendants provided detailed responses to analysts' questions regarding the Companies' regionalization plan, the Promotion, the April 2022 trials, churn, revenue, and subscriber challenges, which supports that they either knew the information underlying those responses or were recklessness in speaking to those topics without first informing themselves of the true nature of UScellular's business.[17] *See* ¶¶173-75; *see also Hedick*, 2021 WL 3566602, at *13 ("The Court may 'readily and reasonabl[y] infer' from their repeated" discussion of the topic that defendants "'made it [their] business to look into' these issues."); *S. Ferry LP #2 Killinger*, 687 F. Supp. 2d. 1248, 1260 (W.D. Wash. 2009) (holding oneself out as knowledgeable "would be at least actionably reckless" if defendant "did not in fact have such knowledge[.]").[18]

---

allegations, which detail the meetings Defendants attended, reports that Defendants received, and costs they considered, go far beyond the CW in *Utesch v. Lannett Co.*, 316 F. Supp. 3d 895, 904 (E.D. Pa. 2018) who merely stated the defendant's approval was required for anything.

[17] Dodging analysts' questions regarding in-store traffic (¶109) also strongly supports scienter. *See Busic v. Orphazyme A/S*, 2022 WL 3299843, at *22 (N.D. Ill. Aug. 11, 2022) (evading questions supports scienter).

[18] *Holwill*, 2020 WL 5235005, at *5 ("[d]efendants' numerous statements" concerning issue was "strong circumstantial evidence" of defendants' knowledge of same); *Ross*, 2012 WL 5363431, at *10 (similar).

## C.  Postpaid Sales Are Defendants' Core Operation, Strongly Supporting Scienter

Corporate officers are assumed to know facts "'critical to a business's core operations...that would affect a company's performance.'" *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *Allison*, 2023 WL 1928119, at *10 (similar). Here, the Companies' core business was postpaid wireless operations—a fact Therivel and Chambers openly acknowledged. ¶168 (Therivel: "the postpaid side of our business is very important."); ¶169 (Chambers: described USM's business as "our core postpaid business[,]" noting "we're primarily a postpaid company"); ¶¶167, 170-72. Postpaid connections also accounted for 90% of USM's connections and monitoring loss of those connections was critical for Defendants, which again, they admitted during the Class Period.[19] *See e.g.*, ¶168 ("we pay a ton of attention to churn."); *Allstate*, 2018 WL 1071442, at *5-6 ("[A] strong inference of scienter may…be credited where it is almost inconceivable that an individual defendant would be unaware"); *Tellabs II*, 513 F.3d at 711 (it is "exceedingly unlikely" that executives, who are "at the top of the corporate pyramid" and who "[a]lmost all the false statements . . . emanated directly from" were unaware of issues with the "company's key products"); *Busic*, 2022 WL 3299843, at *22-23 (collecting cases).[20]

## D.  The FAC's Allegations Holistically Support a Strong Inference of Scienter

When considered holistically, the FAC alleges an overwhelming inference of scienter. Courts in this District routinely sustain similar allegations. *See Azar*, 2020 WL 4077327, at *5-6 (totality of scienter allegations, which included, *inter alia*, that defendants knew customer quality

---

[19] Therivel and Chambers suggest that they were not amongst the executives who received daily churn and in-store traffic reports. DB 16. Given Defendants admittedly monitored churn, consistently acknowledged that postpaid churn was an issue for USM, identified improving churn as a key goal for USM, and publicly reported on store traffic, their made-for-litigation argument that they were in the dark is absurd and belied by their own admissions. *See* ¶¶50, 57, 65, 78-79, 87, 96, 109, 145-51, 155-62, 176-80.

[20] Defendants' reliance on *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021) is misplaced because, whereas *Baxter* merely notes that a core operations allegation "by itself" will "generally" fail to allege scienter, the FAC contains many varieties of scienter allegations.

was low before the challenged statements, closely analyzed metrics related to those customers, later admitted the outcome was expected, and controlled all aspects of the company, supported scienter); *see also ATI*, 2023 WL 5748359, at \*19-20 (allegations, *inter alia*, of defendants' "knowledge of worsening" conditions and "the core nature of" the condition to defendant's business holistically support scienter); *Hedick*, 2021 WL 3566602, at \*12 (allegations that, *inter alia*, executives participated in setting requirements, tracked those requirements through monthly scorecards showing the company was not meeting its targets, and participated in meetings discussing the inability to garner the results supported scienter).

Defendants offer a paltry competing inference "that no such scheme existed[,]" which they rest on the oft-rejected notion that defendants have no reason to defraud investors "for a matter of months[.]" *Compare* DB 35 *with Tellabs II*, 513 F.3d at 710; *Busic*, 2022 WL 3299843, at \*22-24; § II.C, *supra*. Even comparing this "competing inference," which is impermissible under Seventh Circuit law, it is far more likely that Defendants, who knew, discussed, and accessed information contradicting their class period statements, sought to mislead investors in the hopes USM's subscriber and in-store traffic challenges would resolve sooner than the Promotion's April 2022 trial data suggested. *See* §§II.A-C, *supra*; *see also Lewis*, 535 F. Supp. 2d at 931 (the more plausible inference "is that [defendant] recklessly turned a blind eye" or "had knowledge" "but, in order to buy time to fix the problem, opted not to initially disclose the truth.").[21]

---

[21] *City of Livonia Emp.s' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 758-59 (7th Cir. 2013) ("*Boeing I*") is inapposite. *See* DB 29, 33. *Boeing I* concerned alleged false statements that certain airplane defects were being resolved in advance of a major trade conference. The *Boeing I* court affirmed a finding that scienter was not pled because the only allegation supporting knowledge or recklessness came from unspecified "internal e-mails," which were not supported by any factual foundation. *Boeing I*, 711 F.3d at 759. *Boeing I* has no relevance here, where Defendants admitted they knew **before the Class Period** that it would take more time to see subscribership results than they represented to investors (*See* ¶¶163-65) and were aware, prior to August 2022, that the Promotion would devastate USM's financials (*See* §I.C); *see also Boeing I*, 711 F.3d at 758 ("The complaint did not indicate whether [the defendants] who had made

Indeed, the stakes were particularly high for Therivel, who was hired by UScellular to combat years of postpaid subscriber losses, and whose focus was to drive "top line" customer and revenue growth through "gross adds and keeping churn down" in the twelve to eighteen months after joining UScellular.[22] ¶¶49-51, 176. Having failed to achieve these goals, however, Therivel went for a Hail Mary, pivoting from a regional promotional approach in favor of the company-wide, "table stakes" Promotion Defendants hoped would ameliorate USM's dismal postpaid subscriber results.[23] Defendants gambled that by misrepresenting the results of the April 2022 trials and the timeline for subscriber results, that those challenges would resolve sooner than the trial data suggested and investors would be none the wiser.[24] *Boeing II*, 2022 WL 3595058, at *27 ("[G]ambles need not be perfectly rational to support a 10b-5 claim, since the securities laws forbid foolish frauds along with clever ones."). That is consistent with a strong inference of scienter. *Busic*, 2022 WL 3299843, at *23 (scienter pled where "[i]t [was] highly plausible that [d]efendants attempted to conceal... approval issues in the hope they could" buy time to correct them).

Defendants acknowledge the FAC alleges that "Therivel and Chambers wanted to paint a rosier picture for investors than was warranted[.]" DB 33-34. Yet, they assert Plaintiff fails to plead

---

optimistic public statements about the timing of the First Flight knew that their optimism was unfounded."); *id.* at 759 ("Of course the fact that a prediction *may* prove untrue does not justify representing as true a prediction that one knows, to a reasonable certainty, is false.") (emphasis in original).

[22] As Therivel "was hired for the express purpose of . . . fixing" postpaid subscriber issues," it is reasonable to infer he "made it his business to look into [those] practices." *See Ross*, 2012 WL 5363431, at *10.

[23] Unlike in *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) where the court found fraud unlikely because the allegations concerned only one plant and one product that produced less than 10% of the company's income, Defendants' fraud here concerned postpaid sales, which comprised about 90% of the Companies' retail connections and the majority of the Companies' revenues. *See* ¶¶43, 46, 167-70; *see also Tellabs II*, 513 F.3d at 709-11.

[24] Contrary to Defendants' assertion (*see* DB 16, 20), scienter is not negated merely because Therivel made tepid and incomplete statements concerning UScellular's subscriber challenges during the Class Period earnings calls or because Chambers misleadingly suggested that store traffic was slightly down (though purportedly not "concerning"). *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1025 (N.D. Ill. 2010) ("[T]he fact that [defendant] disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for [defendant's] statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.").

motive, pointing to the short duration of the class period and a lack of insider selling allegations.[25] *Id*. Defendants' exact argument was rejected, and Plaintiff's theory of motive credited, in *Tellabs II*. *See* 513 F.3d at 710. There, the Seventh Circuit dispelled the notion that defendants, who did not sell shares during the class period, "had no motive to paint the prospects for [two products] in rosy hues because within months they acknowledged their mistakes and disclosed the true situation." *Id*. Instead, the defendants "may have thought that there was a chance that the situation regarding the two key products would right itself" and thus, "the benefits of concealment might exceed the costs." *Id*.; *see id*. ("The fact that a gamble…fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

When taken holistically, Defendants' motive, Therivel's post-class period admissions, and the FAC's robust allegations demonstrating that the Defendants not only received daily, weekly, and monthly churn and in-store reports but also discussed critical KPIs, which go to the heart of the Companies' core operation, extensively during weekly, monthly, and quarterly meetings, and with analysts, create a cogent and compelling inference of scienter.

### III.     The Court Should Credit the CWs' Convincingly Detailed Accounts

Where a complaint is supported by CWs, those sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged[.]" *Makor*, 437 F.3d at 596. Contrary to Defendants' position (DB 14-16), there is no categorical discount to CW allegations where, as here, Plaintiff describes the witnesses with enough detail to confirm the CWs' foundation for their allegations. *Ross*, 2012 WL

---

[25] Defendants (incorrectly) argue that *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) blanketly held that the absence of stock sales negates scienter. *See* DB 33-34. Not so. Rather, the court found that the plaintiffs' motive allegations were not compelling where there were no allegations the defendants sold the stock alleged to have been obtained through stock option exercises and there were no allegations suggesting that any transactions were suspiciously timed. *Pugh*, 521 F.3d at 695; *cf. Tellabs II*, 513 F.3d at 710.

5363431, at \*4; *Tellabs II*, 513 F.3d at 711-12 (distinguishing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 208 (5th Cir. 2023) ("Discount does not mean unfettered discretion to discard.").[26] The FAC adequately describes the CWs with sufficient detail to support that the sources occupied positions that afforded them with the alleged information.[27]

First, the FAC alleges CW1 was USM's AVP for the Southwest Region from December 2020 through June 2023. CW1 reported first to CMO Jagher, and then to VP of Retail Sales Crisostomo, both of whom reported directly to Therivel. ¶39. The FAC specifies what CW1's relevant responsibilities were, as well as relevant reports, meetings (including with Therivel), and other sources of information that formed the basis of CW1's allegations. ¶¶61-63, 75-76, 95-96, 101; *City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at \*17 (N.D. Ill. Feb. 13, 2013) (describing job title, employment duration, and description of responsibilities is sufficient "to support the probability" that the witness "would possess the information alleged[.]"); *Tellabs II*, 513 F.3d at 712 (crediting CWs, who from their job descriptions, were in a position to know first-hand about returns and sales "dropping off a cliff").

The FAC alleges that CW2 was a former employee in USM's Growth Marketing department involved in creating, approving, and evaluating promotions. ¶41. CW2 was involved in USM's regionalized promotion evaluations, compiling "what-if-scenarios" and promotion

---

[26] Defendants' reliance on *Boeing I*, 711 F.3d at 759 (*see* DB 15) is inapt for the additional reason that a deposition revealed that the CW allegations had not been verified by counsel, and such egregious conduct has not and cannot be levied here. *See* ¶2 (undersigned attorneys interviewed former employees)*; see also Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 934-935 (N.D. Ill. 2015) (declining to categorically discount CW allegations and noting the unusual circumstances in the line of cases, including *Boeing I*, where CWs were discounted).

[27] The FAC's CW allegations exceed those in *Higginbotham,* 495 F.3d at 756-57, where CWs were merely described as consultants and ex-employees with no further job descriptions. *See Tellabs II*, 513 at 711-12.

analyses, and participating in meetings directly with Therivel and Chambers to facilitate approval of such promotions. ¶¶68, 70-73; *see Busic*, 2022 WL 3299843, at \*19 (probable witness possessed information alleged given his "upper-level position within [the] team" responsible for trial results). CW2 also participated in USM's 2021 evaluation for implementing a nationwide free phone promotion and explained granular detail about the findings of that evaluation.[28] ¶¶11, 86, 143.

Faced with these detailed allegations, Defendants baselessly claim that the CW allegations here are merely "second-hand information." DB 16. Defendants are wrong.[29] The FAC's allegations adequately describe the CWs' respective first-hand involvement in USM's sales and promotion evaluations, and in aggregating data for and meeting with Defendants regarding the same. *See* ¶¶39-41, 60-65, 68-73, 75-79, 84, 86-87, 95-96. Thus, the Court should credit the FAC's well-pled confidential witness allegations. *Pierrelouis*, 2021 WL 1608342, at \*8.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[30]

---

[28] Defendants incorrectly claim that the Court must discredit CW2's allegations because the FAC does not allege the duration of CW2's employment. *See* DB 23. However, Plaintiff is not required to allege duration where other facts demonstrate how CW came to learn of the information. *See Lowry*, 532 F. Supp. 3d at 662-63 (disregarding argument that CWs were not employed during the class period and crediting their "firsthand accounts").

[29] As a result, Defendants' reliance on case law where CWs learned information from contact with former co-workers after they left the company or from students re-telling their advisors' accounts, is misplaced. DB 16; *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill. 2006) (discounting CWs who learned information from former co-workers); *Boca Raton Firefighters' & Police Pension Fund v. DeVry, Inc.*, 2012 WL 1030474, at \*6 n.11 (N.D. Ill. Mar. 27, 2012) (CW's account of what students told CW their advisor told them constituted second-hand information).

[30] Because the FAC adequately alleges a primary violation of § 10(b), it adequately alleges control person liability under § 20(a) of the Exchange Act. *Busic*, 2022 WL 3299843, at \*24. Should the Court grant any aspect of Defendants' Motion, Plaintiff respectfully requests leave to amend. *Id.* at \*25.

Dated: November 30, 2023        Respectfully submitted,

/s/ Carol V. Gilden
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
Carol V. Gilden (IL Bar: 6185530)
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
Tel: (312) 629-3737
Fax: (312) 357-0369
cgilden@cohenmilstein.com

*Liaison Counsel for Plaintiff Howard M. Rensin, Trustee of The Rensin Joint Trust, and the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
Morgan M. Embleton (*pro hac vice* forthcoming)
Nicholas R. Lange (IL Bar: 6318106)
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com
nlange@zlk.com

*Lead Counsel for Plaintiff Howard M. Rensin, Trustee of The Rensin Joint Trust, and the Class*

36

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on November 30, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.

*/s/ Carol V. Gilden*
Carol V. Gilden

37