**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, and TELEPHONE AND DATA SYSTEMS, INC.,<br><br>Defendant. | No. 1:23-cv-02764<br><br>Honorable Mary M. Rowland |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................ 4

I.   Plaintiff Has Not Adequately Alleged that the Forward-Looking Statements
     Regarding the Promotion Timeline Are False Or Misleading. .......................................... 4

     A.   Plaintiff's Allegations Regarding Therivel's Timeline Statements
          Fail Because They Are Forward-Looking Statements Protected by
          Both Independent Prongs of the PSLRA Safe Harbor. ................................................ 4

          1.   The Challenged Statements Were Accompanied by
               Meaningful Cautionary Language. ........................................................................ 5

          2.   The Complaint Does Not Allege Facts Giving Rise to a
               "Strong Inference" that the Challenged Statements Were Knowingly False. ......... 7

     B.   The Additional Timeline Statements Plaintiff
          Challenges Are Not Adequately Alleged to be False or Misleading. ........................... 13

II.  The Remaining Statements Are Not Adequately Alleged to Be False or Misleading. ... 15

     A.   Plaintiff Fails to Allege Statements Regarding In-Store
          Traffic Were False or Misleading. ............................................................................... 15

     B.   Plaintiff Fails to Allege Therivel's Statements, Including Statements of Belief,
          Concerning General Expense Discipline and the Balance Between Subscriber and
          Financial Results Were False or Misleading. ............................................................... 17

     C.   Plaintiff Fails to Allege Therivel's Statements, Including
          Statements of Opinion and Belief, Regarding Regional Trials
          and Early Promotion Results Were False or Misleading. ............................................. 18

III. Plaintiff Has Not Alleged a Strong Inference of Scienter that is
     Cogent and at Least as Compelling as the Opposing Innocent Inference. ...................... 18

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ........................................................................16

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ........................................................................20

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ........................................................................10

*City of Livonia Emps. Ret. Sys and Loc. 295/Loc. 851 v. The Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ..........................................................................................13, 19

*City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ........................................................................................1, 3, 13

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ....................................................................................6

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ........................................................................17

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009)...................................................................................12

*In re Westell Techs., Inc. Sec. Litig.*,
2001 WL 1313785 (N.D. Ill. Oct. 26, 2001)..........................................................................16

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ......................................................................5, 6

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ................................................................................................13

*Lowthorp v. Mesa Air Grp. Inc.*,
2021 WL 3089118 (D. Ariz. July 22, 2021) ..........................................................................10

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ................................................................................................17

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ................................................................................................20

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
735 F. Supp. 2d 856 (N.D. Ill. 2010) ....................................................................................20

*Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*,
  2022 WL 1449184 (7th Cir. 2022) ...................................................................................1

*NeoPharm, Inc. Sec. Litig.*,
  2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ..............................................................10, 15, 16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)......................................................................................2, 11, 15, 18

*Pension Tr. Fund For Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) .........................................................................................20

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
  2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) .....................................................................4

*Pierrelouis v. Gogo, Inc.*,
  2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) .....................................................................6

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  679 F.3d 952 (7th Cir. 2012) ..........................................................................................3

*Plumbers and Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v.*
  *Allscripts-Misys Healthcare Sols., Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011) ..........................................................................6, 16

*Selbst v. McDonald's Corp.*,
  2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ....................................................................5

*Smith v. Signature Sys., Inc.*,
  2022 WL 595707 (N.D. Ill. Feb. 28, 2022) .......................................................................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...............................................................................................2, 3, 7

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020) ................................................................................7

*Washtenaw Cty. Emps. Ret. Sys. v. Walgreen Co.*,
  2016 WL 5720375 (N.D. Ill. Sept. 30, 2016) ...............................................................2, 7, 8

*Water Island Event-Driven Fund, LLC v. Trib. Media Co.*,
  39 F.4th 402 (7th Cir. 2022) ..........................................................................................1

*Zerger v. Midway Games, Inc.*,
  2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)......................................................................19

iv

**Statutes**

15 U.S.C. § 78u–4 .................................................................................................................7

15 U.S.C. § 78u-5 .................................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 12(b) .............................................................................................................2

As the Seventh Circuit has often observed, disappointing results are "a business problem, not a securities problem." *City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 597 (7th Cir. 2021); *see also Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184, *1 (7th Cir. 2022). Here, Plaintiff's attempt to convert a disappointing earnings announcement and resulting stock drop into securities fraud is an impermissible claim of "fraud by hindsight" and must be rejected. *Water Island Event-Driven Fund, LLC v. Trib. Media Co.*, 39 F.4th 402, 408 (7th Cir. 2022). As it explained to investors over the course of the putative Class Period,[1] UScellular faced challenges with subscriber results. The Company launched the Promotion in June of 2022 in an attempt to address these challenges. The results of the Promotion in the three months following its launch were positive, albeit not as positive as the Company had hoped at that point. Thus, in its earnings call for the third quarter of 2022, the Company lowered the high end of its service revenue and profitability guidance for the year. Plaintiff does not adequately allege a single statement regarding the Promotion, in-store traffic, expenses, or any other topic that, viewed in proper context, was false, let alone made with scienter. Plaintiff accordingly does not meet the PSLRA's stringent pleading burden.

Plaintiff alleges "falsity" by improperly truncating, or taking wholly out of context, both the challenged statements and the supposed corrective disclosures. Remarkably, Plaintiff then argues that the Court should blind itself to the full transcripts in which the statements at issue appear, *see* Mot. to Strike at 13–14, 13 n.9, as well as other disclosures to shareholders that put necessary context around the challenged statements and Plaintiff's allegations about them. To

---

[1] Except where noted, capitalized terms have the definitions set out in Defendants' Memorandum in Support of their Motion to Dismiss (Dkt. 36) (the "Brief"). Plaintiff's Opposition to Defendants' Motion to Dismiss (Dkt. 40) is referred to herein as the "Opposition" or "Opp.," Plaintiff's Memorandum of Law in Support of their Motion to Strike (Dkt. 38) is referred to herein as the "Motion to Strike" or "Mot. to Strike" and Defendants' Opposition to the Motion to Strike filed herewith is referred to herein as the "Opposition to the Motion to Strike" or the "Opp. to Mot. to Strike."

take the most egregious example, Plaintiff argues that the Court should not consider risk factors in the Company's SEC Form 10-K, which were expressly incorporated by reference into the earnings call transcripts, and that it should not consider earnings press releases, filed with the SEC, accompanying the earnings call transcripts. *See*, *e.g.*, Mot. to Strike at 13–14, 14 n.9. As discussed more fully in the Opposition to the Motion to Strike, filed with this Reply, the Court should not permit Plaintiff to go forward with a securities fraud claim by mischaracterizing and distorting the record and should deny Plaintiff's Motion to Strike in its entirety. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts **must** consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, ***in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice***.") (emphases added).

However, the Court does not need to review anything other than the Complaint to dismiss. Plaintiff's Opposition focuses largely on a handful of statements made by Therivel regarding the timeline on which he expected the Promotion to generate improvements in churn. *See, e.g.*, Opp. at 2–3, 10–13, 19–23. These statements are forward-looking, and are subject to the PSLRA safe harbor. Under the safe harbor, in order adequately to allege falsity, Plaintiff must plead that the statements were not accompanied by meaningful cautionary language and, if such language is not sufficient, plead, with particularity, a strong inference of actual knowledge that the forward-looking statement was false. Br. 25–26; *see also Washtenaw Cty. Emps. Ret. Sys. v. Walgreen Co.*, 2016 WL 5720375, at *4 (N.D. Ill. Sept. 30, 2016). Plaintiff cannot meet this high bar. Moreover, all of the statements at issue were made in oral communications and many were statements of opinion made as "on-the-fly" responses to analyst questions. These statements, too, are held to a more stringent standard. Plaintiff fails to meet it. *Omnicare, Inc. v.*

2

*Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) ("Reasonable investors do not understand [opinion] statements as guarantees," nor are they "treat[ed] … that way" by securities laws); *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) ("Oral exchanges are less precise than written ones," because the speaker "d[oes] not know what question [is] coming, ha[s] to answer off the cuff, and d[oes] not have an opportunity to review the question and edit his answer before the next question [is] posed.").

Plaintiff also fails to allege any stock sales at supposedly inflated prices, or any other reason why Defendants would intentionally conceal or lie about expected results in May and August if the purported "truth" would become known in November. Plaintiff's theory makes no sense. The far more compelling and cogent inference is that Defendants provided investors with their best assessments at the time, but that circumstances did not play out exactly as expected. *Zebra*, 8 F.4th at 595 (securities laws do not "demand perfection from forecasts, which are inevitably inaccurate"). Plaintiff argues that the Court cannot take such competing innocent inferences into account, baldly asserting that "comparing [a] 'competing inference' … is impermissible under Seventh Circuit law." Opp. at 31; *see also id.* at 8, 23; Mot. to Strike at 2. This is not the law. As the Supreme Court has made clear, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court ***must*** consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff … [T]he inference of scienter must be … cogent and compelling … and ***at least as compelling as any opposing inference one could draw*** from the facts alleged." *Tellabs*, 551 U.S. at 324–25; *id.* at 323 (noting that "[t]he strength of an inference cannot be decided in a vacuum. The inquiry ***is inherently comparative***.") (emphases added). Weighing such inferences

3

here, the allegations in the complaint do not give rise to a "strong inference" that the Defendants acted with an intention to defraud. This is an additional and independent basis for dismissal.

For all the reasons discussed in the Brief and below, the Complaint should be dismissed.

## ARGUMENT

**I.**     **Plaintiff Has Not Adequately Alleged that the Forward-Looking Statements Regarding the Promotion Timeline Are False Or Misleading.**

**A.**     **Plaintiff's Allegations Regarding Therivel's Timeline Statements Fail Because They Are Forward-Looking Statements Protected by Both Independent Prongs of the PSLRA Safe Harbor.**

Plaintiff identifies several statements made during the second quarter 2022 earnings call regarding the timeline for the Promotion and asserts that these statements were false or misleading because Defendants supposedly "'knew' *before the Class Period*" that the Promotion "'would take about 6 to 9 months to see the consumer churn benefit.'" Opp. at 10 (citing Am. Compl. ¶¶ 163–64). Plaintiff's challenge to these forward-looking statements fails under both independent prongs of the PSLRA's safe harbor. *See* Br. at 25–32.

Plaintiff seeks to re-characterize these statements as being "mixed with backward-looking aspects," and accordingly not subject to the protections of the safe harbor, citing *Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 2023 WL 5748359, at *7 (N.D. Ill. Sept. 6, 2023) (Opp. at 20.) In *ATI*, the court held that statements such as "the company 'continues to match its clinical staffing levels accordingly'" were mixed present-future statements. However, the *ATI* court held that statements that actually made predictions about the future, such as that the company was "'on track' to meet its 2021 target for new clinics" were forward-looking statements protected by the safe harbor. *Id.* at 8. The statements at issue here—"*[w]hat we expect to see* is steady churn improvement throughout the second half of the year," and "*[s]o we should start to see* some benefit from this in the third quarter, and *we'll see* more benefit, hopefully, in the fourth

quarter"—are predictions about the future, exactly like the statement that a project is "on track," and unlike a statement about a company's "continued" practice. Such predictions are protected by the safe harbor because they "do[] not communicate any concrete, verifiable present-state condition," and instead make an "amorphous prediction about the future." *Id.*[2] So too here. Because Therivel's statements are forward-looking, they are protected by the PSLRA safe harbor. Dismissal is required with respect to such statements if *either*: (1) they are accompanied by meaningful cautionary statements *or* (2) plaintiff fails to allege that they were "made with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1); Br. at 13. Plaintiff does not satisfy either prong.

### 1. The Challenged Statements Were Accompanied by Meaningful Cautionary Language.

The Company's forward-looking statements were accompanied by meaningful cautionary language. As previously explained, UScellular noted risks that were specific and identified the principal contingencies that caused the Company's actual results to depart from its forward-looking statements. *See* Br. at 5, 28. Plaintiff argues that the cautionary language in the Company's risk factors was not meaningful because it was overly generic and "pertain[ed] to any business." Opp. at 21. Not so. The Company expressly disclosed the risks unique to the Company, including its specific challenges as a smaller carrier in a market dominated by larger entities. *See, e.g.*, Ex. A, 2021 10-K at 5 (describing risks posed by competitors who are "larger than UScellular [and] possess greater financial and other resources"). Further, while Plaintiff

---

[2] Plaintiff's other cites are to the same effect. *See Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *8–10 (N.D. Ill. Sept. 21, 2005) (Opp. at 20) ("[W]hen the factors underlying a projection or economic forecast include both assumptions and statements of known fact … the entire list of factors is treated as a forward-looking statement.") (citations omitted); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *15 (N.D. Ill. Aug. 11, 2021) (Opp. at 20) (noting only that statements that specify current actions, such as "we are dealing with" and "we are increasing" are not forward-looking).

argues that the Complaint's allegations "do[] not turn on [the Company]'s ability to compete" (Opp. at 22), continued competitive pressure is precisely the reason the Company cited for why churn had not improved at the rate it had hoped by the third quarter of 2022, which is the crux of Plaintiff's challenge. *See* Ex. M, 22Q3EC at 6 ("Voluntary churn increased as a result of increased switching activity *and aggressive industry-wide competition*." (emphasis added)). Nor did the statements assert only that competition could possibly occur. *See* Opp. at 22. The Company warned that competition in the industry "*is intense* and is expected to intensify" (Ex. A, 2021 10-K at 5 (emphasis added)), and Therivel expressly cautioned investors about competition in the *same response* in which he made a prediction regarding churn: "It is an aggressive competitive environment out there" (Ex. K, 22Q2EC at 10).[3] Plaintiff alleges Therivel failed to predict the precise degree to which competition would ultimately hamper churn improvement in the third quarter, but that level of clairvoyance is not required for cautionary statements to be found meaningful. *Plumbers and Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 875 (N.D. Ill. 2011) ("risks involving, *e.g.*, product introduction … and failures to license third-party technologies" sufficiently identified risks that caused underperformance); *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 846 (N.D. Ill. 2009) ("prescience is not required").

Plaintiff also argues that the disclosures were nonetheless inadequate because they failed to tell investors of the "exorbitant cost" of the Promotion (Opp. at 22), but as previously discussed (Br. at 29, 30–31), Defendants never stated or implied that the Promotion would be inexpensive, and, to the contrary, warned investors that spending on the Promotion would be

---

[3] Plaintiff's citation to *Hedick*, 2021 WL 3566602, at *16, and *Pierrelouis v. Gogo, Inc.,* 2021 WL 1608342 at *11 (N.D. Ill. Apr. 26, 2021) (Opp. at 22), in which risks the defendant knew had materialized were described as conditional or "potential" are accordingly inapposite.

6

"aggressive" (Am. Compl. ¶ 87). Plaintiff additionally argues that the disclosures were insufficient because they failed to include that Defendants "knew the timeline for improvement was materially understated and the data that they received each morning evidenced worsening churn." Opp. at 22. But as discussed below (*see infra* at 12–15), this is, at best, limited preliminary information from which Plaintiff believes Therivel should have drawn different conclusions. The factors that caused the Promotion to deliver churn results on a slightly slower timeline than expected were the precise market risk factors disclosed by the Company, such as continued competitive pressure from other wireless providers, and Plaintiff does not allege otherwise. The challenged statements are protected by the safe harbor and must be dismissed.

### 2. The Complaint Does Not Allege Facts Giving Rise to a "Strong Inference" that the Challenged Statements Were Knowingly False.

Plaintiff has also failed to allege a strong inference that Therivel acted with actual knowledge that his predictions were false and that he did not actually believe that the Company would see "steady churn improvement throughout the second half of the year." *See Washtenaw Cty. Emps. Ret. Sys.*, 2016 WL 5720375, at \*4; *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 667 (N.D. Ill. 2020) (allegations of actual knowledge must satisfy the PSLRA's "strong inference" pleading standard for scienter).[4] The challenged statements regarding the Promotion timeline were made in response to an analyst's question asking, among other things, "is there the ability to get back to positive postpaid phone adds?" Ex. K, 22Q2EC at 10. Therivel answered in the affirmative and then provided the

---

[4] Plaintiff asserts that the Court need not review every statement individually to determine whether it supports a claim. *See* Opp. at 23–24. That is a misstatement of the law. In fact, the PSLRA expressly requires that Plaintiffs "specify *each* statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(1)) (emphasis added). *Smith v. Signature Sys., Inc.*, 2022 WL 595707, at \*5 (N.D. Ill. Feb. 28, 2022) (Opp. at 24), a case under the Biometric Information Privacy Act and not the PSLRA, is not to the contrary.

7

following additional response:

> What is it going to take? I think the biggest step that's going to take in the near term is churn improvement. When I look at voluntary churn, that's where we saw the majority of our pressure in the first quarter. And we -- the offer that we've launched here is specifically designed to address that. One of the things we saw as we -- over the past couple of years is we've seen a larger and larger percentage of customers that are out of contract. And out-of-contract customers churn at a substantially higher rate than in-contract customers. And so the goal is how do we get customers back into contract. And that was one way is with the offer that we put forward. We think it specifically addressed that issue, and we're seeing really good results. So we're seeing upgrades up substantively. We're seeing the ratio of voluntary defections to gross adds improve substantively. […] And so I think execution on this offer, continuation of the momentum that we're seeing, and then *it has to translate into churn reduction, and* <u>*that takes some time*</u>*. But* <u>*you don't see churn immediately dive, right?*</u> **What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter.**

*Id.* at 10 (emphases added).

As is evident from the statement itself, the challenged statements (*i.e.*, the statements in bold italics) were not a promise or a guarantee of quick churn improvement: instead, Therivel was cautioning investors that churn would ***not*** immediately improve. Nor would any reasonable investors take this to be a concrete representation as to the precise timing and magnitude of the results of the Promotion. Indeed, Plaintiff cites statements made regarding timeline in the February 17, 2023 earnings call that confirm that investors had *not* understood the prior statements to constitute such an iron-clad assurance. *See* Am. Compl. ¶ 164 (quoting analyst who asked, *see* Ex. S, 22Q4EC[5] at 12: "Sometimes, I think you've said in the past maybe 6 to 9 months, that should *hopefully* benefit into churn. Are we seeing that?") (emphasis added).

---

[5] Exhibits S and T are earnings call transcripts that are cited in the Complaint (Am. Compl. ¶ 164 (Ex. S); *id.* ¶¶ 50, 84 n.8, 176 (Ex. T)), and central to Plaintiff's arguments (*see e.g.*, Opp. at 5, 11, 20, 23, 25 (Ex. S); *id.* at 4, 32 (Ex. T)), so they are incorporated by reference and can be considered by the Court.

Nevertheless, Plaintiff seeks to convert these hedged statements into an unqualified promise that the Promotion would definitively improve churn by the end of the third quarter. Having erected this strawman, Plaintiff then proceeds to knock it down by pointing to Therivel's post-class period statement in the earnings call for the first quarter of 2023 that "based on the testing we've done in our regional trials, we knew it would take about 6 to 9 months to see the consumer churn benefit." Ex. O, 23Q1EC at 5 (cited Opp. at 10–11). As an initial matter, despite Plaintiff's heavy reliance on this later statement in his Opposition, he simultaneously argues in his Motion to Strike that the first quarter 2023 earnings call is "indisputably not cited in the [Complaint] nor central to its allegations" nor is it "relevant to Plaintiff's claims." Mot. to Strike at 5–6. Plaintiff cannot have it both ways. He cannot justify a claim based on a document he argues is irrelevant and should be stricken.

More importantly, however, Plaintiff's assertion that this later statement is an admission of fraud committed just months earlier is not plausible and does not establish a "strong inference" that Therivel knew this prior comment about the possibility of seeing "some" improvement in the third quarter was knowingly false. The far more reasonable and plausible interpretation of the supposedly "corrective" statement Plaintiff quotes is that, in a conversational way appropriate to an oral statement, Therivel was conveying that the Company understood that in regional trials it had taken about 6 to 9 months to see consumer churn begin to improve following similar promotions. But a nationwide promotion is different than a regional promotion. As previously discussed, Therivel could reasonably have believed when he made the challenged statement that a national Promotion would generate sufficient publicity and momentum such that it would generate churn improvements at a faster clip than a smaller, regional trial (particularly in light of positive leading indicators), and accordingly reasonably

9

believed that the Company would see at least "some" improvement by the end of the third quarter of 2022. Br. at 30–32. That inference is far more compelling than the competing fraudulent inference—that Therivel was deliberately lying in that he knew that it would take *more* than three months before the Company saw *any* improvement whatsoever, all while broadly cautioning that churn improvements would "take some time" and "hopefully" would be showing benefits by the end of the fourth quarter (which, in fact, it did). Plaintiff's inference, implying a level of precision and clairvoyance as to the impact of a nationwide promotion that had never been run before, is neither cogent not compelling.[6]

Plaintiff, for the first time in his Opposition, invents an artificial ticking clock as a purported motive for Therivel to lie, arguing that the Company had hired him to "driv[e] gross adds and keep[] churn down," and that Therivel had a "stated eighteen-month maximum for improvement." Opp. at 1, 5; *see also id*. at 4, 32. There was no such deadline and no such motive. During an August 7, 2020 call, well before the start of the putative Class Period, an analyst asked Therivel the following question: "My first question is for LT, if you could talk a little bit about your top priorities or top objectives as the new CEO over the next 12 to 18 months?" Therivel responded that one of several areas he intended to focus on as CEO, as a "mid-term priority," was subscriber growth. *See* Ex. T, 20Q2EC at 16 (citing growth in addition to other matters, such as looking into expansion in areas like the Company's prepaid or "B2B"

---

[6] Nor do any cases cited by Plaintiff suggest otherwise. *See, e.g.*, *NeoPharm, Inc. Sec. Litig.*, 2003 WL 262369, at *6–7, 14 (N.D. Ill. Feb. 7, 2003) (Opp. at 25) (defendants represented clinical trials had shown successful results when they "had been a failure and had shown no medical benefits"); *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at 6 (N.D. Ill. Feb. 27, 2018) (Opp. at 25) (defendants assured that decrease in underwriting standards was not the cause for reported increased claims frequency when they knew lower standards were expected to cause such an increase, while selling stock at alleged inflated prices); *Lowthorp v. Mesa Air Grp. Inc.*, 2021 WL 3089118, at *11 (D. Ariz. July 22, 2021) (Opp. at 10, 11) (statements that they were attracting and retaining qualified personnel were misleading because defendant later admitted the company was facing personnel shortages).

segments and exploring partnerships). Plaintiff's alleged "eighteen-month maximum for improvement" was simply the timeframe provided by the analyst in asking a question. Moreover, the eighteen-month clock, had it begun ticking in August of 2020, would have expired in February 2022, so, in any event, it does not explain why Therivel would have been so concerned with the timing difference between improvement in September 2022 versus December 2022 that it creates a "strong inference" that he lied to investors.

Plaintiff additionally argues that Therivel "omitted material facts, includ[ing] embedded untrue facts" because, when speaking about his expectations for the Promotion implemented on a national scale, he did not inform investors about the specific results of the regional trials, and, accordingly, the statements cannot benefit from the protection of the safe harbor. Opp. at 11, 20–21. Plaintiff's argument fails because there was no such material omission. While Therivel did discuss regional trials during the second quarter earnings call, all that he said was that "thanks to the trials … we're able to structure this offer in a way that we *believe* will drive *positive subscriber results* in the second half of the year." Ex. K, 22Q2EC at 5 (emphases added). As discussed below, *see infra* at 13–15, that prediction proved true: positive subscriber results did begin to be realized in the form of increased upgrades and other improvements by the end of 2022. Later, during the question and answer portion of the call, Therivel answered an analyst's question by stating what he "expect[ed] to see" regarding *churn improvement*. He did not rest that prediction on results from regional trials or any other factual basis. Instead, that forward-looking statement was a statement of Therivel's expectations based on his business judgment and experience, taking into account numerous factors, not simply regional trials. In order to be material, an omission must not merely supply additional data points; it must "make the statement of opinion *misleading*" if omitted. *Omnicare,* 575 U.S. at 190 (emphasis added) (rejecting the

11

argument that a company must disclose a dissenting position, even if it "ultimately proved correct," since "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement."). Nothing of the sort is alleged here.

Likewise, Plaintiff's allegation that Therivel was required to disclose interim churn rates, premised on the vague allegation from a single CW that "all AVPs and executives received ADS reports every morning by 7:00 a.m. that included churn rates"[7] (Am. Compl. ¶ 78; *see* Opp. at 16, 22), fares no better. In the first place, a claim that "executives" received "reports," devoid of any allegations of how the information in those reports contradicted the public statements at issue, is precisely the sort courts reject. *See, e.g.*, *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 999 (E.D. Wis. 2009) (rejecting allegations of confidential witness regarding "receipt of reports" and information provided to "executives"); *see also* Br. at 15–16. Here, Plaintiff's allegation that Therivel was among the executives who received real-time reports regarding churn, even if credited, fails to allege that: (1) Therivel reviewed the reports, (2) the reports were vetted to a degree that their contents could be disclosed to investors, and (3) the reports showed worsening churn prior to the challenged statements.

Nor does Plaintiff explain why, even if the reports were sufficiently reliable and showed worsening churn, Therivel was required to extrapolate from that information that churn would *continue* to worsen through the end of the third quarter, rather than starting to at least show

---

[7] Plaintiff additionally alleges a single meeting in June at which churn was allegedly discussed. Am. Compl. ¶ 63. Plaintiff takes issue with Defendants' characterizations of this as a single meeting (Opp. at 16 n.5), but that is all Plaintiff alleges with any factual particularity: "Occasionally, Defendant Therivel would cancel the [Business Review] meeting, however CW1 recalled participating with all of the other AVPs and Defendant Therivel in at least one such quarterly Business Review meeting during the period between May 2022 and November 2022, which was in June 2022 to the best of CW1's recollection." Am. Compl. ¶ 63. Regardless of how many meetings occurred, this allegation fares no better than Plaintiff's allegation regarding churn reports because it fails to allege any reason why Therivel was required to disclose further information to investors.

12

"some" improvement. The Seventh Circuit has repeatedly rejected arguments that companies are required to provide an intra-quarter play-by-play of events that are in the midst of unfolding. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007) ("Firms regularly learn financial information between quarterly reports, and they keep it under their hats until the time arrives for disclosure. Silence is not 'fraud' without a duty to disclose."); *City of Livonia Emps. Ret. Sys and Loc. 295/Loc. 851 v. The Boeing Co.*, 711 F.3d 754, 758–59 (7th Cir. 2013) (holding that executives were not required to disclose facts suggesting a potential delay because they believed it could be prevented); *see also Zebra*, 8 F.4th at 596 (holding that securities laws do not require updating investors with a "complete accounting of difficulties" encountered in an ongoing process). In short, Plaintiff falls far short of pleading a strong inference of actual knowledge, as required under the PSLRA safe harbor, and the claims regarding an alleged timeline for churn improvement must be dismissed for that reason as well.

**B.      The Additional Timeline Statements Plaintiff Challenges Are Not Adequately Alleged to be False or Misleading.**

In addition to the statements regarding a purported "timeline" for improvement, Plaintiff also challenges forward-looking statements that do not mention consumer churn benefit at all, including related to "***subscriber results***" (Am. Compl. ¶ 113), "***upgrades***," and the "***ratio of voluntary defections to gross adds***" (*id.* ¶ 114) (emphases added). None of those statements are inconsistent with the supposed "truth" that Defendants "knew." To the contrary, improvements in "upgrades" and the "ratio of voluntary defections to gross adds" had already occurred by the second quarter, as the Company disclosed (Ex. K, 22Q2EC at 10, 17), and Plaintiff does not challenge.[8] Further, Therivel stated that "the early results" of the Promotion (Ex. M, 22Q3EC at

---

[8] Plaintiff makes much of confidential witness allegations that the Company could not meet its postpaid churn quotas and internal goals. *See, e.g.*, Opp. at 6 (citing Am. Compl. ¶ 65). But even setting aside the

13

4), showed "improvement in several key areas," including, specifically, "upgrades" and the Company's "highest percentage [of postpaid customers] in contract that we've seen since 2019" (*id.* at 5). These were all positive subscriber results that benefitted the Company, because "in-contract customers churn at a much lower rate than out-of-contract customers," so the positive subscriber results experienced as of the third quarter of 2022 "should lead to lower churn in future periods." *Id.* Here, too, Plaintiff offers nothing to the contrary.

Rather than pointing to concrete factual allegations that satisfy the heightened requirements of the PSLRA, Plaintiff resorts to conjecture and overblown rhetoric, such as that the "Promotion was financially disastrous and incapable of delivering the subscribership and churn improvement that Defendants described" in the challenged statements. Opp. at 3; *see also id.* at 6 (the "Promotion did not improve [UScellular]'s subscriber challenges"), *id*. at 7 (the "Promotion had wreaked havoc on the Companies' financials without delivering positive subscriber results"). Plaintiff's only possible support for such hyperbole are the statements in Defendants' third quarter 2022 earnings call that Plaintiff asserts "revealed" the "truth" about the Promotion. Am. Compl. ¶¶ 122–39. But that call did not state that the Promotion was a financial "disaster" or "incapable of delivering" churn improvement. To the contrary, the call reported results only for the ***three months*** following the start of the Promotion, and those early results demonstrated that the Promotion had not resulted in churn reduction as hoped, but nevertheless had driven positive leading indicators to reduce churn, which, in turn, were expected to lead to financial benefits in the future. *See, e.g.*, Ex. M, 22Q3EC at 4–5. Moreover, there is no dispute

---

numerous problems with these allegations set out in Defendants' Brief (Br. at 14–16, 21, 23), allegations that the Company is not meeting ***internal goals*** are not inconsistent with announcing improved subscriber results. Numbers can improve but still be lower than what the Company internally hopes to see, particularly in a difficult and competitive market such as the one in which the Company operated.

that the Promotion *did* improve the Company's subscriber challenges, since churn in the fourth quarter of 2022 showed some improvement compared to the third quarter of 2022, and was stable over the prior year. Ex. N, 2.16.23 8-K.[9] The next quarter, churn began to improve year-over-year. Br. at 11.

## II. The Remaining Statements Are Not Adequately Alleged to Be False or Misleading.

### A. Plaintiff Fails to Allege Statements Regarding In-Store Traffic Were False or Misleading.

Plaintiff's claims regarding statements about its in-store traffic also fail. With respect to Chambers' statement, "No. I mean, our store traffic is down slightly year-over-year but nothing concerning" (Am. Compl. ¶ 109), Plaintiff claims this statement was misleading because "in reality there were no positive increases to store traffic in 2022, and it was an issue of Defendants' constant concern" (Opp. at 14). But when viewed in proper context, without Plaintiff's improper truncation (*see* Br. 19–20, 20 n.6), it is clear that Chambers expressly told investors that there were *not* "positive increases to store traffic," and in fact it was declining as of the time of the earnings call (which only concerned the first quarter of 2022, and occurred in May, before the Company was aware of what its in-store traffic rates would be for the rest of the year). Plaintiff does not allege that Chambers was subjectively concerned about store traffic rates, much less that he was concerned about the rates in the first quarter of 2022 specifically. *See Omnicare*, 575 U.S. at 186, 189 (in order adequately to allege falsity, plaintiff must allege the defendant (1) "d[oes] not hold the belief [it] professed" or (2) "omits material facts about [its] inquiry into or knowledge concerning a statement of opinion, and [] those facts conflict with what a reasonable investor would take from the statement itself"); Br. at 12–13. The *NeoPharm* case,

---

[9] Nor was the third quarter of 2022 the unmitigated failure that Plaintiff asserts. Opp. at 7–8. For instance, while churn worsened over the prior quarter, net postpaid losses improved, as did average revenue per user. Ex. L, 11.3.22 8-K at 4.

cited by Plaintiff, illustrates the problem. As that case explains, where problems were "public knowledge and, therefore, part of the total mix of information available to the investor who wished to assess the effect" on the company, "comfort statements" are ***not*** actionable because "a reasonable investor would assess [them] skeptically." *In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369, at \*13 (quoting *In re Westell Techs., Inc. Sec. Litig.*, 2001 WL 1313785, at \*8 (N.D. Ill. Oct. 26, 2001)) (Opp. at 14) (distinguishing statements in which "the full extent of the problems" were not disclosed from circumstance in which "defendants disclosed the ominous news but attempted to downplay its significance in the form of comfort statements assuring investors").[10]

Plaintiff also argues that investors would somehow conclude that in-store traffic was increasing by Therivel's statement on the second quarter 2022 earnings call, which Plaintiff misleadingly truncates as a statement that "we're seeing a lot of customers come into the store." Opp. at 15. In full context, Therivel's statement was about the number of customers coming into the store *who specifically referenced the company's guarantee not to raise prices*: "AT&T and Verizon both raised prices in the second quarter. We committed to our customers, we would not, and that is meaningful to them. And so we're seeing a lot of customers come into the store ***and specifically referenced that price guarantee as a reason for coming in***." Plaintiff argues that quoting the full statement (rather than the truncated version set forth in the Complaint) is an effort to raise a factual dispute inappropriate for a motion to dismiss. *See* Opp. at 14. Not so. "At the pleading stage, the relevant question for deciding whether a statement is misleading is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature

---

[10] Plaintiff's other cases are plainly distinguishable. *See Allscripts-Misys Healthcare Sols., Inc*, 778 F. Supp. 2d at 879 (Opp. at 14–15) (finding actionable statements that misled investors because they failed entirely to disclose "installation problems" that had occurred); *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at \*6 (N.D. Ill. Feb. 10, 2023) (Opp. at 15) (finding actionable statements that company had entirely failed to disclose facts that would substantially affect a reasonable investor's calculations of the probability that the company had violated anti-kickback statutes).

16

of the statement or omission.'" *Flynn v. Exelon Corp.*, 2021 WL 1561712, at \*7 (N.D. Ill. Apr. 21, 2021) (cited Opp. at 14) (quoting *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006)). The only way to make such an assessment is to consider precisely what was said. And reviewing the complete statement demonstrates that it would not be reasonable for investors to have believed that Therivel's statement about a price guarantee, made in the context of other statements of price guarantees, with no other references to in-store traffic, was instead intended to provide commentary on something else entirely – *i.e.*, absolute figures for store traffic as a whole. This claim must be dismissed.

> **B. Plaintiff Fails to Allege Therivel's Statements, Including Statements of Belief, Concerning General Expense Discipline and the Balance Between Subscriber and Financial Results Were False or Misleading.**

Plaintiff claims that statements made by Therivel during the first and second quarter earnings calls were false and misleading because they "materially understated the Promotion's financial impact while overstating its benefit to subscribership and churn outcomes." Opp. at 15–16. These claims fail for the reasons set out in Defendants' Brief. *See, e.g.*, Br. 13–18, 25–30.

Additionally, what Defendants supposedly "knew" about the cost of the Promotion, *e.g.*, the effect that it would have on the Company's budget and the alleged "what-if scenarios" (Opp. at 16 (citing Am. Compl. ¶¶ 70–72, 86)), come from CW2. But, as Plaintiff concedes in his Opposition, CW2 is not even alleged to have been employed at the Company during the Class Period, nor does the Complaint allege anything at all about the time period during which CW2 was employed. Opp. at 35 n.28; Am. Compl. ¶ 41. At best, CW2 can allege that certain financial models were generated *at some point*, but CW2 cannot provide support for allegations that any models that CW2 was familiar with were up-to-date as of the time of the alleged misstatements, much less contradicted statements regarding cost.

More importantly, nothing that Plaintiff alleges—either regarding the financial impacts or the benefits of the Promotion—contradicts in any way the actual public statements that Plaintiff challenges. Two of the statements were made in May 2022, prior to the launch of the Promotion. Opp. at 15 (citing Am. Compl. ¶¶ 105, 107). As explained in Defendants' Brief (Br. at 13–18), these statements were ***not about the Promotion***, which had not yet been launched. To the contrary, the statements were about Therivel's belief regarding the Company's ability to balance its (disclosed) subscriber challenges with financial results. And many other statements likewise were about ongoing cost-cutting measures, not the cost of the Promotion. *See* Br. at 27 n.8. Plaintiff fails entirely to allege these statements of belief were false or misleading.[11]

### C. Plaintiff Fails to Allege Therivel's Statements, Including Statements of Opinion and Belief, Regarding Regional Trials and Early Promotion Results Were False or Misleading.

Plaintiff's final category of statements, Opp. 17–19, is a hodge-podge of statements made by Therivel during the earnings calls for the first and second quarters of 2022, many in response to analyst questions. Plaintiff's general argument is that any general positive statements must have been fraudulent because the Company experienced subscriber challenges. For the reasons set out in Defendants' Brief, these arguments, too, must be rejected. Br. at 24–25.

### III. Plaintiff Has Not Alleged a Strong Inference of Scienter that is Cogent and at Least as Compelling as the Opposing Innocent Inference.

Since many of the challenged statements are forward-looking statements, the scienter and falsity inquiries are intertwined, and Plaintiff fails to allege a strong inference of scienter for all

---

[11] Plaintiff urges the Court to disregard the applicable standard of review set out in the Supreme Court's *Omnicare* case to the statements of opinion or belief in this case, and disregard important caveats and hedges like "we believe." Opp. at 11. But *Omnicare* never instructed courts to disregard statements like "we believe," and in fact said the opposite: "[T]he investor thus distinguishes between the sentences 'we believe X is true' and 'X is true.' […] Reasonable investors do not understand such statements as guarantees," and the securities laws "do not treat them that way." *Omnicare,* 575 U.S. at 185. So too here.

18

the reasons already stated. *See also* Br. at 33.[12] To the extent that Plaintiff is challenging present-tense statements, he has also failed to allege facts giving rise to a "strong inference" that those statements were made with scienter.

Plaintiff devotes many pages in his Complaint and his Opposition to supposed allegations of scienter. *See, e.g.*, Am. Compl. ¶¶ 140–180; Opp. at 24–33. But length should not be confused with merit. Conspicuously, these sections omit virtually any reference to the challenged statements, and instead provide a laundry list of repetitive allegations premised almost exclusively on: (1) general statements from confidential witnesses, and (2) statements made by the Defendants themselves months after the supposedly false statements. None of these sources come close to contradicting the challenged statements. Taken individually or holistically, these allegations of "scienter" establish, at most, that the Company experienced subscriber challenges, that the Promotion would require aggressive spending, and that the third quarter of 2022 was a particularly challenging quarter for the Company. But the Company made no secret of any of these factors, nor the challenging business environment in which it operated throughout the entire Class Period and beyond. These were business problems, not securities fraud.

Moreover, as previously noted, while the PSLRA does not require a specific allegation of motive, that does not mean motive is irrelevant to the "holistic" assessment of scienter that the Court must undertake. *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *10 (N.D. Ill. Oct. 19, 2009) (rejecting complaint and considering plaintiff's deficiencies in pleading motive among the reasons "all the facts alleged, taken together" failed to give rise to a strong inference of scienter); *Boeing*, 711 F.3d at 758 (rejecting complaint with no allegation of motive because

---

[12] Plaintiff's assertion that Defendants' discussion of scienter was a "perfunctory 3-page afterthought" (Opp. at 3), misses this crucial point. Plaintiff's failure to plead scienter with respect to any of the statements at issue means the Complaint must be dismissed.

19

"[w]ithout a motive to commit securities fraud, businessmen are unlikely to commit it."). To the contrary, the Seventh Circuit has clearly held that where, as here, a plaintiff completely fails to allege any motive, "other than a generalized motive common to all corporate executives," this is a factor that cuts against an inference of scienter. *Pension Tr. Fund For Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939–40 (7th Cir. 2018); *see also* Br. at 33–34. Also cutting against scienter is the fact that Plaintiff's alleged short-term fraud scheme makes no economic sense. *See* Br. at 33 (citing cases). The cases Plaintiff cites underscore this point. For instance, in *Tellabs*, defendants allegedly were knowingly "flooding [] customers with tens of millions of dollars worth of 5500s that the customers had not requested, in order to create an illusion of demand." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 706 (7th Cir. 2008) (cited in Opp. at 24, 30–34; *see also id.* at 20). And in the *Busic* case, Defendants were alleged to have knowingly misled investors regarding the FDA's stated concerns with important clinical trials, *Busic v. Orphazyme A/S*, 2022 WL 3299843, at *22–24 (N.D. Ill. Aug. 11, 2022) (cited Opp. at 29 n.17, 30–32, 35; *see also id.* at 35 n.30). Nothing of this type is alleged here, and the Court should not credit Plaintiff's implausible inference of fraud when the innocent inference is the far more plausible, indeed the only plausible, inference.[13]

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Brief, the Complaint should be dismissed with prejudice.

Date: December 20, 2023                                    Respectfully submitted,

---

[13] Based solely on out-of-circuit district court cases, Plaintiff claims that Therivel and Chambers are each "charged" with the other's statements. Opp. at 13 n.3. But Plaintiff has not pleaded any facts that either Therivel or Chambers knowingly failed to correct any alleged misstatements by the other. *See also Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 919 (N.D. Ill. 2010) (rejecting attempt to attribute statement of one officer on a conference call to another and holding that "in order for an officer to be liable for an official statement, the statement must have been actually made by that officer").

By: *James W. Ducayet*

James W. Ducayet (ARDC No. 6236997)
jducayet@sidley.com
Elizabeth Y. Austin (ARDC No. 6308514)
laustin@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

***Attorneys for Defendants***

21