## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:23-cv-02764-MMR |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | Honorable Mary M. Rowland |
| UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, and TELEPHONE AND DATA SYSTEMS, INC., | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Howard M. Rensin, individually and on behalf of a proposed class of persons or entities that purchased or otherwise acquired Defendant TDS's securities, brings suit against Defendants Telephone and Data Systems, Inc., United States Cellular Corporation, Laurent C. Therivel, and Douglas W. Chambers, alleging securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 15 U.S.C. §78j(b) and 78t(a); 17 C.F.R. §240.10b-5. Before the Court is Defendants' motion to dismiss Plaintiff's First Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b). [35, 36]. Defendants' motion is denied in part and granted in part. Plaintiff has also filed a motion to strike [37, 38], which is denied.

1

## I.    Background

The following factual allegations taken from the First Amended Complaint [32] are accepted as true for the purpose of resolving the motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

Defendant United States Cellular Corporation ("UScellular") is a public corporation that provides wireless services in the United States. [32] ¶ 44. Telephone and Data Systems, Inc. ("TDS") is a public corporation that owns approximately 83 percent of UScellular's stock. *Id.* ¶ 27. Defendant Laurent C. Therivel is the president and chief executive officer of UScellular while Defendant Douglas W. Chambers is UScellular's executive vice president, chief financial officer, and treasurer. *Id.* ¶¶ 28–29. Plaintiff Howard W. Rensin owned TDS securities. *Id.* ¶ 25. He alleges he purchased the securities at artificially inflated prices and was damaged because of Defendants' misleading and false statements. *Id.* He brings this suit on behalf of himself and all persons and entities similarly situated, who acquired TDS securities between May 6, 2022 and November 3, 2022, inclusive (the "Class Period"). *Id.* ¶ 1.

Approximately 90 percent of UScellular's individual lines of service are postpaid. *Id.* ¶¶ 45–46. Postpaid services are those for which a customer is billed in monthly installments, typically a month in advance. *Id.* ¶ 46. At all relevant times, the market for postpaid customers was competitive. *Id.* ¶ 5. In this market, UScellular faced increased industry-wide pressure regarding "voluntary churn," which is the rate at which postpaid customers voluntary disconnect each month, and competition from rivals, who offered promotions to attract new customers, including

giving away smartphones. *Id.* ¶¶ 5, 56–57, 80–82. UScellular responded by increasing its promotional activity with the aim of reducing postpaid churn. *Id.* ¶ 66. Instead of unrolling national promotions like its competitors, UScellular implemented its promotions on a regional basis in 2021. *Id.* ¶ 67. This strategy allowed the company to test the promotions and understand their effectiveness. *Id.*

In April 2022, Defendants trialed a company-wide promotion wherein any customer could receive any phone free when signing a UScellular contract (the "Promotion"). *Id.* ¶¶ 83, 87. According to statements Defendant Therivel made in 2023, Defendants learned from the regional trials that it would take at least six and up to nine months for the Promotion to positively impact UScellular's churn and subscribership. *Id.* ¶¶ 88–91, 164. The Promotion was launched nationwide in June 2022. *Id.* ¶ 85. During an August 5, 2022 Quarter Two Earnings Call, Defendant Therivel commented on the anticipated timeline by which the Promotion's impact on churn would be seen, among other optimistic remarks on the Promotion. *See, e.g., id.* ¶¶ 113–15.

In its Quarter Three 2022 press release, dated November 3, 2022, Defendants disclosed that net income attributable to TDS's common shareholders and related diluted earnings had declined to negative $25 million and negative $0.22, respectively, down from positive $28 million and positive $0.24 in the same period a year earlier. *Id.* ¶ 123. Defendants also revised downward the top ends of UScellular's fiscal 2022 guidance ranges for Adjusted OIBDA and Adjusted EBITDA. *Id.* ¶ 124. Defendants also disclosed that churn increased from 1.30% in the second quarter of

2022 to 1.42% in the third quarter. *Id.* ¶ 127. UScellular also reported net postpaid additions of negative 31,000 for the third quarter; an increased decline from negative 8,000 subscribers that UScellullar sustained a year earlier. *Id.* ¶ 94, 127. Finally, UScellular disclosed margins on equipment sold of negative 17.2% and losses on equipment sales of $52 million, both historic lows. *Id.* ¶¶ 98-100.

Plaintiff alleges the market responded to the Quarter Three news. TDS's common stock price dropped 25.89%, declining from $16.57 per share at close on November 3, 2022 to $12.28 per share on November 4, 2022, on unusually heavy trading volume. *Id.* ¶ 138. TDSPrV preferred shares, which closed at $17.20 per preferred share on November 3, 2022, fell to $16.24 per preferred share on November 4, 2022, a decline of 5.6%. *Id.* ¶ 139. TDSPrU preferred shares, which closed at $19.30 per preferred share on November 3, 2022, fell to $18.29 per preferred share on November 4, 2022, a decline of 5.2%. *Id.*

Plaintiff brought this suit alleging securities fraud. Plaintiff challenges statements made by Defendants Therivel and Chambers at UScellular's May 6, 2022 Quarter One Earnings Call and August 5, 2022 Quarter Two Earnings Call related to the Promotion. Now before the Court is Defendant's Motion to Dismiss the Amended Complaint.

## II.   Exhibits to Defendants' Motion and Plaintiff's Motion to Strike

Defendants ask this Court to consider several exhibits attached to their Motion to Dismiss in arriving at its conclusion, which Plaintiff moves to strike. [37, 38]. Courts ordinarily may not consider extrinsic evidence without converting a motion to

dismiss into one for summary judgment. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). Nevertheless, when a document is referenced in the complaint and central to plaintiff's claims, the Court may consider it in ruling on a motion to dismiss. *Id.* ("This rule is a liberal one—especially where…the plaintiff does not contest the validity or authenticity of the extraneous materials."). In addition, the Court may "take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys.*, 858 F.3d 452, 457 (7th Cir. 2017).

Defendants correctly assert that the exhibits Plaintiff challenge are either judicially noticeable or incorporated by reference in the complaint. *See* [45]. However, the Court does not rely on the exhibits and therefore, the Court denies Plaintiff's motion to strike as moot.

## III. Standard

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's

favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

A fraud allegation is subject to the heightened pleading requirements of Rule 9(b), which requires that allegations of fraud be stated "with particularity," Fed. R. Civ. P. 9(b), meaning "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Claims of securities fraud must additionally comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), under which a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quotation marks omitted).

## IV.    Analysis

### A.  Count 1: Section 10(b) and Rule 10b-5

To state a claim of securities fraud under § 10(b) of the Exchange Act and Rule 10b-5(b), a plaintiff must allege: "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)). Defendants argue that Plaintiff fails to allege facts demonstrating the first and third elements of securities fraud.

### i.  Confidential Witnesses

In his complaint, Plaintiff alleges information shared by two confidential witnesses (CW1 and CW2, collectively "CWs") who worked at UScellular. Defendants argue the Court should discount recollections by anonymous employees, who Defendants claim are former employees.

The Court declines to categorically discount the anonymous accounts of the two confidential witnesses. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) (crediting the testimony of confidential sources who had first-hand knowledge of the facts alleged based on their job descriptions and where the

information was detailed); *Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012) ("So long as plaintiffs describe with particularity the sources of their [anonymous] information, including how the sources were in a position to know the matters alleged, such allegations are sufficient under the PSLRA."). Here, Plaintiff has described CW1 and CW2 with "sufficient particularity 'to support the probability that a person in the position occupied by the source[s] would possess the information alleged.'" *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *see, e.g.*, [32] ¶¶ 39, 41, 61–63, 68, 70–73, 75–76, 86, 95–96, 101, 143 (detailing the CWs' job titles and responsibilities). Likewise, Plaintiff adequately alleges the CWs had first-hand knowledge of their allegations and are not merely regurgitating gossip or innuendo. *Compare* [32] ¶¶ 39, 41, 61–63, 68, 70–73, 75–76, 86, 95–96, 101, 143 *with Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 828 (N.D. Ill. 2006) (finding complaint lacked allegations explaining how a confidential witness had access to knowledge underlying conclusions). Where allegations lack a sufficient foundation, they will be discounted on an allegation-by-allegation basis. *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 935 (N.D. Ill. 2015).[1]

### ii. False Statement or Omission

Plaintiff alleges that Defendants made multiple false or misleading statements and omissions between May and August 2022. Specifically, Plaintiff alleges

---

[1] The Court need not discredit CW2's allegations because Plaintiff does not allege CW2 was employed at UScellular during the Class Period. Plaintiff pleads facts sufficient to establish a foundation for CW2's allegations. *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021).

Defendants: (1) understated the length of time it would take for the Promotion to impact postpaid churn; (2) misrepresented the balance of financial and subscriber outcomes from the Promotion; (3) made false statements regarding the volume of in-store customer traffic; and (4) falsely represented satisfaction with the Promotion and the April 2022 trials. Defendants refute that Plaintiff adequately alleges that any of the challenged statements are false or misleading.

### 1. Promotion Timeline

Plaintiff challenges Defendant Therivel's statements, allegedly informed by the April 2022 trials, regarding the time frame when the Promotion was anticipated to impact postpaid churn. Specifically, Plaintiff alleges the following comments made by Therivel during the August 5, 2022 Quarter Two Earnings Call about the timeline are false:

- "[T]hanks to the trials we ran, we're able to structure this offer [the Promotion] in a way that we believe will drive positive subscriber results in the **second half of the year**[.]"

- "What [UScellular] expect[s] to see is steady churn improvement throughout the **second half of the year**."

- "So we should start to see some benefit from this [i.e., the Promotion] in the **third quarter**, and we'll see more benefit, hopefully, in the fourth quarter."

[32] ¶¶ 113–14 (emphasis added). Plaintiff asserts these statements were false when uttered because Therivel's later remarks in 2023 allegedly revealed he knew in August 2022 that the earliest UScellular expected to see positive impact from the Promotion was the first quarter of 2023. *Id.* ¶¶ 89–92, 163–64; *see also* [40] at 10–11. Essentially, Plaintiff alleges Therivel misrepresented the timeframe when subscriber

results would improve. Defendants dispute that these statements are false or misleading. They contend Therivel's statements about the timing of the impact of the Promotion are forward-looking statements protected by the PSLRA safe harbor, inactionable statements of belief, inactionable forecasting imprecision, and consistent with Therivel's beliefs at the time the statements were made. [36] at 30–32.

Defendants contend Therivel's timeline statements are forward-looking and thus non-actionable pursuant to a statutory safe harbor. [36] at 25–32. The PSLRA establishes a safe harbor for certain forward-looking statements. Forward-looking statements include statements containing projections of revenues or income or other financial items, statements of plans and objectives of management for future operations, statements of future economic performance, and any statements of assumptions underlying the aforementioned. 15 U.S.C. § 78u-5(i)(1). Liability does not attach when a comment is (A) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (B) a plaintiff fails to allege the forward-looking statement was "made … with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)&(B). Defendants claim Therivel's timeline statements are protected by either prong of the PSLRA safe harbor.[2]

The PSLRA safe harbor only applies to statements that are truly forward

---

[2] The Court declines to rule on whether Defendants' cautionary statements were sufficiently meaningful to invoke the protection of the PLSRA safe harbor because of (1) the stage of the proceedings and (2) the fact-intensive nature of that inquiry. *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729, 734 (7th Cir. 2004), *as amended*, (Sept. 3, 2004).

looking. "[A] a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs Inc.*, 513 F.3d at 705 (the phrase "still going strong" used to describe sales is a mixed statement and the element of prediction did not entitle the defendant to a safe harbor regarding the statement's representation of current sales). Defendants assert Therivel's timeline statements are "forward-looking" and, to the extent any components of the statements are not forward-looking, Defendants argue Plaintiff does not allege those components are false or misleading. [36] at 25–27 (discussing 15 U.S.C. § 78u-5(c)(1)). Plaintiff argues the timeline projections were "mixed" with backward-looking facts learned from the April 2022 trial and thus the statements are not entitled to the safe harbor's protections. [40] at 20–21.

Therivel's timeline comments are forward-looking statements. Unlike mixed present/future remarks such as "still going strong," *Tellabs Inc.*, 513 F.3d at 705, or "continues to match its … levels," *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 879 (N.D. Ill. 2023), the challenged timeline statements "do[] not communicate any concrete, verifiable present-state condition," *id.* at 880. Instead, the timeline statements are "amorphous prediction[s] about the future." *Id.* (finding "on track to achieve [its] targets" is a purely forward-looking statement). Accordingly, the Court must determine whether the second prong of the safe harbor is satisfied.

The safe harbor's second independent prong requires a plaintiff plead facts establishing a strong inference "that the forward-looking statement … was made … with actual knowledge by [the speaker] that the statement was false or misleading."

15 U.S.C. § 78u-5(c)(1)(B). Actual knowledge of falsity is required; "merely reckless indifference to the danger that a statement is false" is insufficient. *City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citing 15 U.S.C. § 78u-5(c)(1)(B)); *see also In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *10 (N.D. Ill. Nov. 14, 2000) ("a claim under the Securities Act involving forward-looking statements now appears to require, for all practical purposes, proof of scienter").

Plaintiff relies on Therivel's statements during earnings calls in 2023 to show the complaint adequately alleges actual knowledge of falsity. Specifically, Therivel stated in May 2023 that "based on the testing we've done in our regional trials, we knew it would take about 6 to 9 months to see the consumer churn benefit" from the Promotion. [32] ¶ 164. The Promotion launched in late June 2022; six months from late June is December 2022, *i.e.*, the second half of the year. Thus, Plaintiff fails to plausibly allege that Defendants had actual knowledge that statements forecasting improvements in the "second half of the year" were false or misleading. These forward-looking statements therefore are not actionable pursuant to the PLSRA safe harbor.

This leaves Therivel's statement predicting that benefits from the Promotion would be seen in the third quarter and in the fourth quarter of 2022 outside the safe harbor. *Id.* ¶ 114. This statement is not afforded the protection of the safe harbor: Plaintiff adequately alleged it was false at the time it was uttered. If regional testing forecasted that benefits would be seen in six to nine months, then Defendants knew

improvements would not be seen until after the third quarter.[3] Defendants may pursue their alternative theories interpreting the results of the trials through discovery, but the Court cannot credit these inferences on a motion to dismiss. *Lax*, 20 F.4th at 1181.

Therivel's statement that the benefit would be seen in the third quarter of 2022 survives the motion to dismiss, but his other timeline statements are dismissed.

### 2. Subscriber and Financial Balance

Plaintiff alleges several of Defendant Therival's statements falsely or misleadingly portrayed the Promotion as balancing financial and subscriber outcomes or the Promotion was executed in line with UScellular's expense discipline. [32] ¶¶ 105, 107, 113, 117. During his remarks at the May 6, 2022 Quarter One Earnings Call, Therivel stated:

- "[A]lthough [UScellular] regionally tested aggressive offers in the marketplace, [they] also tried to be disciplined from a financial perspective"

- UScellular "continue[s] to try to strike the right balance between financial outcomes and subscriber outcomes."

- "[W]e think we've done a really good job of it, to strike a balance between subscriber results and financial results."

*Id.* ¶¶ 105, 107.

At the August 5, 2022 Quarter Two Earnings Call, Therivel stated:

- The "offer structure [for the Promotion], coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for

---

[3] For the same reason, the Court rejects Defendants' arguments that Therivel's comment was not actionable as a statement of belief, forecasting imprecision, or consistent with Therivel's beliefs at the time the statements were made.

the year even with those aggressive promotions."

- UScellular "continue[s] to maintain expense discipline across the organization, which has allowed us to launch some aggressive promotions and make investments in key growth areas of the business while still maintaining our operating cash flow guidance."

*Id.* ¶¶ 113, 117.

Plaintiff avers Therivel's statements were false and misleading because they materially understated the Promotion's financial costs while overstating its benefit to subscribership and churn outcomes. *Id.* ¶¶ 70–72, 86, 95; *see also* [40] at 16–17. Specifically, CW2 reported UScellular tested a nationwide upgrade promotion—not necessarily *the* Promotion—and determined such an offering would more than double the promotion budget.[4] [32] ¶¶ 70–72, 86. Both Therivel and Chambers regularly received reports of cost and benefit analysis from promotional testing, which Plaintiff argues necessarily includes the results of the nationwide upgrade promotion test. *See id.* ¶¶ 71–72; *see also* [40] at 16. Accordingly, Plaintiff claims Therivel and Chambers knew the high expense of the Promotion and therefore should have known UScellular was not exercising expense discipline.

And after the Promotion began, none of the six geographic areas experienced positive store traffic or met their postpaid churn quotas. *See* [32] ¶¶ 95, 149. According to CW1, this is consistent with reports at quarterly Business Review meetings throughout CW1's entire tenure of "struggle[s]" to meet performance goals related to postpaid churn, including gross and net postpaid customer adds, in-store

---

[4] Defendants assert Plaintiff relies on faulty data regarding the costs of a nationwide upgrade promotion. [44] at 17. Defendants can establish this during discovery, but such an argument is improper at the motion to dismiss stage.

traffic rates and conversion rates. *Id.* ¶ 65. Thus, Plaintiff contends Therival could not credibly believe Defendants had "done a really good job" striking the balance between subscriber and financial results. [40] at 17 (discussing [32] ¶ 107).

Defendants argue Plaintiff's allegations are insufficient for multiple reasons, including that they do not convey any hidden information nor are they inconsistent with UScellular's results and Therivel's statements are non-actionable statements of belief or non-actionable forward-looking statements. [36] at 13–18, 25–30.

Therivel's challenged statements from the Quarter One Earnings Call are sincere statements of pure opinion, not a fact. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (contrasting an opinion, which is "a belief, a view, or a sentiment which the mind forms of persons or things," with a fact, which is "a thing done or existing or an actual happening"). Because the possibility of error implicitly is embedded in opinion statements, such comments are not actionable as false statements of material fact if they prove erroneous. *Id.* at 184. However, opinion statements can be actionable as misleading if (1) the speaker did not hold the belief professed; (2) the statement contained supporting facts which were untrue; or (3) the statement omits material facts about the company's knowledge about an opinion statement and if "those facts conflict with what a reasonable investor would take from the statement itself[.]" *Id.* at 185, 189.

Therivel's opinion statements during the Quarter One Earnings Call regarding subscriber/financial balance and expense discipline are actionable as misleading because Plaintiff pleads sufficient allegations that Therivel omitted

material facts that would conflict with what a reasonable investor would take from those statements. Defendants rely on UScellular's comments to investors that the company continued to struggle with certain results like postpaid churn and in-store traffic. *See* [36] at 16. But that ignores the financial counterbalance at issue: the costs of the Promotion. As alleged, Defendants knew of challenges on both sides of the balance: lagging churn and ballooning costs for a nationwide upgrade promotion. *See, e.g.*, [32] ¶¶ 65, 70–72, 86. A reasonable investor armed with these facts, particularly regarding the budget for a nationwide promotion, would have a conflicting view of the subscriber/financial balance.[5]

Defendants assert Therivel's remarks from the Quarter Two Earnings Call about how the company's "expense discipline" allows UScellular to "maintain [its] profitability" and "operating cash flow guidance" are forward-looking statements protected under both prongs of the safe harbor. [36] at 26–27. But as discussed *supra*, these are mixed present/future statements and the PLSRA safe haven only protects pure future-looking statements. *See Tellabs Inc.*, 513 F.3d at 705 (explaining "still going strong" is a mixed statement); *ATI*, 690 F. Supp. 3d at 879 (same regarding "continues to match its ... levels"). Thus, Defendants cannot invoke the PLSRA safe haven in this instance.

Accordingly, all of Therivel's comments regarding expense discipline that

---

[5] Defendants assert Therivel's challenged statements from the May 2022 Quarter One Earnings Call, that occurred before the late June 2022 nationwide launch of the Promotion, cannot be about the Promotion given the timing. [44] at 18. But Therivel's statements explicitly reference tests of regional promotions, such as the Promotion trials from April 2022. *See* [32] ¶ 105. The Court declines to credit Defendants' interpretation on a motion to dismiss. *Lax*, 20 F.4th at 1181.

Plaintiff challenge survive the motion to dismiss.

### 3. UScellular's In-Store Customer Traffic

Plaintiff claims Defendants Chambers and Therivel made false and misleading comments about UScellular's in-store traffic. During the May 6, 2022 Quarter One Earnings Call, Defendants Chambers answered an analyst question about store traffic by stating:

- "No. I mean, our store traffic is down slightly year-over-year but nothing concerning." *Id.*

[32] ¶ 109. At the August 5, 2022 Quarter Two Earnings Call, Defendant Therivel stated:

- UScellular was "seeing a lot of customers come into the store and specifically referenced that price guarantee as a reason for coming in."

*Id.* ¶ 119.

Plaintiff asserts these statements are false or misleading because, based on information CW1 provided, in-store traffic rates were consistently below target levels before and during the Class Period, and UScellular was concerned about in-store traffic when Chambers and Therivel uttered these statements. *Id.* ¶¶ 65, 95, 110, 120; *see also* [40] at 13–14. In support, Plaintiff offers that CW1 identified difficulties to meet in-store traffic rates were discussed at every Business Review meeting and Therivel would "ask at every quarterly Business Review meeting what strategies the Area VPs intended to employ to improve" in-store traffic. *Id.* ¶ 95.

Defendants argue these allegations fall short of showing Chambers's statements were false or misleading. [36] at 19–21. They claim the confidential witness's statements do not reveal any hidden information Chambers did not disclose

to investors.[6] *Id.* at 19–20. Defendants also argue Plaintiff distorts Chambers's and Therivel's statements and contend Chambers's answer that in-store traffic trends were "nothing concerning" is a non-actionable subjective opinion. *Id.* at 20–22.

As for the alleged distortion of Chambers's response, the Court agrees, contrary to Plaintiff's allegations, Defendant Chambers did not unequivocally answer "no" or that there was "nothing concerning" when asked if in-store traffic diminished. *See* [32] ¶¶ 7, 109; *see also Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992) (the court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim"). But the Court is unwilling to entertain Defendants' alternative interpretation of the exchange as commentary on the industry instead of UScellular on a motion to dismiss.

Chambers's report of the status of in-store customer traffic and characterization as "nothing concerning" are actionable. *Omnicare*, 575 U.S. at 189. Although Chambers disclosed that in-store traffic was down year-over-year, he did not disclose "the full extent of the problem" because he did not share information known to Defendants about how long in-store traffic was below target or otherwise indicate that UScellular was concerned about the trends. *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (holding a reasonable investor could find that the news withheld was misleading and that the

---

[6] Defendants also argue CW1's statements can be disregarded because they are based on one Business Review meeting that occurred in June 2022—after the challenged statement was made. [36] at 19. But this misconstrues CW1's allegations, *see* [32] ¶ 63 ("at least one" Business Review meeting took place during the Class Period), and ignores that the information shared at the June 2022 Business Review meeting was allegedly also shared at other Business Review meetings before the Class Period, *id.* ¶ 65, 75–79, 95–96.

extent of the public knowledge at the time was not sufficient to give a reasonable investor notice of the problems). Chambers's statements may have led a reasonable investor to develop an overly "rosy picture of the risks and the resulting problems" UScellular faced regarding in-store traffic. *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 879 (N.D. Ill. 2011) (finding failure to disclose difficulties was properly pleaded as misleading). Accordingly, Chambers's statement survives the motion to dismiss.

As for Therivel's comments, Plaintiff urges the Court to ignore the plain text of his allegations, but the Court need not look past any facts in the complaint that undermine its allegations. *See Scott*, 975 F.2d at 368. Plaintiff argues that a reasonable investor would be misled to believe that Therivel was describing the volume of in-store traffic generally. *See* [40] at 15. But such a conclusion requires one to disregard the immediate context and, indeed, the remainder of Therivel's sentence about in-store customers asking about the Promotion. It cannot be that the reasonable interpretation would tolerate such ignorance. So Therivel's comments in this regard are dismissed.

In sum, Chambers's comment regarding in-store traffic, [32] ¶ 109, survives the motion to dismiss and Therivel's statement regarding the same, *id.* ¶ 119, is dismissed.

### 4. Satisfaction with Promotion

Plaintiff claims Therivel falsely and misleadingly represented that Defendants were pleased with the Promotion and the April 2022 trials. [32] ¶¶ 106, 113–15.

19

First, Plaintiff challenges Therivel's answer to an analyst question during the May 6, 2022 Quarter One Earnings Call, when he stated:

- "[T]he regional approach you've talked to, I'm very pleased with …"
- "So I'm very pleased with how [the regional approach] is proceeding."

*Id.* ¶ 106. Plaintiff contends these remarks were false or misleading because UScellular soon thereafter abandoned the regional promotion structure it claimed allowed it to compete more aggressively in certain markets, *see e.g.*, *id.* ¶¶ 67, 69, 108(i), and instead launched the nationwide Promotion, ¶¶ 83–85.

Defendants argue Plaintiff misrepresents the company's "regional approach" and asserts that the context of the challenged statements makes plain that a regional strategy was not abandoned but that regional testing was an essential step to roll-out national promotions. [36] at 18–19. But a competing plausible interpretation of the Complaint is that regional testing also precedes regional promotions or national promotions with regional customization. In any event, Defendants' competing explanation is not convincing on a Rule 12(b)(6) motion where the Court "construe[s] the complaint in the light most favorable to the plaintiff . . . and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181.

Defendants also contend Therivel's comments expressing satisfaction are non-actionable opinion statements. Defendants argue that Plaintiff failed to allege that Therivel was not subjectively pleased with the regional strategy or that there was underlying material information about the regional strategy that Therivel did not disclose. [36] at 19. Instead, Defendants construe Therivel's comments at the Quarter One Earnings Call that UScellular planned "a relatively substantial move that was

educated by the regional trial" as an express announcement that the company was diverging from the regional approach. [32] ¶ 106.

The Court agrees Therivel's statements of satisfaction are classic examples of feelings, not facts, and thus are opinion statements. *See, e.g.*, *id.* ("*I'm very pleased with* [the regional approach] … *I'm very pleased with* how [the regional approach is] proceeding.") (emphasis added). As explained *supra*, an opinion statement may be actionable if "the statement omits material facts about the company's inquiry into or knowledge regarding a statement of opinion when 'those facts conflict with what a reasonable investor would take from the statement itself.'" *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-CV-01640, 2022 WL 1136577, at *14 (N.D. Ill. Apr. 18, 2022) (quoting *Omnicare*, 575 U.S. at 189).

Plaintiff plausibly pleaded Defendants' failure to disclose the one-size-fits-all national rollout of the Promotion was a material omission that made the regionalization statements misleading. The imminent national rollout "conflict[s] with what a reasonable investor would take from" Therivel's comments that UScellular was pleased with the regionalization strategy, especially in the context that UScellular touted the regionalization strategy as key to being competitive. *Omnicare*, 575 U.S. at 189. Opaque comments regarding "a relatively substantial move that was educated by the regional trial" do not give any indication as to whether the new "move" would be a nationally uniform or regionally tailored and thus are not sufficient to overcome the misleading nature of Therivel's statements as alleged. *See* [32] ¶ 106.

21

Second, Plaintiff also alleges Therivel's comments voicing satisfaction with the Promotion made during the August 5, 2022 Quarter Two Earnings Call were false or misleading. Plaintiff challenges Therivel's statements that:

- UScellular was "pleased with the results" of the Promotion.

-  He saw a "path to positive consumer postpaid net adds" based on the "really good [Promotion] results."

- The company was "seeing improvement" to the "ratio of gross adds to voluntary defects."

*Id.* ¶¶ 113–15. Plaintiff's allegations in support of the false or misleading nature of these statements are like the averments regarding in-store traffic and subscriber/financial balance: in sum, churn and in-store traffic were perennial concerns for UScellular. *Id.* ¶ 116; *see* [40] at 19. Specifically, CW1 shared that no UScellular region met its postpaid churn quotas during the second or third quarters of 2022 after the Promotion went into effect and that improving churn and in-store traffic was a topic at every Business Review meeting. [32] ¶ 95. But these allegations do not support that Therivel's statements were false or misleading.

An improving ratio of voluntary defects to adds is not contrary to or inconsistent with a failure to meet postpaid churn quotas—one can make progress to a goal but still fall short. Nor does Plaintiff allege this metric did not actually improve after the Promotion launched. Likewise, Plaintiff does not plausibly allege that this statement is misleading. In fact, when discussing how UScellular tracks the ratio of defections to adds during the same Quarter Two Earnings Call, Therivel explicitly stated "we still need to improve postpaid subscriber results." *Id.* ¶ 178.

As Defendants raise, the remaining challenged statements are statements of

opinion. *Id.* ¶¶ 113–14; *Omnicare*, 575 U.S. at 185, 189. Plaintiff does not allege Therivel did not believe his remarks. But these statements, even when viewed in the light most favorable to Plaintiff, are not misleading for the same reason that Therivel's comment about an improving voluntary defect to add ratio was not: Therivel also disclosed UScellular's need to improve postpaid churn. Accordingly, these opinion statements regarding satisfaction with the Promotion are not actionable as fraud.

In sum, Therivel's comments regarding satisfaction with the regional approach made at the 2022 Quarter One Earnings Call survive the motion to dismiss, but his statements regarding satisfaction with the Promotion made at the 2022 Quarter Two Earnings Call are dismissed.

### iii. Strong Inference of Scienter

Under the PSLRA, a plaintiff must state with particularity facts giving rise to a *strong* inference of scienter: "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*, 551 U.S. at 319 (citation omitted). Scienter may be demonstrated by pleading that the defendant "either knew the statement was false [or misleading] or was reckless in disregarding a substantial risk that it was false [or misleading]." *Tellabs, Inc.*, 513 F.3d at 704; 15 U.S.C. § 78u-4(b)(2).[7] "To qualify as 'strong' … an inference of scienter must be more than merely plausible or

---

[7] In the context of omissions, reckless conduct is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977) (citation omitted).

reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. In determining whether inferences can be reasonably drawn, courts "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc.*, 551 U.S. at 310.

First, Plaintiff alleges Therivel's statements on February 17, 2023 and May 5, 2023 regarding the timeframe for when Defendants expected to see postpaid subscriber improvement based on regional trials are "classic evidence of scienter." [40] at 25 (discussing [32] ¶¶ 91–92, 164 and collecting cases). The Court agrees. *NeoPharm, Inc.*, 2003 WL 262369, at *14 (finding allegation that defendants made challenged statements while in possession of non-public contradictory information showed defendants knew or were grossly reckless in not knowing that their public statements were false or misleading when made). Defendants claim an equally plausible inference is that Therivel was conveying that UScellular believed a national promotion would generate churn improvement at a rate faster than seen with regional trials. *See* [36] 30–32; [44] at 9–10. But that inference is wholly unsupported and not as compelling as Therivel knowingly misstating the timeline for improvement, particularly in the context of other allegations in the complaint about the pressure to counter subscriber losses. *See Tellabs, Inc.*, 551 U.S. at 326 ("When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").

Second, Plaintiff contends that Defendants' knowledge of non-public

information suggesting that their public statements were materially inaccurate gives rise to a strong inference of scienter. [40] at 26–29. As discussed at length *supra*, Defendants are alleged to have learned this information through their involvement in the approval of the promotions, [32] ¶¶ 70–73, 86, 142–43, and ongoing monitorship of various metrics, such as churn and in-store traffic, by receipt of reports and attendance at meetings where the metrics were discussed, *id.* ¶¶ 61-65, 75, 160–61, 146.

For many of the same reasons as previously discussed, the Court agrees the alleged knowledge of this information supports a strong inference of scienter. For example, the study of AT&T's nationwide upgrade promotion put Defendants Therivel and Chambers on notice that the cost of a similar promotion would require UScellular to increase its total promotion budget from $175 million to over $400 million. *Id.* ¶ 86. Likewise, through Defendant Therivel's receipt of reports of key performance indicators and discussion of the same at Business Review meetings, including at least one during the Class Period, he was on notice of sustained issues regarding postpaid churn and in-store traffic. *Id.* ¶¶ 61–65, 148–49. Other courts find similar allegations sufficient to support a strong inference of scienter. *ATI*, 690 F. Supp.at 892, 894–95 (finding confidential allegations that executives received materials explicitly documenting the problem and discussed the problem with employees were sufficiently credible and particularized to support a strong inference of scienter); *Flynn v. Exelon Corp.*, No. 19 C 8209, 2021 WL 1561712, at *10 (N.D. Ill. Apr. 21, 2021) (describing "having access to internal corporate documents and

conversations with officers and employees, reviewing reports on the topics on which they spoke, and making public statements as well as by signing public filings" as a "classic fact pattern giving rise to a strong inference of scienter") (cleaned up).

Defendants again dispute reliance on confidential witnesses, especially former employee CW2, and contend the anonymous accounts are too generalized to support a strong inference of scienter. These arguments fail for the same reasons stated above. However, the Court agrees allegations that Therivel and Chambers participated in monthly "deep, deep dive[s]" with other UScellular executives, and that Chambers paid attention to "anything that might cost money" are too generalized to support a strong inference of scienter. *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020) (allegations that "certain 'serious operational and launch issues' were discussed" at meetings insufficient to support inference that defendant knew about specific metrics). But Therivel and Chambers held themselves out as knowledgeable regarding topics about which analysts often asked, such as in-store traffic patterns, among other topics. [32] ¶ 109. This supports a strong inference of scienter.

Third, Plaintiff contends postpaid wireless operations are the core of UScellular's business and corporate officers are assumed to know facts "critical to a business's core operations." *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003). Defendants do not dispute that the core operations inference applies, they only contend the inference alone cannot support an inference of scienter. [36] at 35 (quoting *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill.

Jan. 12, 2021)). That is true, but the complaint plausibly alleges other bases to support a strong inference of scienter.

When assessed holistically, Plaintiff's collective allegations support a strong inference of scienter.

### B. Count 2: Section 20(a)

In addition to the section 10(b) claims asserted in Count I, Plaintiff also seeks to hold Therivel and Chambers liable as "controlling" persons under section 20(a) of the Exchange Act. "To state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Defendants' only argument as to "control person" liability is that because Plaintiff has not alleged a primary violation, the "control person" claim under Section 20(a) of the Exchange Act should also be dismissed. [36] at 35 (citing *Pugh*, 521 F.3d at 693). However, for the reasons discussed above, the Court finds that Plaintiff has alleged a primary violation. As such, Defendants' "control person" argument fails.

### V.    Conclusion

For the stated reasons, Defendants' Motion to Dismiss [35, 36] is granted in part and denied in part. Plaintiff's Motion to Strike [37, 38] is denied as moot.

E N T E R:

Dated: November 1, 2024

_____
MARY M. ROWLAND
United States District Judge