**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, and TELEPHONE AND DATA SYSTEMS, INC.,<br><br>Defendants. | No. 1:23-cv-02764<br><br>Honorable Mary M. Rowland |

**DEFENDANTS' ANSWER TO PLAINTIFF'S**
**FIRST AMENDED COMPLAINT**

Defendants United States Cellular Corporation ("UScellular"), Laurent C. Therivel, Douglas W. Chambers, and Telephone and Data Systems, Inc. ("TDS"), by and through their counsel, hereby answer and assert affirmative defenses to the allegations contained in the First Amended Complaint ("Complaint").

This Answer is based on present knowledge and information, and Defendants reserve all rights to supplement or otherwise amend this answer, including to add affirmative defenses, as discovery proceeds and as otherwise may be appropriate during the course of litigation.

Although Defendants have no obligation to admit or deny the headings, subheadings, footnotes, or prefatory material used in the Complaint, to the extent any response is required, Defendants deny the allegations set forth therein unless otherwise noted. Unless expressly admitted, all allegations set forth in the Complaint are denied. Defendants will use the defined

1

terms and phrases set forth in the Complaint but deny that those defined terms or phrases are proper or accurate. Defendants further answer as follows:

1.     Plaintiff Howard M. Rensin, Trustee of The Rensin Joint Trust ("Plaintiff"), brings this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of himself and all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired securities of Telephone and Data Systems, Inc. ("TDS") between May 6, 2022 and November 3, 2022, inclusive (the "Class Period").

ANSWER: Defendants admit that Plaintiff purports to bring this suit as a class action under Section 10(b) and Section 20(a) of the Exchange Act, but deny that Defendants have caused any injury to the putative class, and deny that a class may be properly certified. Defendants deny the remaining allegations in Paragraph 1.

2.     Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of his undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding TDS and United States Cellular Corporation ("UScellular" or "USM") (collectively with TDS, the "Companies"), TDS' majority-owned subsidiary; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with individuals who are former employees of UScellular; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning the Companies and the industry in which they operate; and (v) pertinent court filings.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as the Plaintiff's knowledge or beliefs, or the conduct of counsel, and for that reason deny the allegations in Paragraph 2.

## I.     NATURE OF THE ACTION

3.     Plaintiff brings this securities class action alleging that throughout the Class Period, TDS, UScellular, and the Companies' executive officers knowingly represented a materially false timeline to investors regarding subscribership and financial benefits that were anticipated from one of the most expensive promotions UScellular ever offered to attract "postpaid" wireless connections (i.e., customers who have a line of service with USM that is billed in monthly installments, generally one month in advance).

2

**ANSWER:** Defendants admit that this action is styled as a class action and that the Complaint includes certain allegations regarding alleged material misstatements, but deny that any class may be properly certified and otherwise deny the remaining allegations in Paragraph 3.

4.     At all relevant times, UScellular operated as a majority-owned subsidiary of TDS. Throughout the Class Period, TDS owned approximately 83% of UScellular's common shares, had the voting power to elect every director of UScellular, and controlled 96% of the voting power in matters other than the election of UScellular directors. In 2022, UScellular accounted for over 75% of TDS' total operating revenues.

**ANSWER:** Defendants admit that UScellular is a majority-owned subsidiary of TDS. Defendants admit that TDS was an approximately 83% owner of UScellular during the Class Period, and that with respect to voting power, TDS had the voting power to elect all of the directors of UScellular and controlled 96% of the voting power in matters other than the election of directors of UScellular. Defendants further admit that UScellular accounted for approximately 77% of TDS' operating revenues in 2022. Defendants deny the remaining allegations in Paragraph 4, including because "at all relevant times" is vague.

5.     Before and during the Class Period, UScellular operated in an oligopolistic wireless industry that was dominated by a small and viciously competitive set of carriers—namely, T-Mobile, AT&T, and Verizon, which market analysts such as Wells Fargo referred to as the "Big 3." As a result of this competition for subscribers, UScellular was battling a systemic loss of postpaid customers (26,000 in 2021 alone). Likewise, UScellular's "churn" rate of postpaid customers (which is the rate that postpaid customers disconnect service each month) increased over the same period. This was a serious threat to the Companies' sales growth and profitability because postpaid subscriptions were admittedly the Companies' "core business." Indeed, approximately 90% of UScellular's wireless connections during the Class Period were postpaid

**ANSWER:** Defendants admit that during the Class Period and at certain times prior to the Class Period, UScellular operated in a wireless industry that was highly competitive and that those competitors included T-Mobile, AT&T and Verizon, in addition to other carriers, mobile virtual network operators and resellers. Defendants admit that UScellular lost net postpaid customers in 2021, and that UScellular's "churn" rate of postpaid customers increased in 2021. Defendants admit that aggressive industry-wide competition was a cause of UScellular's increased postpaid

3

handset net losses in 2022. Defendants admit that UScellular's lines of business include providing wireless telecommunications services. Defendants further admit that approximately 90% of UScellular retail connections were postpaid as of December 31, 2022. Defendants deny the remaining allegations in Paragraph 5, including because "before and during the class period" is vague.

6.     In 2021 and early 2022, UScellular primarily sought to address churn and customer attrition through a patchwork of regionally-tested promotions. Through its "regionalization" approach, UScellular purportedly could offer a particular promotion in one or more of the six specific regions it operated to test and evaluate the promotion's effectiveness and cost while avoiding the financial impact of applying the promotion over its entire footprint.

**ANSWER:** Defendants admit that UScellular conducted regional promotions in 2021 and early 2022. Defendants further admit that, during 2021 and 2022, UScellular offered certain promotions on a regional basis to test different offers and to help identify approaches that balanced subscriber growth with profitability. Defendants deny the remaining allegations in Paragraph 6.

7.     In 2021 and the first half of 2022, Defendants touted the benefits of UScellular's regional-testing strategy, claiming that the trials and testing they ran allowed them to find the right balance between financial outcomes and subscriber outcomes. For example, in May 2022 during an earnings call, Defendants asserted they were "very pleased" with the results "we've seen so far." Moreover, when Defendants were asked point blank during the same earnings call whether in-store traffic had diminished (at a time when the Big 3 were offering expensive, nationwide promotions), Defendant Douglas Chambers, UScellular's Executive Vice President, Chief Financial Officer, and Treasurer, unequivocally stated "No[,]" and that there was "nothing concerning."

**ANSWER:** Defendants admit that Paragraph 7 purports to quote from statements made during an earnings call held in May 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 7.

8.     However, as UScellular's regional-testing strategy failed to improve postpaid subscriber results, Defendants pivoted from small regional promotional offers to the Companies' "Any Phone Free for Anyone, New and Existing Customers" promotion (the "Any Phone Free

Promotion") that was offered across UScellular's entire footprint. Launched in late June 2022, the Any Phone Free Promotion was designed to attract new customers and encourage existing customers to sign long-term renewal agreements when upgrading their phones, keeping them "in contract" and reducing postpaid customer churn. This promotion was purportedly based on the results of a series of regional tests and trials conducted during "the second quarter" of 2022. Confidential Witness ("CW") 1, one of only six UScellular Area Vice Presidents ("AVP"s), confirmed the tests and trials for the Any Phone Free Promotion were conducted in April 2022.

**ANSWER:** Defendants admit that UScellular conducted a promotion beginning in June 2022. Defendants further admit that the promotion was intended to reduce churn and increase service revenue, among other goals. To the extent Paragraph 8 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 8.

9. During the Class Period, citing the Any Phone Free Promotion's trial results and prior testing, Defendants communicated an unequivocally false timeline to investors regarding the promotion's forecasted benefits. For example, on August 5, 2022, at an earnings call jointly held by TDS and USM, Defendant Laurent Therivel, UScellular's President, Chief Executive Officer and a Director of both Companies, represented that Defendants' anticipated timeline for "steady churn improvement" (born out of the spring 2022 trials and tests) would begin in "***the third quarter***" and would continue "***throughout the second half of the year.***" Defendants also attributed their ability to offer the Any Phone Free Promotion to purported learnings derived from UScellular's previous "regionalization" strategy, which tested "different go-to-market [promotional approaches] in our individual regions."

**ANSWER:** Defendants admit that Paragraph 9 purports to quote from statements made during an earnings call held on August 5, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 9.

10. Additionally, throughout the Class Period, Defendants touted that because of the Any Phone Free Promotion, UScellular was observing results demonstrating that the promotion was addressing postpaid customer attrition while balancing UScellular's promotional activity with its profitability. For instance, during the Class Period, Defendants confirmed they had "done a really good job…***strik[ing] a balance between subscriber results and financial results***[,]" and touted that UScellular's Any Phone Free Promotion had "meaningfully address[ed] a number of

*the subscriber challenges that we identified earlier in the year*[.]" Defendants also falsely claimed these results stemmed from the Any Phone Free Promotion's "*offer structure, coupled with our ongoing expense discipline*[,]" and falsely attributed the results as the purported justification which "*enable*[d Defendants] *to maintain our profitability outlook* for the year even with those aggressive promotions."

**ANSWER:** Defendants admit that Paragraph 10 purports to quote from statements made during earnings calls held on May 6, 2022 and August 5, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcripts of the calls for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 10.

11. However, unbeknownst to investors, UScellular did not implement the "Any Phone Free Promotion" because the regional trials demonstrated that the promotion was striking the right balance between subscriber and financial outcomes but rather, UScellular was pressured to launch the Any Phone Free Promotion, regardless of the impacts to profitability, in order to remain relevant against the Big 3, who each had their own free phone promotion. This situation—where UScellular needed to match competitors' promotions with one of its own—was referred to internally at the Companies as "table stakes." Indeed, CW2 explained that UScellular had modelled AT&T's free phone promotion and concluded that the cost of implementing such a deal would more than double UScellular's total promotion budget from $175 to over $400 million.

**ANSWER:** To the extent Paragraph 11 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 11.

12. Critically, Defendants knew, as a result of the tests and trials they conducted in "the second quarter" of 2022, which were purportedly the basis for UScellular's Any Phone Free Promotion, that their timeline for anticipated benefits was far longer than they had represented to investors. After the Class Period, Defendants would admit knowing that their timeline for anticipated churn and subscriber benefits flowing from the Any Phone Free Promotion was actually **at least "6 to 9 months"**—*i.e., the first quarter 2023 at the earliest*. Defendants further admitted they knew of the "6 to 9" month timeline since the tests and trials run in April 2022.

**ANSWER:** Denied.

13. Defendants Therivel and Chambers also knew that their Class Period statements were false because they were involved in UScellular's promotion approval process and, according to CW2, Therivel was the "ultimate determinator." In the promotion approval process for **every proposed promotion**, Defendants Therivel and Chambers received reports analyzing costs and benefits and numerous "what-if-scenarios," including analysis of what anticipated benefit would

6

be necessary to believe the promotion would make sense for UScellular's business. As such, Defendants knew the financial impact of the Any Phone Free Promotion was materially understated in the third quarter of 2022, while the impact that the promotion would have on subscribership and churn outcomes was materially overstated and delayed.

**ANSWER:** To the extent Paragraph 13 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 13.

14. Moreover, throughout the Class Period, Defendants knew UScellular's churn rates and financial performance were disastrous. According to CW1, each quarter, CW1 and all other AVPs would aggregate the Key Performance Indicators ("KPI") results from their Region to report that progress to Defendant Therivel for use during a quarterly Business Review meeting. In connection with the quarterly Business Review meetings, CW1 stated that attendees received quarterly reports that detailed UScellular's KPI performance for each Area, which were broken down by month and aggregated for the quarter. CW1 stated that, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates, and the rates that customer interactions were converted to sales. Further, CW1 confirmed that throughout 2Q 2022 and 3Q 2022, "according to the numbers" CW1 saw in the Business Review meetings, there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. In response, AVPs would be asked and meeting participants would discuss why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn. Additionally, CW1 recalled that Defendant Therivel mentioned that in-store traffic and margins were below target and needed to improve at every Business Review meeting throughout CW1's tenure.

**ANSWER:** To the extent Paragraph 14 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 14.

15. Though Defendants continued to publicly laud UScellular's ability to offer promotions that balanced subscriber growth with profitability, privately, Defendant Therivel confirmed, during a one-on-one meeting in September or October 2022 with CW1, that 2022 had been "a tough year" with respect to revenue, postpaid churn, and gross and net postpaid customer additions.

**ANSWER:** To the extent Paragraph 15 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 15.

16.     On November 3, 2022 and November 4, 2022, Defendants disclosed the truth when reporting operating results for the third fiscal quarter of 2022. During on the Companies' November 4, 2022 earnings call, Defendants revealed that they knew from trials and tests in second quarter 2022 that the Companies' timeline for anticipated postpaid churn improvement was ***more than six months***, contradicting Defendants' earlier statements that UScellular would benefit as early as the third quarter of 2022. Further, Defendants admitted that the Any Phone Free Promotion failed to correct UScellular's increasing postpaid churn rate while substantially eroding UScellular's profitability given the "offer structure['s]" lack of "expense discipline." Defendants disclosed that UScellular's fiscal year 2022 financial guidance was being revised downward. Defendants admitted that the guidance changes were "impacted" by "our subscriber growth challenges in 2022" and "the promotional investment we are making in our new and existing promotion" (i.e., Free Phone for Anyone).

**ANSWER:** Defendants admit that Paragraph 16 purports to quote from statements made during an earnings call held on November 4, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 16.

17.     On this news, the price of TDS' securities plummeted as the artificial inflation caused or maintained by Defendants' misstatements was removed from the price of TDS' securities. Indeed, on November 4, 2022, TDS' common stock price declined 25.89%, declining from a closing price of $16.57 per share on November 3, 2022, to $12.28 per share at market close on November 4, 2022, on unusually heavy trading volume.

**ANSWER:** Defendants admit that TDS' common stock closed at $16.57 per share on November 3, 2022 and $12.28 per share on November 4, 2022. Defendants further admit that certain public sources report that trading volume for TDS' common stock was approximately 4,321,900 on November 4, 2022. Defendants deny the remaining allegations in Paragraph 17.

18.     The price of TDS' preferred stock, TDSPrU and TDSPrV, also declined on unusually heavy trading volume. The preferred stock price of TDSPrV, which closed at $17.20 per preferred share on November 3, 2022, fell to $16.24 per preferred share at market close on November 4, 2022, a decline of 5.6%. The preferred stock price of TDSPrU, which closed at $19.30 per preferred share on November 3, 2022, fell to $18.29 per preferred share at market close on November 4, 2022, a decline of 5.2%.

**ANSWER:** Defendants admit that TDS Preferred Series VV closed at $17.20 per share on November 3, 2022 and $16.24 per share on November 4, 2022. Defendants admit that certain

8

public sources report that trading volume for TDS Preferred Series VV was approximately 130,581 on November 4, 2022. Defendants admit that TDS Preferred Series UU closed at $19.30 per share on November 3, 2022 and $18.29 per share on November 4, 2022. Defendants further admit that certain public sources report that trading volume for TDS Preferred Series UU was approximately 90,450 on November 4, 2022. Defendants deny the remaining allegations in Paragraph 18.

19. Analysts reacted immediately, evidencing their surprise at Defendants' admissions that the timeline for anticipated subscriber results from the Any Phone Free Promotion was longer than previously represented. For example, Wells Fargo reported that "EBITDA miss driven by promotions….This, while churn increased…and postpay net losses mounting, ***leave us questioning whether the promotions will ultimately prove effective driving profitable growth over time***." Similarly, Morningstar Equity Research reported that "[a]lthough U.S. Cellular's management highlighted some positive signs it believes show its strategy to improve performance with postpaid wireless customers is on the right track, ***the results don't yet show it.*** Worse, expenses associated with these customers skyrocketed."

**ANSWER:** Defendants admit that Paragraph 19 purports to quote from statements made in reports published by Wells Fargo and Morningstar Equity Research but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the reports for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 19.

20. Defendants' fraud as alleged herein caused investors to lose millions of dollars. Plaintiff now seeks damages individually and on behalf of the Class.

**ANSWER:** Defendants admit that Plaintiff purports to seek damages individually and on behalf of a putative class. Defendants deny the remaining allegations in Paragraph 20.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.§ 240.10b-5.

**ANSWER:** Defendants admit that the Plaintiff purports to bring this suit pursuant to the statutes enumerated in Paragraph 21, but deny any liability to Plaintiff or the putative class, deny

9

that Defendants have caused any injury to the putative class, and deny that a class may be properly certified. Defendants deny the remaining allegations in Paragraph 21.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

**ANSWER:** Defendants admit that this Court has jurisdiction over this action, but deny the remaining allegations in Paragraph 22.

23. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

**ANSWER:** Defendants admit that this court has jurisdiction over Defendants. Defendants deny the remaining allegations in Paragraph 23.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. TDS and UScellular are both headquartered in this District, with TDS' principal place of business located at 30 North LaSalle Street, Suite 4000, Chicago, Illinois 60602 and UScellular's principal place of business located at 8410 West Bryn Mawr, Chicago, Illinois 60631.

**ANSWER:** Defendants admit that venue is proper in this court. Defendants admit that TDS is headquartered at 30 North LaSalle Street, Suite 4000, Chicago, Illinois 60602. Defendants further admit that UScellular is headquartered at 8410 West Bryn Mawr, Chicago, Illinois 60631. Defendants deny the remaining allegations in Paragraph 24.

## III. PARTIES

### A. Plaintiff

25. Lead Plaintiff Howard M. Rensin, Trustee of The Rensin Joint Trust, was damaged by purchasing the TDS securities set forth in his Certification of Named Plaintiff Pursuant to Federal Securities Laws (ECF No. 1), which Plaintiff incorporates by reference herein, at artificially inflated prices during the Class Period caused by Defendants' materially false and misleading public statements.

**ANSWER:** Denied.

10

**B.     Defendants**

26.     Defendant Telephone and Data Systems, Inc. is a public corporation, organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. Its common stock trades on the New York Stock Exchange ("NYSE") and is traded under the symbol "TDS." TDS' preferred shares also trade on the NYSE under the symbols "TDSPrV" and "TDSPrU."

**ANSWER:** Defendants admit that Telephone and Data Systems, Inc. ("TDS") is a public

corporation. Defendants admit that TDS is incorporated in Delaware and headquartered in

Chicago, Illinois. Defendants admit that TDS' common stock is listed on the NYSE. Defendants

admit that TDS' common stock is traded under the symbol "TDS". Defendants further admit that

TDS' preferred shares trade on the NYSE under the symbols "TDSPrV" and "TRDSPrU".

Defendants deny the remaining allegations in Paragraph 26.

27.     Defendant United States Cellular Corporation, is a public corporation, organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. Its common stock trades on the NYSE and is traded under the symbol "USM." Throughout the Class Period, TDS owned approximately 83% of UScellular's stock.

**ANSWER:** Defendants admit that UScellular is a public corporation. Defendants admit

that UScellular is incorporated in Delaware and headquartered in Chicago, Illinois. Defendants

admit that UScellular stock is listed on the NYSE. Defendants admit that UScellular stock trades

under the symbol "USM". Defendants admit that TDS was an approximately 83% owner of

UScellular during the Class Period. Defendants deny the remaining allegations in Paragraph 27.

28.     At all relevant times, Defendant Laurent C. Therivel served as President, Chief Executive Officer ("CEO") & Director of UScellular. During the Class Period, Defendant Therivel also served as a Director of TDS. As President and CEO, according to UScellular's Definitive Proxy Statement for the 2022 Annual Meeting, Therivel was "responsible for day-to-day leadership and performance" of USM, which includes "regularly confer[ring] and consult[ing] with the Chairman [i.e., LeRoy T. Carlson, Jr.] with respect to important strategic, operating and financial activities and decisions."

**ANSWER:** Defendants admit that Laurent C. Therivel has served as the President and

Chief Executive Officer of UScellular. Defendants further admit that Mr. Therivel has served as a

Director of TDS. Defendants admit that Paragraph 28 purports to quote from UScellular's 2022 proxy statement, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the proxy statement for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 28, including because the phrase "at all relevant times" is vague.

29.     At all relevant times, Defendant Douglas W. Chambers served as Executive Vice President ("Executive VP"), Chief Financial Officer ("CFO"), and Treasurer of UScellular.

**ANSWER:** Defendants admit that Douglas W. Chambers has served as Executive Vice President, Chief Financial Officer, and Treasurer of UScellular. Defendants deny the remaining allegations in Paragraph 29, including because the phrase "at all relevant times" is vague.

30.     Defendant Therivel and Defendant Chambers are collectively referred to herein as "Individual Defendants."

**ANSWER:** Paragraph 30 contains an assertion to which no answer is required. To the extent a response is required, Defendants deny the allegations in Paragraph 30.

31.     The Companies and the Individual Defendants are collectively referred to herein as "Defendants."

**ANSWER:** Paragraph 31 contains an assertion to which no answer is required. To the extent a response is required, Defendants deny the allegations in Paragraph 31.

32.     The Individual Defendants, by virtue of their high-level positions at UScellular, directly participated in the management of UScellular and were directly involved in the day-to-day operations of UScellular at their highest levels. As such, they were privy to confidential, proprietary information concerning the Companies and their business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

**ANSWER:** Defendants admit that Mr. Therivel and Mr. Chambers hold high-level positions at UScellular, are involved in managing UScellular, and receive confidential, proprietary

information concerning UScellular and its business operations, growth, and financial condition.

Defendants deny the remaining allegations in Paragraph 32.

33. As senior executives at a publicly held company with securities registered with the SEC and traded on the NYSE, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Companies' business, operations, financial statements, and internal controls, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of TDS' publicly traded securities would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

**ANSWER:** Paragraph 33 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants admit that Mr. Therivel and Mr. Chambers are senior executives at a publicly held company with securities registered with the SEC and traded on the NYSE, and that they owe certain duties by virtue of their positions. Defendants otherwise deny the allegations in Paragraph 33.

34. As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the public statements issued by the Companies during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the materially false and misleading public statements detailed in this complaint.

**ANSWER:** Defendants admit that Mr. Therivel and Mr. Chambers were senior executives of UScellular. Paragraph 34 otherwise contains legal statements to which no answer is required. To the extent an answer is required, Defendants deny the allegations of Paragraph 34.

35. As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about the Companies' business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about the Companies materially false and misleading.

**ANSWER:** Denied.

13

C.    **Relevant Non-Parties**

36.    At all relevant times, LeRoy T. Carlson, Jr. ("Carlson") served as the President and CEO of TDS. During the Class Period, Carlson also served as Chairman of the Board of UScellular and as a trustee of the TDS Voting Trust (defined infra, at ¶199). According to TDS' Definitive Proxy Statement for the 2022 Annual Meeting, filed with the SEC on April 6, 2022, Carlson "is responsible for day-to-day leadership and performance of TDS." Additionally, according to UScellular's Definitive Proxy Statement for the 2022 Annual Meeting, Carlson "regularly conferred and consulted with" Defendant Therivel "with respect to important strategic, operating and financial activities and decisions" for UScellular.

**ANSWER:** Defendants admit that LeRoy T. Carlson, Jr. is the President and Chief Executive Officer of TDS and Chairman of the Board of Directors of UScellular. Defendants admit that Mr. Carlson was a trustee of the TDS Voting Trust during the Class Period. Defendants further admit that Paragraph 36 purports to quote from statements made in UScellular's 2022 proxy statement, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the proxy statement for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 36, including because "at all relevant times" is vague.

37.    Peter L. Sereda ("Sereda") served as the Executive VP and CFO of TDS during the Class Period until he retired on May 24, 2022.

**ANSWER:** Admitted.

38.    During the Class Period, Vicki L. Villacrez ("Villacrez") served as Executive VP and CFO of TDS from Sereda's retirement on May 24, 2022 through the present. Villacrez was also appointed as a Director of UScellular on May 17, 2022 and remains in that role presently.

**ANSWER:** Admitted.

39.    CW1 is a former UScellular employee, who was Area Vice President, Southwest Region from December 2020 through June 2023. As AVP for the Southwest Region, CW1 managed all UScellular retail operations in Kansas, Missouri, Oklahoma, and Texas, including both UScellular-owned stores, as well as stores owned by franchisees known internally at UScellular as "agencies." CW1 initially reported to Eric Jagher, Chief Marketing Officer, until June 2022 when CW1 began reporting to Sheila Crisostomo, Vice President of Retail Sales and Operations. Both Jagher and Crisostomo reported to Defendant Therivel.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, for that reason, deny those allegations.

40. CW1 stated that CW1 was hired in connection with UScellular's decision to institute the AVP position, an initiative that went into effect January 1, 2021 and represented the first time UScellular pursued a decentralized organization, whereby nationwide operations were divided into six Regions: Southwest; Mid-Atlantic (comprised of North and South Carolina, Tennessee, and West Virginia); Northwest; Northeast; Iowa and Nebraska; and Wisconsin and Illinois.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and, for that reason, deny those allegations.

41. CW2 is a former UScellular employee, who was a member of the Growth Marketing department and involved in the creation, approval, and evaluation of promotions. CW2 explained that at UScellular, Growth Marketing is the group responsible for ideating and executing pricing, offers, marketing strategies, and customer relationship management, and that the VP of the Marketing Department reported directly to Defendant Therivel.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, for that reason, deny those allegations.

## IV. SUBSTANTIVE ALLEGATIONS

### A. TDS is a Telecommunications Company Whose Core Business was Operating UScellular, Its Majority-Owned Subsidiary

42. TDS is a telecommunications company that, throughout the Class Period, operated through two business segments: UScellular and TDS Telecommunications LLC ("TDS Telecom"). TDS conducts all its wireless operations through its majority-owned subsidiary UScellular. Throughout the Class Period, TDS owned approximately 83% of the combined total of UScellular's outstanding common shares and Series A common shares and controlled 96% of the combined voting power of both classes of UScellular's common stock. TDS Telecom is a wholly owned subsidiary of TDS that provides broadband, video, and voice services.

**ANSWER:** Defendants admit that TDS operates through TDS Telecommunications LLC and UScellular. Defendants admit that TDS was an approximately 83% owner of UScellular during the Class Period and controlled approximately 96% of the combined voting power of both classes of UScellular common stock as of the end of 2022. Defendants admit that UScellular provides wireless telephone services. Defendants further admit that TDS Telecommunications LLC is a

15

wholly-owned subsidiary of TDS and provides broadband, video, and voice services. Defendants

deny the remaining allegations in Paragraph 42.

43.     As shown in **Figures A and B** below, prior to and throughout the Class Period, TDS Telecom generated less than one-quarter of TDS' total revenues and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

**Figure A**



**Figure B**



**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, Figure A, and Figure B and, for that reason, deny those allegations.

44.     UScellular provides wireless services to markets across 21 states that collectively represent a total population of 32 million people. UScellular's wireless operating markets are entirely within the United States.

**ANSWER:** Defendants admit that UScellular provides wireless telecommunications services in 21 states. Defendants further admit that all of UScellular's wireless operating markets are within the United States. Defendants deny the remaining allegations in Paragraph 44.

45.     At the beginning of the Class Period, UScellular serviced customers with approximately 4.83 million retail wireless connections. By the end of the Class Period, however, UScellular's retail wireless connections decreased to approximately 4.75 million. UScellular defines "retail connections" as "individual lines of service associated with each device activated by a postpaid or prepaid customer."

**ANSWER:** Defendants admit that UScellular had approximately 4.83 million retail connections at the end of Q1 2022. Defendants further admit that UScellular had approximately 4.75 million retail connections at the end of Q3 2022. Defendants admit that UScellular has defined "retail connections" as "individual lines of service associated with each device activated by a postpaid or prepaid customer." Defendants deny the remaining allegations in Paragraph 45.

46.     Throughout the Class Period, UScellular reported that approximately 90% of its retail connections were postpaid connections. Whereas UScellular's prepaid service enables individuals to obtain services without credit verification by paying for all services in advance, a postpaid connection represents an individual line of service for a device for which a customer is generally billed one month in advance for a monthly access charge in return for access to UScellular's network services.

**ANSWER:** Admitted.

47.     Throughout the Class Period, UScellular purportedly offered connections for multiple types of devices, including smartphones, handsets, tablets, and mobile hotspots. UScellular also offered a varied range of network services, i.e., wireless connections compatible with fourth-generation long-term-evolution ("4G LTE") and fifth-generation ("5G") networks.

17

**ANSWER:** Defendants admit that during the Class Period UScellular provided wireless connections for multiple types of devices, including smartphones, handsets, tablets, and mobile hotspots. Defendants further admit that UScellular offered a range of network services, including access to 4G LTE and 5G networks. Defendants deny the remaining allegations in Paragraph 47.

48.     UScellular sells its wireless services and devices to customers using multiple channels, including retail sales, direct sales, telesales, ecommerce, indirect sales, independent agents and third-party national retailers. For in-person wireless sales during the Class Period, UScelluar operated its own retail store locations, maintained relationships with independent businesses who were either exclusive or non-exclusive UScelluar agents ("agencies") that obtain customers for UScellular on a commission basis, and maintained relationships with national retailers, such as Walmart, through which USM primarily sold prepaid devices.

**ANSWER:** Defendants admit that UScellular supports a multi-faceted distribution program, including retail sales, direct sales, telesales, ecommerce, indirect sales, independent agents and third-party national retailers. Defendants admit that UScellular maintains company-owned retail store locations and has relationships with exclusive and non-exclusive agents that obtain customers for UScellular on a commission basis. Defendants further admit that UScellular maintains relationships with national retailers that primarily sell prepaid devices. Defendants deny the remaining allegations in Paragraph 48.

**B.     The Companies Appoint Defendant Therivel as UScellular's CEO to Assuage Investor Concerns Regarding Subscriber Growth and Capital Efficiency**

49.     On June 1, 2020, following years of postpaid subscriber losses, UScellular and TDS announced that Defendant Therivel would be joining UScellular as President and CEO, and would be appointed to both the UScellular and TDS Boards of Directors. In a video message from Defendant Therivel, included in UScellular's June 1, 2020 announcement of his employment, Therivel explained that his "focus at U.S. Cellular" included "driving profitable growth."

**ANSWER:** Defendants admit that on June 1, 2020, it was announced that Mr. Therivel would join UScellular as President and CEO. Defendants admit that on June 1, 2020, it was also announced that Mr. Therivel would join the Board of Directors of UScellular and TDS. Defendants admit that Paragraph 49 and its corresponding footnote purport to quote from statements made in

18

a video message published on June 1, 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the video message for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 49 and its corresponding footnote.

50.     When asked about his top objectives as the new CEO during a conference call held by the Companies on August 7, 2020, Defendant Therivel confirmed that his focus on "driving that top line growth" would be accomplished, in part, via "good work in driving gross adds and keeping churn down[.]" During that same earnings call, Defendant Therivel added that his focus on driving top line growth included discipline around margin and CapEx efficiency, stating in relevant part:

> And finally, I have a priority of funding that growth. We're going to have to continue to get disciplined around margin and around CapEx efficiency. And so you can expect to see continued action on the OpEx and the CapEx side to make sure that we create room to fund that growth moving forward.

**ANSWER:** Defendants admit that Paragraph 50 purports to quote from statements made during a conference call held on August 7, 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 50.

51.     Defendant Carlson elaborated on TDS' and its Board's priorities for Therivel during an August 20, 2020 Special Call, stating in relevant part:

> In terms of priorities, really two priorities. The number one priority is getting growth and strong growth at U.S. Cellular. And of course, that would mean customer growth and also revenue growth. And the secondary priority is increasing our return on capital in the context of continuing to have a strong network.

**ANSWER:** Defendants admit that Paragraph 51 purports to quote from statements made during a conference call held on August 20, 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 51.

**C.      COVID-19 Pandemic Temporarily Boosts UScellular Subscribership and Stalls Customer Switching**

52.      In 2020 and early 2021, the COVID-19 pandemic temporarily benefitted UScellular's operations in primarily two ways: it boosted postpaid customer demand and limited postpaid customer switching activity. During the Companies' August 20, 2020 Special Call, Carlson explained COVID-19's positive impact on customer demand:

> In terms of our businesses, our businesses in some ways are actually stronger in this COVID environment than we had anticipated. Because people realize that their broadband service, whether it's developed over wireless or over wireline, is essential and it's particularly essential when you're working from home because you've got to communicate. So connectivity is even more important than it would have been when you were at the office where you could just go down the hallway and talk to someone. So both businesses are benefiting from that. And I think that having customers once realized how important connectivity is to them on both sides, wireless and wireline, I don't think that that's image of importance is going to go away very rapidly. I think it's going to stay with us.

**ANSWER:** Defendants admit that Paragraph 52 purports to quote from statements made during a conference call held on August 20, 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 52.

53.      Similarly, during the Companies' February 19, 2021 Earnings Call to discuss the Companies' fourth quarter 2020 results, Defendant Chambers explained that the increase in gross additions was attributed to COVID-19 increasing customer demand for various UScellular products:

> As mentioned, we saw connected device gross additions increased by 12,000 year-over-year. **This was driven by gross additions of hotspots, routers and fixed wireless devices as a result of an increase in demand by customers seeking wireless products to meet their need for remote connectivity due to the impacts of COVID-19.**

**ANSWER:** Defendants admit that Paragraph 53 purports to quote from statements made during a conference call held on February 19, 2021, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize

20

the statements. Defendants respectfully refer to the transcript of the conference call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 53.

54.    The COVID-19 Pandemic also impacted customers' shopping behavior by decreasing foot traffic in stores, resulting in less customer switching activity. During the Companies' respective quarterly earnings calls throughout 2020, Defendant Chambers reported a decline in quarterly store traffic of 50%, 20%, 25%, and 30% year-over-year for each quarter. Although the decline in customer switching activity impeded new customers switching to UScellular, it also deterred UScellular's customers from switching away to competitors. In this way, the COVID-19 pandemic kept UScellular's churn rate from increasing throughout 2020 and the first quarter of 2021.

**ANSWER:** Defendants admit that Paragraph 54 purports to characterize statements made during conference calls held in 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcripts of the calls for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 54.

55.    As Defendant Chambers stated during the Companies' February 19, 2021 Earnings Call, UScellular's decrease in churn "was due primarily to lower switching activity as customers' shopping behaviors were altered due to the pandemic."

**ANSWER:** Defendants admit that Paragraph 55 purports to quote from statements made during an earnings call held on February 19, 2021, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 55.

**D.    As Pandemic Conditions Subside in 2021 and In-Store Operations Increase, UScellular Postpaid Customers Begin Switching Carriers in Droves**

56.    As business operations returned to normal through 2021, competition was fierce for postpaid customers who would return to retail stores and commit to a new wireless service contract. Indeed, over the course of the 2021, UScellular's main competitors, the Big 3, all offered luxurious promotions designed to attract and retain new customers, such as giving away free smartphones, offering steep discounts on other phones and connected devices, and offering other promotions for switching or adding new lines of service.

21

**ANSWER:** Defendants admit that the wireless industry is highly competitive and experienced increased promotional aggressiveness in 2021. To the extent Paragraph 56 purports to subjectively characterize the activities of third parties, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 56 and its corresponding footnotes.

57.     Throughout 2021, UScellular struggled to compete with the Big 3's promotions. Consequently, the Companies reported an overall increase in UScellular's postpaid churn rate, as depicted in **Figure C**, below. Specifically, UScellular's postpaid churn rate increased in the second, third, and fourth quarters of 2021, as compared to the same periods during 2020, by 24.72%, 8.49%, and 11.57%, respectively. UScellular's "postpaid churn rate" represents the percentage of the postpaid connections that disconnect service each month. USM reported churn rates as the average monthly churn rate for each respective period.

**Figure C**



**ANSWER:** Defendants admit that the wireless industry is highly competitive and experienced increased promotional aggressiveness in 2021. Defendants admit that UScellular's postpaid churn rate increased in the second, third, and fourth quarters of 2021, as compared to the same periods in 2020, by 24.72%, 8.49%, and 11.57%, respectively. Defendants further admit that "postpaid churn rate" represents the percentage of the postpaid connections that disconnect service

22

each month, and that UScellular reported churn rates as the average monthly churn rate for each respective period. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57 and Figure C and, for that reason, deny those allegations.

58.     Further, as a result of UScellular's increasing postpaid churn throughout 2021, UScellular's net additions of postpaid connections (i.e., the total number of new connections added during the period, net of connections that were terminated during that period) declined each quarter over the second, third, and fourth quarters of 2021 (as compared on a year-over-year basis to the same periods in 2020), dropping 150%, 128.57%, and 209.09%, respectively, as set forth in Figure D, below.

**Figure D**



ANSWER: Defendants admit that net additions of postpaid connections declined in the second, third, and fourth quarters of 2021, as compared to the same periods in 2020, by 150%, 128.57%, and 209.09%, respectively. Defendants further admit that UScellular defines net additions as the total number of new connections added during the period, net of connections that were terminated during that period. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and Figure D and, for that reason, deny those allegations.

23

59.     Accordingly, before the Class Period even began, investors were attuned to the fact that any information affecting the Companies' ability to mitigate postpaid churn and increase customer adds was highly material to the Companies' financial performance. Indeed, before the Class Period commenced, Morningstar Equity Research published a report on February 18, 2022, titled "Areas of Improvement Don't Outweigh U.S. Cellular's Inability to Add Customers", stating in relevant part:

> We see reasons for optimism about U.S. Cellular's future, **but in the near term, continual customer losses are holding it back**. Even longer term, potential sources of sales growth coming from a renewed focus on tower leasing and a rollout of fixed wireless service in the coming years **will be secondary to how successful the firm is in building its postpaid smartphone customer base**. With customer additions in 2021 disappointing, and the firm's guidance making us doubt that 2022 will be much better, we're reducing our fair value estimate from $33 to $31.

**ANSWER:** Defendants admit that Paragraph 59 purports to quote from statements made in a Morningstar Equity Research report published on February 18, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the report for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 59.

### E.     Prior to and Throughout the Class Period, UScellular's Executive Management Closely Tracked Operational Metrics and Reviewed them with Regional Managers

60.     Beginning on January 1, 2021, according to CW1, UScellular implemented a decentralized organization, whereby nationwide operations were divided into six Regions: Southwest; Mid-Atlantic (comprised of North and South Carolina, Tennessee, and West Virginia); Northwest; Northeast; Iowa and Nebraska; and Wisconsin and Illinois.

**ANSWER:** To the extent Paragraph 60 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 60.

61.     CW1 stated that within the Southwest Region were seventeen "business entities" representing different "sub-markets" which reported to CW1 on all manner of KPIs, including: revenue, postpaid and prepaid churn, gross and net customer adds (both postpaid and prepaid), the number of postpaid handsets had been sold in a month, the number of customers who visited a store or agency, conversion rates (representing the rates that interactions with customers were converted into sales), and numerous others.

24

**ANSWER:** To the extent Paragraph 61 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 61.

62. CW1 explained that every month, CW1 and all other AVPs would aggregate the KPI results from their Region for discussion at a monthly AVP meetings with Jagher prior to June 2022, and with Crisostomo after June 2022. CW1 stated that, depending on the period of time, either Jagher or Crisostomo would use the information presented in the monthly AVP meeting to prepare for a meeting with Defendant Therivel, amongst others, that would take place the day following the monthly AVP meeting.

**ANSWER:** To the extent Paragraph 62 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 62.

63. CW1 explained that each quarter, CW1 and all other AVPs would aggregate the KPI results from their Region to report that progress to Defendant Therivel for use during a quarterly Business Review meeting. Occasionally, Defendant Therivel would cancel the meeting, however CW1 recalled participating with all of the other AVPs and Defendant Therivel in at least one such quarterly Business Review meeting during the period between May 2022 and November 2022, which was in June 2022 to the best of CW1's recollection. In connection with the quarterly Business Review meetings, CW1 and other AVPs would circulate reports to all of the meeting participants, including Defendant Therivel. CW1 stated that reports presented KPI data in terms of how actual performance compared to what had been budgeted (i.e., projected) for the period, as well as comparisons to prior periods. CW1 stated that the results in these reports from each Area, which were broken down by month and aggregated for the quarter, were reviewed during the quarterly Business Review meetings with Therivel.

**ANSWER:** To the extent Paragraph 63 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 63.

64. CW1 further stated that in the quarterly reports that AVPs sent to Defendant Therivel, each particular KPI performance item was coded red, yellow, or green, depending on whether the actual results fell below or exceeded what had been budgeted. For instance, if a budgeted sales goal had been $10,000, but the actual result was only $9,000, this particular item would be coded as red because it had not met the budgeted goal. If the sales had exceeded the goal, it would be coded as green. Yellow meant the performance had been close to what was budgeted. CW1 stated that items that were red-coded received significant discussion during quarterly Business Review meetings.

25

**ANSWER:** To the extent Paragraph 64 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 64.

65. Throughout CW1's entire tenure, all six AVPs repeatedly reported at every quarterly Business Review meetings that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates, and conversion rates. CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the AVPs.

**ANSWER:** To the extent Paragraph 65 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 65.

**F.      In Response to Growing Postpaid Customer Attrition, in 2021 UScellular Begins Small-Scale, Regional Trials of a Variety of Promotions Rather than Expensive Nationwide Promotions Like the Big 3's Promotions**

66. UScellular's systemic loss of postpaid customers in 2021 as a result of the competitive promotional environment in the wireless industry forced Defendants to increase UScellular's own promotional activity to remain competitive.

**ANSWER:** Defendants admit that UScellular increased its promotional activity in 2021. Defendants admit that the wireless industry is highly competitive and experienced increased promotional aggressiveness in 2021. Defendants deny the remaining allegations in Paragraph 66.

67. Rather than follow some of the Big 3's expensive programs such as a company-wide "free phone" promotion, Defendants implemented a "regional" approach to trialing and testing promotions in 2021. Under this approach, UScellular offered promotions to specific geographic regions, which purportedly allowed USM to gain insight into the promotions effectiveness while balancing costs. For instance, UScellular conducted trials leading up to the 2021 holiday season wherein it tested and ultimately ran a promotion offering customers the choice of a free smartphone device or a free year of service.

**ANSWER:** Defendants admit that in 2021 UScellular used a regionally focused strategy to test different offers. Defendants further admit that UScellular ran a promotion in 2021 that allowed new UScellular customers to choose between getting a smartphone for free or a free year of service on select wireless plans. Defendants deny the remaining allegations in Paragraph 67.

26

68.    CW2 provided a hypothetical explanation of how UScellular's regionalized approach to promotions worked, explaining that UScellular may offer a promotion of $500 off a new phone for new customers located in Iowa but in Oklahoma, UScellular may offer a promotion of $700 off a new phone for new customers.

**ANSWER:** To the extent Paragraph 68 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 68.

69.    During Citi's January 7, 2021 Global TMT West Conference, Defendant Therivel explained that the purported benefit of this approach was that UScellular could "afford to take different actions in different regions" and "get aggressive in some of [the] lower share markets without the commensurate sacrifice" financially if USM applied the promotion footprint wide.

**ANSWER:** Defendants admit that Paragraph 69 purports to quote from statements made by Mr. Therivel on January 7, 2021, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the statements themselves for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 69.

70.    To evaluate whether a particular promotion should be implemented in a particular region, according to CW2, Growth Marketing coordinated promotion "experiments" and attempted to measure the impact of every promotion in terms of cost and benefit by financial modeling and forecasting. CW2 explained that the cost and benefit analysis varied on the objective of a given promotion – i.e., some promotions might be to increase customer acquisition, to increase revenue per customer, to reduce churn – but a key objective was to realize a substantial revenue benefit to justify the cost of a given "change" (i.e., promotion). In other words, a key objective was to ensure UScellular's promotions were profitable and a net benefit to the business.

**ANSWER:** To the extent Paragraph 70 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 70.

71.    After running the experiments, CW2 and the Growth Marketing department would report the results of the cost and benefit analysis to Defendants Therivel and Chambers. CW2 explained that UScellular had a pricing and promotion approval process wherein the Growth Marketing department would propose a particular plan or tactic, the Finance department would conduct financial calculations regarding the impact of the promotion, and the Growth Marketing

department would then present the proposal and the financial calculations to the CFO, CEO, COO, and "relevant marketing executives."

**ANSWER:** To the extent Paragraph 71 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 71.

72.     CW2 also explained that Defendants Therivel and Chambers received "what-if-scenarios" for any proposed promotion that looked at what the cost of the promotion was, and what anticipated benefit would be necessary to believe the promotion would make sense for UScellular's business. Considerations for the "what-if-scenarios" included how much spending was being forecasted for the promotion and whether the promotional budget would be exceeded (and if so, by how much). CW2 explained that when a promotion arose, UScellular would try to make such a promotion "hurt as little as possible" in terms of the revenue impact.

**ANSWER:** To the extent Paragraph 72 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 72.

73.     CW2 stated that the promotional approval process occurred in meeting formats around 5 or 6 times a year, in which, inter alia, CW2, Defendant Therivel, and Defendant Chambers participated to plan the promotions. Though the CFO, CEO, COO, and "relevant marketing executives" were involved in deciding whether to approve a promotion, CW2 explained that Defendant Therivel was the "ultimate determinator."

**ANSWER:** To the extent Paragraph 73 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 73.

74.     Ultimately, UScellular's promotional efforts in 2021 to attract and retain postpaid customers were ineffective. UScellular continued to lose postpaid customers despite its heavy promotional activity and regional promotion trials.

**ANSWER:** Defendants admit that UScellular's total net additions for postpaid customers were negative in 2021. Defendants deny the remaining allegations in Paragraph 74.

28

**G.      Unbeknownst to Investors, UScellular Experienced Shockingly Low In-Store Traffic Undercutting the Companies' Efforts to Improve Postpaid Churn and Subscribership**

75.      CW1 stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas, which CW1 knew from CW1's participation in the quarterly Business Review meetings.

**ANSWER:** To the extent Paragraph 75 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 75.

76.      CW1 confirmed that in-store traffic in every UScellular store was measured by ShopperTrak software that tracked, in real time, how many times every day the doors at UScellular's stores swung open. AVPs received reports every morning containing in-store traffic metrics, including on month-to-date, year-to-date, and quarter-to-date basis, for every store in each region and market.

**ANSWER:** To the extent Paragraph 76 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 76.

77.      CW1 stated one of the biggest factors unique to why UScellular struggled increasing in-store traffic was that its in-store systems, in particular the point-of-sale system, were so old and cumbersome. UScellular's point-of-sale system was so outdated that a transaction taking fifteen minutes at T-Mobile would take an hour at UScellular. CW1 stated that throughout CW1's entire tenure, UScellular customers in all six Regions would enter stores and have to sit in waiting areas for inordinate amounts of time. According to CW1, UScellular simply had not invested in its point-of-sale infrastructure so that UScellular was still using technology that Verizon (where CW1 had also worked for 15 year) had abandoned in the early 2010s.

**ANSWER:** To the extent Paragraph 77 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 77.

78.      CW1 stated that quarterly postpaid churn quotas for the Southwest region were never met and were "always in the red" each quarter throughout CW's employment. CW1 stated that these churn details were included in the reports that were disseminated in connection with the quarterly Business Review meetings and used, in part, to inform regional pricing decisions. Moreover, all AVPs and executives received ADS reports every morning by 7:00 a.m. that

included churn rates on a month-to-date, year-to-date, and quarter-to-date basis, which thereby made it possible "to see in real time" the numbers of subscribers that had been lost.

**ANSWER:** To the extent Paragraph 78 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 78.

79.     Throughout CW1's entire tenure, all six AVPs repeatedly reported at every quarterly Business Review meetings that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates, and conversion rates. CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the Area Vice Presidents.

**ANSWER:** To the extent Paragraph 79 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 79.

**H.     In Response to Mounting Competition in 2022, the Companies Introduce UScellular's Most Aggressive "Any Phone Free Promotion" Across Its Entire Footprint While Misrepresenting the Time Frame for Anticipated Benefits and Knowingly Understating the Risk of Exorbitant Costs**

80.     The intense competitive environment of the wireless market in 2021 continued into 2022. For instance, T-Mobile introduced promotions over the course of 2022 specifically designed to drive competitors' customers to switch service and subscribe with T-Mobile. These promotions included, in part: giving away free iPhones "on T-Mobile;" free smartphones for new lines; free Samsung Galaxies when adding a new line on T-Mobile's Magenta MAX data plan; and 4 iPhones for free and 4 lines for $25/line when trading in 4 qualifying devices. T-Mobile also offered to pay up to $800 to pay off 5G phones when switching to T-Mobile, offered to give "up to $1,000 when you switch your family on our Magenta Max plan", and offered a third line for free when joining with two qualifying lines.

**ANSWER:** Defendants admit that UScellular operated in a highly competitive environment in 2021 and 2022. To the extent Paragraph 80 and its corresponding footnote rely on the statements and activities of third parties, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 80 and its corresponding footnote.

30

81.     Verizon and AT&T offered similar competitive promotions over the course of 2022 geared to add and retain new customers. For example, AT&T offered an "iPhone 14 on us" for customers with eligible trade-ins, $800 off the Samsung Galaxy S22 Ultra for customers who traded-in an older Galaxy series smartphone, and half-priced iPhone 12 mini for well-qualified customers, among other offers.

**ANSWER:** Defendants admit that UScellular operated in a highly competitive environment in 2021 and 2022. To the extent Paragraph 81 and its corresponding footnote rely on the statements and activities of third parties, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 81 and its corresponding footnote.

82.     Similarly, Verizon offered free 5G phones for all its customers who signed up for any 5G unlimited plan and had an eligible trade-in, free iPhone 13s for new and current customers who signed up for any 5G unlimited plan and had an eligible trade-in, and a bundled deal including an iPhone 14 Pro, Apple Watch SE, iPad, and Beats Fit Pro for customers who traded-in an eligible iPhone, selected an unlimited 5G plan, and service plans for the iPad and Apple Watch.

**ANSWER:** Defendants admit that UScellular operated in a highly competitive environment in 2021 and 2022. To the extent Paragraph 82 and its corresponding footnote rely on the statements and activities of third parties, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 82 and its corresponding footnote.

83.     Desperate to compete with the Big 3, reduce churn, and boost customer additions, UScellular shifted its focus away from tailored, regional promotions in favor of one-size-fits-all company-wide promotions.

**ANSWER:** Defendants admit that UScellular operated in a highly competitive environment in 2021 and 2022. Defendants further admit that in late June, 2022, UScellular launched a promotion throughout the majority of UScellular's footprint. Defendants deny the remaining allegations in Paragraph 83.

84.     According to CW2, when it was necessary to stay relevant in the market against competitors' promotions, UScellular would offer a comparable promotion, which internally were

31

referred to as "table stakes," including by members of the Growth Marketing team, Therivel, and Chambers.

**ANSWER:** To the extent Paragraph 84 and its corresponding footnote rely on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 84 and its corresponding footnote.

85.      Therefore, in response to the Big 3 each launching their own free phone promotions, UScellular introduced its Any Phone Free Promotion to virtually all UScellular regions in late June of 2022. The Any Phone Free Promotion was designed to attract new customers and encourage existing customers to upgrade their phones, keeping them "in contract" and reducing the postpaid customer churn.

**ANSWER:** Defendants admit that UScellular operated in a highly competitive environment in 2022. Defendants admit that UScellular launched a promotion throughout the majority of UScellular's footprint in late June, 2022. Defendants further admit that the promotion was intended to drive improved subscriber results. Defendants deny the remaining allegations in Paragraph 85

86.      However, those purported benefits were only one part of the equation. As stated above, UScellular tested all of its promotions and measured not only the anticipated benefits of any promotion, but also ***the anticipated costs which would affect UScellular's profitability***. For example, CW2 stated that UScellular examined AT&T's nationwide upgrade promotion in 2021 and determined that to imitate that plan UScellular would need to increase the total promotion budget of $175 million to over $400 million.

**ANSWER:** To the extent Paragraph 86 relies on the statements of CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 86.

87.      According to CW1, Defendant Therivel discussed various promotions that UScellular was running, including the Any Phone Free Promotion that UScellular tested and trialed in April 2022, during a Directors Forum held in May 2022. Defendant Therivel would later publicly describe the testing process for the Any Phone Free Promotion during an earnings call the Companies held to discuss their financial and operating results of the second quarter of 2022 ("2Q 2022 Earnings Call"). Defendant Therivel stated that "regional tests and trials" were purportedly

performed during 2Q 2022 and that, based on those trial results, the promotion would drive positive subscriber results with manageable expense pressure:

> As I detailed during that first quarter earnings call, we identified some specific areas of subscriber pressure where we saw opportunities to improve. And that was noticeably churn and add-a-line. ***And this led to a series of regional tests and trials during the second quarter. And as a result of those trials, we launched our new promotion in late June, and that was any phone free for anyone and that's for new and existing customers.*** Now because of the timing of when we launched this promotion, it had little impact on second quarter subscriber results. But we believe this will meaningfully address a number of the subscriber challenges that we identified earlier in the year. And while it's early, so far, we're pleased with the results. We've seen significant increase in add-a-line and upgrade activity, and we expect that upgrade activity to result in improved churn downstream.

> ***And thanks to the trials that we ran, we're able to structure this offer in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable.*** And that offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions. In fact, we're going to be maintaining all of our guidance, which Doug will discuss further later in the presentation….

> Do I see a price to -- do I see a path to positive consumer postpaid net adds? Yes, I do. What is it going to take? I think the biggest step that's going to take in the near term is churn improvement. When I look at voluntary churn, that's where we saw the majority of our pressure in the first quarter. And we -- the offer that we've launched here is specifically designed to address that. One of the things we saw as we -- over the past couple of years is we've seen a larger and larger percentage of customers that are out of contract. And out-of-contract customers churn at a substantially higher rate than in-contract customers. And so the goal is how do we get customers back into contract. And that was one way is with the offer that we put forward. We think it specifically addressed that issue, and we're seeing really good results. So we're seeing upgrades up substantively. We're seeing the ratio of voluntary defections to gross adds improve substantively. […] **What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter.**

**ANSWER:** Defendants admit that Paragraph 87 purports to quote from statements made by Mr. Therivel during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and

accurate contents. To the extent Paragraph 87 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 87.

88.     Accordingly, as a result of such testing and trials, during and throughout the Class Period, Defendants knew the anticipated timeframe that UScellular would realize purported subscriber benefits, and Defendants also knew the anticipated impact that UScellular's Any Phone Free Promotion would have on profitability.

**ANSWER:** Defendants admit that Mr. Therivel expressed certain expectations with respect to the Any Phone Free Promotion. The remainder of Paragraph 88 consists of a legal conclusion to which no response is required and is otherwise denied.

89.     Though Defendant Therivel represented that the tests and trials indicated that the Any Phone Free Promotion would drive positive subscriber results in the "third quarter" and throughout the "second half" of 2022, unbeknownst to investors, Defendants knew that it would take at least six months for the promotion to have a meaningful impact on UScellular's churn rates and subscribership challenges. Indeed, Defendant Therivel later admitted that Defendants knew it would take more than six months to see the consumer churn benefit from the Any Phone Free Promotion.

**ANSWER:** Defendants admit that Mr. Therivel expressed certain expectations with respect to the Any Phone Free Promotion. Paragraph 89 is otherwise denied.

90.     Specifically, Defendant Therivel stated during an earnings call the Companies held to discuss their financial and operating results of the third quarter of 2022 ("3Q 2022 Earnings Call") that "[i]n the markets that we trialed them in previously, *it took us 6 months or so, 6, 7 months to see the improvements in voluntary churn.*"

**ANSWER:** Defendants admit that Paragraph 90 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 90.

91.     Later, during an earnings call the Companies held to discuss their financial and operating results of the fourth quarter of 2022, an analyst asked Defendant Therivel a question

premised on the Any Phone Free Promotion taking *six to nine months to benefit UScellular's churn*. Defendant Therivel responded, "yes[.]"

**ANSWER:** Defendants admit that Paragraph 91 purports to quote from statements made during UScellular's Q4 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 91.

92. Additionally, during an earnings call the Companies held to discuss their financial and operating results for the first quarter of 2023, Defendant Therivel again confirmed that Defendants knew all along, based on "the testing we've done in our regional trials," that "*it would take about 6 to 9 months to see the consumer churn benefit*."

**ANSWER:** Defendants admit that Paragraph 92 purports to quote from statements made during UScellular's Q1 2023 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 92.

I. **USM's Heavy Promotional Activity in 2022 Fails to Reduce Postpaid Churn or Improve Postpaid Customer Adds and Causes Massive Cost Increases, Including Losses on Equipment**

1. **UScellular's Heavy Promotion Fails to "Meaningfully Address" Postpaid Churn and Subscriber Challenges**

93. UScellular suffered significantly higher churn in 2022. As demonstrated in **Figure E** below, while postpaid churn rates in 1Q 2021 and 2Q 2021 were 1.12% and 1.11%, respectively, postpaid churn rates rose to 1.30% in the same quarters in 2022.

**Figure E**

UScellular's Total Postpaid Churn Rate

**ANSWER:** Defendants admit that UScellular's total postpaid churn rate was 1.12% in Q1 2021 and 1.11% in Q2 2021. Defendants further admit that UScellular's total postpaid churn rate was 1.3% in Q1 2022 and 1.3% in Q2 2022. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 and Figure E and, for that reason, deny those allegations.

94.     Similarly, UScellular's net postpaid customer additions were even worse than 2021 results. While net additions (losses) of postpaid subscribers were *negative* 6,000 in both 1Q 2021 and 2Q 2021, those losses had worsened to *negative* 44,000 and *negative* 40,000 in the same quarters in 2022. Despite UScellular's Any Phone Free Promotion beginning in June 2022, net additions were *negative* 31,000 in the third quarter of 2022, a massive decline from only *negative* 8,000 in the third quarter of 2021, representing a plummeting decline of 287%.

**ANSWER:** Defendants admit that UScellular's net postpaid connections losses were 44,000 in Q1 2022 and 6,000 in Q1 2021. Defendants admit that UScellular's postpaid connections losses were 40,000 in Q2 2022 and 6,000 in Q2 2021. Defendants further admit that UScellular's postpaid connections losses were 31,000 in Q3 2022 and 8,000 in Q3 2021. Defendants deny the remaining allegations in Paragraph 94.

95.     CW1 stated that, throughout 2Q22 and 3Q22, "according to the numbers" CW1 saw in the Business Review meetings, there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the

36

Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn. In every Business Review meeting it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn. CW1 confirmed that Defendant Therivel would ask at every quarterly Business Review meeting what strategies the Area VPs intended to employ to improve these metrics, particularly with respect to in-store traffic and "sales conversion." CW1 also stated that Defendant Therivel mentioned at every business review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve.

**ANSWER:** To the extent Paragraph 95 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 95.

96. CW1 further discussed difficulties with postpaid churn, in-store traffic, and poor sales with Defendant Therivel during one-on-one meetings. CW1 stated that such meetings occurred twice a year throughout CW1's employment. CW1 stated that going into 2022, Defendant Therivel had told CW1 that 2022 would be one of the company's "toughest years" and that "churn will be a problem for us" and that in another one-on-one meeting in September or October 2022 Defendant Therivel confirmed that, as Therivel had anticipated, 2022 had been "a tough year" with respect to revenue, postpaid churn, and gross and net postpaid customer additions.

**ANSWER:** To the extent Paragraph 96 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 96.

### 2. UScellular's Heavy Promotion in 2022 Causes Massive Cost Increases, Including Losses on Equipment, Destroying USM's Profitability

97. Not only did UScellular's heavy promotional activity in 2022 fail to "meaningfully address" the elevated churn rates and subscribership challenges or improve service revenues, it also devastated USM's profitability by massively increasing costs, such as losses on equipment.

**ANSWER:** Denied.

98. From 1Q 2022 through 1Q 2023, the Free Phone for Anyone Promotion drove UScellular's margins on equipment sold and losses on equipment sold—*which were already negative*—to historic lows. *See* **Figure F**, below.

37

**Figure F**



**ANSWER:** Defendants admit that UScellular's promotions activity increased losses on equipment in Q3 2022 compared to Q3 2021 and in Q4 2022 compared to Q4 2021. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98 and Figure F and, for that reason, deny those allegations.

99.     As a result of UScellular's heavy promotions, USM suffered increasing losses on equipment sales, peaking at a loss of $56 million in 4Q 2022. *See* **Figure G**, below.

**Figure G**

| UScellular's Equipment Sales Performance | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1Q 2021 | 2Q 2021 | 3Q 2021 | 4Q 2021 | 1Q 2022 | 2Q 2022 | 3Q 2022 |
| Equipment Sales | $ 252 | $ 240 | $ 228 | $ 286 | $ 223 | $ 244 | $ 302 |
| Cost of Equipment Sold | $ 275 | $ 258 | $ 252 | $ 332 | $ 257 | $ 275 | $ 354 |
| Loss on Equipment Sold | $ (23) | $ (18) | $ (24) | $ (46) | $ (34) | $ (31) | $ (52) |
| Margin on Equipment Sold | -9.1% | -7.5% | -10.5% | -16.1% | -15.2% | -12.7% | -17.2% |

**ANSWER:** Defendants admit that UScellular incurred losses on equipment sales in 2021 and 2022. Defendants further admit that UScellular's revenue from equipment sales was approximately $274 million in Q4 2022 and UScellular's cost of equipment sold was approximately $330 million in Q4 2022. Defendants lack knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 99 and Figure G and, for that reason, deny those allegations.

100. During the 3Q 2022 Earnings Call, Chambers discussed the high costs of the Free Phone for Anyone Promotion:

> ***Adjusted operating income declined 23%, driven by increases in loss in equipment*** and bad debt expense. As LT commented earlier, we ran our [Free Phone for Anyone Promotion] throughout the third quarter in a majority of our footprint. This promotion is designed to reward our existing customers, reduce churn and ultimately increase service revenue from increased customer volumes and ARPU over time. As previously discussed, in the near term, ***this promotion drove a high upgrade rate in the third quarter and was the primary driver of a $28 million increase in loss on equipment***. […] ***We expect loss on equipment and bad debts expense to remain at higher levels than the prior year in the fourth quarter as we plan to continue our [Free Phone for Anyone Promotion]***.

**ANSWER:** Defendants admit that Paragraph 100 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 100.

101. Thus, the Any Phone Free Promotion was devastating to the Companies' financial performance. Indeed, CW1 stated, sometime between October 1 and November 15 in 2022, there had been a "Directors forum" in which anyone at the Director-level and above met in Chicago. There, Defendant Therivel said that 2023 was "going to be a tough year" and explained the reason was that UScellular had invested so much in its 5G buildout but had not yet realized any return on it and "this was why the company's stock had been dropping."

**ANSWER:** To the extent Paragraph 101 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 101.

## V. DEFENDANTS MADE OR FAILED TO CORRECT MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

102. Throughout the Class Period, UScellular, TDS' core business, suffered increasing rates of churn, negative net additions of postpaid subscribers, and ballooning losses on equipment that were caused by high costs and footprint-wide promotions that were not designed to balance

subscriber growth with profitability. UScellular also experienced dismal in-store traffic that contributed to its subscriber challenges. To conceal these issues from investors, throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in the Companies' public statements. These material misstatements and omissions created the false impression that: (i) UScellular's regional-testing strategy allowed them to find the right balance between financial outcomes and subscriber outcomes; (ii) the timeline to realize anticipated postpaid churn outcomes from the Any Phone Free Promotion was materially shorter (i.e., "third quarter" and "second half" of 2022) than what Defendants knew from internal tests and trials (i.e., first quarter of 2023); and (iii) UScellular's in-store traffic was "nothing concerning."

**ANSWER:** Denied.

103. Plaintiff asserts that all statements set forth below that are bolded and underlined were materially false and/or misleading for the reasons set forth therein when made, or when the Individual Defendants knew such statements were false and failed to correct them. Non-bolded statements are included for context.

**ANSWER:** Paragraph 103 contains an assertion to which no answer is required. To the

extent a response is required, Defendants deny the allegations in Paragraph 103.

### A. Materially False and Misleading Statements on the May 6, 2022 1Q 2022 Earnings Call

104. The Class Period begins on May 6, 2022, when the Companies disclosed results for the first quarter ending March 31, 2022. That morning, before market open, TDS and UScellular executives, including Defendant Therivel, Defendant Chambers, Sereda, and Villacrez, jointly held a conference call with analysts (the "1Q 2022 Earnings Call"), a recording of which was contemporaneously uploaded to the Companies' Investor Relations webpages.

**ANSWER:** Defendants admit that Plaintiff's putative class period begins on May 6, 2022,

but deny that a class may be properly certified. Defendants admit that TDS and UScellular held an

earnings call on May 6, 2022. Defendants further admit that Laurent C. Therivel, Douglas W.

Chambers, Peter L. Sereda, and Vicki L. Villacrez spoke during the earnings call on May 6, 2022,

and that a link to a recording of the earnings call was added to the Companies' Investor Relations

webpages. Defendants deny the remaining allegations in Paragraph 104.

105. During prepared remarks, Defendant Therivel falsely and/or misleadingly claimed that, despite the significant loss on equipment sales and growing churn and subscribership problems, UScellular's promotional offers were financially disciplined and continuing to balance financial and subscriber outcomes. Specifically, Defendant Therivel stated, in pertinent part:

[A]lthough we've regionally tested aggressive offers in the marketplace, particularly from an acquisition standpoint, **we've also tried to be disciplined from a financial perspective**, and you see that in our strong adjusted operating income performance for the quarter….

So to summarize, I'm pleased with the financial outcomes in the first quarter. We continue to see positive momentum in growth investment areas of the business. Although subscriber results were challenged, particularly in postpaid, **we continue to try to strike the right balance between financial outcomes and subscriber outcomes.**

**ANSWER:** Defendants admit that Paragraph 105 purports to quote from statements made during an earnings call held on May 6, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 105.

106. During the question-and-answer portion of the call, in response to a question from a GAMCO Investors, Inc. analyst, Defendant Therivel assured investors that UScellular was pleased with the results that USM was seeing by trialing pricing and promotions through its regionalized approach, stating in relevant part:

**Sergey Dluzhevskiy**
*GAMCO Investors, Inc.*

My first question is on kind of your go-to-market strategy, LT. So obviously, you have a differentiated regional approach and you're trying different things in different markets. You have various clusters that are noncontiguous, so you can do that. Maybe if you could reflect, since you implemented this approach, what have been the results so far. What has worked on that front? What could be improved? And how do you make this approach more effective to maximize potential gross add and share gain opportunity going forward?

**Laurent C. Therivel**
*President, CEO & Director*

Sergey, **the regional approach you've talked to, I'm very pleased with**, and let me put it in context. It is not easy to pivot to create -- not only creating regions and putting the processes and the structures in place to use those regions as test beds but then executing on that. And over the last 12 months, we've executed over 40 discrete pricing and promotional and marketing mix trials across our regions.

One of the -- I hate doing this on calls like this but I can't give details on the specific plan we're going to be rolling out. But later in the quarter, we're going to be doing a relatively substantial move that was educated by the regional trial. Another example I'll give is the ARPU increase we've seen, so we've seen very attractive ARPU performance. I'd contrast that with some of our competitors.

And we've been able to do that because of lessons learned from individual or regional trials. We haven't had to require specific plan upsell to get the ARPU growth that we've seen. We've done it with sales. We've done it with strong execution, and we've done that because we're able to trial different approaches, as you mentioned, different go-to-market in our individual regions. And so very pleased with what we've seen so far and you can expect to see it continue.

At times, we will roll out national programs like the 1 I just talked about around the rate plan guarantee. But at the same time, we continue to test, whether it's individual device promotions. We vary our prepaid rate plans fairly substantively region to region to make sure we strike the right approach. We vary our distribution approach fairly significantly. So we're really trying to test and learn, and it's helped us optimize and will continue to help us optimize. **So I'm very pleased with how it's proceeding**.

> **ANSWER:** Defendants admit that Paragraph 106 purports to quote from statements made during an earnings call held on May 6, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 106.

107.  During the question-and-answer portion of the call, Defendant Therivel also doubled down and falsely and/or misleadingly represented that UScellular was curbing subscriber erosion while also being financially disciplined. Specifically, Defendant Therivel stated, in pertinent part:

**Richard Hamilton Prentiss**
*Raymond James & Associates, Inc.*

Makes sense. <u>And one more back to LT on the switcher pool but for postpaid. What are you seeing as far as the upgrade market out there?</u> I don't know if you reported what's your percent was, but how does that look like? It's trending. It used to be iconic devices would spike it a little bit, but that's really kind of [indiscernible]. So what was your upgrade number and where do you see it heading?....

**Laurent C. Therivel**
*President, CEO, & Director*

And so finally, we have -- we believe we have an opportunity to really dig in and invest now on the churn side. We tried over the last couple of quarters and **we think we've done a really good job of it, to strike a balance between subscriber results and financial results**. And when the industry has extremely aggressive upgrade offers out there, we've tried to make sure that we're driving positive ARPU and we're driving positive OCF, and we think we've done that.

**ANSWER:** Defendants admit that Paragraph 107 purports to quote from statements made during an earnings call held on May 6, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 107.

108. The above statements in ¶¶ 105-07, individually and when read in context with each other during the 1Q 2022 Earnings Call, were materially false, misleading, and/or lacked a reasonable basis when made. Defendants were not pleased with how the promotions were performing in the regional trials, so much so that Defendants were actively testing the Any Phone Free Promotion as a substitute. Moreover, Defendants' statements were materially false, misleading, and/or lacked a reasonable basis when made because they knew, through extensive trialing in April 2022, that the Any Phone Free Promotion was exorbitantly costly and would cause expenses to be highly imbalanced compared with subscriber outcomes. The material falsity of Defendants' statements is supported by ample evidence, given that:

(i) Defendants were imminently abandoning their regionalization strategy in favor of the one-size-fits-all Any Phone Free Promotion across UScellular's entire footprint;

(ii) When it was necessary to stay relevant in the market against competitors' promotions, UScellular would offer a comparable promotion, which internally were referred to as "table stakes," including by members of the Growth Marketing team, Therivel, and Chambers. Thus, given that each of the Big 3 introduced free phone promotions, Defendants did not implement the "Any Phone Free Promotion" because they were pleased with how it was performing or because the regional trials demonstrated that it was striking the right balance between subscriber and financial outcomes but rather, because the promotion was considered "table stakes" and was necessary to stay relevant in the market against competitors' promotions;

(iii) According to CW2, Defendants knew the range of potential costs, benefits, and what-if-scenarios, for every single promotion that UScellular offered. Thus, Defendants knew, and materially understated, the financial impact of the Any Phone Free Promotion, including with respect to anticipated losses on equipment sales;

43

(iv) According to CW2, Defendants knew the range of potential costs, benefits, and what-if-scenarios, for every single promotion that UScellular offered. Thus, Defendants knew, and materially overstated, the impact that the Any Phone Free Promotion would have on subscribership and churn outcomes;

(v) According to CW1, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates and conversion rates. Further, CW1 explained that every month, all AVPs would aggregate the KPI results from their Area for discussion at a monthly AVP meetings and that Jagher and/or Crisostomo would use the information to prepare for meetings with Defendant Therivel and others the following day;

(vi) CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the AVPs;

(vii) CW1 stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas;

(viii) "According to the numbers" CW1 saw in the Business Review meetings throughout the second and third quarters of 2022 there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn;

(ix) According to CW1, UScellular's quarterly postpaid churn quotas for the Southwest region were never met and were "always in the red" each quarter throughout CW's employment. CW1 stated that those details were included in reports disseminated in connection with the quarterly Business Review meetings;

(x) According to CW1, in every Business Review meeting, it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn, and Defendant Therivel would ask at every quarterly Business Review meeting what strategies the AVPs intended to employ to improve these metrics, particularly with respect to in-store traffic and "sales conversion";

(xi) According to CW1, Defendant Therivel mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve;

(xii) CW1 stated that, going into 2022, Defendant Therivel admitted during a one-on-one meeting that 2022 would be one of the company's "toughest years" and that

44

"churn will be a problem for us," which Therivel confirmed at another one-on-one meeting in September or October 2022; and

(xiii)    Defendants had not balanced expenses from promotional activities. Indeed, CW1 stated, sometime between October 1 and November 15 in 2022, there had been a "Directors forum" where Defendant Therivel admitted that 2023 was "going to be a tough year" and explained the reason was that UScellular had invested so much in its 5G buildout but had not yet realized any return on it and "this was why the company's stock had been dropping."

**ANSWER:** To the extent Paragraph 108 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 108.

109.    Additionally, Defendants were repeatedly asked by Morgan Stanley analyst Simon William Flannery to comment on in-store traffic trends. Initially, Defendant Therivel skirted a request to comment on "softening in store traffic." After receiving no response, Mr. Flannery repeated his question which Defendant Chambers categorically, and falsely, denied:

**Simon William Flannery**
Okay, great. <u>And store traffic any sense of the consumer slowing down</u> or the industry slowing down after a strong year?

**Douglas W. Chambers**
**<u>No. I mean, our store traffic is down slightly year-over-year but nothing concerning.</u>**

**ANSWER:** Defendants admit that Paragraph 109 purports to quote from statements made during an earnings call held on May 6, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 109.

110.    The above statements in ¶ 109 were materially false, misleading, and/or lacked a reasonable basis when made because Defendants were always "concern[ed]" about store traffic in 2022, and Defendant Chambers' false denial that store traffic was "slowing down" (after being pinned down by the analyst on a second attempt) and his reference to in-store traffic being "down slightly year-over-year" created a material misimpression of the Companies' business given that:

(i)     According to CW1, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals,

45

> including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates and conversion rates. Further, CW1 explained that every month, all AVPs would aggregate the KPI results from their Area for discussion at a monthly AVP meetings and that Jagher and/or Crisostomo would use the information to prepare for meetings with Defendant Therivel and others the following day;

> (ii) CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the AVPs;

> (iii) CW1 stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas;

> (iv) "According to the numbers" CW1 saw in the Business Review meetings throughout the second and third quarters of 2022 there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn;

> (v) According to CW1, in every Business Review meeting, it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn, and Defendant Therivel would ask at every quarterly Business Review meeting what strategies the AVPs intended to employ to improve these metrics, particularly with respect to in-store traffic and "sales conversion"; and

> (vi) According to CW1, Defendant Therivel mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve.

**ANSWER:** To the extent Paragraph 110 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 110.

111. Defendants' false representations, including misrepresentations that UScelluar was using a disciplined approach to promotions that was striking a balance between subscriber results and financial results, successfully misled investors. For instance, on May 9, 2022, Raymond James published a report, titled "Reiterate Strong Buy; Competition Dampens Nets Adds, but Value Remains Significant[,]" stating in relevant part:

> We reiterate our Strong Buy rating on USM and raise target price to $41, from $40, after the company reiterated 2022 guidance and reported slight beats on Service

Revenue and Adj. OIBDA despite very weak postpaid net adds (-44K vs. RJE - 10.0K and Street -5.2K), as the company took a more disciplined approach to promotions while competitor promotions remain aggressive. USM is focused on improving market share in under-indexed segments including prepaid and business/ government/IoT, while stabilizing postpaid market share, and we hope these efforts will begin to show up in net adds in the coming quarters. But ARPU is steadily improving, with postpaid ARPU up 4.3% y/y. As USM continues the 5G upgrade, the customer value proposition on its best-in-footprint network should further improve, and similar to TMUS and VZ, USM looks to further monetize the network through Fixed Wireless Broadband[.]

**ANSWER:** Defendants admit that Paragraph 111 purports to quote from statements made in a report published by Raymond James on May 9, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the report for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 111.

### B. Materially False and Misleading Statements on the August 5, 2022 2Q 2022 Earnings Call

112. On August 5, 2022, the Companies held the 2Q 2022 Earnings Call, a recording of which was contemporaneously uploaded to the Companies' Investor Relations webpages. Defendant Therivel, Defendant Chambers, and Villacrez participated in that call.

**ANSWER:** Defendants admit that TDS and UScellular held an earnings call on August 5, 2022. Defendants further admit that Laurent C. Therivel, Douglas W. Chambers, and Vicki L. Villacrez spoke during the earnings call on August 5, 2022, and that a link to a recording of the call was added to the Companies' Investor Relations webpages. Defendants deny the remaining allegations in Paragraph 112.

113. During the 2Q 2022 Earnings Call, in prepared remarks, Defendant Therivel reassured investors that UScellular's Any Phone Free Promotion, was meaningfully addressing UScellular's churn and would "drive positive subscriber results" over the second half of the year while allowing USM to simultaneously maintain "expense discipline." Defendant Therivel predicated Defendants' "second half of the year" timeline upon on the April 2022 "trials that we ran[.]" Specifically, Defendant Therivel stated, in pertinent part:

As I detailed during that first quarter earnings call, we identified some specific areas of subscriber pressure where we saw opportunities to improve. And that was

noticeably churn and add-a-line. And this led to a series of regional tests and trials during the second quarter. And as a result of those trials, we launched our new promotion in late June, and that was any phone free for anyone and that's for new and existing customers. Now because of the timing of when we launched this promotion, it had little impact on second quarter subscriber results. But we believe this will meaningfully address a number of the subscriber challenges that we identified earlier in the year. **And while it's early, so far, we're pleased with the results**. We've seen significant increase in add-a-line and upgrade activity, and we expect that upgrade activity to result in improved churn downstream.

**And thanks to the trials that we ran, we're able to structure this offer in a way that we believe will drive positive subscriber results in the second half of the year, but with expense pressure that we believe is manageable. And that offer structure, coupled with our ongoing expense discipline, enables us to maintain our profitability outlook for the year even with those aggressive promotions**. In fact, we're going to be maintaining all of our guidance, which Doug will discuss further later in the presentation.

**ANSWER:** Defendants admit that Paragraph 113 purports to quote from statements made during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 113.

114. Similarly, during the question-and-answer portion of the 2Q 2022 Earnings Call, the very first question pressed for further detail regarding postpaid subscribership and the "second half of the year" timeline that Defendant Therivel had articulated earlier on the call. In response, Defendant Therivel misleadingly touted "a path to positive consumer postpaid net adds" and "steady churn improvement" "in the third quarter" and falsely stated that UScellular was realizing "really good" subscribership and churn results:

**Richard Hamilton Prentiss**
*Raymond James & Associates, Inc., Research Division*

[…] Help us understand, is there the ability to get back to positive postpaid phone adds? And what does that take? Does it take larger switcher pool? Does it take lowering churn? Does it take more aggressive local offers. Just help us understand the path back to positive postpaid phone adds? […]

**Laurent C. Therivel**
*President, CEO & Director*

Rick. I guess it's cheating to just say yes, yes, yes and yes and move on to the next question. So I'll try and give you a bit more color. But in general, it's everything you list. **Do I see a price to -- do I see a path to positive consumer postpaid net adds? Yes, I do.** What is it going to take? I think the biggest step that's going to take in the near term is churn improvement. When I look at voluntary churn, that's where we saw the majority of our pressure in the first quarter. And we -- the offer that we've launched here is specifically designed to address that. One of the things we saw as we -- over the past couple of years is we've seen a larger and larger percentage of customers that are out of contract. And out-of-contract customers churn at a substantially higher rate than in-contract customers. And so the goal is how do we get customers back into contract. And that was one way is with the offer that we put forward. **We think it specifically addressed that issue, and we're seeing really good results. So we're seeing upgrades up substantively. We're seeing the ratio of voluntary defections to gross adds improve substantively.** […] **What we expect to see is steady churn improvement throughout the second half of the year. So we should start to see some benefit from this in the third quarter, and we'll see more benefit, hopefully, in the fourth quarter.**

**ANSWER:** Defendants admit that Paragraph 114 purports to quote from statements made during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 114.

115. Defendant Therivel, in response to another analyst during the 2Q 2022 Earnings Call, misleadingly represented that UScellular's promotions were improving the ratio of gross adds to voluntary defects, stating in relevant part:

**Simon William Flannery**
*Morgan Stanley, Research Division*

LT, could you just talk a little bit more about the new promotions. <u>It sounds like they're having a good impact.</u> Help us understand what the accounting is going to look like for those promotions? How much of the cost will you need to take upfront? And how long will you amortize most of it over? And then on the partnerships, just coming back to that, it did look like the equity and earnings dropped about 21% year-over-year. I don't know if there's any kind of one-timers driving that? Or has there been any change that we -- is likely to go forward from here?

**Laurent C. Therivel**
*President, CEO & Director*

49

Yes, Simon, I think in terms of the revenue opportunity of those promotions, right? I talked a little bit earlier about the increased upgrade momentum that we're seeing, the increased add-a-line momentum[.] One metric we track fairly closely is **the ratio of gross adds to voluntary defects. We're seeing improvement there.**

**ANSWER:** Defendants admit that Paragraph 115 purports to quote from statements made during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 115.

116. The above statements in ¶¶ 113-15, individually and when read in context with other false statements during the 2Q 2022 Earnings Call, were materially false, misleading, and/or lacked a reasonable basis when made because Defendant Therivel's purported timeline for "subscribership results" in "the second half of the year" was admittedly untrue, and because Defendants were not seeing substantive improvements to the rate of voluntary churn, and were not pleased with their results or ability to structure promotions in a way that would drive positive subscribers results while managing expense pressure and maintaining profitability. The material falsity of Defendants' statements is supported by ample evidence, given that:

(i) On November 4, 2022, during the 3Q 2022 Earnings Call, Defendant Therivel admitted that Defendants previously knew from the underlying testing in 2Q 2022 that the "Any Phone Free Promotion" would not meaningfully address churn for at least six to seven months. Defendant Therivel would confirm that this timeline was in excess of six months again during earnings calls in February and May 2023;

(ii) When it was necessary to stay relevant in the market against competitors' promotions, UScellular would offer a comparable promotion, which internally were referred to as "table stakes," including by members of the Growth Marketing team, Therivel, and Chambers. Thus, given that each of the Big 3 introduced free phone promotions, Defendants did not implement the "Any Phone Free Promotion" because they were pleased with how it was performing or because the regional trials demonstrated that it was striking the right balance between subscriber and financial outcomes but rather, because the promotion was considered "table stakes" and was necessary to stay relevant in the market against competitors' promotions;

(iii) According to CW2, Defendants knew the range of potential costs, benefits, and what-if-scenarios, for every single promotion that UScellular offered. Thus, Defendants knew, and materially understated, the financial impact of the Any Phone Free Promotion, including with respect to anticipated losses on equipment sales;

(iv)     According to CW2, Defendants knew the range of potential costs, benefits, and what-if-scenarios, for every single promotion that UScellular offered. Thus, Defendants knew, and materially overstated, the impact that the Any Phone Free Promotion would have on subscribership and churn outcomes;

(v)      According to CW1, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates and conversion rates. Further, CW1 explained that every month, all AVPs would aggregate the KPI results from their Area for discussion at a monthly AVP meetings and that Jagher and/or Crisostomo would use the information to prepare for meetings with Defendant Therivel and others the following day;

(vi)     CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of AVPs;

(vii)    CW1 stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas. Thus, poor in-store traffic prevented UScellular from "driv[ing] positive subscriber results";

(viii)   "According to the numbers" CW1 saw in the Business Review meetings throughout the second and third quarters of 2022 there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn;

(ix)     According to CW1, UScellular's quarterly postpaid churn quotas for the Southwest region were never met and were "always in the red" each quarter throughout CW's employment. CW1 stated that those details were included in reports disseminated in connection with the quarterly Business Review meetings;

(x)      According to CW1, in every Business Review meeting, it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn, and Defendant Therivel would ask at every quarterly Business Review meeting what strategies the AVPs intended to employ to improve these metrics, particularly with respect to in-store traffic and "sales conversion";

(xi)     According to CW1, Defendant Therivel mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve;

(xiv)    CW1 stated that, going into 2022, Defendant Therivel admitted during a one-on-one meeting that 2022 would be one of the company's "toughest years" and that

51

"churn will be a problem for us," which Therivel confirmed at another one-on-one meeting in September or October 2022; and

(xv)     Defendants had not balanced expenses from promotional activities. Indeed, CW1 stated, sometime between October 1 and November 15 in 2022, there had been a "Directors forum" where Defendant Therivel admitted that 2023 was "going to be a tough year" and explained the reason was that UScellular had invested so much in its 5G buildout but had not yet realized any return on it and "this was why the company's stock had been dropping."

**ANSWER:** Defendants admit that Paragraph 116 purports to characterize statements made during an earnings call held on November 4, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcripts of the call for their complete and accurate contents. To the extent Paragraph 116 relies on the statements of CW1 and CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 116.

117.     During the 2Q 2022 Earnings Call Defendant Therivel also stated:

**We also continue to maintain expense discipline across the organization, which has allowed us to launch some aggressive promotions and make investments in key growth areas of the business while still maintaining our operating cash flow guidance**. I mentioned investing in growth areas and halfway through the year, we're seeing positive momentum in a number of those areas.

**ANSWER:** Defendants admit that Paragraph 117 purports to quote from statements made during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 117.

118.     The above statements in ¶ 117, individually and when read in context with other false statements during the 2Q 2022 Earnings Call, were materially false, misleading, and/or lacked a reasonable basis when made because Defendants were not maintaining expense discipline

52

while launching aggressive promotions, which, combined with undisclosed churn and subscribership problems, decimated operating cash flow. The material falsity of Defendants' statements is supported by ample evidence, given that:

(i)     When it was necessary to stay relevant in the market against competitors' promotions, UScellular would offer a comparable promotion, which internally were referred to as "table stakes," including by members of the Growth Marketing team, Therivel, and Chambers. Thus, given that each of the Big 3 introduced free phone promotions, Defendants did not implement the "Any Phone Free Promotion" because they were pleased with how it was performing or because the regional trials demonstrated that it was striking the right balance between subscriber and financial outcomes but rather, because the promotion was considered "table stakes" and was necessary to stay relevant in the market against competitors' promotions;

(ii)    According to CW2, Defendants knew the range of potential costs, benefits, and what-if-scenarios, for every single promotion that UScellular offered. Thus, Defendants knew, and materially understated, the financial impact of the Any Phone Free Promotion, including with respect to anticipated losses on equipment sales;

(iii)   According to CW2, Defendants knew the range of potential costs, benefits, and what-if-scenarios, for every single promotion that UScellular offered. Thus, Defendants knew, and materially overstated, the impact that the Any Phone Free Promotion would have on subscribership and churn outcomes;

(iv)   According to CW1, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates and conversion rates. Further, CW1 explained that every month, all AVPs would aggregate the KPI results from their Area for discussion at a monthly AVP meetings and that Jagher and/or Crisostomo would use the information to prepare for meetings with Defendant Therivel and others the following day;

(v)    CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the AVPs. Thus, these challenges prevented UScellular from "maintaining our operating cash flow guidance";

(vi)   CW1 stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas, Thus, poor in-store traffic prevented UScellular from "maintaining our operating cash flow guidance";

(vii)  "According to the numbers" CW1 saw in the Business Review meetings throughout the second and third quarters of 2022 there had not been a single one of the six areas

53

that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn;

(viii)    According to CW1, UScellular's quarterly postpaid churn quotas for the Southwest region were never met and were "always in the red" each quarter throughout CW's employment. CW1 stated that those details were included in reports disseminated in connection with the quarterly Business Review meetings;

(ix)    According to CW1, in every Business Review meeting, it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn, and Defendant Therivel would ask at every quarterly Business Review meeting what strategies the AVPs intended to employ to improve these metrics, particularly with respect to in-store traffic and "sales conversion";

(x)    According to CW1, Defendant Therivel mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve;

(xi)    CW1 stated that, going into 2022, Defendant Therivel admitted during a one-on-one meeting that 2022 would be one of the company's "toughest years" and that "churn will be a problem for us," which Therivel confirmed at another one-on-one meeting in September or October 2022; and

(xii)    Defendants had not balanced expenses from promotional activities. Indeed, CW1 stated, sometime between October 1 and November 15 in 2022, there had been a "Directors forum" where Defendant Therivel admitted that 2023 was "going to be a tough year" and explained the reason was that UScellular had invested so much in its 5G buildout but had not yet realized any return on it and "this was why the company's stock had been dropping."

**ANSWER:** To the extent Paragraph 118 relies on the statements of CW1 and CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 118.

119.    Additionally, Defendant Therivel falsely touted UScellular's in-store traffic performance:

Finally, as you know, I mean, we don't operate in a vacuum. It is an aggressive competitive environment out there. But I see some opportunity. AT&T and Verizon both raised prices in the second quarter. We committed to our customers, we would not, and that is meaningful to them. **And so we're seeing a lot of customers come**

**into the store** and specifically referenced that price guarantee as a reason for coming in. And by the way, that's before we even put television advertising behind it, which we didn't -- really didn't launch until July. So a lot of the momentum is positive. I'm optimistic that we're heading in the right direction. But what will it take to get to positive.

**ANSWER:** Defendants admit that Paragraph 119 purports to quote from statements made during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 119.

120. The above statements in ¶ 119, individually and when read in context with other false statements during the 2Q 2022 Earnings Call, were materially false, misleading, and/or lacked a reasonable basis when made because UScellular's in-store traffic had been disastrous for years and was a material headwind to improvements in churn and subscribership. The material falsity of Defendants' statements is supported by ample evidence, given that:

(i) According to CW1, throughout CW1's tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates and conversion rates. Further, CW1 explained that every month, all AVPs would aggregate the KPI results from their Area for discussion at a monthly AVP meetings and that Jagher and/or Crisostomo would use the information to prepare for meetings with Defendant Therivel and others the following day;

(ii) CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the AVPs;

(iii) CW1 stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas;

(iv) "According to the numbers" CW1 saw in the Business Review meetings throughout the second and third quarters of 2022 there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn;

55

(v)     According to CW1, in every Business Review meeting, it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn, and Defendant Therivel would ask at every quarterly Business Review meeting what strategies the Area VPs intended to employ to improve these metrics, particularly with respect to in-store traffic and "sales conversion"; and

(vi)    According to CW1, Defendant Therivel mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve.

**ANSWER:** To the extent Paragraph 120 relies on the statements of CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 120.

121.    Defendants' representations that UScellular's promotions were structured such that they were driving postpaid subscribers while still effectively managing costs quelled investors' concerns. For instance, on August 10, 2022, Wells Fargo Equity Research published a report, titled "USM: Getting Creative with Promotions to Spark Subscribers Growth amid Heightened Competitive Environment; Q2'22 Mixed[,]" stating in relevant part:

> USM reported mixed Q2'22 results as competition in the wireless market shows no signs of slowing down. The company reported more net postpay customer losses as a result and has introduced offers in the market to try and reverse that trend, including a price lock through at least YE2023 and free devices for new and existing customers. USM sees some positive indicators in terms of store traffic and customer activity that suggest an improving subscriber outlook in 2H'22, although the competitive environment between the Big 3 carriers (and cable) will remain a headwind. ARPU growth continues to be a strong point for USM, with postpay ARPU +4.9% y/y as 34% of handset customers are on the highest 2 unlimited data plans. Despite the elevated level of churn, USM reiterated its 2022 guide, which includes stable service revenue y/y. We continue to believe the stock present compelling value at ~5x EBITDA and reiterate our Overweight rating on the shares.

**ANSWER:** Defendants admit that Paragraph 121 purports to quote from statements made in a report published by Wells Fargo Equity Research on August 10, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the report for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 121.

## VI.    DEFENDANTS REVEALED THE TRUTH IN A SET OF DISCLOSURES MADE ON NOVEMBER 3, 2022 AND NOVEMBER 4, 2022

122.    On November 3, 2022, Defendants announced TDS' 3Q 2022 financial results in a press release (the "3Q 2022 Press Release"), issued after market close, via PR Newswire. The 3Q 2022 Press Release was concurrently filed with the SEC on Form 8-K.

**ANSWER:** Defendants admit that TDS issued a press release that reported its financial results for the third quarter of 2022 on November 3, 2022. Defendants admit that TDS filed Form 8-K with the SEC on November 3, 2022. Defendants deny the remaining allegations in Paragraph 122.

123.    In the 3Q 2022 Press Release, Defendants revealed that net income attributable to TDS' common shareholders and related diluted earnings had declined to *negative* $25 million and n*egative* $0.22, respectively, down from positive $28 million and positive $0.24 in the same period a year earlier.

**ANSWER:** Defendants admit that Paragraph 123 purports to characterize the contents of the Q3 2022 press release, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the press release for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 123.

124.    Defendants also revealed in the 3Q 2022 Press Release that estimates for USM's Adjusted Operating Income Before Depreciation and Amortization ("OIBDA") and Adjusted EBITDA were being revised downward to ranges of $750-825 million and $925-1,000 million, respectively. USM's previous estimates for Adjusted OIBDA and Adjusted EBITDA had included high-end estimates of $900 and $1,075, respectively.

**ANSWER:** Defendants admit that Paragraph 124 purports to characterize the contents of the Q3 2022 press release, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the press release for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 124.

125.    On November 4, 2022, the Companies also published a joint slide presentation on their Investor Relations webpages (the "3Q 2022 Earnings Presentation") to inform discussion during the 3Q 2022 Earnings Call. Defendant Therivel, Defendant Chambers, and Villacrez participated in the 3Q 2022 Earnings Call, and a recording of the 3Q 2022 Earnings Call was contemporaneously uploaded to the Companies' Investor Relations webpages.

**ANSWER:** Defendants admit that TDS and UScellular held a joint earnings call on November 4, 2022. Defendants admit that Vicki L. Villacrez, Laurent C. Therivel, and Douglas W. Chambers spoke during the earnings call on November 4, 2022, that the Companies also published a joint slide presentation, and that a link to a recording of the call was added to the Companies' Investor Relations webpages. Defendants deny the remaining allegations in Paragraph 125.

126.    The 3Q 2022 Earnings Call and 3Q 2022 Earnings Presentation corrected the misimpression from Defendants' previous statements—including Defendant Therivel's assertions that the Any Phone Free Promotion's regional testing "results" demonstrated that the promotion would address postpaid attrition challenges while balancing costs, and that UScellular would see steady churn improvement in the "third quarter" and "throughout the second half of the year." Rather, Defendants' disclosures evidenced that, in reality, UScellular's churn rates had not been improving and that USM's churn rates and promotional costs in 3Q 2022 had increased significantly.

**ANSWER:** Denied.

127.    The 3Q 2022 Earnings Presentation included the following slides (**Figures H-I**) which demonstrated that despite the massive spending on promotions, UScellular experienced a net loss of 31,000 postpaid subscribers, due in significant part to increases in churn rates.

**Figure H** (demonstrating a net loss of 31,00 postpaid subcribers in 3Q 2022)



**Figure I** (demonstrating increases in handset and total postpaid churn in 3Q 2022)



**ANSWER:** Defendants admit that Paragraph 127, Figure H, and Figure I purport to quote from the Q3 2022 earnings presentation, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements.

Defendants respectfully refer to the presentation for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 127.

128. The 3Q 2022 Earnings Presentation starkly contrasted with Defendants' prior statements that they were pleased with the early results from the Free Phone for Anyone Promotion.

**ANSWER:** Denied.

129. On the 3Q 2022 Earnings Call, Defendants revealed that UScellular had "tightened guidance ranges" going into the fourth quarter of 2022. Chambers elaborated:

> However, we are lowering the top end of the range for service revenues, adjusted operating income and adjusted EBITDA. All of these ranges are negatively impacted by our subscriber growth challenges in 2022.

**ANSWER:** Defendants admit that Paragraph 129 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 129.

130. Additionally, the 3Q 2022 Earnings Call revealed that, contrary to Defendants' earlier claims that UScellular had been able to maintain expense discipline and operating cash flow guidance while launching aggressive promotions and investing in key growth areas, UScellular's promotions resulted in a $28 million increase in loss of equipment. Defendant Chambers also revealed that UScellular's promotional expenses were a factor in USM's "tightened guidance ranges":

> Further, the adjusted operating income and adjusted EBITDA ranges are also impacted by the promotional investment we are making in our new and existing promotion [i.e., Free Phone for Anyone.]

**ANSWER:** Defendants admit that Paragraph 130 purports to quote from statements made during UScellular's Q3 2022 earnings call but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 130.

60

131. Defendants' disclosure during the 3Q 2022 Earnings Call that the Companies experienced "increased loss on equipment" arising from such aggressive promotions that completely overshadowed the benefits of TDS' cost optimization program also partially corrected their earlier misstatements assuring investors that "expense pressure" was "manageable" and that UScellular's "offer structure" was driving positive subscribership results while simultaneously managing costs from "aggressive promotions" through "ongoing expense discipline."

**ANSWER:** Denied.

132. During the 3Q 2022 Earnings Call, Defendants also revealed that in spite of the massive and aggressive promotions being offered, USM was still experiencing "postpaid subscriber growth challenges" and "an increase in [postpaid handset] churn[.]"

**ANSWER:** Defendants admit that Paragraph 132 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 132.

133. Defendants also confirmed that UScellular's promotions could not, for example, "balance … profitability and subscriber growth." Indeed, the massive, negative financial impact of UScellular's heavy, broad-based promotion—any phone free for anyone, new and existing customers, in a majority of UScellular's regions—betrayed Defendants' earlier assurances that UScellular was offering promotions capable of a balancing customer growth and profitability.

**ANSWER:** Defendants admit that Paragraph 133 purports to characterize and quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 133.

134. For example, in prepared remarks, Defendant Therivel acknowledged that the promotions were not yielding positive results to date, stating: "you can see our all-in postpaid subscriber results are still challenged." Likewise, Defendant Chambers stated:

> Voluntary churn increased as a result of increased switching activity and aggressive industry-wide competition….Total postpaid churn, combining handsets and connected devices, increased due to higher handset churn and certain business and government customers disconnecting connected devices, many of which were

originally activated during the pandemic in conjunction with government and agency funding that has subsequently ended….

**ANSWER:** Defendants admit that Paragraph 134 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 134.

135.    During the 3Q 2022 Earnings Call, Sergey Dluzhevskiy of GAMCO Investors, Inc. asked Therivel what was needed to increase the effectiveness of the promotions that had been trialed and "rolled out to a wider base in the third quarter." In response, Defendant Therivel revealed, contrary to his earlier representation that the Free Phone for Anyone Promotion was expected to meaningfully address churn rates and subscribership challenges in 2022, that the trials had shown that it would take **6 or 7 months**—i.e., first quarter 2023—to yield results:

> And I won't rehash since Rick already gave me a hard time about requoting things from my script, I won't do it again. But you get a sense of what we're seeing from an upgrade perspective and an ad align perspective ***in the areas where we're running our existing same as new promotion. The key dynamic is, are those promotions going to drive the desired churn -- the voluntary churn performance that we need them to? In the markets that we trialed them in previously, it took us 6 months or so, 6, 7 months to see the improvements in voluntary churn***. And so if you forecast that forward, that helps explain why we are cautiously optimistic that we're going to see that voluntary churn trend turn in the fourth quarter and into early next year. But you don't know.

**ANSWER:** Defendants admit that Paragraph 135 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 135.

136.    Defendant Therivel's purportedly reference to anticipated churn improvement late in the fourth quarter and into "early next year" further evidences the Defendants knew, but concealed from investors, that, based on the regional trials, the timeline for churn improvement was actually six to nine months.

**ANSWER:** Denied.

137.    Defendant Chambers also explained the inordinate expense that UScellular's promotions incurred, stating, in relevant part:

Adjusted operating income declined 23%, ***driven by increases in loss in equipment and bad debt expense. As LT commented earlier, we ran our new and existing promotion throughout the third quarter in a majority of our footprint.*** This promotion is designed to reward our existing customers, reduce churn and ultimately increase service revenue from increased customer volumes and ARPU over time. As previously discussed, in the near term, ***this promotion*** drove a high upgrade rate in the third quarter and ***was the primary driver of a $28 million increase in loss on equipment***. Further, bad debts expense increased $29 million as our involuntary churn rate has returned to prepandemic levels and the average write-off has increased ***as a result of customers selecting higher-priced devices, partially attributable to promotional incentives.*** […]

***We expect loss on equipment and bad debt expense to remain at higher levels than the prior year in the fourth quarter as we plan to continue our new and existing promotion,*** and we expect involuntary churn and bad debt expense to continue to follow prepandemic trends. […]

Our guidance remains within the original ranges that we have provided all year. However, we are lowering the top end of the range for service revenues, adjusted operating income and adjusted EBITDA. ***All of these ranges are negatively impacted by our subscriber growth challenges in 2022. Further, the adjusted operating income and adjusted EBITDA ranges are also impacted by the promotional investment we are making in our new and existing promotion and relatively higher levels of bad debt expense.***

**ANSWER:** Defendants admit that Paragraph 137 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 137.

138.    On this news, TDS' common stock price declined 25.89%, declining from a closing price of $16.57 per share on November 3, 2022 to a closing price of $12.28 per share on November 4, 2022, on unusually heavy trading volume.

**ANSWER:** Defendants admit that TDS' common stock closed at $16.57 per share on November 3, 2022 and $12.28 per share on November 4, 2022. Defendants further admit that

certain public sources report that trading volume for TDS' common stock was approximately 4,321,900 on November 4, 2022. Defendants deny the remaining allegations in Paragraph 138.

139. The price of TDS' preferred stock, TDSPrU and TDSPrV, also declined on this news on unusually heavy trading volume. The stock price of TDSPrV, which closed at $17.20 per preferred share on November 3, 2022, fell to $16.24 per preferred share at market close on November 4, 2022, a decline of 5.6%. The stock price of TDSPrU, which closed at $19.30 per preferred share on November 3, 2022, fell to $18.29 per preferred share at market close on November 4, 2022, a decline of 5.2%.

**ANSWER:** Defendants admit that TDS Preferred Series VV closed at $17.20 per share on November 3, 2022 and $16.24 per share on November 4, 2022. Defendants admit that certain public sources report that trading volume for TDS Preferred Series VV was approximately 130,581 on November 4, 2022. Defendants admit that TDS Preferred Series UU closed at $19.30 per share on November 3, 2022 and $18.29 per share on November 4, 2022. Defendants further admit that certain public sources report that trading volume for TDS Preferred Series UU was approximately 90,450 on November 4, 2022. Defendants deny the remaining allegations in Paragraph 139.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

140. Numerous facts alleged herein support a strong inference that Defendants knew or recklessly disregarded that the statements set forth in Section V above were materially false and misleading when made. The below facts further solidify a strong, cogent, and compelling inference of scienter as to the Individual Defendants, which is properly imputed to the Companies.

**ANSWER:** Denied.

**A.    Defendants Knew From Meetings and Access to Internal Reporting that UScellular's Promotions Were Not Balancing Subscriber Growth with Profitability, the UScellular's Key Metrics Were Failing Across the Board, and that UScellular's Cash Position Was Waning**

**Information Shared at "Executive Team" Meetings**

141. On September 9, 2021, Defendant Therivel was interviewed on the On the Horizon with Kristin Deutmeyer podcast hosted by Kristin Deutmeyer. During the podcast, Defendant Therivel admitted that he and the executive team, which included Chambers, Executive Vice President and Chief Technology Officer Michael Irizarry, Ph.D., Senior Vice President of Enterprise Sales and Operations Kimberly Green-Kerr, Jagher, among others, met in-person multiple times each month to discuss UScellular's operations. For example, Defendant Therivel

admitted that he and UScellular's executive team, which included Defendant Chambers, met every Monday for staff meetings. Defendant Therivel also stated during the podcast that he meets with UScellular's executive team for two days in the middle of each month to do a "deep, deep dive on what's going on in the business."

**ANSWER:** Defendants admit that Paragraph 141 and its corresponding footnote purport to characterize and quote from statements made during an interview published on September 9, 2021, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the recording of the interview for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 141 and its corresponding footnote.

**Information Shared During the Promotion Approval Process**

142.    According to CW2, UScellular had a promotion approval process wherein the Growth Marketing department provided Defendants Therivel and Chambers, among others, with cost and benefit analysis reports and "what-if-scenarios" for any proposed promotion.

**ANSWER:** To the extent Paragraph 142 relies on statements made by CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 142.

143.    Though the cost and benefit analysis varied depending on the objective of the given promotion, a key objective was to realize a substantial revenue benefit to justify the cost of a given "change" (i.e., promotion). Similarly, the "what-if-scenarios" evaluated what the cost of the promotion was and what anticipated benefit would be necessary to believe the promotion would make sense for UScellular's business, and included the forecasted amount of spending for the promotion and by how much the promotional budget would be exceeded. For example, according to CW2, Defendants Therivel and Chambers knew that UScellular would need to increase the total promotion budget of $175 to over $400 million to implement promotions akin to AT&T's nationwide upgrade promotion.

**ANSWER:** To the extent Paragraph 143 relies on statements made by CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and

65

for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 143.

144.    CW2 stated that the promotional approval process occurred in meeting formats around 5 or 6 times a year, in which, inter alia, CW2, Defendant Therivel and Defendant Chambers participated to plan the promotions. Moreover, though Therivel, Chambers, the COO, and "relevant marketing executives" were involved in deciding whether to approve a promotion, CW2 explained that Defendant Therivel was the "ultimate determinator."

ANSWER: To the extent Paragraph 144 relies on statements made by CW2, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 144.

### Information Shared at AVP Meetings

145.    CW1 stated that within the Southwest Region were seventeen "business entities" representing different "sub-markets" which reported to CW1 on all manner of Key Performance Indicators (KPI)s, including: revenue, postpaid and prepaid churn, gross and net customer adds (both postpaid and prepaid), the number of postpaid handsets had been sold in a month; the number of customers who visited a store or agency; conversion rates (representing the rates that interactions with customers were converted into sales); and numerous others.

ANSWER: To the extent Paragraph 145 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 145.

146.    CW1 explained that every month, CW1 and all other AVPs would aggregate the KPI results from their Region for discussion at monthly AVP meetings with Jagher prior to June 2022, and with Crisostomo after June 2022. CW1 stated that, depending on the period of time, either Jagher or Crisostomo would use the information presented in the monthly AVP meeting to prepare for a meeting with Defendant Therivel, amongst others, that would take place the day following the monthly AVP meeting.

ANSWER: To the extent Paragraph 146 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and

66

for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 146.

147. As such, throughout the Class Period, Defendant Therivel was informed of key metrics for every one of UScellular's sub-markets including churn, revenue, inventories, and numbers of handsets sold on a monthly basis.

**ANSWER:** To the extent Paragraph 147 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 147.

### Information Shared at Business Review Meetings

148. CW1 explained that each quarter, CW1 and all other AVPs would aggregate the KPI results from their Region to report that progress to Defendant Therivel for use during a quarterly Business Review meeting. Occasionally, Defendant Therivel would cancel the meeting, however CW1 recalled participating with all of the other AVPs and Defendant Therivel in at least one such quarterly Business Review meeting during the period between May 2022 and November 2022, which was in June 2022 to the best of CW1's recollection. In connection with the quarterly Business Review meetings, CW1 and other AVPs would circulate reports to all of the meeting participants, including Defendant Therivel. CW1 stated that reports presented KPI data in terms of how actual performance compared to what had been budgeted (i.e., projected) for the period, as well as comparisons to prior periods. CW1 stated that the results in these reports from each Area, which were broken down by month and aggregated for the quarter, were reviewed during the quarterly Business Review meetings with Therivel.

**ANSWER:** To the extent Paragraph 148 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 148.

149. CW1 stated that, throughout 2Q22 and 3Q22, "according to the numbers" CW1 saw in the Business Review meetings, there had not been a single one of the six areas that had positive store traffic or met their postpaid churn quotas. CW1 stated that it was discussed at the Business Review meetings and described in the accompanying reports that poor instore traffic was a contributing factor to increasing churn. In every Business Review meeting it would be asked and discussed why UScellular's promotions and other efforts were not working to improve in-store traffic and postpaid churn. CW1 further confirmed that Defendant Therivel would ask at every quarterly Business Review meeting what strategies the Area VPs intended to employ to improve

these metrics, particularly with respect to in-store traffic and "sales conversion." CW1 also stated that Defendant Therivel mentioned at every Business Review meeting throughout CW1's tenure that in-store traffic and margins were below target and needed to improve.

**ANSWER:** To the extent Paragraph 149 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 149.

150.    Throughout CW1's entire tenure, all six AVPs repeatedly reported at every quarterly Business Review meeting that it was a "struggle" to meet KPI goals, including goals related to postpaid churn, gross and net postpaid customer adds, in-store traffic rates, and conversion rates. CW1 explained that, during CW1's tenure, store traffic and maintaining existing customers (i.e., preventing churn) were the biggest challenges for all six of the AVPs.

**ANSWER:** To the extent Paragraph 150 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 150.

151.    CW1 further stated that poor in-store traffic hampered performance across KPIs during CW1's tenure. According to CW1, for stores that UScellular operated in 2021, there had not been a single positive increase to in-store traffic in any month in 2022 in any of the six areas, which CW1 knew from CW1's participation in the quarterly Business Review meetings.

**ANSWER:** To the extent Paragraph 151 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 151.

**Information Shared a Director Forums**

152.    CW1 also reported that UScellular held Directors Forums twice a year, in May and in early November. CW1 stated that, during a Directors Forum held in May 2022, Defendant Therivel discussed various promotions that UScellular was running, including the Any Phone Free Promotion that UScellular tested and trialed in April 2022.

**ANSWER:** To the extent Paragraph 152 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 152.

**Information Shared at Meetings with Defendant Chambers**

153. Additionally, CW1 regularly participated in separate monthly meetings throughout the Class Period with Defendant Chambers. CW1 recalled a mandatory meeting with CFO Douglas Chambers every month to discuss anything that might cost money. For instance, CW1 provided a hypothetical example that Defendant Chambers may reject requests such as an approval to sign a new store lease or renew a store lease, forcing UScellular's AVPs to search for other store locations that cost less money.

**ANSWER:** To the extent Paragraph 153 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 153.

154. Defendant Chambers' hands on involvement with managing UScellular's costs supports a strong inference of scienter.

**ANSWER:** Denied.

**Information Shared at One-On-One Meetings with Defendant Therivel**

155. CW1 further discussed difficulties with postpaid churn, in-store traffic, and poor sales with Defendant Therivel during one-on-one meetings. CW1 stated that such meetings occurred twice a year throughout CW1's employment. CW1 stated that going into 2022, Therivel had told CW1 that 2022 would be one of the company's "toughest years" and that "churn will be a problem for us" and that in another one-on-one meeting in September or October 2022 Defendant Therivel confirmed that, as Therivel had anticipated, 2022 had been "a tough year" with respect to revenue, postpaid churn, and gross and net postpaid customer additions.

**ANSWER:** To the extent Paragraph 155 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 155.

156.    Defendant Therivel's private admission to CW1 that "churn will be a problem for us," that 2022 was going to be one of UScellular's toughest years, and that in-store traffic and margins were below target are directly contrary to Defendants' statements falsely describing UScellular's ability to balance customer attrition with profitability through its promotions. Defendant Therivel's admission supports a strong inference of scienter.

**ANSWER:** To the extent Paragraph 156 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 156.

**Information Shared via Reports Throughout the Class Period**

157.    As described in Section IV.E, *supra*, CW1 explained that each quarter, CW1 and all other AVPs would aggregate the KPI results from their Region to report that progress to Defendant Therivel for use during a quarterly Business Review meeting. In connection with the quarterly Business Review meetings, CW1 and other AVPs would circulate reports to all of the meeting participants, including Defendant Therivel. CW1 stated that reports presented KPI data in terms of how actual performance compared to what had been budgeted (i.e., projected) for the period, as well as comparisons to prior periods. CW1 stated that the results in these reports from each Area, which were broken down by month and aggregated for the quarter, were reviewed during the quarterly Business Review meetings with Defendant Therivel.

**ANSWER:** To the extent Paragraph 157 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 157.

158.    As such, Defendant Therivel had access to reports containing UScellular's KPIs and operational metrics, which included monthly figures for each KPI or metric and which provided comparisons to prior months and quarters. These reports included, inter alia, revenue, postpaid and prepaid churn, gross and net customer adds (both postpaid and prepaid), the number of postpaid handsets had been sold in a month; the number of customers who visited a store or agency; conversion rates (representing the rates that interactions with customers were converted into sales).

**ANSWER:** To the extent Paragraph 158 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and

for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 158.

159.    CW1 further stated that in the quarterly reports that AVPs sent to Defendant Therivel, each particular KPI performance item was coded red, yellow, or green, depending on whether the actual results fell below or exceeded what had been budgeted. For instance, if a budgeted sales goal had been $10,000, but the actual result was only $9,000, this particular item would be coded as red because it had not met the budgeted goal. If the sales had exceeded the goal, it would be coded as green. Yellow meant the performance had been close to what was budgeted. CW1 stated that items that were red-coded received significant discussion during quarterly Business Review meetings.

**ANSWER:** To the extent Paragraph 159 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 159.

160.    With respect to churn quotas, CW1 stated that quarterly postpaid churn quotas for the Southwest region were never met and were "always in the red" each quarter throughout CW's employment. CW1 stated that these churn details were included in the reports that were disseminated in connection with the quarterly Business Review meetings and used, in part, to inform regional pricing decisions. Moreover, CW1 confirmed that all AVPs and executives received ADS reports every morning by 7:00 a.m. that included churn rates on a month-to-date, year-to-date, and quarter-to-date basis, which thereby made it possible "to see in real time" the numbers of subscribers that had been lost.

**ANSWER:** To the extent Paragraph 160 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 160.

161.    In-store traffic across UScellular stores was also closely reported on a daily basis. For example, CW1 confirmed that in-store traffic in every UScellular store was measured by ShopperTrak software that tracked, in real time, how many times every day the doors at UScellular's stores swung open. AVPs received reports every morning containing in-store traffic metrics, including on month-to-date, year-to-date, and quarter-to-date basis, for every store in each region and market.

**ANSWER:** To the extent Paragraph 161 relies on statements made by CW1, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations, and for that reason deny those allegations. Defendants deny the remaining allegations in Paragraph 161.

162. In sum, Defendants' abundance of meetings and reports prior to and throughout the Class Period where the Individual Defendants were briefed regarding the Companies' failures with respect to store traffic, churn, customer adds, margins and many other KPIs create a strong inference that Defendants made the misstatements alleged herein knowingly and/or recklessly.

**ANSWER:** Denied.

**B.    Defendants Admitted They Knew that the Free Phone for Anyone Promotion would not Impact Churn in 2022**

163. During the Companies' 3Q 2022 Earnings Call, Defendant Therivel admitted that Defendants knew, as a result of previous regional trials that purportedly were the basis for UScellular's Any Phone Free Promotion, that it would take at least six months to see promotional benefits to churn—i.e., first quarter 2023—stating: "In the markets that we trialed them in previously, *it took us 6 months or so, 6, 7 months to see the improvements in voluntary churn.*"

**ANSWER:** Defendants admit that Paragraph 163 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 163.

164. Similarly, on February 17, 2023 and May 5, 2023 during earnings calls, Defendant Therivel again admitted that Defendants knew prior to the launch of UScellular's Free Phone for Anyone Promotion that improvements to churn would take "6 to 9 months" which was far longer than represented during the Class Period. For example, during the May 5, 2023 earnings call, Defendant Therivel stated, in relevant part: "based on the testing *we've* done in our regional trials, *we knew it would take about 6 to 9 months to see the consumer churn benefit*."

**ANSWER:** Defendants admit that Paragraph 164 purports to quote from statements made during earnings calls held on February 17, 2023 and May 5, 2023, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or

mischaracterize the statements. Defendants respectfully refer to the transcripts of the calls for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 164.

165. As such, Defendant Therivel's admission as to Defendants' knowledge during the 3Q 2022 Earnings Call and two subsequent earnings calls directly contradicted false statements made during the Class Period regarding the length of time to see promotional results and supports a strong inference of scienter.

**ANSWER:** Denied.

**C.** **Defendants Knew of UScellular's Postpaid Subscribership Problems, and the Causes of Those Problems, Because Postpaid Sales Were the Companies' Core Operations**

166. Throughout the Class Period, Defendants knew granular details about issues concerning every aspect of UScellular's inability to attract and keep postpaid subscribers, because during the Class Period, UScellular's postpaid wireless operations were the Companies' core operations.

**ANSWER:** Paragraph 166 includes Plaintiff's vague and subjective characterizations, for instance alleging that Defendants knew "granular details" concerning "every aspect" of certain alleged phenomena, and accordingly is not susceptible to admission or denial. To the extent a response is required, Paragraph 166 is denied.

167. Indeed, UScellular is a prototypical "core operation" given its materiality to the Companies' overall business. Throughout the Class Period, postpaid represented approximately 90% of UScellular's retail connections.

**ANSWER:** Defendants admit that postpaid connections represented approximately 90% of UScellular's total retail connections as of September 30, 2022. Paragraph 167 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the allegations in Paragraph 167.

168. Defendant Therivel has also admitted that postpaid connections constitute UScellular's core operations. During the January 6, 2022 Citi's AppsEconomy Conference, for example, Therivel stated to investors that "we're pushing all of our energy towards … stabilizing our postpaid business" because "obviously, I mean, *the postpaid side of our business is very important.*" On the same January 6, 2022 presentation, Therivel reiterated that "[m]y industry, I mean, we pay a ton of attention to churn."

73

**ANSWER:** Defendants admit that Paragraph 168 purports to quote from statements made by Mr. Therivel on January 6, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the statements for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 168.

169. Further, during the Raymond James 43rd Institutional Investors Conference on March 7, 2022, Defendant Chambers stated to investors that about 90% of UScellular's connections are postpaid. During that same conference, Defendant Chambers described UScellular's postpaid business as "our core postpaid business" and reported that "we're primarily a postpaid company." Moreover, during the Companies' 1Q 2022 Earnings Call, Defendant Therivel described UScellular's postpaid revenues as "core postpaid revenues."

**ANSWER:** Defendants admit that Paragraph 169 purports to quote from statements made by Mr. Chambers and Mr. Therivel on March 7, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the statements for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 169.

170. Likewise, UScellular's core postpaid operations were TDS' core business because UScellular represents the overwhelming majority of TDS' operations. For example, TDS admitted in its annual report for the year ended December 31, 2022, that "TDS conducts all of its wireless operations through [UScellular.]" Specifically, UScellular accounted for over 75% of TDS' total operating revenues throughout the Class Period, compared to less than approximately 20% from TDS telecom and 5% or less from TDS' other operations. Moreover, as of December 31, 2022, TDS reported 62% of its gross investment in property, plant, and equipment was at UScellular, versus only 36% at TDS Telecom and 2% elsewhere.

**ANSWER:** Defendants admit that UScellular accounted for approximately 77% of TDS' operating revenues and approximately 62% of its gross investment in property, plant, and equipment in 2022. Defendants admit that TDS Telecom accounted for approximately 19% of TDS' operating revenues and approximately 36% of its gross investment in property, plant, and equipment in 2022. Defendants admit that TDS' other operations accounted for approximately 4% of TDS' operating revenues and approximately 2% of its gross investment in property, plant, and

equipment in 2022. Defendants further admit that Paragraph 170 purports to quote from statements made in TDS' 2022 Form 10-K, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the Form 10-K for its complete and accurate contents. Paragraph 170 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 170.

171.    That UScellular was core to TDS is also demonstrated by the fact that both TDS and UScellular routinely present quarterly and annual financial and operating results on joint earnings calls with investors and post the same earnings presentations and call transcripts on the Companies' respective websites. Indeed, every earnings call during the Class Period began with the operator administrating the call welcoming investors and analysts to the "TDS and U.S. Cellular [Fiscal Period]… Results" call. Moreover, each earnings call is attended by top management from both TDS and UScellular, many of whom have roles within both companies, as set forth in ¶¶ 192-94, *infra*.

**ANSWER:** Defendants admit that TDS and UScellular have presented their financial results on joint conference calls that have been attended by leaders of both TDS and UScellular. Defendants admit that TDS and UScellular have posted similar earnings presentations to their company websites. Defendants further admit that Paragraph 171 purports to quote from statements made during earnings calls held during the Class Period, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcripts of the calls for their complete and accurate contents. Paragraph 171 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 171.

172.    Given that postpaid connections represent the vast majority of the Companies' operations, Defendants are presumed to know all aspects of UScelluar's postpaid business, including efforts to correct its declining postpaid subscribership and metrics used to evaluate those efforts. These issues included, but were not limited to UScellular's: 1) postpaid promotional activity; 2) regional testing for postpaid promotions; 3) costs and expenses associated with postpaid promotions; 4) postpaid churn and subscriber figures; and 5) in-store traffic and sales conversions.

**ANSWER:** Paragraph 172 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants admit that Mr. Therivel and Mr. Chambers have knowledge of UScellular's postpaid business, and otherwise deny the allegations in Paragraph 172.

D. **Defendants' Detailed Responses to Analyst Questions Admitting Knowledge of Promotions and Postpaid Customer Attrition Show They Closely Monitored and Tracked Those Items**

173. Throughout the Class Period, during the Companies' earnings calls analysts regularly asked Defendants questions concerning postpaid customer attrition, UScellular's promotional activity to address its postpaid churn, and the financial impacts of those promotions. Defendants did not demur or claim ignorance of these matters. Rather, the Individual Defendants repeatedly provided detailed answers to these questions, indicating their personal knowledge on the subjects, and frequently discussed their own knowledge and understanding of these issues.

**ANSWER:** Defendants admit that Paragraph 173 purports to characterize statements made during earnings calls, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcripts of the calls for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 173.

174. Some of the Individual Defendants' numerous, detailed statements given during prepared remarks and in response to analysts questioning on such issues include, but are not limited to, the following:

**May 6, 2022 Earnings Call**

Sergey Dluzhevskiy

**Sergey Dluzhevskiy**
*GAMCO Investors, Inc.*

My first question is on kind of your go-to-market strategy, LT. So obviously, you have a differentiated regional approach and you're trying different things in different markets. You have various clusters that are noncontiguous, so you can do that. Maybe if you could reflect, since you implemented this approach, what have been the results so far. What has worked on that front? What could be improved? And how do you make this approach more effective to maximize potential gross add and share gain opportunity going forward?

**Laurent C. Therivel**

76

*President, CEO & Director*

Sergey, the regional approach you've talked to, I'm very pleased with, and let me put it in context. It is not easy to pivot to create -- not only creating regions and putting the processes and the structures in place to use those regions as test beds but then executing on that. And over the last 12 months, we've executed over 40 discrete pricing and promotional and marketing mix trials across our regions.

One of the -- I hate doing this on calls like this but I can't give details on the specific plan we're going to be rolling out. ***But later in the quarter, we're going to be doing a relatively substantial move that was educated by the regional trial.*** Another example I'll give is the ARPU increase we've seen, so we've seen very attractive ARPU performance. I'd contrast that with some of our competitors.

***And we've been able to do that because of lessons learned from individual or regional trials.*** We haven't had to require specific plan upsell to get the ARPU growth that we've seen. We've done it with sales. ***We've done it with strong execution, and we've done that because we're able to trial different approaches, as you mentioned, different go-to-market in our individual regions. And so very pleased with what we've seen so far and you can expect to see it continue.***

At times, we will roll out national programs like the 1 I just talked about around the rate plan guarantee. ***But at the same time, we continue to test, whether it's individual device promotions.*** We vary our prepaid rate plans fairly substantively region to region to make sure we strike the right approach. We vary our distribution approach fairly significantly. ***So we're really trying to test and learn, and it's helped us optimize and will continue to help us optimize. So I'm very pleased with how it's proceeding.***

### August 5, 2022 Earnings Call

**Simon William Flannery**
*Morgan Stanley, Research Division*

LT, could you just talk a little bit more about the new promotions. It sounds like they're having a good impact. Help us understand what the accounting is going to look like for those promotions? How much of the cost will you need to take upfront? And how long will you amortize most of it over? […]

**Laurent C. Therivel**
*President, CEO & Director*

Yes, Simon, I think in terms of the revenue opportunity of those promotions, right? I talked a little bit earlier about the increased upgrade momentum that we're seeing, the increased add-a-line momentum ***One metric we track fairly closely is the ratio of gross adds to voluntary defects***. We're seeing improvement there. And so I'm optimistic that it's going to have the long-term effect that we want to have on upgrade, on churn, on add-a-line. Let me let Doug talk about specifically how the

77

expenses of that promotion are managed and then he can answer your second question as well.

**Douglas W. Chambers**
*Executive VP, CFO & Treasurer*

Simon, so ***with*** respect to accounting for the promotions. Think about 40% of the cost of the promotion is recognized upfront on day 1, if you will, and then about 60% is recognized in service revenue over the contract period, which is 36 months. ***So that's how to think about the spread of revenue***. Also remember offsets for revenue pickups and gross adds and things that we're gaining from the promotion. ***So those are all offsets as well when you think about total operating cash flow***.

**ANSWER:** Defendants admit that Paragraph 174 purports to quote from statements made during earnings calls held on May 6, 2022 and August 5, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcripts of the calls for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 174.

175.    Defendants' numerous, detailed discussions with analysts and investors regarding UScellular's postpaid customer attrition and promotional activity are probative of Defendants' knowledge of those subjects and support a strong inference of scienter.

**ANSWER:** Denied.

**E.    Defendant Therivel Admitted That Defendants Were Closely Monitoring Churn as Early as 2Q 2020**

176.    Defendant Therivel was hired to correct UScellular's years-long trend of losing postpaid customers. For example, during a conference call held by the Companies on August 7, 2020, when asked about his top objectives as the new CEO over the next twelve to eighteen months, Defendant Therivel confirmed that his focus on "driving that top line growth" would be accomplished, in part, via "***good work in driving gross adds and keeping churn down***." Defendant Therivel further confirmed that "one of the things we're going to be watching very, very carefully is the switching and the churn dynamics to make sure that we don't see a spike in the back end of the year on that."

**ANSWER:** Defendants admit that Paragraph 176 purports to quote from statements made during a conference call held on August 7, 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the

78

statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 176.

177. When asked during a special call with the Companies on August 20, 2020 about Defendant Therivel's priorities going forward, Defendant Carlson reiterated that "the number one priority is getting growth and strong growth at U.S. Cellular. And of course, that would mean customer growth and also revenue growth."

**ANSWER:** Defendants admit that Paragraph 177 purports to quote from statements made during a conference call held on August 20, 2020, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 177.

178. Similarly, during the 2Q 2022 Earnings Call, which was attended by Defendant Therivel, Defendant Chambers, and Villacrez, Therivel stated that "we still need to improve postpaid subscriber results. We're highly focused on this." He also stated: "[o]ne metric we track fairly closely is the ratio of gross adds to voluntary defects" and "[o]ne of the things we track really closely is our customers switching to another provider[.]"

**ANSWER:** Defendants admit that Laurent C. Therivel, Douglas W. Chambers, and Vicki L. Villacrez spoke during UScellular's Q2 2022 earnings call. Defendants further admit that Paragraph 178 purports to quote from statements made during UScellular's Q2 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 178.

179. As such, Defendant Therivel admitted that prior to and during the Class Period, Defendants were closely tracking churn metrics, including but not limited to postpaid customer additions and postpaid voluntary defections.

**ANSWER:** Defendants admit that Mr. Therivel has stated that UScellular was highly focused on improving the company's churn metrics. Defendants deny the remaining allegations in Paragraph 179.

180. Despite having admitted to closely monitoring churn metrics throughout the Class Period, Defendants knowingly made materially false and misleading statements throughout the Class Period concerning UScellular's postpaid churn rates, efforts to correct UScellular's postpaid customer attrition problems, including promotional activity, and the results of those promotions on postpaid customer attrition.

**ANSWER:** Denied.

## VIII.  LOSS CAUSATION

181. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of TDS' securities and/or maintaining the artificial inflation in TDS' common and preferred stock prices, by publicly issuing and endorsing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Companies' business, operations, and prospects as alleged herein.

**ANSWER:** Denied.

182. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants named in this action made or caused to be made, or failed to correct, a series of materially false or misleading statements concerning the Companies' business prospects. Defendants' statements were materially and objectively misleading when made, as set forth supra, and had the cause and effect of creating in the market an unrealistically positive assessment of UScellular's ability to effectively address its declining number of postpaid customers and its ability to balance costly promotions while balancing profitability as it previously committed to, thus causing TDS' securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made or endorsed by Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing TDS' stock at artificially inflated prices, thus causing the damages complained of herein.

**ANSWER:** Denied.

183. As a result of their purchases of TDS' securities during the Class Period at artificially inflated prices, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price declines in TDS' securities, the statements in Defendants' corrective disclosures, and the market's reaction negate

any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Companies that were unrelated to Defendants' fraudulent conduct. This is supported by the stock chart in **Figure J**, below, which demonstrates the clear divergence in the performance of TDS' (TDS) and UScellular's (USM) common stock prices from T-Mobile (TMUS), AT&T (T), and Verizon (VZ) when the truth emerged in a series of partial disclosures on November 3, 2022:

**Figure J**

**ANSWER:** Denied.

184.     Beginning after market close on November 3, 2022, Defendants issued a set of corrective disclosures contained within the: (i) November 3, 2022 3Q 2022 Press Release; (ii) November 4, 2023 3Q 2022 Earnings Presentation; and (iii) Companies' November 4, 2022 3Q 2022 Earnings Call. This set of corrective disclosures revealed, *inter alia*, that, contrary to Defendants' representations, UScellular's heavy promotional activity, including its expensive Any Phone Free Promotion, did *not* balance subscriber growth and expenses in the third quarter and "throughout the second half of the year." Instead, as Defendants began to reveal, UScellular's total postpaid churn rate actually worsened over the quarter, both sequentially and year-over-year, and UScellular lost another 31,000 postpaid subscribers over the quarter. Moreover, the exorbitant costs associated with UScellular's "free phone" promotion drove a $28 million increase in loss on equipment and 23% decline in adjusted operating income over the quarter. UScellular's poor postpaid results and increased promotional costs also caused it to lower its full year adjusted OIBDA guidance midpoint down 5%.

**ANSWER:** Defendants admit that Paragraph 184 purports to characterize statements made

in a press release issued on November 3, 2022, an earnings call held on November 4, 2022, and a

presentation given on November 4, 2022 but deny the allegations because they selectively quote,

inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements.

Defendants respectfully refer to the earnings call, press release, and presentation for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 184.

185.    On November 4, 2022, in response to Defendants' corrective disclosures, the price of TDS' common stock fell sharply, dropping $4.29 per share or 25.89% on unusually heavy trading volume, declining from a closing price of $16.57 per share on November 3, 2022 to $12.28 per share on November 4, 2022, thereby removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who had purchased TDS' common stock during the Class Period.

**ANSWER:** Defendants admit that TDS' common stock closed at $16.57 per share on November 3, 2022 and $12.28 per share on November 4, 2022. Defendants further admit that certain public sources report that trading volume for TDS' common stock was approximately 4,321,900 on November 4, 2022. Defendants deny the remaining allegations in Paragraph 185.

186.    On November 4, 2022, TDS' preferred shares trading under the symbols TDSPrU and TDSPrV also dropped $1.01 and $0.96 per preferred share, or 5.2% and 5.6%, respectively, declining from a closing price of $19.30 and $17.20 per preferred share on November 3, 2022 to $18.29 and $16.24 per preferred share on November 4, 2022, respectively. Both declines removed artificial inflation caused and/or maintained by Defendants' false and misleading statements and caused economic loss to investors who had purchased TDSPrU and TDSPrV preferred shares during the Class Period.

**ANSWER:** Defendants admit that TDS Preferred Series VV closed at $17.20 per share on November 3, 2022 and $16.24 per share on November 4, 2022. Defendants admit that TDS Preferred Series UU closed at $19.30 per share on November 3, 2022 and $18.29 per share on November 4, 2022. Defendants deny the remaining allegations in Paragraph 186.

187.    Analysts were surprised by Defendants' disclosures. During the Companies' 3Q 2022 Earnings Call, an analyst from JPMorgan Chase confronted Defendants about the apparent contradiction between their prior representations about UScellular's ability to balance subscriber growth with profitability and the results that demonstrated UScellular did not have such capabilities, asking:

> I see you fighting hard, and I see the creativity, but ***this doesn't seem to be working out***. *So without going back through your script*, ***help investors understand why they should have faith that you can turn the direction of subscriber growth without destroying profitability in the business?***

**ANSWER:** Defendants admit that Paragraph 187 purports to quote from statements made during UScellular's Q3 2022 earnings call, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the transcript of the call for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 187.

188. On November 4, 2022, Wells Fargo analysts published an investment research report entitled "Oof! Q3'22 Misses as Promotions Weigh Heavy on EBITDA & Outlook" which similarly questioned whether UScellular's claim of balancing growth and profitability was even possible in light of the quarter's dismal results:

> USM's postpay net losses were -31K vs. our -20K est., and postpay churn jumped to 1.42% (vs. our 1.20% est.), up from 1.15% y/y. Prepay net adds were +2K, down from 11K y/y, and prepay churn was 4.07% vs. 4.09% y/y. Our 2022/2023 EPS estimates are adjusted to $0.55/$1.17 from $0.98/$1.22, respectively.
>
> ***EBITDA miss driven by promotions meant to grow the mix and number of in-contract customers. The Q3 EBITDA miss was driven by USM's promotions meant to catalyze subscriber gains***. SG&A was $369M in Q3, up $23M y/y and 47.2% of service revenue (vs. 43.9% y/y). ***This, while churn increased 27bps y/y and 12bps seq., and postpay net losses mounting, leave us questioning whether the promotions will ultimately prove effective driving profitable growth over time***.

**ANSWER:** Defendants admit that Paragraph 188 purports to quote from statements made in a report published by Wells Fargo on November 4, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the report for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 188.

189. Analysts from Morningstar Equity Research echoed the same concerns as the JPMorgan Chase analyst during the earnings call and the Wells Fargo report. On November 4, 2022, Morningstar Equity Company issued a report stating, in pertinent part:

> ***Although U.S. Cellular's management highlighted some positive signs it believes show its strategy to improve performance with postpaid wireless customers is on the right track, the results don't yet show it. Worse, expenses associated with these customers skyrocketed.*** […]

83

The firm lost 31,000 postpaid phone customers in the quarter, a slight improvement compared with each of the last two quarters. The number of postpaid gross additions—151,000—was excellent, which we attribute to promotions the firm has in place through 2022. ***However, those promotions have hurt the current financial performance, and postpaid customer churn of 1.42% was the highest level for any quarter in about six years.*** Some of the churn was involuntary, which showed up in much higher bad debt expense.

[….] ***The poor postpaid customer performance and elevated expenses rightfully drowned out the good news in the quarter***. However, the small parts of U.S. Cellular's business are performing well, and postpaid average revenue per user, or ARPU, remains high as customers are more often choosing higher rate plans. Postpaid ARPU grew more than 4% year over year to over $50 for the second straight quarter. As a result, postpaid revenue grew 1.6% year over year.

**ANSWER:** Defendants admit that Paragraph 189 purports to quote from statements made in a report published by Morningstar Equity Research on November 4, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the report for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 189.

190.    On November 7, 2022, a Raymond James analyst report also noted that postpaid customer attrition problems and heightened expenses drove UScellular to revise its annual guidance downward, reporting "3Q22 postpaid net losses were worse than expected (-31K vs. RJE -20K, Street -18K) and adj. OIBDA also came in weak ($16M vs. RJE $199M, Street $201M), with full year adj. OIBDA guidance midpoint down ~5% (now $750-825M vs. $750-900M), driven primarily by bad debt expense and Loss on Equipment (LOE)." The report concluded that "[i]n terms of what would get us back to positive on the name, stabilizing the postpaid subscriber base is important, as USM has lost ~3% of postpaid subscribers in the [last twelve months]."

**ANSWER:** Defendants admit that Paragraph 190 purports to quote from statements made in a report published by Raymond James on November 7, 2022, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the report for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 190.

191.    These analyst reports demonstrated that investors viewed the Companies' disclosures as revealing that UScellular was *not* able to meaningfully address postpaid churn while

84

balancing costs in the third quarter or "throughout the second half of the year," as Defendants previously stated. Instead, UScellular pursued subscriber growth and reduced churn rates without material success at the expense of profitability.

**ANSWER:** Denied.

## IX. ADDITIONAL ALLEGATIONS EVIDENCING TDS' CONTROL OVER USCELLULAR

192.     Given TDS' ownership of the bulk of UScellular's outstanding common shares and Series A common shares, and control over the vast majority of the combined voting power of both classes of UScellular's common stock, TDS has the voting power to elect all the directors of UScellular and controls 96% of the voting power in matters other than the election of UScellular directors. UScellular is therefore considered a "controlled company" under NYSE listing standards because over 50% of the voting power for the election of directors is held by TDS. During the Class Period, five of the eleven directors of UScellular were also directors of TDS and/or executive officers of TDS and/or UScellular.

**ANSWER:** Defendants admit that UScellular is a "controlled company" as such term is defined by the NYSE. Defendants admit that TDS has the voting power to elect all of the directors of UScellular and controls 96% of the voting power in matters other than the election of directors of UScellular. Defendants deny the remaining allegations in Paragraph 192, including because the final sentence in the Paragraph is ambiguous.

193.     Because of TDS' ownership of UScellular's common shares, at all relevant times, TDS has been effectively able to elect all of UScellular's directors and otherwise control the management and operations of UScellular. During the Class Period, UScellular and TDS also shared much of the same senior leadership. For example, Defendant Therivel served as both CEO and director of UScellular and a director on TDS' board. Defendant Chambers served as both Executive VP, CFO, and treasurer of UScellular and previously served as Senior Vice President – Finance and Chief Accounting Officer of TDS, among other TDS roles. Villacrez served as both Executive VP and CFO of TDS and director of UScellular. Carlson served as both the Chair of UScellular and the president and CEO of TDS. Additionally, Anita J. Kroll served as the Chief Accounting Officer of both UScellular and TDS.

**ANSWER:** Defendants admit that Laurent C. Therivel has served as the Chief Executive Officer of UScellular, as a member of the UScellular Board of Directors, and as a member of the TDS Board of Directors. Defendants admit that Douglas W. Chambers has served as Executive

85

Vice President, Chief Financial Officer, and Treasurer of UScellular as well as Senior Vice President – Finance of TDS and as Chief Accounting Officer of TDS. Defendants admit that Vicki L. Villacrez has served as the Executive Vice President and Chief Financial Officer of TDS and as a member of the UScellular Board of Directors. Defendants admit that LeRoy T. Carlson has served as the President and Chief Executive Officer of TDS and as the Chairman of the UScellular Board of Directors. Defendants further admit that Anita J. Kroll has served as Chief Accounting Officer of TDS and UScellular. Paragraph 193 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 193.

194.    Throughout the Class Period, every quarterly earnings call presented by TDS and USM were joint calls, as the business operations of USM were also the primary business operations of TDS. For the same reason, throughout the Class Period, every TDS quarterly or annual financial report included UScellular's quarterly or annual financial results therein. Carlson and Sereda signed TDS' quarterly financial results reports from the beginning of the Class Period until Sereda's retirement on May 24, 2022, whereafter Carlson and Villacrez, among others, signed TDS' quarterly and annual reports.

**ANSWER:** Defendants admit that TDS and UScellular have held joint earnings calls. Defendants admit that LeRoy T. Carlson and Peter L. Sereda signed the Form 10-Q that was filed by TDS on May 6, 2022. Defendants further admit that Mr. Carlson and Vicki L. Villacrez have signed reports made by TDS on Form 10-K and Form 10-Q. Defendants deny the remaining allegations in Paragraph 194, including because the phrases "quarterly or annual financial report" and "quarterly financial results reports" are vague.

195.    TDS and UScelluar's business relationship is governed by various agreements, including, *inter alia*, UScellular's Restated Certificate of Incorporation and the Cash Management and Investment Services Agreement, through which TDS was able to control certain of UScellular's operations. For instance, pursuant to UScellular's Restated Certificate of Incorporation, as amended, UScelluar is not permitted to "directly or indirectly own, invest or otherwise have an interest in, lease, operate or manage any business other than a business engaged solely in the construction of, the ownership of interests in and/or the management of wireless telephone systems" without the written consent of TDS "so long as not less than 500,000 [US cellular] Series A Common Shares are outstanding." This restriction precludes UScellular from

86

pursuing ostensibly any business transactions unless TDS consents in writing, which TDS is not obligated to do.

**ANSWER:** Defendants admit that Paragraph 195 and its corresponding footnote purports to quote from and characterize statements in UScellular's Restated Certificate of Incorporation and Cash Management and Investment Services Agreement, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the documents for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 195 and corresponding footnote.

196. The UScellular Restated Certificate of Incorporation also authorizes UScellular's Board of Directors, the majority of the members of which were elected by TDS and four members of which during the Class Period were TDS executives, directors, or TDS Voting Trust trustees, to designate and issue preferred shares in one or more classes or series from time to time without any further shareholder action or authorization unless applicable laws or regulations would require such approval. As UScellular stated in its 2022 Annual Report, TDS' ability to issue preferred shares could be used "to preserve TDS' control of UScellular."

**ANSWER:** Defendants admit that Paragraph 196 purports to characterize and quote from statements in UScellular's Restated Certificate of Incorporation and 2022 Form 10-K, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the documents for their complete and accurate contents. Defendants deny the remaining allegations in Paragraph 196.

197. Under the Cash Management and Investment Services Agreement, entered into between TDS, UScellular, and certain of UScellular's wholly owned subsidiaries and dated December 15, 2017 ("Cash Management Agreement"), UScellular is required deposit its excess cash with TDS for investment under TDS' cash management program.

**ANSWER:** Defendants admit that Paragraph 197 purports to characterize statements in the companies' Cash Management and Investment Services Agreement, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the Agreement for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 197.

198.     Pursuant to the Cash Management Agreement, TDS is also designated as an authorized agent of UScellular and is authorized to enter into cash management agreements with banks through which TDS is able to: (i) disburse UScellular funds through, *inter alia*, check, automated clearing house transfer, wire transfer, other electronic funds transfer and otherwise; (ii) deposit or collect UScellular funds; (iii) access information relating to any and all of UScellular's accounts, collection and disbursement activity; and (iv) use software and/or Internet-based products to undertake the aforementioned actions.

**ANSWER:** Defendants admit that Paragraph 198 purports to characterize statements in the companies' Cash Management and Investment Services Agreement, but deny the allegations because they selectively quote, inaccurately quote, reference out of context, add emphasis to, or mischaracterize the statements. Defendants respectfully refer to the document for its complete and accurate contents. Defendants deny the remaining allegations in Paragraph 198.

199.     TDS is also considered a "controlled company" under NYSE listing standards because over 50% of the voting power for the election of its directors is held by the trustees of the TDS Voting Trust. The TDS Voting Trust holds over 90% of the voting power in the election of directors elected by the holders of Series A Common Shares and thus has the voting power to elect the majority of TDS' directors. The TDS Voting Trust also controls a majority of the voting power of TDS with respect to matters other than the election of directors. The trustees of the TDS Voting Trust include, *inter alia*, Carlson, Walter C. D. Carlson, Prudence E. Carlson and Letitia G. Carlson, M.D.

**ANSWER:** Defendants admit that TDS is a "controlled company" as such term is defined by NYSE. Defendants admit that over 50% of the voting power for the election of directors of TDS is held by the trustees of the TDS voting trust. Defendants admit that a substantial majority of the outstanding TDS Series A Common Shares are held in the TDS Voting Trust. Defendants further admit that LeRoy T. Carlson, Jr., Walter C. D. Carlson, Prudence E. Carlson, and Letitia G. Carlson are trustees of the TDS Voting Trust. Paragraph 199 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 199.

## X. DEFENDANTS USCELLULAR, THERIVEL, AND CHAMBERS WERE AGENTS OF TDS

200. Throughout the Class Period, Defendants UScellular, Therivel, and Chambers (collectively, the "UScellular Defendants") were operating in the scope of their authority and acting as agents of TDS when they reported UScellular and TDS operational and financial results.

**ANSWER:** Paragraph 200 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the allegations in Paragraph 200.

201. The fact that Defendants UScellular, Therivel, and Chambers were agents of TDS is evidenced, among other things, by TDS' control over UScellular. As set forth above, ¶¶ 4, 27, 42, at all relevant times, TDS owned approximately 83% of the combined total of UScellular's outstanding common shares and Series A common shares, controlled 96% of the combined voting power of both classes of UScellular's common stock, had the power to elect UScellular's directors, controlled its operations, had common senior leadership with UScellular, and derived approximately over 75% of its operating revenue from its UScellular segment.

**ANSWER:** Defendants admit that TDS was an approximately 83% owner of UScellular during the Class Period, and that with respect to voting power, TDS had the voting power to elect all of the directors of UScellular and controlled 96% of the voting power in matters other than the election of directors of UScellular. Defendants admit that several leaders of UScellular have served on TDS' Board of Directors. Defendants admit that several leaders of TDS have served on UScellular's Board of Directors. Defendants further admit that UScellular accounted for approximately 77% of TDS' operating revenues in 2022. Paragraph 201 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 201, including because the phrase "at all relevant times" is vague.

202. At all relevant times while communicating with investors, the Companies' interests were aligned in positively portraying UScellular's operations and finances to investors and analysts.

**ANSWER:** Paragraph 202 includes Plaintiff's vague and subjective characterizations, and accordingly is not susceptible to admission or denial. To the extent a response is required, Paragraph 202 is denied.

89

203.    At all relevant times, the UScellular Defendants represented UScellular's operations and finances to investors as agents of TDS, on behalf of TDS, at TDS' direction, and under TDS' supervision. Throughout the Class Period, the Companies communicated with investors and analysts via joint earnings calls attended by executive leadership of both Companies and via substantively identical earnings call presentations. During each such earnings calls, both UScellular's and TDS' leadership jointly remarked upon UScellular's operating and financial results and communicated jointly with analysts on these topics. TDS leadership was present for every such statement made by UScellular during these earnings calls but made no effort to correct the alleged false statements identified *supra*.

**ANSWER:** Defendants admit that TDS and UScellular have held joint earnings calls.

Paragraph 203 contains a legal statement to which no answer is required. To the extent an answer

is required, Defendants deny the remaining allegations in Paragraph 203, including because "at all

relevant times" is vague.

### XI.    CLASS ALLEGATIONS

204.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired TDS publicly traded securities between May 6, 2022 and November 3, 2022, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are the Companies and their subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

**ANSWER:** Defendants admit that Plaintiff purports to bring this action pursuant to Rule

23(a) and Rule 23(b)(3). Defendants further admit that Plaintiff purports to exclude the entities

listed in Paragraph 204 from the putative class. Defendants deny that a class may be properly

certified. Defendants deny the remaining allegations in Paragraph 204.

205.    Because TDS' securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by TDS or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

**ANSWER:** Defendants admit that TDS or its transfer agent maintain certain records.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations regarding Plaintiff's beliefs in Paragraph 205 and, for that reason, deny those allegations. Defendants deny the remaining allegations in Paragraph 205.

206.    Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent who are experienced in class action and securities litigation.

**ANSWER:** Defendants deny the allegations of the first sentence of Paragraph 206. Defendants lack knowledge of the allegations of the second sentence of Paragraph 206 and on that basis deny them. Paragraph 206 is otherwise denied.

207.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a.      Whether Defendants violated the federal securities laws as alleged herein;

b.      Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Companies' business and operations;

c.      Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether the Individual Defendants caused the Companies to issue false and misleading SEC filings and public statements during the Class Period;

e.      Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.      Whether the prices of TDS' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.      Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

**ANSWER:** Denied.

208.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** Defendants disagree that a class may be certified or that any damages have been suffered and on that basis deny the allegations of Paragraph 208.

## XII. PRESUMPTION OF RELIANCE

209. Plaintiff is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for TDS' securities was an efficient market that promptly digested current information related to TDS and UScellular from all publicly available sources and reflected such information in the prices of TDS' securities. Throughout the Class Period:

a. TDS' common stock and preferred stock were actively traded on the NYSE;

b. The market price of TDS' securities reacted promptly to the dissemination of public information regarding the Companies;

c. TDS was followed by financial analysts, including those cited in this Complaint;

d. TDS securities maintained a high average weekly trading volume during the Class Period;

e. As a regulated issuer, the Companies filed with the SEC periodic public reports during the Class Period;

f. The Companies regularly communicated with public investors via established market communication mechanisms; and

g. During the Class Period, TDS' combined classes of common stock had over 105,000,000 shares outstanding and its market capitalization was over $1.88 billion on November 3, 2022.

**ANSWER:** Defendants admit that TDS' stock was listed on the NYSE, that securities analysts followed TDS, that TDS and UScellular filed periodic reports with the SEC, and that TDS and UScellular communicated with investors. Defendants admit that there were over 106,000,000 Common Shares and over 7,000,000 Series A Common Shares of TDS stock outstanding as of September 30, 2022. Defendants further admit that the aggregate market value of TDS' Common Shares held by non-affiliates was approximately $2 billion as of June 30, 2022. Defendants deny the remaining allegations in Paragraph 209.

210. Throughout the Class Period, the Companies were consistently followed by the market, including securities analysts. The market relies upon the Companies' financial results and

management to accurately present the Companies' financial results. During this period, the Companies and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Companies and material facts relevant to UScellular's failure to attract and retain postpaid customers. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of TDS' securities.

**ANSWER:** Defendants admit that the Companies were followed by securities analysts and that the Companies release financial results. Defendants deny the remaining allegations in Paragraph 210.

211.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for TDS' securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

**ANSWER:** Denied.

212.    Plaintiff and other Class members justifiably relied on the integrity of the market price for TDS' securities and were substantially damaged as a direct and proximate result of their purchases of TDS' securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

**ANSWER:** Denied.

213.    Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

**ANSWER:** Paragraph 213 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the allegations in Paragraph 213.

214.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased TDS' securities at artificially inflated prices.

**ANSWER:** Denied.

## XIII.   NO STATUTORY SAFE HARBOR

215.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

**ANSWER:** Denied.

216.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**ANSWER:** Denied.

217.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Companies who knew that the statement was false when made.

**ANSWER:** Denied.

**COUNT I**
**Violation of Section 10(b) of the**
**Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

218.    Plaintiff realleges each allegation as if fully set forth herein.

**ANSWER:** Defendants incorporate and restate each and every response contained above

as if fully set forth herein.

219.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

**ANSWER:** Defendants admit that Plaintiff purports to bring this suit pursuant to Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5. Defendants deny the remaining

allegations in Paragraph 219.

220. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TDS' securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire TDS' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

**ANSWER:** Denied.

221. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, all in an effort to maintain artificially high market prices for TDS' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Companies' outlooks and condition, as reflected in the misrepresentations and omissions set forth above.

**ANSWER:** Denied.

222. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Companies were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Companies, their control over, and/or receipt and/or modification of the Companies' allegedly materially misleading statements, and/or their associations with the Companies which made them privy to confidential proprietary information concerning the Companies, Defendants participated in the fraudulent scheme alleged herein.

**ANSWER:** Denied.

223. The Individual Defendants, who are the senior officers and/or directors of the Companies, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Companies to members of the investing public, including Plaintiff and the Class.

**ANSWER:** Denied.

224. As a result of the foregoing, the market price of TDS' securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiff and the other

members of the Class relied on the statements and business plans described above and/or the integrity of the market price of TDS' securities during the Class Period in purchasing TDS' securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

**ANSWER:** Denied.

225. Had Plaintiff and the other members of the Class been aware that the market price of TDS' securities had been artificially and falsely inflated by the Companies' and the Individual Defendants' misleading statements and by the material adverse information which the Companies and the Individual Defendants did not disclose, they would not have purchased TDS' securities at the artificially inflated prices that they did, or at all.

**ANSWER:** Denied.

226. As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiff and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Companies. Plaintiff and other members of the Class purchased TDS' securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of TDS' securities through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' concealment of material facts related to UScellular's failure to attract and retain postpaid customers.

**ANSWER:** Denied.

227. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of TDS' securities during the Class Period.

**ANSWER:** Denied.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

228. Plaintiff realleges each allegation as if fully set forth herein.

**ANSWER:** Defendants incorporate and restate each and every response contained above

as if fully set forth herein.

229. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

96

**ANSWER:** Defendants admit that Plaintiff purports to bring this suit under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. Defendants deny the remaining allegations in Paragraph 229.

230. TDS, UScellular, and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

**ANSWER:** Denied.

231. The Individual Defendants acted as controlling persons of the Companies within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause the Companies to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**ANSWER:** Denied.

232. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Companies, directly or indirectly, controlled the conduct of the Companies' business and their representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Companies' SEC filings, press releases and interviews with various news sources cited herein related to Plaintiff's and the Class's investments in TDS' securities within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Companies' fraud, as alleged herein.

**ANSWER:** Denied.

233. The Individual Defendants controlled and had the authority to control the content of Companies' SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Companies, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

**ANSWER:** Denied.

234. The Individual Defendants knew or recklessly disregarded the fact that the Companies' representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

**ANSWER:** Denied.

235. By virtue of their high-level positions and their participation in and awareness of the Companies' operations and public statements, the Individual Defendants were able to and did

influence and control the Companies' decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

**ANSWER:** Defendants admit that Mr. Therivel and Mr. Chambers held high-level positions at UScellular. The remainder of Paragraph 235 contains a legal statement to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in Paragraph 235.

236.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

**ANSWER:** Denied.

237.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of TDS' securities.

**ANSWER:** Denied.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiff as a Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.    Granting Plaintiff leave to amend this complaint to conform to the evidence; and

E.    Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

**ANSWER:** Defendants deny that Plaintiff is entitled to any relief in this case, including the relief sought in their prayer for relief.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

**ANSWER**: Defendants admit that Plaintiff has requested a trial by jury. Defendants deny the remaining allegations in this paragraph.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses against Plaintiff and any members of the putative class, as applicable. Defendants may assert that resolving one or more of these defenses would require individualized analyses of the defenses as to the individual class members, making class certification improper. By asserting these defenses, Defendants are not waiving Plaintiff's burden of proving all elements of their claims (including each Defendant's fiduciary status, a breach of fiduciary duty, causation, and damages) or of proving that class certification is proper. These defenses are pleaded in the alternative, and Defendants expressly reserve the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

1.     The Amended Complaint and each purported claim or cause of action asserted against Defendants fails to state a claim upon which relief may be granted.

2.     Defendants are not liable because the statements identified in the complaint did not contain any untrue statements of material fact or material omissions.

3.     Defendants are not liable because the allegedly untrue statements of material fact and/or omissions of material fact were forward-looking and contained meaningful cautionary language.

4.     Defendants are not liable because the allegedly untrue statements of material fact and/or omissions were expressions of personal opinion or belief.

99

5. Defendants are not liable because the losses of Plaintiff and members of the putative class, if any, were caused by market factors, superseding or intervening causes, or other factors for which Defendants are not responsible, or by acts of other persons for whom Defendants are not responsible, and did not result from any acts or omissions of Defendants.

6. Plaintiff's claims and the claims of putative class members are barred, in whole or in part, because the depreciation in the price of TDS securities, if any, resulted from factors other than the purportedly false or misleading statements or omissions alleged in the Amended Complaint.

7. Plaintiff's and the putative class members' claims are barred because Plaintiff and the putative class members did not rely on any alleged misrepresentations or omissions by Defendants.

8. Plaintiff's and the putative class members' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, acquiescence, and/or ratification.

9. Plaintiff is not an appropriate representative for the purported class and therefore cannot pursue a class action on its behalf.

10. Plaintiff lacks standing to pursue some or all of their claims to the extent that they do not allege that they purchased or sold securities issued by UScellular.

11. Plaintiff's and the putative class members' claims are barred, in whole or in part, because they voluntarily assumed the risk of the losses alleged in the Amended Complaint.

12. Defendants deny that Plaintiff or any putative class member was injured in the nature and to the extent claimed.

13. Plaintiff's claims and the claims of putative class members are barred, in whole or in part, to the extent they proximately caused, contributed to, or failed to mitigate any losses.

100

14.     Plaintiff's and the putative class members' claims are barred, in whole or in part, or are subject to offset to the extent that the conduct complained of conferred a benefit upon Plaintiff or the putative class members.

15.     Plaintiff's claims and the claims of putative class members are barred, in whole or in part, by the relevant statutes of limitations.

16.     The damages sought by Plaintiff and the putative class exceed those permitted under the Securities Exchange Act of 1934, the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule or regulation.

17.     To the extent Plaintiff or putative class members executed a waiver or release of claims, some or all of their claims are barred by that waiver or release.

WHEREFORE, Defendants request that judgment be entered in their favor and against Plaintiff, that Defendants be awarded their costs and attorneys' fees, and that Defendants be awarded any other appropriate relief.

Dated: January 13, 2025                    Respectfully submitted,

*By: /s/ James W. Ducayet*
SIDLEY AUSTIN LLP
James W. Ducayet (ARDC No. 6236997)
Elizabeth Y. Austin (ARDC No. 6308514)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
jducayet@sidley.com
laustin@sidley.com

**Counsel for Defendants**