**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HOWARD M. RENSIN, TRUSTEE OF THE RENSIN JOINT TRUST, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES CELLULAR CORPORATION, LAURENT C. THERIVEL, DOUGLAS W. CHAMBERS, TELEPHONE AND DATA SYSTEMS, INC., <br><br> Defendants. | No. 1:23-cv-02764-MMR <br><br> <u>CLASS ACTION</u> <br><br> Honorable Mary M. Rowland |

**DECLARATION OF GREGORY M. POTREPKA IN SUPPORT OF (I) LEAD
PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION
FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION
EXPENSES, AND AWARD TO LEAD PLAINTIFF**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ....................................................................................................3

II.    PROCEDURAL HISTORY.....................................................................................6

     A.    Initial Complaint and Appointment of Lead Plaintiff and Lead Counsel................6

     B.    Amended Complaint and Defendants' Motions to Dismiss ...................................7

     C.    Fact Discovery ......................................................................................................10

     D.    Settlement Negotiations........................................................................................11

     E.    Preliminary Approval of the Settlement ...............................................................12

III.   THE RISKS OF CONTINUED LITIGATION ....................................................12

     A.    Risks to Proving Liability .....................................................................................12

     B.    Risks in Obtaining and Maintaining Class Action Status.....................................14

     C.    Risks to Proving Damages....................................................................................15

     D.    Other Risks, Including Trial and Appeals.............................................................16

     E.    The Complexity, Expense and Duration of Continued Litigation ........................17

IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM...................................18

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ...........................22

VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES AND LEAD PLAINTIFF AWARD ..........................................................................................................................25

     A.    The Fee Application...............................................................................................25

           1.    The Outcome Achieved is the Result of the Significant Time and Labor That Lead Counsel Devoted to the Action .....................................26

           2.    The Significant Risks Borne by Lead Counsel.........................................29

           3.    The Experience and Standing of Lead Counsel and the Standing and Caliber of Defendants' Counsel ..........................................................31

ii

4.     Public Policy Interests, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Case .......................................................................................32

5.     The Reaction of the Settlement Class Supports Lead Counsel's Fee Request.......................................................................................32

B.     Reimbursement of the Requested Litigation Expenses is Fair and Reasonable .......................................................................................33

C.     The Lead Plaintiff Awards are Fair and Reasonable and Should Be Approved.......................................................................................36

VII.     CONCLUSION.................................................................................37

I, GREGORY M. POTREPKA, declare as follows:

1.      I, Gregory M. Potrepka, am a partner at the law firm of Levi & Korsinsky, LLP ("Levi & Korsinsky"), counsel for Lead Plaintiff Howard M. Rensin, Trustee of the Rensin Joint Trust ("Lead Plaintiff"), and Lead Counsel for the proposed Settlement Class in the above-captioned action (the "Action").[1]  I am admitted to practice in this District *pro hac vice*.  I have personal knowledge of the facts stated herein and, if called upon as a witness, I could and would testify competently thereto.

2.      I submit this declaration, together with the exhibits thereto, in support of (i) Lead Plaintiff's unopposed motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the proposed $7,750,000 Settlement for the benefit of the Settlement Class and the proposed plan of allocation of Settlement proceeds (the "Final Approval Motion"); and (ii) Lead Counsel's motion for attorneys' fees in the amount of one-third (33⅓%) of the Settlement Fund (plus applicable interest thereon), reimbursement of litigation expenses in the total amount of $106,945.65, plus interest, and an award of $20,000 to Lead Plaintiff pursuant to the Private Litigation Reform Act of 1995 ("PSLRA") to reimburse Lead Plaintiff's reasonable time, costs and expenses in representing the Settlement Class (the "Fee and Expense Application").  In support of these motions, Lead Plaintiff and Lead Counsel also submit: (i) the exhibits attached hereto; (ii) Lead Plaintiff's Memorandum of Law in Support of Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum"); and (iii) the Memorandum in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award to Lead Plaintiff (the "Fee Memorandum").

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation of Settlement dated April 25, 2025 (the "Stipulation").  ECF No. 74-1.

1

This declaration includes the following attachments:

| | |
|---|---|
| Exhibit 1 | Declaration of Josephine Bravata |
| Exhibit 1-A | Notice and Claim Form |
| Exhibit 1-B | Letter Sent to Nominees |
| Exhibit 1-C | Postcard Notice |
| Exhibit 1-D | Summary Notice Publication Confirmation |
| Exhibit 2 | Declaration of Howard M. Rensin |
| Exhibit 3 | Declaration of Gregory M. Potrepka on behalf of Levi & Korsinsky |
| Exhibit 4 | Levi & Korsinsky Firm Resume |
| Exhibit 5 | 2024 NERA Report |
| Exhibit 6 | 2024 Cornerstone Report |
| Exhibit 7 | Select Seventh Circuit Cases Awarding Attorneys' Fees of 33% or More in Common Fund Cases |
| Exhibit 8 | Declaration of Carol Gilden |
| Exhibit 8-1 | Cohen Milstein Firm Resume |

3.      The Court preliminarily approved the proposed Settlement by Order dated May 8, 2025 (the "Preliminary Approval Order") and thereby directed notice of the Settlement to be disseminated to the Settlement Class.  ECF No. 77.  Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by email, mail, and by publication.  The details of the notice program are set forth in the Declaration of Josephine Bravata Concerning: (A) Mailing/Emailing of the Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("SCS Decl."), a true and correct copy of which is attached hereto as Exhibit 1.

2

4.      In total, Postcard Notice of the Settlement has been disseminated to 22,373 potential Settlement Class Members, and thus far, no requests for exclusion have been received, and no objections have been filed with the Court.  *See* SCS Decl., ¶¶6-9, 14-15.

## I.      INTRODUCTION

5.      On May 2, 2023, Lead Plaintiff filed a securities class action asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5. On July 11, 2023, the Court held a telephonic conference at which time it appointed Howard M. Rensin, Trustee of the Rensin Joint Trust, as Lead Plaintiff and approved his selection of Levi & Korsinsky to serve as Lead Counsel. ECF Nos. 27-28.

6.      On September 1, 2023, Lead Plaintiff filed the operative First Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"). ECF No. 32. Lead Plaintiff's claims were brought on behalf of all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired securities of Telephone and Data Systems, Inc. ("TDS") between May 6, 2022 and November 3, 2022, inclusive (the "Class Period"). In the Complaint, "Defendants" collectively referred to TDS, United States Cellular Corporation ("UScellular" or "USM" and together with TDS, the "Companies"), Laurent C. Therivel ("Therivel"), and Douglas W. Chambers ("Chambers").

7.      The Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $7,750,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, the proposed Settlement represents a fair and adequate result for the Settlement Class considering the case's procedural posture as well as the significant risks remaining in the Action.

8.     As explained in greater detail herein, this Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class.  Lead Counsel's investigation and prosecution of the Action included, among other things:

- Filing an initial and amended complaint based on, *inter alia*, review and analysis of (a) filings with the SEC by both TDS and USM; (b) public reports, news articles, and research reports prepared by securities and financial analysts concerning the Companies; (c) transcripts of investor calls conducted by the Companies' management; and (d) press releases issued by and about the Companies;

- Filing a motion for appointment of Lead Plaintiff and Lead Counsel pursuant to PSLRA;

- Conducting further investigation of the claims asserted in the Action in support of an amended complaint by, *inter alia*, consulting with experts in market efficiency, loss causation and damages, and working with a private investigator to interview former employees of the Companies, and conduct in-depth investigation of USM's business in the regions in which it operated;

- Preparing and filing the detailed Amended Complaint, which included, *inter alia*: (a) new alleged evidence based on information obtained through the use of the private investigator, including through witness interviews performed by Lead Counsel, and in-depth investigation of the Companies and their operations; (b) additional false statements; and (c) new theories concerning the falsity behind Defendants' statements;

- Researching, drafting, and filing an opposition to Defendants' motion to dismiss the Complaint, which this Court denied in part and granted in part (ECF No. 52; *Rensin v. U.S. Cellular Corp.*, 755 F.Supp.3d 1048 (N.D. Ill. Nov. 1, 2024); the "Motion to Dismiss Order");

- Researching, drafting, and filing a motion to strike documents appended to Defendants' motion to dismiss, and a reply in further support thereof;

- Engaging in substantial discovery, which entailed, *inter alia*: (a) exchanging initial disclosures; (b) negotiating, drafting, and filing a joint status report concerning a case management schedule for discovery and further proceedings; (c) serving requests for the production of documents on Defendants and objecting and responding to Defendants' requests for production; (d) serving ten subpoenas on third parties and negotiating document productions therefrom; (e) negotiating an ESI and search protocol with Defendants (ECF No. 61), as well as an Agreed Confidentiality Order (ECF No. 59), pursuant to which Defendants and third parties produced over 6,300 pages and 5,000 pages of documents, respectively, that Lead Counsel reviewed and

4

analyzed; (f) engaging in extensive meet-and-confer sessions and correspondence regarding all of the foregoing; and (g) reviewing and producing documents from Lead Plaintiff responsive to Defendants' requests for production;

- Engaging in a full-day mediation session overseen by a mediator highly experienced in complex actions, Michelle Yoshida, Esq., of Phillips ADR Enterprises, which involved an exchange of detailed mediation submissions concerning the facts of the case, liability, and damages, and consultation with damages experts; and

- Engaging in weeks of follow-up negotiations with Ms. Yoshida and Defendants' Counsel (through Ms. Yoshida) following the initial mediation session, that ultimately resulted in a mediator's double-blind recommendation to settle the Action for $7.75 million. *See* Stipulation (ECF No. 74-1), Section I-II, pp. 2-5.

9. Based on the foregoing efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

10. In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of a consulting damages expert. The Plan of Allocation provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Loss divided by the total Recognized Losses of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

11. Finally, Lead Counsel requests an award of attorneys' fees and litigation expenses

5

as set forth in the accompanying Fee and Expense Application. As discussed in detail in the Fee Memorandum, the requested one-third (33⅓%) fee, plus interest, is squarely within the range of percentage awards granted by courts in this Circuit in comparable securities class actions. Additionally, the fairness and reasonableness of the request is warranted in light of the extent and quality of the work performed, the fully contingent nature of the representation, and the substantial result achieved. Although not generally utilized in this Circuit, a lodestar cross-check further confirms the Settlement's reasonableness. Likewise, the requested reimbursement of Plaintiff's Counsel's out-of-pocket litigation costs of $106,945.65, plus interest, and an award pursuant to the PSLRA in the amount of $20,000 to Lead Plaintiff, are also fair and reasonable. Accordingly, as set forth in the Fee and Expense Application and herein, Lead Counsel respectfully requests that its request for attorneys' fees and reimbursement of litigation expenses be approved.

## II. PROCEDURAL HISTORY

### A. Initial Complaint and Appointment of Lead Plaintiff and Lead Counsel

12. On May 2, 2023, Lead Plaintiff filed the above-captioned putative securities class action (the "Action"), against TDS, UScellular, Therivel, Chambers, Leroy T. Carlson, Jr. ("Carlson"), Peter L. Sereda ("Sereda"), and Vicki L. Villacrez ("Villacrez"), on behalf of all persons or entities who purchased or otherwise acquired TDS securities between May 6, 2022 and November 3, 2022, inclusive. ECF No. 1 at ¶2.

13. On July 5, 2023, plaintiff Howard M. Rensin, Trustee of the Rensin Joint Trust, moved to be appointed as lead plaintiff and moved for Levi & Korsinsky to be appointed as lead counsel. ECF Nos. 20-22.

14. On July 11, 2023, the Court held a telephonic conference at which time it appointed Howard M. Rensin, Trustee of the Rensin Joint Trust, as Lead Plaintiff and approved his selection

6

of Levi & Korsinsky to serve as Lead Counsel. ECF Nos. 27-28.

### B. Amended Complaint and Defendants' Motions to Dismiss

15. On September 1, 2023, Lead Plaintiff filed a robust and detailed First Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") against TDS, UScellular, Therivel, and Chambers. The allegations in the Complaint were based on Lead Counsel's extensive investigation which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding TDS and USM; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews that Lead Counsel and its investigator conducted with individuals who are former employees of the Companies; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning the Companies and the industry in which they operate; (v) pertinent court filings; and (vi) consultations with an expert in market efficiency, loss causation and damages.

16. As a result of Lead Counsel's investigation, the Complaint included (a) extensive new allegations based on information obtained from witness interviews and an in-depth investigation of the Companies and their operations; (b) a refinement of the list of individuals named as defendants; (c) additional false statements; (d) new theories concerning the falsity behind Defendants' statements; (e) critical allegations regarding the Defendants' scienter, including information obtained from Confidential Witnesses who were former employees of UScellular; (f) additional details regarding the corrective disclosures; (g) additional allegations regarding loss causation, class-wide reliance, and damages; and (h) additional allegations evidencing TDS's control over USM. ECF No. 32.

17. Thus, the Complaint alleged two causes of action on behalf of all persons who

7

purchased or otherwise acquired TDS securities at artificially inflated prices during the Class Period: (a) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder against all Defendants (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5); and (b) violations of Section 20(a) of the Exchange Act against Defendants Therivel and Chambers (15 U.S.C. § 78t(a)).  ECF No. 32.

18.     On September 5, 2023, Lead Plaintiff filed a notice of voluntary dismissal of Carlson, Sereda, and Villacrez, which the Court endorsed in a Minute entry dated September 6, 2023. ECF Nos. 33-34.

19.     On October 16, 2023, Defendants jointly moved to dismiss the Complaint, arguing, *inter alia*, that (a) the Section 10(b) claim failed because Lead Plaintiff had not alleged any actionable misleading statement or omission or pled scienter with the requisite particularity, and (b) the 20(a) control person claims failed because Lead Plaintiff had not pled an underlying primary claim.  ECF Nos. 35-36.

20.     Defendants' Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint totaled 263 pages as it appended 18 exhibits consisting of various documents and excerpts of documents that Defendants sought to rely upon in their motion. ECF No. 36.

21.     On November 30, 2023, Lead Plaintiff moved to strike a number of the exhibits appended to Defendants' motion to dismiss, arguing in a memorandum in support of the motion to strike that the exhibits were not subject of judicial notice and were not incorporated into the Complaint by reference, and requesting that the Court refuse to consider the improperly proffered exhibits for the truth of the matter asserted or to draw inferences in Defendants' favor. ECF Nos. 37-39.

22.     On November 30, 2023, Lead Plaintiff also filed a memorandum of law in

opposition to the Defendants' motion to dismiss the Complaint, addressing all of Defendants' arguments. ECF No. 40. On December 20, 2023, Defendants filed a reply in support of their motion to dismiss the Complaint. ECF No. 44.

23.     On December 20, 2023, Defendants also filed a response to Lead Plaintiff's motion to strike the exhibits that Defendants appended to the motion to dismiss. ECF No. 45. On January 10, 2024, Lead Plaintiff filed a reply in support of Lead Plaintiff's motion to strike. ECF No. 47.

24.     On November 1, 2024, the Court granted in part, and denied in part, the Defendants' motion to dismiss the Complaint and denied, as moot, Lead Plaintiff's motion to strike. ECF Nos. 51-52.

25.     In its Memorandum Opinion and Order, the Court granted in part and denied in part the motion to dismiss. With respect to the aspects of the motion to dismiss that were denied, the Court first held that Lead Plaintiff had adequately alleged Therivel had made a false statement concerning the timeline for expected subscriber benefit from a USM nationwide promotion because the statement was adequately alleged to be made with Therivel's actual knowledge of its falsity. ECF No. 52 at 10-12. The Court also found that the Complaint adequately alleged that Therivel made certain actionable misstatements regarding USM's balance of financial and subscriber outcomes in connection with its nationwide promotion, and regarding his satisfaction with a regionalized promotion strategy that preceded the nationwide plan. ECF No. 52 at 13-15, 23. The Court further held that, at the pleadings stage, Defendant Chambers plausibly misstated the status of USM's in-store customer traffic in a way that "may have led a reasonable investor to develop an overly rosy picture of the risks and the resulting problems UScellular faced regarding in-store traffic." ECF No. 52 at 18-19 (internal citation omitted). The Court also found that, when assessed holistically, the Complaint's allegations adequately alleged a strong inference

9

of Defendants' scienter. ECF No. 52 at 27.

26. As a result of the Court's Memorandum Opinion and Order denying the motion to dismiss in part, the PSLRA's automatic discovery stay dissolved and the Action advanced to discovery.

### C. Fact Discovery

27. On November 13, 2024, Lead Plaintiff filed a Joint Initial Status Report on behalf of the Parties which contained a proposed schedule for fact discovery and deadlines to submit further status reports regarding proposed schedules for expert discovery, dispositive motions, and trial. ECF No. 55. On November 14, 2024, the Court adopted the Parties' proposed schedule. ECF No. 57.

28. On November 14, 2024, Lead Plaintiff served Plaintiff's First Set of Requests for Production of Documents on Defendants. In response to these Requests, Defendants produced more than 6,300 pages.

29. On November 15, 2024, Lead Plaintiff noticed and served ten subpoenas *duces tecum* on third parties. In response to these subpoenas, Lead Plaintiff has received and reviewed more than 5,000 pages of documents.

30. On November 25, 2024, the Parties exchanged initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

31. On December 2, 2024, Defendants served Defendants' First Requests for Production of Documents to Plaintiff.

32. On December 2, 2024, the Parties negotiated the terms of a confidentiality order and moved for an Agreed Confidentiality Order which the Court entered on December 3, 2024. ECF No. 59.

33.     On December 16, 2024, Defendants served on Lead Plaintiff the Defendants' Responses and Objections to [Plaintiff's] First Set of Requests for Production of Documents. Defendants thereafter produced over 6,300 pages of responsive documents.

34.     On January 2, 2025, Lead Plaintiff served Plaintiff's Responses and Objections to Defendants' First Set of Requests for Production of Documents on Defendants and produced responsive documents.

35.     On January 8, 2025, the Parties negotiated and stipulated to a protocol to govern and manage discovery of electronically stored information ("Stipulated ESI Protocol") and on January 10, 2025 the Court ordered the Stipulated ESI Protocol. ECF Nos. 61-62.

36.     On January 13, 2025, Defendants answered the Complaint. ECF No. 63.

**D.  Settlement Negotiations**

37.     On February 4, 2025, the Parties attended a full-day, in-person mediation session presided over by Michelle Yoshida, Esq., a well-respected and highly experienced mediator of Phillips ADR Enterprises. Prior to the mediation session, the Parties submitted to the mediator, and exchanged with each other, voluminous briefing and exhibits concerning the Parties' respective views as to disputed issues, including liability, causation, and damages. The mediation was unsuccessful. ECF No. 64. However, the Parties continued to negotiate a possible settlement through Ms. Yoshida over the next several weeks.

38.     On February 26, 2025, Ms. Yoshida issued a double-blind mediator's recommendation to resolve the claims in the Action, which all Parties subsequently accepted. On February 28, 2025, the Parties jointly notified the Court that they had agreed in principle to resolve all issues and claims involved in this Action. ECF No. 66.

39.     The Parties thereafter memorialized the substantive terms of the settlement in a

11

confidential Term Sheet (the "Term Sheet") dated March 11, 2025, subject to certain terms and conditions and the execution of a customary "long form" stipulation of settlement and related papers. The Stipulation was executed on April 25, 2025. ECF No. 74-1.

### E. Preliminary Approval of the Settlement

40. On April 25, 2025, Lead Plaintiff filed his Unopposed Motion for Preliminary Approval of Class Action Settlement and papers in support thereof, including the Stipulation, exhibits thereto, and memorandum and supporting declaration. ECF Nos. 72-74.

41. On May 8, 2025, the Court held a hearing concerning the Motion for Preliminary Approval. ECF No. 76. Later that same day, on May 8, 2025, the Court issued the Preliminary Approval Order, *inter alia*, approving the notice program, setting the briefing schedule for Lead Plaintiff's Final Approval Motion and the Fee and Expense Application, and setting September 3, 2025 as the date for the Settlement Hearing. ECF No. 77.

## III. THE RISKS OF CONTINUED LITIGATION

42. The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $7,750,000. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A. Risks to Proving Liability

43. Lead Plaintiff and Lead Counsel faced numerous significant risks at summary judgment and trial, including in establishing Defendants' liability. As an initial matter, Defendants have argued that the Court's Motion to Dismiss Order narrowed the scope and appeal of Lead Plaintiff's case because it found some of the alleged misstatements were not actionable.

44. Additionally, some of the alleged misstatements the Court found to be actionable were found to be forward-looking statements and statements of "pure opinion." ECF No. 52 at 11, 15. Establishing liability for forward-looking statements and statements of pure opinion is often more difficult than establishing liability for false statements regarding past or present facts because it requires the additional element of proving the defendant's actual knowledge of falsity and/or their subjective disbelief of the statement. At the pleading stage, the Court properly drew inferences in favor of Lead Plaintiff, but at summary judgment and at trial, Lead Plaintiff would not have enjoyed the same standard of review.

45. Moreover, Defendants emphatically deny Lead Plaintiff's claims, including whether the alleged misstatements were materially misleading. For instance, in their motion to dismiss, the Defendants challenged falsity by arguing that Therivel's statements that he was pleased with the regional approach were not false or misleading, despite Lead Plaintiff's allegation that UScellular was abandoning its "regionalization" strategy, because "adoption of a national promotion following a regional trial was an essential part of UScellular's 'regional approach.'" ECF No. 36 at 18-19. The Court acknowledged that Defendants had presented a "competing plausible interpretation" but held that on a Rule 12(b)(6) motion the Court draws all reasonable inferences in plaintiff's favor. ECF No. 52 at 20. Although the Court sustained statements like these at the motion to dismiss stage, discovery could have disproved the inferences that the Court drew in Lead Plaintiff's favor at the pleadings stage.

46. Issues of proof are a risk to all litigation, and in securities class actions even more so, as the overwhelming majority of relevant documents and witnesses are controlled by the Defendants. Indeed, Defendants' counsel would undoubtedly attempt to challenge the credibility of the Confidential Witnesses cited in the Complaint at deposition, and there was no guarantee

13

that any other witnesses would testify favorably for Plaintiff.

47. Further, if litigation continued, Defendants were certain to testify that they did not make the surviving misstatements with an intention to deceive or conceal information, and there can be no assurance Lead Plaintiff could prove the misstatements were made with the requisite scienter.

48. Even if Lead Plaintiff's claims survived a motion for summary judgment, which was not guaranteed, there is a significant risk that Lead Plaintiff would not be able to prove his case before a jury. In this securities litigation relating to complex matters such as: (a) Defendants' interpretation and understanding of the time frame when promotions were expected to impact postpaid churn; (b) Defendants' interpretation and understanding of whether promotions were balancing financial outcomes against subscriber outcomes; (c) Defendants' descriptions of in-store customer traffic and the reasonable investor's understanding and interpretation of those statements; and (d) Defendants' satisfaction with a promotion structure and the reasons for abandoning that promotion structure, there is a risk that a jury would not understand Lead Plaintiff's theories of the case, and the theories' intersection with economic and statistical analyses that underpin causation and damages issues. This is compounded by the fact that Lead Plaintiff would be forced to tell his story to the jury through Defendants' documents and adverse witnesses, if such evidence were able to be obtained at all. Conversely, Defendants would be able to obtain testimony from the Individual Defendants themselves, as well as many other witnesses who are supportive of the Defendants or may still be employed by them.

**B. Risks in Obtaining and Maintaining Class Action Status**

49. Had the Action not settled, Lead Plaintiff would have had to move to certify the class. While Lead Counsel had researched and analyzed class certification at the time the

Settlement was reached, and were confident that the Court would have certified the proposed class, Lead Plaintiff bears the burden of proof on class certification, and Defendants had already raised several arguments in their discussions with Lead Plaintiff challenging the propriety of class certification, which may have ultimately been credited in whole or in part, either on class certification or at summary judgment or trial, and either defeated class certification, or significantly narrowed the size of the class and therefore total damages. For example, Defendants argued that Lead Plaintiff may not be able to establish a link between the alleged corrective disclosures regarding USM's business and a decline in the prices for TDS's securities, rather than UScellular's. Thus, the risk that Defendants may succeed in arguing that Lead Plaintiff does not satisfy all the requirements to be a class representative was a real risk to the litigation.

### C. Risks to Proving Damages

50. Even if Lead Plaintiff was successful in establishing liability, he would still face substantial risks in establishing damages on a class wide basis. For example, Defendants certainly would have, and already had, disputed damages by claiming that there was no causal connection between Defendants' allegedly misleading statements and later declines in the price of TDS securities, and that even if there were such a connection, the damages suffered by the putative class were less than the amount sought by Lead Plaintiff.

51. As noted above, the Complaint's asserted damages could be substantially reduced if a jury did not agree with the measure proffered by Lead Plaintiff. In particular, Defendants likely would have argued that analyst commentary immediately after the corrective disclosures indicates that the decline in price of TDS securities was the result of market-wide factors and not the revelation that Defendants' statements were false. For example, Defendants would likely argue that any decline in TDS stock price was the result of lowered top-end guidance and not a

revelation that previous statements were false. If Defendants were to prevail on such an argument, in whole or in part, the amount of potentially recoverable damages would have been diminished significantly.

52. Further, Lead Plaintiff's claims and damages theories would both be subject to complex expert testimony offered by Defendants' experts that would likely conflict with Lead Plaintiff's experts' analyses. The opinions of each side's experts can vary substantially, and continued litigation poses the risk that Defendants would prevail in a "battle of experts."

**D. Other Risks, Including Trial and Appeals**

53. Lead Plaintiff would have had to prevail at several stages of litigation, each of which would have presented significant risks. Lead Counsel knows, from experience, that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured. For example, in 2023, Lead Counsel was lead trial counsel in a three-week securities class action jury trial in the Northern District of California. After five years of litigation, and despite the fact that the Court ruled for *plaintiffs* at summary judgment on the elements of falsity and scienter, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs, the jury returned a verdict for the defendants. *See In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023), *aff'd*, 2024 WL 4688894 (9th Cir. Nov. 6, 2024). This is yet another example demonstrating that complex securities class action litigation is highly uncertain, and success in cases like this one is never assured. *See infra*, ¶89.

54. Moreover, even if Lead Plaintiff succeeded in proving all elements of his case at trial and obtained a jury verdict, Defendants would almost certainly have appealed. An appeal not only would have renewed the risks faced by Lead Plaintiff—as Defendants would have reasserted

16

their arguments summarized above—but also would have resulted in significant additional delay and increased litigation costs. Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe the Settlement represents a fair result for the Settlement Class.

55. In addition to the risks of continued litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages as it provides the Settlement Class an immediate and certain recovery of $7.75 million. If Lead Plaintiff had fully prevailed in their claims at the trial stage, and if the Court and jury accepted Plaintiff's damages theory—*i.e.*, Plaintiff's best-case scenario—estimated total maximum aggregated damages would be approximately $65.2 million in damages for TDS common and preferred stock. Thus, under Lead Plaintiff's estimated best-case scenario, assuming a 100% claims take rate and no disaggregation of confounding information, the Settlement represents approximately an 11.9% recovery, which is well within the zone of reasonableness for a complex securities class action like this one. *See* Ex. 5, at 26 (2024 NERA Report: median settlement for cases between 2015 and 2024 with NERA-defined investor losses between $50 and $99 million was 3.8%); Ex. 6, at 7 (2024 Cornerstone Report: "In 2024, the overall median settlement" was 7.3%). Thus, the $7.75 million Settlement is an excellent result for the Settlement Class.

### E. The Complexity, Expense and Duration of Continued Litigation

56. As noted, securities class actions are notoriously complex, lengthy, and expensive to litigate. However, this Action presented particular complexities, costs and likely delays, even more than the usual securities class action. First, it involves certain forward-looking statements and statements of pure opinion which require additional elements to establish their falsity. *See* ECF No. 52 at 11, 15 (finding the alleged false statements to be forward-looking and pure opinion). Second, it concerns the securities of a parent company impacted by the statements made

17

by the officers of its subsidiary (concerning the performance of the subsidiary), thereby potentially presenting unique issues of corporate control, agency, and loss causation. *See* ECF No. 32 at 12 (Complaint explaining TDS conducts all its wireless operations through a majority-owned subsidiary, UScellular).

57. Even under the best of circumstances, assuming Lead Plaintiff's claims were certified under Rule 23 (and not reversed on a Rule 23(f) interlocutory appeal or a subsequent motion for class de-certification), and survived summary judgment, litigating the Action through trial and post-trial appeals would have undoubtedly been a long and expensive endeavor. Were the litigation to continue, a potential recovery—if any—would occur years from now, substantially delaying payment to the Settlement Class. By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class, without exposing the Settlement Class to the risk, expense, and delay of continued litigation.

## IV. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING THE NOTICE PROGRAM

58. The Preliminary Approval Order directed that the postcard notice highlighting key information regarding the proposed Settlement (the "Postcard Notice") be disseminated to the Settlement Class, in addition to the online posting of the Notice and Claim Form, and the publication of the Summary Notice.[2] ECF No. 77. The Preliminary Approval Order also set a deadline of August 13, 2025 (21 calendar days prior to the Settlement Hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final fairness

---

[2] Copies of the Notice and Claim Form, Letter Sent to Nominees, Postcard Notice, and Summary Notice publication confirmation are attached as Exhibits 1-A, 1-B, 1-C, and 1-D, respectively, to the SCS Decl., which is Ex. 1 hereto.

hearing date of September 3, 2025 (the "Settlement Hearing").

59.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and publish the Summary Notice. Contemporaneously with the dissemination of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice of Pendency of Class Action and Proposed Settlement, Settlement Hearing and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form (the "Claim Form") online at www.strategicclaims.net/tds/ (the "Settlement Website"). Upon request, also SCS mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

60.     The Postcard Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice and Claim Form. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of a Settlement Class Member's right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed one-third (33⅓%) of the Settlement Fund plus interest, and for reimbursement of litigation expenses in an amount not to exceed $350,000 plus interest, and to apply for an award of up to $20,000 for the Lead Plaintiff for his time and expenses related to his representation of the Settlement Class. *See* Ex. 1-A (Notice and Claim Form) at 2. In accordance with paragraph 19 of the Preliminary Approval Order, the Notice explained that

19

reasonable Notice and Administration Expenses may be paid from the Settlement Fund. *See id.* p. 9 (Q. #16).

61. On May 22, 2025, Lead Counsel received the names and addresses of potential Settlement Class Members from Defendants, pursuant to paragraph 8 of the Preliminary Approval Order (the "Record Holder List"). Lead Counsel immediately forwarded the Record Holder List to SCS. SCS Decl. ¶5.

62. On May 22, 2025, SCS provided a copy of the Notice and Claim Form to Depository Trust Company ("DTC"), for posting on its Legal Notice System ("LENS"), which may be accessed by any nominee that participates in the DTC's security system, and provides DTC participants the ability to search and download legal notices and receive email alerts based on particular notices, or security identifiers (CUSIPs). *Id.* at ¶3.

63. In addition, SCS maintains a proprietary master list consisting of 1,049 banks and brokerage companies ("Nominee Account Holders"), as well as 1,414 mutual funds, insurance companies, pension funds, and money managers ("Institutional Groups"). On May 22, 2025, SCS caused a letter to be mailed or e-mailed to the 2,463 nominees contained in the SCS master mailing list. The letter notified them of the Settlement and requested that they, within 7 calendar days from the date of the letter, either send the Postcard Notice or email the link to the location of the Notice and Claim Form on the settlement website to their clients who may be beneficial purchasers/owners within 7 calendar days after receipt of Postcard Notice copies or after receipt of the link or provide SCS with a list of the names, last known addresses, and email addresses (if available) of such beneficial purchasers/owners so that SCS could promptly either mail the Postcard Notice or email the link to the location of the Notice and Claim Form on the settlement website. *Id*. at ¶4; Ex. 1-B (Letter Sent to Nominees).

64.    On May 23, 2025, SCS mailed, by first class mail, postage prepaid, the Postcard Notice to 1,587 persons or organizations identified in the transfer records that were provided to SCS by Lead Counsel. SCS Decl. ¶7. These records reflect the persons or entities that purchased TDS common or preferred stock for their own accounts, or for the account(s) of their clients, during the Settlement Class. Following this May 23, 2025 mailing, SCS received 3,560 additional names and addresses of potential Settlement Class Members from individuals or nominees requesting that a Postcard Notice be mailed by SCS, SCS received a request from a nominee for 6,851 Postcard Notices so that the nominee could forward them to their clients, and SCS received notification from a nominee that they mailed the Postcard Notices to 963 of their clients. *Id*. SCS also received 31 requests from potential Settlement Class Members for the Notice and Claim Form to be mailed to them. *Id*. at n. 2. SCS immediately mailed the Notice and Claim Forms to the potential Settlement Class Members. To date, 12,961 Postcard Notices have been mailed to potential Settlement Class Members. *Id*. at ¶7.

65.    Additionally, SCS sent the direct link to the Notice and Claim Form to 1,276 email addresses that SCS received from Lead Counsel and nominees, and SCS was notified by a nominee that they emailed 8,136 of their clients to notify them of this settlement and provide a direct link to the Notice and Claim Form on the settlement website. *Id*. at ¶8.

66.    In total, 22,373 potential Settlement Class Members were notified either by mailed Postcard Notice or emailed a direct link to the Notice and Claim Form, as of July 30, 2025. *Id*. at ¶9.

67.    Out of the 12,961 Postcard Notices mailed, 349 were returned as undeliverable. Of these, the United States Postal Service provided forwarding addresses for 23, and SCS immediately mailed another Postcard Notice to the updated addresses. The remaining 326

21

Postcard Notices returned as undeliverable were "skip-traced" to obtain updated addresses and 85 were re-mailed to updated addresses. *Id*. at ¶10.

68. On June 9, 2025, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published once over *Globe Newswire* newswire service. *Id.* at ¶11; Ex. 1-D (Summary Notice publication confirmation).

69. Lead Counsel also caused SCS to establish the Settlement Website, which became operational on May 20, 2025, and maintain a toll-free telephone number to provide Settlement Class Members with information concerning the Settlement, including how to submit a claim form online and download copies of the Notice and Claim Form, as well as where to obtain copies of the Stipulation, Preliminary Approval Order, and the Complaint. *Id.* at ¶¶12-13.

70. The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the Fee and Expense Application or to request exclusion from the Settlement Class is August 13, 2025. To date, no requests for exclusion have been received. *Id.* at ¶14. SCS will file a supplemental declaration after the August 13, 2025, opt-out deadline addressing whether any requests for exclusion have been received. *Id.* In addition, to date, no objections to the Settlement or the Plan of Allocation have been entered on this Court's docket or have otherwise been received by Lead Counsel. *Id.* at ¶15. Lead Counsel will file reply papers by August 27, 2025, that will address any objections that may be received.

## V. ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

71. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $7.75 million Settlement Amount, plus interest earned thereon less: (i) Court-awarded attorneys' fees and expenses (including any award to Lead Plaintiff for his reasonable time and

22

expenses directly related to Lead Plaintiff's representation of the Settlement Class); (ii) Notice and Administration Expenses; (iii) Taxes and Tax Expense; and (iv) any other fees, expenses or other deductions approved by the Court), must submit a valid Claim Form with all required information postmarked or received no later than August 27, 2025. *See id.*, Ex. 1-A (Notice and Claim Form), p. 5-6 and Qs. 6, 7. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation approved by the Court. *Id.* at p. 11.

72.     The proposed Plan of Allocation is detailed in the Notice. *Id.* at pp. 11-15. The Notice is posted online on the Settlement Website, is downloadable, and upon request, will be mailed to any potential Settlement Class Member. The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses due to the alleged violations of the Exchange Act, and takes into consideration when each Authorized Claimant purchased or otherwise acquired and/or sold TDS securities. *Id.* at p.11.

73.     As stated in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial, or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *See id.* at p. 11.

74.     The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. In developing

23

the Plan of Allocation, Lead Plaintiff's expert calculated the amount of estimated artificial inflation in the prices of TDS common and preferred stock related to Defendants' alleged false and misleading statements in this Action by considering the price changes in such shares in reaction to the alleged corrective disclosures, considered Lead Counsel's assessment of the strengths and weaknesses of the various claims and defenses, and accounted for the damages limitation provision of the PSLRA, 15 U.S.C. §78u-4(e), which incorporates a 90-day lookback period.

75.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages. Pursuant to the Plan of Allocation, a "Recognized Loss Amount" will be calculated by the Claims Administrator for each purchase of TDS common or preferred stock during the Settlement Class Period, as listed in the Claim Form, and for which adequate documentation is provided. The Claims Administrator will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Loss compared to the aggregate Recognized Losses of all Authorized Claimants. Calculation of Recognized Losses will depend upon several factors, including when a claimant purchased shares during the Settlement Class Period and whether these shares were sold during the Settlement Class Period and, if so, when.

76.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on their purchases or acquisitions of TDS shares that were attributable to the conduct and violations of the Exchange Act alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

24

77.     As noted above, as of July 30, 2025, a total of 22,373 Postcard Notices have been disseminated to potential Settlement Class Members and their nominees. *See* SCS Decl. at ¶9.  To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket. *Id*. at ¶15.

## VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES AND LEAD PLAINTIFF AWARD

78.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a total fee award of one-third (33⅓%) of the Settlement Fund (or $2,583,333.33, plus interest earned at the same rate as the Settlement Fund). Plaintiff's Counsel also request reimbursement of their out-of-pocket litigation expenses incurred in connection with the prosecution of the Action in the amount of $106,945.65, plus interest, and request an award of $20,000 to Lead Plaintiff for his costs, including time incurred in connection with his representation of the Settlement Class. Each of these requested amounts was described in the Notice. The legal authorities supporting a one-third (33⅓%) fee award and the requested expenses are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith, and the requested litigation expense amount is well below the maximum expense amount of $350,000 set forth in the Notice.[3]  The primary factual bases for the requested fee and reimbursement of litigation expenses and Lead Plaintiff's award are summarized below.

### A.  The Fee Application

79.     Lead Counsel are applying for a percentage-of-the-common-fund fee award to

---

[3] These amounts do not include claims administration expenses, which are explained in the Notice at p.5 and Q.21. Lead Plaintiff will provide updated claims administration expense numbers both in the reply brief and at the Settlement Hearing.

compensate Lead Counsel for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm also minimizes unnecessary drain on the Court's resources. Notably the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Seventh Circuit for cases of this nature.

80.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee Memorandum, a one-third (33⅓%) fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit. *See also* Ex. 7 (Select Seventh Circuit Cases Awarding Attorneys' Fees of 33% or More in Common Fund Cases).

### 1. The Outcome Achieved is the Result of the Significant Time and Labor That Lead Counsel Devoted to the Action

81.     As described in greater detail above, Lead Counsel devoted substantial time to the prosecution of the Action. Among other things, the work that Lead Counsel performed in this Action included: (a) filing an initial complaint based on, *inter alia*, review and analysis of (i) filings with the SEC by both TDS and USM; (ii) public reports, news articles, and research reports prepared by securities and financial analysts concerning the Companies; (iii) transcripts of investor calls conducted by the Companies' management; and (iv) press releases issued by and about the Companies; (b) filing a motion for appointment of Lead Plaintiff and Lead Counsel; (c)

26

as Lead Counsel, conducting further investigation into the claims asserted in the Action in support of an amended complaint by, *inter alia*, consulting with experts in market efficiency, loss causation and damages, and working with a private investigator to interview former employees of the Companies, and conduct in-depth investigation of USM's business in the regions in which it operated; (d) drafting and filing the detailed Amended Complaint, which included, *inter alia*: (i) new evidence based on information obtained through the use of the private investigator, including through witness interviews that Lead Counsel personally conducted and in-depth investigation of the Companies and their operations; (ii) additional false statements; and (iii) new theories concerning the falsity behind Defendants' statements; (e) researching, drafting, and filing a motion to strike documents appended to Defendants' motion to dismiss, and a reply in further support thereof; (f) engaging in substantial discovery, which entailed, *inter alia*: (i) exchanging initial disclosures; (ii) negotiating, drafting, and filing a joint status report concerning a case management schedule for discovery and further proceedings; (iii) serving requests for the production of documents on Defendants and objecting and responding to requests for production served by Defendants; (iv) serving ten subpoenas on third parties and negotiating document productions therefrom; (v) negotiating an ESI and search protocol with Defendants, as well as a stipulated Protective Order, pursuant to which Defendants and third parties produced over 6,300 pages and 5,000 pages of documents, respectively, that Lead Counsel reviewed and analyzed; (vi) engaging in extensive meet-and-confer sessions and correspondence regarding all of the foregoing; and (vii) collecting, reviewing and producing documents from Lead Plaintiff responsive to Defendants' requests for production; (g) engaging in a full-day mediation session overseen by a mediator highly experienced in complex actions, Michelle Yoshida, Esq., of Phillips ADR Enterprises, which involved an exchange of detailed mediation submissions

27

concerning the facts of the case, liability, and damages, and consultation with damages experts; and (h) engaging in weeks of follow-up negotiations with Ms. Yoshida and Defendants' Counsel (through Ms. Yoshida) following the initial mediation session, that ultimately resulted in a mediator's double-blind recommendation to settle the Action for $7.75 million.

82.     Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As lead attorney on the case, I personally monitored and maintained control of the work performed by other lawyers at Levi & Korsinsky throughout the litigation. Other experienced attorneys at our firm were also involved in the drafting, reviewing and/or editing of pleadings, motion papers and other significant court filings, court appearances, the mediation process, the settlement negotiations and in negotiating the terms of the Stipulation, and other matters.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

83.     Attached hereto as Exhibit 3 is a declaration in support of Lead Counsel's motion for attorneys' fees on behalf of Lead Counsel's firm, Levi & Korsinsky (the "Fee Declaration"). The Fee Declaration includes a schedule summarizing the lodestar of the firm. The Fee Declaration indicates the amount of time spent on the Action by Levi & Korsinsky's attorneys and professional support staff, and the lodestar calculations based on their current hourly rates. The Fee Declaration was prepared from contemporaneous daily time records regularly maintained and prepared by Levi & Korsinsky. The first page of Exhibit 3 is a chart that summarizes the information set forth in the Fee Declaration, listing the total hours expended and lodestar amounts for Lead Counsel's firm and totals for the numbers provided.

84.     As set forth in Exhibits 3 and 8, Lead Counsel and Liaison Counsel collectively expended a total of over 2,443 hours in the investigation and prosecution of the Action. The

28

resulting lodestar is $1,821,893.75. Thus, the requested fee of one-third (33⅓%) of the Settlement

Fund, plus interest, represents a multiplier of approximately 1.4 of Plaintiff's Counsel's lodestar.[4]

85.     The above amounts do not include the additional time that Lead Counsel will devote

overseeing and assisting in the administration of the Settlement, for which Lead Counsel will not

be paid. This work will include answering questions posed by Settlement Class Members about

the Settlement and the distribution of the Settlement proceeds, overseeing the work performed by

the Claims Administrator, addressing any questions or disputes raised by Settlement Class

Members about the allocation of the Settlement proceeds, and drafting and filing motions for

distribution of the Net Settlement Fund.

86.     As discussed in further detail in the Fee Memorandum, the requested multiplier is

on the lower end of the range of fee multipliers typically awarded in comparable securities class

actions and in other class actions involving significant contingency fee risk, in this Circuit and

elsewhere, and is particularly appropriate under the circumstances of this case.

### 2. The Significant Risks Borne by Lead Counsel

87.     This prosecution was undertaken by Lead Counsel on an entirely contingent-fee

basis. As discussed above in connection with the litigation risks supporting approval of this

Settlement, from the outset, this Action was an especially difficult, complex and highly uncertain

securities case. There was no guarantee that Lead Counsel would ever be compensated for the

substantial investment of time and money the case would require. In undertaking that

responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to

the investigation and prosecution of the Action, that funds were available to compensate attorneys

---

[4] "Plaintiff's Counsel" refers to L&K and Liaison Counsel, Cohen, Milstein, Sellers, & Toll, PLLC ("Cohen Milstein").

and staff, and that the considerable litigation costs required by a complex, securities fraud case like this one, which presented formidable discovery challenges including in seeking, obtaining, and facilitating discovery from numerous third-parties, were covered. Moreover, with an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation since the initiation of this Action more than three years ago, and Plaintiff's Counsel has incurred $106,945.65 in hard out-of-pocket litigation-related expenses in prosecuting the Action.

88. Additionally, Lead Plaintiff and Lead Counsel developed and alleged Lead Plaintiff's claims in the Complaint without information gained through government or regulatory actions, or parallel private derivative actions, and were hindered by the PSLRA's automatic discovery stay.

89. Finally, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured and the risks are high. As noted above in the discussion of litigation risks in this case favoring Settlement approval, Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement, whether on a motion to dismiss, at summary judgment, at trial, or even on post-trial appeals. *See In re Tesla*, 2023 WL 4032010 (defendants prevailed at trial despite summary judgment for plaintiffs on falsity and scienter, and SEC settlement based on same alleged conduct); *see also In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (defendants prevailed on summary judgment despite DOJ and state Attorney General prosecutions); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict reversed on appeal and judgment entered for defendant).

90. Lead Counsel's extensive efforts in the face of substantial risks and uncertainties

have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, Lead Counsel respectfully submit that the requested fee is reasonable and should be approved.

### 3. The Experience and Standing of Lead Counsel and the Standing and Caliber of Defendants' Counsel

91.     Lead Counsel's firm resume is attached as Exhibit 4. As demonstrated by the firm resume, Levi & Korsinsky is among the most experienced and successful securities class action law firms in the country. Over the last few years, Levi & Korsinsky has been co-lead or lead counsel in more than 50 securities class actions that have resulted in over $200 million in recoveries for investors. Since 2020, Levi & Korsinsky has consistently ranked in the Top 10 in terms of number of settlements achieved for shareholders each year, according to reports published by *ISS*. Levi & Korsinsky was also ranked as one of the Top 5 Securities Firms for the period from 2018 to 2020 in *Lex Machina's* Securities Litigation Report. Recent class recoveries as sole lead or co-lead counsel include an $80 million recovery in *In re Grab Holdings Ltd. Sec. Litig.*, No. 1:22-CV-02189-JLR (S.D.N.Y.); a $47.5 million recovery in *In re QuantumScape Securities Class Action*, No. 3:21-cv-00058-WHO (N.D. Cal.); a $40 million recovery in *In re U.S. Steel Consolidated Cases*, No. 2:17- 579-CB (W.D. Pa.); and $24.6 million recovery in *Kohl v. Loma Negra Industrial Argentina Sociedad Argentina*, Index, No. 653114/2018 (Sup. Ct., N.Y. Cty.). Other notable recoveries include a $79 million recovery in *E-Trade Financial Corp. Sec. Litig.*, No. 07-cv-8538 (S.D.N.Y) and a $522 million recovery for shareholders in *In re Google Inc. Class C Shareholder Litigation*, C.A. No. 7469-CS (Del. Ch.).

92.     Lead Counsel believes that Levi & Korsinsky's extensive experience in the field, and the wide-ranging skills of our attorneys, added valuable leverage during the litigation and settlement negotiations.

31

93. Further, the quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Sidley Austin LLP, an elite global law firm with expertise in securities litigation that ranks among the most prestigious and well-respected defense firms in the country, who vigorously and ably defended the Action at every turn. In the face of this experienced and formidable opposition, Lead Counsel were able to develop strong claims, litigate and prosecute them successfully, and negotiate with Defendants to settle the case on terms that are extremely favorable to the Settlement Class.

### 4. Public Policy Interests, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Case

94. Courts consistently recognize that it is in the public interest to have experienced and able counsel available to enforce the securities laws and regulations governing the duties of officers and directors of public companies. For this important public policy to be realized in practice, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks such counsel undertake in prosecuting a securities class action on a contingent-fee basis. Relatedly, it is long-recognized public policy that settlements are to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements on behalf of litigants who—absent the class action mechanism—would be economically unable to prosecute such actions.

### 5. The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

95. As noted above, notice has been provided to at least 22,373 potential Settlement Class Members or their nominees informing them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third (33⅓%) of the Settlement Fund plus a

32

proportionate amount of interest accrued while the Settlement Fund has been held in Escrow. SCS Decl. ¶9, Exs. 1-A (Notice and Claim Form), 1-C (Postcard Notice). In addition, the Court-approved Summary Notice has been published and transmitted over *Globe Newswire*. SCS Decl. at ¶11, Ex. 1-D (Summary Notice publication confirmation). To date, no objections to the indicated attorneys' fees request set forth in the Postcard Notice and Notice have been received or entered on this Court's docket. SCS Decl. at ¶15. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers to be filed by August 27, 2025. Moreover, the Lead Plaintiff supports the requested fee award. Ex. 2, ¶¶11-13 (Rensin Decl.).

**B. Reimbursement of the Requested Litigation Expenses is Fair and Reasonable**

96.     Lead Counsel seeks a total of $106,945.65, plus interest thereon, in reimbursement of out-of-pocket litigation expenses reasonably and necessarily incurred by Lead Counsel and Liaison Counsel in connection with commencing, litigating, and settling the claims asserted in the Action, to be paid from the Settlement Fund. *See* Ex. 3 (Fee Decl., Tables 1 and 2).

97.     The Postcard Notice and long-form Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of litigation expenses in an amount not to exceed $350,000. The total amount requested by Lead Counsel thus falls well below the $350,000 that Settlement Class Members were advised could be sought. Ex.1-A (Notice and Claim Form), p.2; Ex. 1-C (Postcard), p.2. To date, no objections have been raised as to the expenses set forth in the Postcard Notice and Notice. SCS Decl. at ¶15. If any objection to the request for reimbursement of litigation (or any other) expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

98.     From the outset of the Action, Lead Counsel were aware that they might not recover any of their out-of-pocket expenses and, even in the event of a recovery, would not recover any

such expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action. Accordingly, Lead Counsel were motivated to, and did, take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

99.     The largest component of expenses, $35,148.87, or approximately 33% of the total out-of-pocket expenses, related to the retention of experts in the fields of market efficiency, loss causation and damages, including Forensic Economics Inc. and Crowninshield Financial Research, and obtaining the necessary analyst reports and market studies to facilitate such work. Ex. 3, ¶5; *Kelsey*, No. 14 Civ. 7837, ECF Nos. 111, 118 (approving reimbursement for, *inter alia*, expert fees and analyst reports) (Rowland, J.). These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, the opposition to Defendants' motion to dismiss, reports on damages, preparation of the mediation submissions and responses thereto, negotiation of the Settlement, the preparation of the proposed Plan of Allocation, and preparation of the Claim Form.

100.     The next largest component of expenses, $19,601.00, or approximately 18% of the total out-of-pocket expenses, was paid to a private investigator service for investigation services that were critical to the development of the facts alleged in the Complaint such as locating and interviewing witnesses, including the Confidential Witnesses that the Court relied upon in denying the motion to dismiss. Ex. 3, ¶5.

101.     Lead Counsel also paid $15,554.00, 15% of total expenses, to newswire services for publication of notices directly relevant and necessary to this Action and the Settlement,

34

including the notices of Lead Counsel's investigation that led to the commencement of the Action for the benefit of the Settlement Class, and notice required by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A). Ex. 3, ¶5.

102.    Plaintiff's Counsel also paid $12,314.22 for necessary legal database costs, comprising 12% of total expenses incurred. Ex. 3, ¶5; *Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *4 (S.D. Ill. July 17, 2015) (reimbursing research database fees).

103.    Lead Counsel paid $11,250.00 in mediation service fees to Phillips ADR Enterprises for the services Ms. Yoshida provided in connection with the mediation and subsequent negotiations of the Settlement. Ex. 3, ¶5. This expense constituted approximately 11% of the total out-of-pocket expenses. Ms. Yoshida's efforts to continue mediating between the Parties even after formal mediation ended were critical to achieving a Settlement in this Action.

104.    Additionally, Lead Counsel paid $6,603.07 to JND eDiscovery, a division of JND Legal Administration, for hosting the document database for documents produced in this Action for approximately ten months, which is approximately 6% of the total expenses out-of-pocket incurred. Ex. 3, ¶5. Document hosting is an essential function in complex securities fraud actions like this one in which thousands of pages of production documents need to be stored securely.

105.    Lead Counsel also paid $4,255.64 for travel, lodging, and meals. Ex. 3, ¶5. Lead Counsel also paid a total of $1,503.60 for process server fees. Ex. 3, ¶5. Lead Counsel also paid $715.25 in transcription service fees and filing fees necessary to the litigation. Ex. 3, ¶5.

106.    All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by the Lead Plaintiff. Ex. 2, ¶13 (Rensin Decl.). Moreover, as noted, all potential Settlement Class Members were told in the Postcard Notice and Notice that Lead Counsel would seek up to $350,000 in reimbursement

35

of their out-of-pocket litigation expenses, and to date there have been no objections.

### C. The Lead Plaintiff Awards are Fair and Reasonable and Should Be Approved

107. Finally, Lead Plaintiff seeks reimbursement of the reasonable costs that Lead Plaintiff incurred directly in connection with his representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum. Specifically, Lead Plaintiff seeks an award of $20,000, which is modest in comparison to his efforts and the size of the Settlement that Lead Plaintiff was able to obtain for the Settlement Class. *See, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming $25,000 incentive award to plaintiff as "a named plaintiff is an essential ingredient of any class action"); *Pierrelouis v. Gogo Inc.,* No. 18-CV-04473, 2022 WL 7950362, at *2 (N.D. Ill. Oct. 13, 2022) (awarding $20,000 from the Settlement Fund as reimbursement for lead plaintiff's reasonable costs and expenses directly related to his representation of the Settlement Class); *Will v. Gen. Dynamics Corp.,* 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (awarding $25,000 to each of three named plaintiffs); *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (overruling objections and granting incentive awards of $25,000 to two representatives); *Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *11 (S.D.N.Y. Sept. 29, 2022) ("Plaintiffs' requested awards are commensurate with the level of their involvement in the Action, and, further, the awards only represent approximately 0.3% of the total settlement amount.").

108. As detailed in the Rensin Declaration (Ex. 2), Lead Plaintiff was highly involved in the litigation and communicated regularly with Lead Counsel. Lead Plaintiff made himself freely available to perform his representative functions, including speaking and emailing often with Lead Counsel. The tasks performed by Lead Plaintiff in executing his duties and

responsibilities as Lead Plaintiff in this Action included, among others: (a) reviewing the relevant court papers in the case; (b) communicating with Lead Counsel via email and telephone about case developments and litigation strategy; (c) providing documents and responses to Defendants' discovery requests; (d) preparing for the mediation sessions, including discussing with Lead Counsel the Parties' mediation statements, as well as mediation strategy; (e) considering the mediator's recommendation, conferring with counsel, and ultimately approving the Settlement; and (f) communicating with counsel regarding the process of finalizing the Settlement.

109.    A true and correct copy of Lead Plaintiff's declaration attesting to these facts is attached hereto as Exhibit 2. To date, no objections to the Lead Plaintiff Award, which was also specifically disclosed in the Notice, have been received. Ex 1-A, p. 2 (Notice and Claim Form) (describing award for Lead Plaintiff not to exceed $20,000).

## VII.    CONCLUSION

110.    For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of one-third (33⅓%) of the Settlement Fund plus interest accrued thereon while said amount was in escrow should be approved as fair and reasonable, and the request for reimbursement of Plaintiff's Counsel's out-of-pocket litigation expenses in the amount of $106,945.65 plus interest, and the Lead Plaintiff Award, in the amount of $20,000 to the Lead Plaintiff, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated:  July 30, 2025

    /s/ *Gregory M. Potrepka*
        Gregory M. Potrepka